UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WALGREEN CO.
200 Wilmot Road
Deerfield, IL 60015

ECKERD CORPORATION
50 Service Road
Warwick, RI 02886

MAXI DRUG, INC. d/b/a
BROOKS PHARMACY,
50 Service Road
Warwick, RI 02886

THE KROGER CO.,                              CIVIL ACTION NO.
1014 Vine Street
Cincinnati, OH 45202

NEW ALBERTSON'S, INC.,
250 East Park Center Blvd.
Boise, Idaho 83706

SAFEWAY, INC.,
5918 Stoneridge Mall Road
Pleasanton, CA 94588

HY-VEE, INC.
5820 Westtown Parkway
W. Des Moines, Iowa  50266

and

AMERICAN SALES COMPANY, INC.
4201 Walden Avenue
Lancaster, NY 14086

       Plaintiffs,

vs.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

       Plaintiffs Walgreen Co., Eckerd Corporation, The Kroger Co., Maxi Drug, Inc. d/b/a Brooks Pharmacy, American Sales Company, Inc., New Albertson's, Inc., Safeway, Inc. and Hy-Vee, Inc. (collectively "Plaintiffs") sue Defendants AstraZeneca Pharmaceuticals L.P., AstraZeneca L.P., Zeneca, Inc. and Zeneca Holdings, Inc. under the antitrust and trade regulation laws of the United States, and for their Complaint allege as follows:

### Nature of the Action

       1.      This is a civil action seeking treble damages and other relief arising out of Defendants' unlawful monopolization and attempted monopolization of the market for omeprazole and its enantiomers (including the prescription drugs Prilosec, Nexium and any AB-rated generic equivalents of either), by converting the market from Prilosec, which now has generic competition, to a virtually identical drug, Nexium, which does not. This expensive, unnecessary and fraudulent conversion was undertaken solely in order to thwart and impede generic competition and thereby maintain Defendants' dominant position in the omeprazole market. Defendants' unlawful conduct has deprived Plaintiffs and other purchasers of the benefits of effective generic competition from December 2002 through the present.

**Parties**

2.      Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business in Deerfield, Illinois.  Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Walgreen purchased Prilosec and Nexium from pharmaceutical wholesalers Cardinal Health, Inc. ("Cardinal") and AmerisourceBergen Corporation ("ABC"), which purchased the drugs directly from Defendants for resale to Walgreen.  Walgreen brings this action in its own behalf and as the assignee of Cardinal and ABC.

3.      Plaintiff Eckerd Corporation ("Eckerd") is a Delaware corporation having its principal place of business in Warrick, Rhode Island.  Eckerd owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Eckerd purchased Prilosec and Nexium directly from Defendants and also from pharmaceutical wholesaler McKesson Corporation ("McKesson"), which purchased the drugs directly from Defendants for resale to Eckerd.  Eckerd brings this action in its own behalf and as McKesson's assignee.

4.      Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal place of business in Cincinnati, Ohio.  Kroger owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Kroger purchased Prilosec and Nexium from Cardinal, which purchased the drugs directly from Defendants for resale to Kroger.  Kroger brings this action in its own behalf and as Cardinal's assignee.

5.      Plaintiff Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") is a Delaware corporation having its principal place of business in Warrick, Rhode Island.  Brooks owns and

operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Brooks purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Brooks. Brooks brings this action in its own behalf and as McKesson's assignee.

6.      Plaintiff American Sales Company, Inc. ("ASC") is a Delaware corporation having its principal place of business in Lancaster, New York. ASC purchases pharmaceutical and other products and distributes those products to retail stores owned and operated by affiliated companies, at which prescription drugs are dispensed to the public. During the relevant period, ASC purchased Prilosec and Nexium from Cardinal, which purchased the drugs directly from Defendants for resale to ASC. ASC brings this action in its own behalf and as Cardinal's assignee.

7.      Plaintiff New Albertson's, Inc. ("Albertson's") is a Delaware corporation having its principal place of business in Boise, Idaho. Albertson's owns and operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Albertson's (and its predecessors) purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Albertson's. Albertson's brings this action in its own behalf and as McKesson's assignee.

8.      Plaintiff Safeway, Inc. ("Safeway") is a Delaware corporation having its principal place of business in Pleasanton, California. Safeway owns and operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Safeway purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Safeway. Safeway brings this action in its own behalf and as McKesson's assignee.

4

9.    Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation having its principal place of business in West Des Moines, Iowa.  Hy-Vee owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Hy-Vee purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Hy-Vee.  Hy-Vee brings this action in its own behalf and as McKesson's assignee.

10.    Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.  AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

11.    Defendant AstraZeneca L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.

12.    Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

13.    Defendant Zeneca Holdings, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

14.    The Defendants identified in paragraphs 10 through 13 above will be referred to collectively as "AstraZeneca."

### Jurisdiction and Venue

15.    Counts I and II of this Complaint are civil antitrust claims arising under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

15(a) and 26. The Court has subject-matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

16.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is an inhabitant of this District or is found or transacts business there.

## Trade and Commerce

17.     The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## Characteristics of Pharmaceutical Markets

18.     The sale of pharmaceutical products in the United States contains a significant market imperfection that can be exploited by manufacturers in order to create or maintain monopoly power with respect to the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to buy. When the person who chooses the product also pays for it, the price of the product plays an appropriate role in the buyer's choice of product and the manufacturer of the product has an appropriate incentive to lower its price.

19.     The pharmaceutical industry is characterized by a "disconnect" between the payment obligation and product selection. State laws prohibit pharmacists from dispensing a large class of pharmaceutical products, including omeprazole, without a prescription from the patient's physician. This prohibition on dispensing drugs without a prescription creates a disconnect between the payment obligation and product selection. The patient (and in most cases his or her insurer) has

the obligation to pay for the product, but the patient's physician chooses which product the patient will buy.

20.     Many pharmaceutical manufacturers, including AstraZeneca, exploit this defect in pharmaceutical markets. The so-called brand manufacturers (i.e., the manufacturers of branded, as opposed to generic, pharmaceuticals) employ large forces of sales representatives, known as "detailers," who visit physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products. These detailers do not advise physicians regarding the cost of their company's products. Studies show that physicians typically are not aware of the relative cost of branded pharmaceutical products and that, even when physicians are aware of relative cost, they are insensitive to price differences because they do not themselves have the obligation to pay for the products. The result is a marketplace in which price plays a virtually negligible role in product selection.

21.     The relative unimportance of price in pharmaceutical markets reduces what economists call the price elasticity of demand—the extent to which sales go down when price goes up—which in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing sales. The ability to raise price above marginal cost without losing sales is referred to by economists and antitrust courts as market power or monopoly power. Thus, one result of the market imperfections and marketing practices described above is to allow brand manufacturers to achieve and maintain monopoly power.

22.     Generic companies market products in a fundamentally different way. Rather than exploit the market defect by promoting products to doctors, generic companies market to pharmacies based principally on price. Drug Product Selection, Staff Report to the FTC (Jan. 1979)

7

["FTC Staff Rep.'] at 49-50; *see also* A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS ["Generic Substitution"] at 5 (FTC 1985). They do so not out of altruism, but necessity. A company cannot profitably promote a *generic* product to doctors because it would have no assurance that a pharmacist would dispense its generic product rather than another's. FTC Staff Rep. at 50. It is thus impossible for generic companies to exploit the price disconnect by promoting products to doctors, so they must try to increase sales by offering low prices to pharmacies. *See id.* It would also be socially undesirable for generic companies to exploit the market defect by detailing to doctors: when two companies market chemically identical drugs to doctors, they are both able to exploit the defect and sell their products at supracompetitive prices.

### The Economic Rationale For Generic Substitution Laws

23.     Congress sought to ameliorate the price disconnect in the pharmaceutical marketplace, and restore some normal competitive pressures to the pharmaceutical marketplace, by authorizing the manufacture and sale of generic pharmaceuticals. State legislatures continued the same policy by mandating or permitting generic substitution by pharmacists without physician approval. When a pharmacist receives a prescription for a branded pharmaceutical product, and a generic version of that product is available, state law permits (or in some cases requires) the pharmacist to dispense the generic product instead of the branded product. In this way, the importance of price is reintroduced to the product selection decision at the pharmacy counter. When generic versions of a brand-name drug become available, the branded manufacturer loses its ability to exploit the market imperfection, its monopoly power dissipates, and some normal competitive pressures are restored.

24.     Today, all 50 states have Drug Product Selection ("DPS") laws that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever possible. These DPS laws are premised on the economic fact that brand companies exploit the market defect by promoting to doctors and that generic companies are unable to do so and therefore promote their products by offering low prices to pharmacies:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices.  That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists.  Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.

Generic Substitution at 7.

25.     DPS laws "shift the choice of [drug product] for most prescriptions from the physician to the pharmacist." *Id*.  As the FTC put it, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons -- the pharmacist and the patient -- to select drug products on the basis of price."  FTC Staff Rep. at 7.

### State And Federal Promotion of Generic Entry

26.     Based on this economic rationale, it became State and national policy to encourage generic substitution for branded drugs.  Working together, the FTC and the FDA in 1979 developed a Model Drug Product Selection Act ("Model Act") for State legislatures to enact.  *See* FTC Staff Rep. at 273.  The Model Act permits pharmacists to dispense an AB-rated generic unless the doctor specifies that the brand is medically necessary.  The FTC and FDA were "committed to facilitating drug product selection [*i.e.*, generic substitution]," and believed "that effective drug

9

product selection laws will work to stimulate price competition in a multi-source prescription drug market." *Id.* at 291.

27.    The FDA also helped promote generic substitution by developing a list of therapeutically equivalent, AB-rated drugs that could be safely substituted for branded products (today called the "Orange Book"). The purpose of the FDA's list was to "enhance the ability of drug purchasers to recognize and take advantage of opportunities for direct savings by drug selection." Rules and Regulations, Dept. of Health and Human Services, Food and Drug Admin., Therapeutically Equivalent Drugs; Availability of List, 45 F.R. 72582 (Oct. 31, 1980) at 41. This list helps make drug products "sufficiently interchangeable so that price can be a major factor in their selection." Office of Technology Assessment, Drug Bioequivalents, at 57 (July 1974).

28.    These (and other) federal administrative efforts to encourage generic substitution were ratified by Congress in 1984 with the enactment of the Hatch-Waxman Act. As noted in detail below, that Act speeded generic entry by easing the FDA approval process.

### Federal Regulation of New Pharmaceutical Products

29.    Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce. Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

30.    In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Amendments or the Hatch-Waxman Act. Hatch-Waxman simplified the regulatory hurdles for

prospective generic drug manufacturers by eliminating the need for generic companies to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA approval. Instead, such companies are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and effectiveness data already supplied to the FDA by the brand-name manufacturer. Hatch-Waxman also added a number of patent-related provisions to the statutory scheme, as described below. Congress's principal purpose in enacting the Hatch-Waxman Amendments was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

31.    New drugs that are approved for sale by the FDA are sometimes protected by a patent or patents, which provide the patent owner with the exclusive right to sell that drug in the United States for the duration of the patent or patents involved, plus any extensions. Under 21 U.S.C. § 355(b)(1), a patent holder seeking FDA approval for a new drug is required to "file with the FDA the patent number and expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." Patent information received by the FDA with respect to approved drugs is published in a book entitled "Approved Drug Products With Therapeutic Equivalence Evaluations," commonly known as the "Orange Book," where it can be found and consulted by future FDA applicants.

32.    Generic drugs are drugs which the FDA has found to be bioequivalent to brand name drugs. The first generic competitor to enter a market typically does so at a price at least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial amount

11

of market share away from the brand-name manufacturer. As additional generic competitors come to market, the price of the generics continues to fall, and their combined market share continues to grow. In many cases, generic competitors sell products equivalent to brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have captured as much as 90% of the brand-name drug's pre-generic sales.

33.     The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, at all levels of the distribution chain, who are able to buy the same chemical substance at much lower prices. Retail pharmacies, such as those owned and operated by Plaintiffs, substitute generic drugs for brand-name drugs whenever possible in order to lower their own costs and those of their customers.

## Abbreviated New Drug Applications for Generic Drugs

34.     Under Hatch-Waxman, a drug manufacturer may seek expedited FDA approval to market a generic version of a brand-name drug by filing an ANDA pursuant to 21 U.S.C. § 355(j). An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand-name drug.

35.     An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied: (1) the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification"); (2) the patent or patents have expired (a "paragraph II certification"); (3) the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or (4) the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii). If an

12

unexpired patent has been listed in the Orange Book by the brand-name manufacturer, a generic applicant is required to file either a paragraph III or a paragraph IV certification.

36.    If a generic manufacturer submits a paragraph IV certification stating that a listed patent is invalid or will not be infringed, it must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed.  21 U.S.C. § 355(j)(2)(A)(vii)(IV).

37.    The patent owner, upon receiving a paragraph IV certification from an ANDA applicant, has 45 days in which to initiate a premarketing patent infringement action against the applicant (a cause of action created by Hatch-Waxman).  If no action is initiated within 45 days, FDA approval of the generic proceeds without regard to patent issues.  However, if a patent infringement lawsuit is brought within the 45-day window, the FDA is automatically barred from granting final approval to the generic applicant until 30 months after the patent holder's receipt of the Paragraph IV certification, unless the patent expires or is held invalid or noninfringed first.  21 U.S.C. § 355(j)(5)(B)(iii).  This automatic stay of FDA approval is triggered without regard to the merits of the patent holder's lawsuit.

38.    The Hatch-Waxman Amendments and the federal regulations that implement them do not give the FDA authority to resolve issues of patent law.  The FDA is required to accept as true information it obtains from patent holders, and to withhold its approval of new generic drugs whenever the patent holder presents a litigated dispute (whether genuine or not) regarding the validity or infringement of a patent.

39.    One result of the statutory and regulatory provisions described above is that brand-name manufacturers have a strong incentive to obtain, list and enforce patents against prospective generic applicants even if the patent is ultimately held to be invalid or not infringed by

the generic applicant's proposed generic drug. If a brand-name manufacturer is able to obtain a patent from the Patent and Trademark Office, list the patent in the Orange Book and bring actions under the Hatch-Waxman Act to enforce the patent, the brand-name manufacturer can effectively block the entry of generic competition for up to 30 months. This delay, which is triggered without regard to the merit of the patent holder's claim, can be worth hundreds of millions of dollars to the manufacturer of a successful brand-name drug.

40.    FDA regulations provide a second means for an unscrupulous brand manufacturer to delay the onset of generic competition. Under the Hatch-Waxman Act and State regulatory regimes, described above, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug. In order to receive an AB-rating, a generic drug must be: (1) therapeutically equivalent to its brand name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength and safety and efficacy profile, and (2) bioequivalent to its brand name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.

41.    If an unscrupulous brand manufacturer that is about to experience generic competition to its original product (drug 1) stops promoting that product and starts promoting a virtually identical product instead (drug 2), the ability of a generic version of drug 1 to compete for sales of the chemical will be significantly hindered, because most physicians will stop writing prescriptions for drug 1 and the approved generic product will not be substitutable for drug 2. Thus, the brand manufacturer will effectively protect its sales and profits from generic competition. In order to compete for all sales of the chemical, the generic applicant must start over and submit a new

ANDA seeking approval to market a generic version of drug 2, which will add at least several years to the FDA approval process.

42.    As shown in detail below, Defendants developed and marketed Nexium as part of exactly this kind of generic-impairing scheme. Nexium was not a medical improvement over Prilosec. But because Nexium was a slight chemical variant of the soon-to-be-approved generic versions of Prilosec, those generics could not be AB-rated to Nexium. Defendants knew, based on the economics of the pharmaceutical industry and the AB-rating system, that switching the market from Prilosec to Nexium would substantially impede competition from generic Prilosec, and thus allow Defendants to maintain their monopoly. Defendants' unlawfully exclusionary conduct allowed them to maintain their monopoly by impeding the generic entry that the Hatch-Waxman Act was designed to foster.

## Omeprazole and Esomeprazole

43.    Prilosec is one of a class of drugs referred to as "proton pump inhibitors," which are used to treat heartburn and related conditions. The active ingredient in Prilosec is omeprazole. By 1999, sales of Prilosec in the United States had exceeded $4 billion, making it the top-selling drug in the world.

44.    AstraZeneca owned a patent on omeprazole that was issued by the Patent and Trademark Office in March 1981 and, after various extensions, expired in October 2001. Defendants (or their affiliates) obtained and listed in the Orange Book more than a dozen other patents related to omeprazole. However, as of October 2001, the active pharmaceutical ingredient in Prilosec was unpatented, leaving Prilosec vulnerable to generic competition.

45.    Omeprazole is a "racemate," a substance consisting of equal parts of two different physical forms (or isomers) of the same molecule. The two physical forms are mirror images of one another but are otherwise identical. Each form is referred to as an "enantiomer." Esomeprazole is the left-handed or "S" (for *sinister*, the Latin word for "left-handed") enantiomer of omeprazole. Thus, omeprazole consists of equal parts of the right- and left-handed forms of the molecule, while esomeprazole consists exclusively of the left-handed form.

46.    The FDA approved 20 mg Prilosec capsules in September 1989, 10 mg capsules in October 1995, and 40 mg capsules in January 1998. AstraZeneca began marketing each strength of the drug shortly after receiving FDA approval. From September 1989 until December 2002, AstraZeneca was the only manufacturer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.

47.    AstraZeneca was acutely aware that its best-selling drug would lose patent protection in 2001 and, during the mid-1990's, began devising ways to delay or impede generic competition. AstraZeneca convened a group of marketers, lawyers and scientists and charged them with the job of finding a solution to the impending patent expiration of the company's best-selling drug. The ad-hoc group called itself the "Shark Fin Project" after the shape the Prilosec sales chart would trace if they did nothing: an inverted V.

48.    The basic scheme devised by the Shark Fin Project was three-fold. First, prior to the commencement of generic competition, AstraZeneca would seek and obtain FDA approval for a drug containing esomeprazole as its active ingredient, later named Nexium, for which, because it used a slightly different form of the molecule, generic versions of Prilosec would not be substitutable. Second, AstraZeneca would engage in an enormously expensive detailing and

advertising campaign, using false and misleading claims, to convert existing Prilosec prescriptions to Nexium and thereby protect those prescriptions from generic substitution. Third, AstraZeneca would effectively withdraw branded Prilosec from the market, cause managed care organizations not to cover the costs of generic Prilosec, and thus drive patients to the much higher-priced Nexium. This scheme was approved by AstraZeneca and put into effect beginning in the late 1990=s. While the scheme required AstraZeneca to incur massive costs to develop and market a new drug, AstraZeneca accurately predicted that these costs would be far outweighed by the monopoly profits AstraZeneca could continue to extract from its customers by selling a blockbuster drug free of generic competition. This scheme was approved by AstraZeneca and put into effect beginning in the late 1990's. While the scheme required AstraZeneca to incur massive costs to develop and market a new drug, AstraZeneca accurately predicted that these costs would be far outweighed by the monopoly profits AstraZeneca could continue to extract from its customers by selling a blockbuster drug free of generic competition.

49.     As set forth in detail below, AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to interfere with competition from generic Prilosec. Participants in the Shark Fin Project have admitted that, of the dozens of potential actions that they considered to replace the anticipated lost Prilosec sales, launching and switching prescriptions to Nexium was the worst for consumers. Nexium brought no medical benefits to consumers as compared to generic Prilosec. Accordingly, AstraZeneca knew that, *absent the adverse effect on sales of generic Prilosec*, Nexium was a losing business proposition for AstraZeneca—the costs of research, development and marketing of Nexium would not be justified by Nexium sales.

Absent the adverse effects on sales of generic Prilosec, AstraZeneca's development and marketing of Nexium made no economic sense.

### Defendants' Exclusionary Scheme to Impede Generic Competition

### Defendants Develop Nexium While Blocking Generic Prilosec

50.    Anticipating the expiration of Defendants' patent on omeprazole, several generic companies filed ANDAs with the FDA seeking approval to market a generic version of Prilosec upon expiration of the basic omeprazole patent.  Each of these applicants submitted a paragraph III certification with respect to that basic patent and paragraph IV certifications with respect to the other patents AstraZeneca had listed in the Orange Book, stating that these additional patents were either invalid or would not be infringed by their proposed generic products.  Within 45 days of receiving notice of each ANDA filing, AstraZeneca (or an affiliate) sued each such company for patent infringement under Hatch-Waxman, thereby triggering a stay of regulatory approval on each such company's ANDA.

51.    These lawsuits were ultimately consolidated in the United States District Court for the Southern District of New York. *In re Omeprazole Patent Litigation*, MDL Docket No. 1291 (S.D.N.Y.) (Jones, J.).  After a bench trial in late 2001 and early 2002, the district court ruled that the relevant patents were valid but were not infringed by the proposed generic product developed by one of the generic applicants, Kremers Urban Development Co. ("KudCo").  222 F. Supp. 2d 423 (S.D.N.Y. 2002).  KudCo's ANDA was subsequently approved by the FDA and KudCo entered the market with generic Prilosec in December 2002, shortly after the district court decision and more than a year after the basic omeprazole patent had expired.  The Federal Circuit affirmed the district

court's ruling in December 2003. *In re Omeprazole Patent Litigation*, 84 Fed. App. 76 (Fed. Cir. 2003).

52.    During the delay that resulted from the patent infringement cases filed against generic applicants, Defendants put into effect the strategy developed by the Shark Fin Project— developing a minutely altered form of Prilosec and converting as much of the Prilosec market as possible to that product prior to the commencement of generic competition.

53.    The minutely altered form of Prilosec developed by AstraZeneca was Nexium, which is identical to Prilosec except that Nexium contains esomeprazole rather than omeprazole as its active pharmaceutical ingredient. As explained above, esomeprazole is the left-handed form of the molecule, while omeprazole contains equal parts of the left- and right-handed forms. The two drugs are otherwise substantially identical. Accordingly, when the FDA approved Nexium in February 2001, it found that the drug did not contain a new active chemical entity and refused to reward Nexium with "New Product" exclusivity.

### AstraZeneca's Product Switching Scheme

54.    As compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers. AstraZeneca developed Nexium and brought it to market solely because of its effectiveness in impeding generic competition.

55.    It is a well known phenomenon in the pharmaceutical industry that doctors who are in the routine of prescribing Product A will not begin prescribing Product B once a generic version of Product B becomes available. This is true even if Products A and B are closely related chemical entities and even if Product A provides no significant medical benefits over Product B. As noted in detail above, doctors are particularly susceptible to brand manufacturer advertising in

the form of "detailing." And as also noted in detail above, generic manufacturers are economically precluded from employing large detailing forces.

56.    This phenomenon provides an opportunity for the manufacturer of two closely related brand-name pharmaceuticals, one of which is vulnerable to generic competition, to shield that product from the full force of generic competition. For example, assume that in Year 1 a brand manufacturer makes sales of 100 units of Product B. The brand manufacturer knows that Product B will face generic competition in Year 3 and that the generics are expected to take 80% of the unit sales, or 80 units. In order to impair that generic competition, the brand manufacturer introduces Product A in Year 1 and directs its marketing efforts to encouraging doctors to stop prescribing Product B and instead begin prescribing Product A. Because the same brand manufacturer produces both Product A and Product B, there are no "counter-detailers" to dissuade the doctors from switching from Product B to Product A. In addition, the brand manufacturer can stop providing to doctors free samples of Product B and provide only free samples of Product A. Studies show that providing (or not providing) free samples has a substantial effect on which brand product doctors will prescribe. And, again, there is no countervailing marketing effort with respect to samples, the generic versions of Product B having not yet received FDA marketing approval. Through such a strategy, a brand manufacturer can progress from selling 0 units of Product A and 100 units of Product B in Year 1 to, say, selling 70 units of Product A and 20 units of Product B in Year 3. Thus, instead of having an opportunity to sell 80% of 100 units of Product B, generic manufacturers are limited to having an opportunity to sell 80% of 20 units of Product B.

57.    This is exactly the generic-impairing strategy on which AstraZeneca's Shark Fin Project was based.

**Defendants Conduct a Massive and Fraudulent Campaign to Convert the Market from Prilosec to Nexium**

58.     Notwithstanding the FDA's conclusion and its own concession that the clinical data did not support a claim of superiority of esomeprazole over omeprazole, AstraZeneca launched a massive advertising and detailing campaign designed to persuade doctors and consumers that Nexium was a significant improvement over Prilosec. This fraudulent and misleading campaign was devised by the Shark Fin Project to impair generic competition to AstraZeneca's most profitable product. AstraZeneca conducted this campaign, despite its enormous cost, in order to maintain its monopoly position in the market.

59.     The claims made by AstraZeneca to doctors and consumers were false and misleading, and were know to be false and misleading in the following particulars:

a.      AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that the FDA did not approve any claim of superiority of Nexium over Prilosec;

b.      AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that, in order to obtain FDA approval, AstraZeneca assured the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole;"

c.      AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that AstraZeneca's own set of studies showed no statistically significant difference in healing rates between Nexium and Prilosec for the most common indication, *i.e.,* common heartburn;

21

      d.      AstraZeneca's claims affirmatively asserted that Nexium was superior to Prilosec;

      e.      AstraZeneca claimed the superiority of Nexium over Prilosec with respect to healing erosive esophagitis, but that claim was not supported by the set of studies submitted by AstraZeneca to the FDA, (or by any other set of studies) and, in fact, the studies were included in the product label "to make physicians understand that Nexium is not superior to omeprazole";

      f.      AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without limiting the claims to superiority of 40 mg of Nexium as compared to 20 mg of Prilosec, when in fact AstraZeneca had no study showing clinical superiority of 20 mg of Nexium over 20 mg of Prilosec;

      g.      AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without disclosing that most studies did not support that claim and that the one study that could have done so was based solely upon a comparison of 40 mg of Nexium to 20 mg of Prilosec.

      60.      This campaign of false and misleading statements to doctors and patients, backed by a billion dollars in marketing outlays, was a material factor in causing the sales switches described in detail above, from Prilosec to Nexium.

      61.      In 2001, AstraZeneca employed approximately 6,600 detailers to promote its products to doctors. It has been reported that the company hired an additional 1,300 individuals just

to detail Nexium. Beginning in March 2001, these detailers (along with the ones AstraZeneca already employed) blanketed doctors' offices with literature, samples and promotional material and began urging all Prilosec prescribers to stop prescribing Prilosec and to start prescribing Nexium instead. Between March 2001 and the launch of generic omeprazole in December 2002, AstraZeneca's sales representatives were aggressively detailing doctors to prescribe Nexium instead of Prilosec based on the claimed superiority of the new drug over the old. The claims made by AstraZeneca's detailers were false, were known to be false, and were made for the purpose of inducing physicians to convert their patients to Nexium and thereby restrain the ability of generic manufacturers to compete for all sales of the chemical.

62.     AstraZeneca spent approximately $1 billion on detailing and advertising Nexium during the two years after it was introduced. A substantial portion of this sum was spent blanketing the airwaves with ubiquitous direct-to-consumer television advertisements promoting Nexium as the new "purple pill."

63.     As part of its detailing effort, AstraZeneca also provided doctors with free samples of Nexium and stopped providing free samples of Prilosec. Doctors typically give free samples of drugs to their patients and simultaneously give the patient a prescription for that drug. By providing samples of Nexium rather than Prilosec, AstraZeneca encouraged physicians to stop prescribing Prilosec and start prescribing Nexium.

64.     Upon the introduction of Nexium, AstraZeneca completely stopped detailing and promoting Prilosec, despite the fact that Prilosec did not yet face generic competition and would not face such competition for another 18 months. AstraZeneca stopped making positive product claims about Prilosec and, instead began making negative (and false) claims about the effectiveness

of Prilosec in treating the conditions for which it is prescribed. AstraZeneca attempted to weaken the competitive position of its own product, Prilosec, in favor of a newer product, Nexium, for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec.

65.    AstraZeneca's strategy was enormously successful in impairing generic competition for Prilosec. In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of Prilosec of 29.6 million units. With the introduction of Nexium in March 2001, and with AstraZeneca's determined efforts to switch doctors from Prilosec to Nexium, in 2002 AstraZeneca had U.S. sales of 19.6 million units of Prilosec and 13.4 million units of Nexium. With the introduction of generic omeprazole in December 2002, AstraZeneca continued its market-switching strategy into 2003. In 2003, AstraZeneca continued to switch sales from Prilosec to Nexium, growing Nexium's unit sales from 13.4 million in 2002 to 18.8 million in 2003 (much of the growth at the expense of Prilosec, and the rest as a result of growth in the therapeutic category).

66.    While this product-switching strategy was enormously successful and profitable for AstraZeneca, it was an economic disaster for American consumers. As compared to Prilosec, Nexium provides no significant medical benefits to consumers. Yet, had AstraZeneca not engaged in the product-switching scheme, a minimum of 13.4 million more units of Prilosec would have been available annually for generic competition. AstraZeneca's product-switching scheme has cost direct purchasers of omeprazole and esomeprazole more than $2 billion in increased prescription costs.

67.    AstraZeneca's product-switching from Prilosec to Nexium was profitable for AstraZeneca only because the strategy had the effect of impairing generic competition to Prilosec.

24

Absent the effect of impairing generic competition to Prilosec, it would have made no economic

sense for AstraZeneca to engage in the product switching.  In 2000, AstraZeneca had U.S. sales of

29.6 million units of Prilosec; in 2002, AstraZeneca had U.S. sales of 33 million units of Nexium

and Prilosec combined (an 11.4% increase).  During this same time period, however, the combined

U.S. sales of all proton-pump inhibitors increased from 56.5 million units to 73.9 million units (a

30.8% increase).  Thus, sales in the overall therapeutic category increased nearly three times the rate

as that of combined Nexium/Prilosec U.S. sales.  Thus, AstraZeneca had fewer U.S. sales of Nexium

and Prilosec combined than if AstraZeneca had sold only Prilosec.  As AstraZeneca knew when it

decided to engage in its scheme, the product switching caused AstraZeneca to lose the momentum

from its prior Prilosec detailing and advertising efforts and caused some doctors, when asked to

switch from Prilosec to Nexium, to instead switch from Prilosec to a non-AstraZeneca proton-pump

inhibitor.

    68. In addition to this loss of sales, AstraZeneca also incurred enormous out-of-

pocket expenses in order to effect the product switch from Prilosec to Nexium.  These enormous

expenses, calculated in the billions of dollars, include (but are not limited to) the costs of research

and development to produce and obtain FDA approval for Nexium, incremental detailing and

marketing expenses, stocking allowances paid to retailers to induce them to carry Nexium, and

returned goods allowances paid to wholesalers and other direct purchasers in connection with the

return of unused shipments of Prilosec.

    69. AstraZeneca incurred these enormous costs in order to introduce a product that

was no better than Prilosec and to make fewer sales of Nexium and Prilosec combined than if

AstraZeneca had sold only Prilosec. AstraZeneca's product-switching strategy made no economic sense absent its effect of impairing generic competition for Prilosec.

## The Scheme to Mislead Doctor and Patients

70.     To obtain FDA approval for Nexium, AstraZeneca had to test it in clinical trials. Most of the clinical trials used by AstraZeneca to obtain FDA approval of Nexium compared Nexium only with placebos (which is all that is required to obtain FDA approval). But several trials compared Nexium to Prilosec.

71.     AstraZeneca sought FDA approval to market Nexium for three indications: (1) treatment of symptomatic gastroesophageal reflux disease ("GERD"), or common heartburn; (2) treatment of erosive esophagitis; and (3) maintenance of healing of erosive esophagitis. The vast majority of prescriptions for Nexium and other proton-pump inhibitors are written for GERD, or common heartburn. In stark contrast, erosive esophagitis cannot even be diagnosed without the doctor performing an invasive endoscopy. Consequently, only a small minority of prescriptions for Nexium and other proton-pump inhibitors are written for erosive esophagitis. A similarly small percentage are written for maintenance of healing of erosive esophagitis.

72.     In an attempt to prove the superiority of Nexium over Prilosec for both common heartburn and erosive esophagitis, AstraZeneca conducted clinical trial No. 172. AstraZeneca scientists concluded that, in order to support a claim of clinical superiority (*i.e.,* actual better results for patients in the real world), it would be necessary for the clinical trials to establish a 10% statistical difference between Nexium and Prilosec with 95% accuracy. Clinical trial No. 172 compared the results of use of each of 40 mg of Nexium and 20 mg of Nexium to the use of 20 mg of Prilosec. The results showed no statistically significant difference between 20 mg Nexium and

20 mg Prilosec in the treatment of heartburn. While there was a slight statistical difference between 40 mg Nexium and 20 mg Prilosec at the four-week mark, that difference disappeared by the eight-week mark. For the treatment of erosive esophagitis, the results showed no statistically significant difference between the use of 20 mg of Nexium and 20 mg of Prilosec. The results showed a small statistical difference (9.7% at 4 weeks and 6.2% at 8 weeks) as between 40 mg of Nexium and 20 mg of Prilosec for the treatment of erosive esophagitis. But the statistical difference did not meet AstraZeneca's own parameters (*i.e.,* a 10% statistical difference) to establish a clinically significant difference.

73.    After obtaining the results of clinical trial No. 172, AstraZeneca abandoned any further attempt to establish that Nexium -- even at twice the dosage strength -- provided improved clinical outcomes for patients being treated for common heartburn.

74.    With respect to further clinical trials for treatment of erosive esophagitis, AstraZeneca conducted clinical trial No. 173. This clinical trial compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. The results showed no statistically significant difference in outcomes for patients.

75.    AstraZeneca also conducted clinical trial No. 174, which compared the use of 20 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. The results showed no statistically significant difference in outcomes for patients. The results did show, however, that the use of Nexium resulted in worse outcomes for patients with respect to certain common side effects.

76.    AstraZeneca eventually conducted clinical trial No. 222, which again compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive

esophagitis. The results showed a moderate statistical difference, of 12% at four weeks and 9% at 8 weeks. These results thus barely met AstraZeneca's parameter of a 10% statistical difference in order to show any clinical difference in outcomes, and did so only at the four-week mark.

77.    In addition to conducting the four clinical trials described above, AstraZeneca also conducted three supportive trials related to treatment of erosive esophagitis. One supportive trial compared the use of each of 40 mg of Nexium and 20 mg of Nexium to the use of 20 mg of Prilosec; another compared the use of each of 40 mg of Nexium to the use of 20 mg of Prilosec; and the third compared the use of 20 mg of Nexium to the use of 20 mg of Prilosec. The results of all three supportive trials failed to show a statistically significant difference as between the use of Nexium and Prilosec.

78.    The FDA Medical Officer who reviewed the clinical studies submitted by AstraZeneca in support of its NDA for Nexium concluded that "superiority of Nexium over omeprazole was not demonstrated." According to the FDA Medical Officer=s Review, "a superiority claim of Nexium over omeprazole is NOT SUPPORTED by either the comparison of [Nexium 40 mg] vs. [Prilosec 20 mg] or the comparison of [Nexium 40 mg] vs. [Nexium 20 mg]." The FDA Medical Officer's Review is available on the FDA's web site.

79.    In summarizing the medical review, the reviewer noted in a report dated September 21, 2000 that "the sponsor's conclusion that [Nexium] has been shown to provide significant clinical advance over omeprazole in the first-line treatment of patients with acid-related disorders **is not supported by data**." In the reviewer's conclusion, he reiterated that "it is recommended not to allow the sponsor to claim that esomeprazole magnesium has any significant

clinical advantage over omeprazole in the first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted."

80.     The FDA accepted the reviewer's recommendation and did not permit AstraZeneca to assert that Nexium provides a significant clinical advance over Prilosec.   In negotiations between the FDA and AstraZeneca concerning the labeling for Nexium, AstraZeneca agreed that the clinical trials and supportive trials did not support any claim that Nexium is superior to Prilosec.  In a meeting on February 6, 2001, AstraZeneca's Vice President specifically informed the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole."  AstraZeneca's product Director specifically asserted that AstraZeneca wanted to include the results of the clinical trials and supportive trials in Nexium's product label in order "to make physicians understand that Nexium is not superior to omeprazole."   In reliance on these assurances, the FDA approved the Nexium product label and the inclusion of the trial results in the label.

### Defendants Effectively Withdraw Prescription Prilosec from the Market

81.     AstraZeneca was not content merely to switch the market to Nexium and let the manufacturers of generic Prilosec fight for the few Prilosec prescriptions that might continue to be written.  Instead, AstraZeneca effectively withdrew branded Prilosec from the market.

82.     Approximately 90% of all U.S. consumers have health coverage provided by managed care organizations ("MCOs") that pay for some or all of the costs of prescription pharmaceuticals.  AstraZeneca knew that it is the policy of the vast majority of MCOs to discontinue providing coverage for prescription pharmaceuticals when an over-the-counter ("OTC") version of a prescription product becomes available.  Although the costs of OTC medications are thus generally

29

borne by consumers themselves rather than by their insurers, OTC medications nevertheless usually result in overall lower health care costs and are thus usually procompetitive. AstraZeneca, however, arranged things differently.

83.     On January 27, 2000, AstraZeneca and its OTC marketing partner, Procter & Gamble jointly applied to the FDA for approval to market Prilosec OTC. Importantly, they sought approval only for short-term (14-day) use of OTC Prilosec even though the quantity of active ingredient in OTC Prilosec and prescription Prilosec (for longer-term use) is the same.

84.     On June 20, 2003, the FDA approved the sale of Prilosec OTC. The FDA awarded AstraZeneca three years of exclusivity in the OTC market because of safety studies performed and submitted by AstraZeneca. Thus, AstraZeneca was assured of being the only manufacturer of OTC omeprazole until 2006.

85.     AstraZeneca (through its distributor, Procter & Gamble) began selling Prilosec OTC in September 2003, approximately ten months after the launch of generic Prilosec.

86.     As AstraZeneca knew and intended, upon the introduction of Prilosec OTC in September 2003, nearly all MCOs refused to provide coverage for prescription Prilosec because of the availability of the OTC version. As AstraZeneca also knew and intended, the MCOs also stopped providing coverage for *generic* Prilosec. And as AstraZeneca further knew and intended, the MCOs did so even though OTC Prilosec was recommended for use only for 14 days or less.

87.     AstraZeneca advises patients who begin therapy on OTC Prilosec, but who need longer-term treatment, to consult their physicians to obtain an appropriate prescription. As a result of AstraZeneca's conduct, however, patients who consult their physicians and their MCOs will learn that there is no coverage for prescription Prilosec, whether brand or generic. The chemically

closest product to OTC Prilosec is, of course, Nexium. Thus, a physician writing a prescription for a patient who has started therapy on OTC Prilosec is likely to write the prescription for Nexium. Moreover, because most MCOs no longer cover Prilosec, the physician can confer a financial benefit on the patient by prescribing Nexium rather than advising the patient to continue taking Prilosec OTC or writing a prescription for Prilosec, both of which would have to be paid for out of the patient=s own pocket.

88.     Thus, by obtaining FDA approval to market OTC Prilosec, but only for short-term use, AstraZeneca simultaneously: (1) caused MCOs not to cover branded Prilosec and thus effectively withdrew branded Prilosec from the market; (2) caused MCOs not to cover generic Prilosec; and (3) drove patients who otherwise would have received less-expensive generic Prilosec to receive instead a prescription for much more expensive branded Nexium. AstraZeneca then exacerbated the anticompetitive consequences of this aspect of its scheme by providing a grossly insufficient supply of Prilosec OTC to meet the market demands. Throughout the three-year term of AstraZeneca's OTC market exclusivity, the market was beset with "shortages" of the Prilosec OTC supply. As the sole manufacturer of Prilosec OTC, AstraZeneca was solely responsible for these artificial shortages. In fact, the intended and foreseeable effect of these shortages was to drive Prilosec OTC patients to see their physicians and obtain a prescription for Nexium.

89.     The success of this aspect of AstraZeneca's scheme is again seen in the data on unit sales. In 2003, the combined U.S. sales of branded and generic Prilosec were 15.9 million units. In 2004, after the initiation of AstraZeneca's Prilosec OTC scheme in September 2003, the combined sales of branded and generic prescription Prilosec declined to just 9 million units. A

substantial portion of those lost units is accounted for in increased unit sales of Nexium, which increased from 18.8 million in 2003 to 20.6 million in 2004.

## Relevant Market

90.    The relevant product market is the sale of prescription pharmaceutical products containing the omeprazole/esomeprazole molecule—i.e., Prilosec, Nexium and any AB-rated generic equivalent of either.  The relevant geographic market is the United States.  A firm that was the only seller of such products in the United States could and would impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by AstraZeneca's ability to profitably charge supracompetitive prices during the period in which it lacked generic competition.

91.    From the time it introduced Prilosec until December 2002, AstraZeneca had a 100% share of the relevant market.  Thereafter, and solely because of the exclusionary conduct alleged above, AstraZeneca has maintained a market share of at least 70%.  But for the exclusionary conduct alleged above, AstraZeneca would have been forced to lower its prices to the price charged for generic omeprazole or its market share after December 2002 would have fallen precipitously to less than 20%.

92.    AstraZeneca's unlawful actions were taken for the purpose of preventing or impeding generic competition and allowing it to continue to charge monopoly prices free of effective generic competition.

## Effects of Defendants' Unlawful Conduct

93.    Defendants' exclusionary conduct has impeded the sale of generic omeprazole in the United States, and has unlawfully enabled Defendants to sell the omeprazole/esomeprazole

molecule at monopolistic, artificially inflated prices. By engaging in such conduct, Defendants have harmed the competitive process and have perpetuated their ability to extract supracompetitive prices from wholesalers, retailers and consumers. But for Defendants' illegal conduct, KudCo and other generic competitors would have been able to compete for all sales of the chemical beginning in December 2002, and Plaintiffs and other purchasers would have benefitted from that competition by substituting lower-priced generic omeprazole for all of their purchases of higher-priced Nexium.

94.    There are no procompetitive justifications for Defendants' conduct. The conduct alleged above created no efficiency gains or increases in consumer welfare. On the contrary, Defendants' conduct substantially decreased or eliminated the efficiency gains that would otherwise have occurred through the successful introduction of a less expensive generic version of Prilosec that could be substituted at the pharmacy counter for branded Prilosec—efficiency gains that Congress and state legislatures intended to bring about when they enacted Hatch-Waxman and state generic substitution laws.

95.    As a result of Defendants' unlawful and exclusionary conduct, Plaintiffs (or their assignors) continued to purchase branded omeprazole/esomeprazole from Defendants at monopoly prices rather than generic omeprazole from a generic manufacturer at lower prices. Plaintiffs continue to be overcharged by paying higher prices for the drug than would have prevailed in the absence of Defendants' unlawful conduct.

96.    Plaintiffs' claims asserted herein accrued no earlier than December 10, 2002.

## Count I
## Monopolization (15 U.S.C. § 2)

97.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 96 above.

98.    At all relevant times, AstraZeneca has possessed monopoly power in the relevant market.

99.    During the relevant period, AstraZeneca willfully and unlawfully maintained its monopoly power by, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to protect its monopoly profits from effective generic competition; (b) engaging in a massive and deceptive advertising and promotional campaign to convert patients from Prilosec to Nexium in anticipation of the entry of generic versions of Prilosec; and (c) effectively withdrawing branded Prilosec from the market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the supply of Prilosec OTC in order to drive patients to physicians' offices, where they would be given a prescription for Nexium.

100.    Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have had precisely the intended effect.

101.    Plaintiffs (or their assignor) have been injured in their business and property by reason of Defendants' unlawful monopolization. Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

102.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

## Count II
## Attempt to Monopolize (15 U.S.C. § 2)

103.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 96 above.

104.    At all relevant times, AstraZeneca has possessed monopoly power in the relevant market or there has been a dangerous probability of its achieving monopoly power.

105.    During the relevant period, AstraZeneca willfully engaged in exclusionary, anticompetitive conduct designed to impede competition on the merits, including, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to protect its monopoly profits from effective generic competition; (b) engaging in a massive and deceptive advertising and promotional campaign to convert patients from Prilosec to Nexium in anticipation of the entry of generic versions of Prilosec; and (c) effectively withdrawing branded Prilosec from the market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the supply of Prilosec OTC in order to drive patients to physicians' offices, where they would be given a prescription for Nexium.

106.    At all relevant times, AstraZeneca has had a specific intent to achieve or maintain a monopoly in the relevant market.

107.    Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have had precisely the intended effect.

108.    Plaintiffs (or their assignors) have been injured in their business and property by reason of Defendants' unlawful attempted monopolization. Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

109.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    On Counts I and II, a judgment for three times the damages actually sustained by Plaintiffs, as determined by a jury;

B.    A declaration that Defendants have violated the antitrust laws in the ways described above;

C.    Permanent injunctive relief which enjoins Defendants from continuing their illegal conduct, and requires them to take affirmative steps to dissipate the effects of their prior violations;

D.    The costs of this suit, including a reasonable attorneys' fee; and

E.    Such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

Robert D. W. Landon III
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Tel.: (305) 373-1000
Fax: (305) 372-1861
Attorneys for Plaintiffs

Of counsel:

Richard Alan Arnold
Scott E. Perwin
Lauren C. Ravkind
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Tel.: (305) 373-1000
Fax: (305) 372-1861
232355.3

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I (a) PLAINTIFFS

WALGREEN CO., ECKERD CORPORATION, MAXI DRUG, INC. d/b/a BROOKS PHARMACY, THE KROGER CO., NEW ALBERTSON'S, INC., SAFEWAY, INC., HY-VEE, INC. and AMERICAN SALES COMPANY, INC.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Fulton County, IL
**(EXCEPT IN U.S. PLAINTIFF CASES)**

88888

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert D.W. Landon, III, Esq.
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard, 1100 Miami Center
Miami, FL 33131-4327 Tel. 305-373-1000

### DEFENDANTS

ASTRAZENECA PHARMACEUTICALS L.P.; ASTRAZENECA L.P.; ZENECA, INC.; and ZENECA HOLDINGS, INC.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)** _____
NOTE: IN LAND CONDEMNATION CASES... THE
TR...

CASE NUMBER  1:06CV02084

JUDGE: Richard W. Roberts

DECK TYPE: Antitrust

DATE STAMP: 12/07/2006

JURY ACTION

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

☒ Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant

□ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHI...
FOR PLAINTIFF AN...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☒ **A.  Antitrust**

☒ 410 Antitrust

□ **B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

□ **C. Administrative Agency Review**

□ 151 Medicare Act

**Social Security:**
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

□ **D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

□ **E.  General Civil (Other) OR** □ **F.  Pro Se General Civil**

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or defendant
□ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.
□ 460 Deportation

□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ G. *Habeas Corpus/* *2255* | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. §2 – Monopolization and attempt to monopolize; 15 U.S.C. §1125(a) – False Advertising

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS    □    ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** ☒ YES    □ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    □ YES    ☒ NO    If yes, please complete related case form.

DATE  _12.7.06_    SIGNATURE OF ATTORNEY OF RECORD  _Robert Drix_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.