UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


WALGREEN CO.
200 Wilmot Road
Deerfield, IL 60015

ECKERD CORPORATION
50 Service Road
Warwick, RI 02886

MAXI DRUG, INC. d/b/a
BROOKS PHARMACY,
50 Service Road
Warwick, RI 02886

THE KROGER CO.,
1014 Vine Street
Cincinnati, OH 45202

NEW ALBERTSON'S, INC.,
250 East Park Center Blvd.
Boise, Idaho 83706

SAFEWAY, INC.,
5918 Stoneridge Mall Road
Pleasanton, CA 94588

HY-VEE, INC.
5820 Westtown Parkway
W. Des Moines, Iowa  50266

and

AMERICAN SALES COMPANY, INC.
4201 Walden Avenue
Lancaster, NY 14086

       Plaintiffs,

vs.

CIVIL ACTION NO. 1:06 CV 02084-RWR

JURY TRIAL DEMANDED

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Walgreen Co., Eckerd Corporation, The Kroger Co., Maxi Drug, Inc. d/b/a

Brooks Pharmacy, American Sales Company, Inc., New Albertson's, Inc., Safeway, Inc. and Hy-

Vee, Inc. (collectively "Plaintiffs") sue Defendants AstraZeneca Pharmaceuticals L.P.,

AstraZeneca L.P., Zeneca, Inc. and Zeneca Holdings, Inc. under the antitrust and trade regulation

laws of the United States, and for their Complaint allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action seeking treble damages and other relief arising out of

Defendants' unlawful monopolization and attempted monopolization of the market for

omeprazole and its enantiomers, including the prescription drugs Prilosec, Nexium and any AB-

rated generic equivalents of either, by switching the market from Prilosec, which now has

generic competition, to a virtually identical drug, Nexium, which does not. Defendants

implemented this product switch solely in order to impair generic competition and thereby

maintain Defendants' dominant market position. Defendants' unlawful conduct has deprived

Plaintiffs and other purchasers of the benefits of effective generic competition from December

2002 through the present.

## PARTIES

2.      Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business in Deerfield, Illinois.  Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Walgreen purchased Prilosec and Nexium from pharmaceutical wholesalers Cardinal Health, Inc. ("Cardinal") and AmerisourceBergen Corporation ("ABC"), which purchased the drugs directly from Defendants for resale to Walgreen.  Walgreen brings this action in its own behalf and as the assignee of Cardinal and ABC.

3.      Plaintiff Eckerd Corporation ("Eckerd") is a Delaware corporation having its principal place of business in Warrick, Rhode Island.  Eckerd owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Eckerd purchased Prilosec and Nexium directly from Defendants and also from pharmaceutical wholesaler McKesson Corporation ("McKesson"), which purchased the drugs directly from Defendants for resale to Eckerd.  Eckerd brings this action in its own behalf and as McKesson's assignee.

4.      Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal place of business in Cincinnati, Ohio.  Kroger owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Kroger purchased Prilosec and Nexium from Cardinal, which purchased the drugs directly from Defendants for resale to Kroger.  Kroger brings this action in its own behalf and as Cardinal's assignee.

5.      Plaintiff Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") is a Delaware corporation having its principal place of business in Warrick, Rhode Island.  Brooks

owns and operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Brooks purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Brooks. Brooks brings this action in its own behalf and as McKesson's assignee.

6. Plaintiff American Sales Company, Inc. ("ASC") is a Delaware corporation having its principal place of business in Lancaster, New York. ASC purchases pharmaceutical and other products and distributes those products to retail stores owned and operated by affiliated companies, at which prescription drugs are dispensed to the public. During the relevant period, ASC purchased Prilosec and Nexium from Cardinal, which purchased the drugs directly from Defendants for resale to ASC. ASC brings this action in its own behalf and as Cardinal's assignee.

7. Plaintiff New Albertson's, Inc. ("Albertson's") is a Delaware corporation having its principal place of business in Boise, Idaho. Albertson's owns and operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Albertson's (and its predecessors) purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Albertson's. Albertson's brings this action in its own behalf and as McKesson's assignee.

8. Plaintiff Safeway, Inc. ("Safeway") is a Delaware corporation having its principal place of business in Pleasanton, California. Safeway owns and operates retail stores in several states at which it dispenses prescription drugs to the public. During the relevant period, Safeway purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Safeway. Safeway brings this action in its own behalf and as McKesson's assignee.

4

9.    Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation having its principal place of business in West Des Moines, Iowa.  Hy-Vee owns and operates retail stores in several states at which it dispenses prescription drugs to the public.  During the relevant period, Hy-Vee purchased Prilosec and Nexium from McKesson, which purchased the drugs directly from Defendants for resale to Hy-Vee.  Hy-Vee brings this action in its own behalf and as McKesson's assignee.

10.    Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.  AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

11.    Defendant AstraZeneca L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.

12.    Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

13.    Defendant Zeneca Holdings, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

14.    The Defendants identified in paragraphs 3 through 6 above, together with their predecessors-in-interest, will be referred to collectively as "AstraZeneca."  AstraZeneca is the successor-in-interest to Astra-Merck Inc. and is liable for the conduct of that entity.

## JURISDICTION AND VENUE

15.    Counts I and II of this Complaint are civil antitrust claims arising under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15(a) and 26.  The Court has subject-matter jurisdiction over those claims pursuant to 28

U.S.C. §§ 1331 and 1337(a).

16.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15

U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is an inhabitant of this District or is

found or transacts business here.

## TRADE AND COMMERCE

17.     The pharmaceutical products at issue in this case are sold in interstate

commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a

substantial effect upon, interstate commerce.

## CHARACTERISTICS OF PHARMACEUTICAL MARKETS

18.     The sale of pharmaceutical products in the United States suffers from a

significant market imperfection that can be exploited by manufacturers in order to create or

maintain monopoly power with respect to the sale of a particular pharmaceutical composition.

Markets function best when the person responsible for paying for a product is also the person

who chooses which product to buy.  When the person who chooses the product also pays for it,

the price of the product plays an appropriate role in the buyer's choice of product and,

correspondingly, the manufacturer of the product has an appropriate incentive to lower its price.

19.     The pharmaceutical industry is characterized by a "disconnect" between

the payment obligation and product selection.  State laws prohibit pharmacists from dispensing

many pharmaceutical products, including omeprazole, without a prescription from the patient's

physician.  This prohibition on dispensing certain drugs without a prescription creates a

disconnect between the payment obligation and product selection.  The patient (and in most

cases his or her insurer) has the obligation to pay for the product, but the patient's physician chooses which product the patient will buy.

20.    The relative unimportance of price in pharmaceutical markets reduces what economists call the price elasticity of demand -- the extent to which sales go down when price goes up -- which in turn gives brand manufacturers the ability to profitably raise price substantially above marginal cost. The ability to profitably raise price above marginal cost is referred to by economists and antitrust courts as market power or monopoly power. Thus, one result of the market imperfections and market structure described above is to allow manufacturers of branded prescription pharmaceuticals to achieve and maintain monopoly power.

21.    Many pharmaceutical manufacturers, including AstraZeneca, exploit this defect in pharmaceutical markets. The so-called brand manufacturers (*i.e.*, the manufacturers of branded, as opposed to generic, pharmaceuticals) employ large forces of sales representatives, known as "detailers," who visit physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products. These detailers do not advise physicians regarding the cost of the manufacturer's products. Studies show that physicians typically are not aware of the relative cost of branded pharmaceutical products and that, even when physicians are aware of relative cost, they are insensitive to price differences because they do not themselves have the obligation to pay for the products. As noted above, the result is that price plays a negligible role in product selection as between branded prescription pharmaceuticals.

22.    Manufacturers of generic prescription pharmaceuticals ("generic firms") market their products in a fundamentally different way. Rather than exploit the market defect by marketing their products to doctors, generic firms market their products to pharmacies based

principally on price.  *See* Drug Product Selection, Staff Report to the FTC (Jan. 1979) ["FTC

Staff Rep."] at 49-50; A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION

DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS ["Generic

Substitution"] at 5 (FTC 1985).  They do so not out of altruism, but necessity.  A generic firm

typically cannot profitably promote a *generic* product to doctors because the firm would have no

assurance that a pharmacist would dispense its generic product rather than another's.  FTC Staff

Rep. at 50. It is thus economically infeasible for generic firms to exploit the price disconnect by

promoting products to doctors, so the firms must try to increase sales by offering low prices to

pharmacies.  *See id*.  It would also be socially undesirable for generic firms to exploit the market

defect by detailing to doctors: when two firms market chemically identical drugs to doctors, both

firms are able to exploit the defect and sell their products at supracompetitve prices.

## THE ECONOMIC RATIONALE FOR GENERIC SUBSTITUTION LAWS

　　　　23.　　　　Congress sought to ameliorate the price disconnect in pharmaceutical

markets, and restore some normal competitive pressures to those markets, by authorizing the

manufacture and sale of generic pharmaceuticals.  State legislatures continued the same policy

by mandating or permitting generic substitution by pharmacists without physician approval.

When a pharmacist receives a prescription for a branded pharmaceutical product, and a generic

version of that product is available, state law permits (or in some cases requires) the pharmacist

to dispense the generic product instead of the branded product.  In this way, the importance of

price is reintroduced to the product selection decision at the pharmacy counter.  When generic

versions of a brand-name drug become available, the branded manufacturer loses its ability to

exploit the market imperfection, its monopoly power dissipates, and some normal competitive

pressures are restored.

24.     Today, all 50 states have Drug Product Selection ("DPS") laws that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever possible. These DPS laws are premised on the economic fact that brand companies exploit the market defect by promoting to doctors and that generic firms are unable to do so and therefore promote their products by offering low prices to pharmacies:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices.  That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists.  Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.

Generic Substitution at 7.

25.     DPS laws "shift the choice of [drug product] for most prescriptions from the physician to the pharmacist."  *Id*.  As the FTC Report put it, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons --  the pharmacist and the patient -- to select drug products on the basis of price." FTC Staff Rep. at 7.

## STATE AND FEDERAL PROMOTION OF GENERIC ENTRY

26.     Based on this economic rationale, it became State and national policy to encourage generic substitution for branded drugs.  Working together, the Federal Trade Commission and the Food & Drug Administration in 1979 developed a Model Drug Product Selection Act ("Model Act") for State legislatures to enact.  *See* FTC Staff Rep. at  273.  The Model Act permits pharmacists to dispense a generic unless the doctor  specifies that the brand is medically necessary.  The FTC and FDA were "committed to facilitating drug product selection

[*i.e.*, generic substitution]," and believed "that effective drug product selection laws will work to stimulate price competition in a multi-source prescription drug market." *Id.* at 291.

27.    The FDA also helped promote generic substitution by developing a list of therapeutically equivalent, generic drugs that could be safely substituted for branded products (today called the "Orange Book").  The purpose of the FDA's list was to "enhance the ability of drug purchasers to recognize and take advantage of opportunities for direct savings by drug selection."  Rules and Regulations, Dept. of Health and Human Services, Food and Drug Admin., Therapeutically Equivalent Drugs; Availability of List, 45 F.R. 72582 (Oct. 31, 1980) at 41.  This list helps make drug products "sufficiently interchangeable so that price can be a major factor in their selection."  Office of Technology Assessment, Drug Bioequivalents, at 57 (July 1974).

28.    The first generic competitor to enter a market typically does so at a price at least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial amount of market share away from the brand-name manufacturer.  As additional generic competitors come to market, the price of the generics continues to fall, and their combined market share continues to grow.  In many cases, generic competitors sell products equivalent to brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have captured as much as 90% of the brand-name drug's pre-generic sales.

29.     The price competition engendered by generic pharmaceuticals benefits all purchasers of the drug, at all levels of the distribution chain, who are able to buy the same drug substance at much lower prices.  Retail pharmacies, such as those owned and operated by Plaintiffs, substitute generic drugs for brand-name drugs whenever possible.

## FEDERAL REGULATION OF NEW PHARMACEUTICAL PRODUCTS

30.    The federal administrative efforts to encourage generic substitution were ratified by Congress in 1984 with the enactment of the Hatch-Waxman Act.  As noted in detail below, that Act speeded generic entry by easing the FDA approval process.

31.    Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq*., approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce.  Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

32.    In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act.  The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic firms to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA approval.  Instead, such firms are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and efficacy data already supplied to the FDA by the brand-name manufacturer.  The Hatch-Waxman Act also added a number of patent-related provisions to the statutory scheme, as described below.  Congress's principal purpose in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible."  *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

33.    New drugs that are approved for sale by the FDA are sometimes protected by a patent or patents, which provide the patentee with the (conditional) right to exclude others from selling that drug in the United States for the duration of the patent or patents involved, plus

any extensions.  Under 21 U.S.C. § 355(b)(1), a patentee seeking FDA approval for a new drug is required to file with the FDA the patent number and expiration date of any patents that claim the drug for which the applicant seeks approval.

34.    An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied: (1) the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification"); (2) the patent or patents have expired (a "paragraph II certification"); (3) the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or (4) the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification").  21 U.S.C. § 355(j)(2)(A)(vii).

35.    If a generic manufacturer submits a paragraph IV certification stating that a listed patent is invalid or will not be infringed, it must notify the patentee of the filing and explain why the patent is invalid or will not be infringed.  21 U.S.C. § 355(j)(2)(A)(vii)(IV).

36.    The patentee, upon receiving a paragraph IV certification from an ANDA applicant, has 45 days in which to initiate a premarketing patent infringement action against the applicant (a cause of action created by the Hatch-Waxman Act).  If no action is initiated within 45 days, FDA approval of the generic proceeds without regard to patent issues.  If a patent infringement lawsuit is brought within the 45-day window, however, the FDA is automatically barred from granting final approval to the generic applicant until 30 months after the patentee's receipt of the paragraph IV certification, unless the patent expires or is held invalid or noninfringed first.  21 U.S.C. § 355(j)(5)(B)(iii).  This automatic stay of FDA approval is triggered without regard to the merits of the patentee's lawsuit.

37.     The Hatch-Waxman Act and the federal regulations that implement it do not give the FDA authority to resolve issues of patent law.  The FDA is required to accept as true information it obtains from patentees, and to withhold its approval of new generic drugs whenever the patentee presents a litigated dispute (whether genuine or not) regarding the validity or infringement of a patent.

38.     One result of the statutory and regulatory provisions described above is that brand-name manufacturers have a strong incentive to obtain, list and enforce patents against prospective generic applicants even if the patent is ultimately held to be invalid or not infringed by the generic drug.  If a brand-name manufacturer is able to obtain a patent from the Patent and Trademark Office, list the patent in the Orange Book and bring actions under the Hatch-Waxman Act to enforce the patent, the brand-name manufacturer can effectively block the entry of generic competition for up to 30 months.  This delay, which is triggered without regard to the merit of the patentee's claim, can be worth hundreds of millions of dollars to the manufacturer of a successful brand-name drug.

39.     FDA regulations also provide a second means for an unscrupulous brand manufacturer to impair generic competition.  Under the Hatch-Waxman Act and State regulatory regimes, described above, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug.  In order to receive an AB-rating, a generic drug must be: (1) therapeutically equivalent to its brand name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength and safety and efficacy profile, and (2) bioequivalent to its brand name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.

40.    An unscrupulous brand manufacturer that expects to experience generic competition to its original product (Product A) can stop promoting that product and start promoting a virtually identical product instead (Product B).  Such a scheme can significantly impair the ability of a generic version of Product A to compete  for all sales of the chemical, because most physicians -- in response to the brand manufacturer's detailing efforts -- will stop writing prescriptions for Product A and the approved generic product will not be substitutable for Product B.  Thus, the brand manufacturer will effectively protect its sales and profits from generic competition.  In order to compete for all sales of the chemical, the generic firm must start over and submit a new ANDA seeking approval to market a generic version of Product B, which will significantly delay the onset of effective generic competition.

41.    As shown in detail below, Defendants developed and marketed Nexium as part of exactly this kind of generic-impairing scheme.  Nexium was not a medical improvement over Prilosec.  But because Nexium was a slight chemical variant of the soon-to-be-approved generic versions of Prilosec, those generics could not be AB-rated to Nexium.  Defendants knew, based on the economics of the pharmaceutical industry and the AB-rating system, that switching the market from Prilosec to Nexium would substantially impair competition from generic Prilosec, and thus allow Defendants to maintain their monopoly.  Defendants' exclusionary conduct allowed them to maintain their monopoly by impairing the generic entry that the Hatch-Waxman Act was designed to foster.

**OMEPRAZOLE**

42.    Prilosec is one of a class of drugs referred to as "proton pump inhibitors," which are used to treat heartburn and related conditions.  The active ingredient in Prilosec is

omeprazole.  By 1999, sales of Prilosec in the United States had exceeded $4 billion, making it the top-selling drug in the world.

43.    AstraZeneca owned a patent on omeprazole that was issued by the Patent and Trademark Office in March 1981 and, after various extensions, expired in October 2001. Defendants (or their affiliates) obtained and listed in the Orange Book more than a dozen other patents related to omeprazole.  As of October 2001, however, the active pharmaceutical ingredient in Prilosec was unpatented, leaving Prilosec vulnerable to generic firms that could attempt to invalidate or "design-around" the other patents.

44.    The FDA approved 20 mg Prilosec capsules in September 1989.  From September 1989 until December 2002, AstraZeneca was the only marketer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.

## DEFENDANTS' EXCLUSIONARY SCHEME
## TO IMPAIR GENERIC COMPETITION

45.    AstraZeneca was acutely aware that its best-selling drug would become potentially vulnerable to generic competition in 2001 and, during the mid-1990's, began devising ways to delay or impair generic competition.  AstraZeneca convened a group of marketers, lawyers and scientists and charged them with the job of finding a solution to the impending patent expiration of the company's best-selling drug.  The group called itself the "Shark Fin Project," named after the shape that the Prilosec sales chart would trace if Prilosec faced unimpaired generic competition: an inverted V.

46.    The basic scheme devised by the Shark Fin Project was multifaceted. First, before the onset of generic competition, AstraZeneca would seek and obtain FDA approval for a new brand name drug (later named Nexium) containing the active ingredient esomeprazole

15

magnesium,[1] which because it was not chemically identical to omeprazole would not be AB-rated to (*i.e.*, subject to substitution by) generic versions of Prilosec.  AstraZeneca did not care whether Nexium was clinically superior to Prilosec, and in fact knew that it was not.  Second, AstraZeneca would engage in an enormously expensive detailing and advertising campaign, using distortions and misdirections to cause doctors to switch Prilosec prescriptions to Nexium and thereby protect those prescriptions from generic substitution.  Prilosec being AstraZeneca's own product, there were and are no "counter-detailers" to refute AstraZeneca's distortions.  Third, AstraZeneca would further prevent effective generic competition against Nexium by causing managed care organizations not to cover the costs of generic Prilosec, and thus drive patients to the much higher-priced Nexium.   This scheme required AstraZeneca to incur massive costs to develop and market a new drug, but AstraZeneca accurately predicted that these costs would be far outweighed by the continued monopoly profits that AstraZeneca would enjoy as a result of impairing generic competition.

47.    As set forth in detail below, AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to interfere with competition from generic Prilosec.  Participants in the Shark Fin Project have admitted that, of the dozens of potential actions that they considered to replace the anticipated lost Prilosec sales, launching and switching prescriptions to Nexium was the worst for consumers.  Nexium brought no medical benefit to consumers as compared to generic Prilosec.  Accordingly, AstraZeneca knew that, *absent the adverse effect on sales of generic Prilosec*, Nexium was a losing business proposition for AstraZeneca -- the costs of research, development, and marketing of Nexium would not be

---

[1]  Hereinafter, esomeprazole and its salts will be referred to as "esomeprazole."

justified by Nexium sales. Absent the adverse effect on sales of generic Prilosec, AstraZeneca's development and marketing of Nexium made no economic sense.

48.    Anticipating the expiration of Defendants' patent on omeprazole, several generic firms filed ANDAs with the FDA seeking approval to market a generic version of Prilosec upon expiration of the basic omeprazole patent. Each of these applicants submitted a paragraph III certification with respect to that basic patent and paragraph IV certifications with respect to the other patents that AstraZeneca had listed in the Orange Book, stating that these additional patents were either invalid or would not be infringed by their proposed generic products. Within 45 days of receiving notice of each ANDA filing, AstraZeneca (or an affiliate) sued each generic firm for patent infringement under the Hatch-Waxman Act, thereby triggering a stay of regulatory approval on each firm's ANDA.

49.    These lawsuits were ultimately consolidated in the United States District Court for the Southern District of New York. *In re Omeprazole Patent Litigation*, MDL Docket No. 1291 (S.D.N.Y.) (Jones, J.). After a bench trial in late 2001 and early 2002, the district court ruled that the relevant patents were valid but were not infringed by the proposed generic product developed by one of the generic applicants, Kremers Urban Development Co. ("KudCo"). 222 F. Supp. 2d 423 (S.D.N.Y. 2002). KudCo's ANDA was subsequently approved by the FDA and KudCo entered the market with generic Prilosec in December 2002, shortly after the district court decision. The Federal Circuit affirmed the district court's ruling in December 2003. *In re Omeprazole Patent Litigation*, 84 Fed. App. 76 (Fed. Cir. 2003).

50.     During the delay that resulted from the patent infringement cases filed against generic firms, Defendants put into effect the strategy developed by the Shark Fin Project -- developing a minutely altered form of Prilosec and converting as many Prilosec sales as possible to that product prior to the commencement of generic competition.

51.     The minutely altered form of Prilosec developed by AstraZeneca was Nexium.   The drug substance omeprazole does not consist of a single molecule, but rather a mixture of two very closely related chiral molecules that are mirror images of one another.  A chiral molecule possesses the special property that, like a human hand, it cannot be superimposed on its mirror image.  Achiral molecules, in contrast, are molecules whose mirror images can be superimposed on one another, and are therefore in all respects identical.

52.     Each form (or isomer) of a chiral molecule is referred to as an "enantiomer."  The left-handed isomer is typically designated as the "S" enantiomer (for *sinister*, the Latin word for "left-handed").  The right-handed isomer is typically designated as the "R" enantiomer.

53.     A mixture in equal parts of two corresponding enantiomers is referred to as a "racemic mixture."  Omeprazole, the active ingredient in Prilosec, is a racemic mixture of the (S)-omeprazole and (R)-omeprazole enantiomers.  Thus, a 20-mg dose of Prilosec contains 10-mg of (S)-omeprazole and 10-mg of (R)-omeprazole.  In contrast to Prilosec, the active ingredient in Nexium is (S)-omeprazole by itself, or esomeprazole.  Thus, a 20-mg dose of Nexium contains 20-mg of (S)-omeprazole and essentially no (R)-omeprazole.

54.     Importantly, omeprazole, whether the racemic mixture or either enantiomer alone, is only a prodrug.  Accordingly, omeprazole in itself is inactive.  The active drug, a cyclic sulfenamide, is formed in the body of the patient in the parietal cells of the

18

stomach. *This cyclic sulfenamide is not a chiral compound, i.e.,* it does *not* exhibit "handedness." There is thus no pharmacodynamic reason why a dose of (S)-omeprazole would interact with the proton pump in the body's parietal cells any differently than would an equal dose of the racemic mixture, *i.e.,* omeprazole.

55.    As compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers. AstraZeneca developed Nexium and brought it to market solely because of its effectiveness in impairing generic competition.

56.    It is a well known phenomenon in the pharmaceutical industry that doctors who are in the routine of prescribing Product A will not begin prescribing Product B even if a generic version of Product B becomes available and is thus much less expensive than Product A. This is true even if Products A and B are closely related chemical entities and even if Product A provides no significant medical benefits over Product B. As noted in detail above, doctors are particularly susceptible to brand manufacturer advertising in the form of "detailing." And as also noted in detail above, generic firms are economically precluded from employing large detailing forces.

57.    This phenomenon provides an opportunity for the manufacturer of two closely related brand-name pharmaceuticals, one of which is vulnerable to generic competition, to shield that product from the full force of generic competition. For example, assume that in Year 1 a brand manufacturer makes sales of 100 units of Product B. The brand manufacturer knows that Product B will face generic competition in Year 3 and that the generics are expected to take 80% of the unit sales, or 80 units. In order to impair that generic competition, the brand manufacturer introduces Product A in Year 1 and directs its detailers to persuade doctors to stop prescribing Product B and instead begin prescribing Product A. Because the same brand

manufacturer produces both Product A and Product B, there are no "counter-detailers" to dissuade the doctors from switching from Product B to Product A. In addition, the brand manufacturer can stop providing to doctors free samples of Product B and provide only free samples of Product A. Studies show that providing (or not providing) free samples has a substantial effect on which brand product doctors will prescribe. And, again, there is no countervailing marketing effort with respect to samples because the generic versions of Product B have not yet received FDA marketing approval. Through such a strategy, a brand manufacturer can progress from selling 0 units of Product A and 100 units of Product B in Year 1 to, say, selling 70 units of Product A and 20 units of Product B in Year 3. Thus, instead of having an opportunity to sell 80% of 100 units of Product B, generic firms are limited to having an opportunity to sell 80% of only 20 units of Product B.

58.     This is exactly the generic-impairing strategy on which AstraZeneca's Shark Fin Project was based. As admitted by a senior AstraZeneca executive, its strategy was to develop a "broad[] base" of Prilosec sales until Nexium received FDA approval, and then "switch[] from Losec/Prilosec to [Nexium]."

59.     In 2001, AstraZeneca employed approximately 6,600 detailers to promote its products to doctors. It has been reported that the company hired an additional 1,300 individuals just to detail Nexium. Beginning in March 2001, these detailers (along with the ones AstraZeneca already employed) blanketed doctors' offices with literature, samples and promotional material and began urging all Prilosec prescribers to stop prescribing Prilosec and to start prescribing Nexium instead.

60.     Between March 2001 and the launch of generic omeprazole on or about December 9, 2002, AstraZeneca's sales representatives were aggressively detailing doctors to

prescribe Nexium instead of Prilosec based on the claimed superiority of the new drug over the old. AstraZeneca spent approximately $1 billion on detailing and advertising Nexium during the two years after it was introduced.

61.    As part of its detailing effort, AstraZeneca also provided doctors with free samples of Nexium and stopped providing free samples of Prilosec. Doctors typically give free samples of drugs to their patients and simultaneously give the patient a prescription for that drug. By providing samples of Nexium rather than Prilosec, AstraZeneca encouraged physicians to stop prescribing Prilosec and start prescribing Nexium.

62.    Upon the introduction of Nexium, AstraZeneca completely stopped detailing and promoting Prilosec, despite the fact that Prilosec did not yet face generic competition and would not face such competition for another 18 months. AstraZeneca stopped making positive product claims about Prilosec and, instead, began making negative (and false) claims about the effectiveness of Prilosec in treating the conditions for which it is prescribed. AstraZeneca attempted to weaken the competitive position of its own product, Prilosec, in favor of a newer product, Nexium, for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec.

63.    AstraZeneca's strategy was enormously successful in impairing generic competition for Prilosec. In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of Prilosec of 29.6 million units. With the introduction of Nexium in March 2001, and with AstraZeneca's determined efforts to switch doctors from Prilosec to Nexium, in 2002 AstraZeneca had U.S. sales of 19.6 million units of Prilosec and 13.4 million units of Nexium. With the introduction of generic omeprazole in December 2002, AstraZeneca continued its market-switching strategy into 2003. In 2003, AstraZeneca continued to switch sales from

Prilosec to Nexium, growing Nexium's unit sales from 13.4 million in 2002 to 18.8 million in 2003 (much of the growth at the expense of Prilosec, and the rest as a result of growth in the number of patients with the relevant medical conditions).

64.    While this product-switching strategy was enormously successful and profitable for AstraZeneca, it was an economic disaster for American consumers. As compared to Prilosec, Nexium provides no medical benefits to consumers. Yet, had AstraZeneca not engaged in the product-switching scheme, a minimum of 13.4 million more units of Prilosec would have been available *annually* -- beginning in December 2002 and continuing until the termination of AstraZeneca's Nexium patents in 2014 -- for generic competition. AstraZeneca's product-switching scheme thus has and will cost direct purchasers of prescription omeprazole and esomeprazole more than $11.5 billion in increased prescription costs.

65.    AstraZeneca's product-switching from Prilosec to Nexium was profitable for AstraZeneca only because the strategy had the effect of impairing generic competition to Prilosec. Absent that effect, engaging in the product switch would have made no economic sense for AstraZeneca. In 2000, AstraZeneca had U.S. sales of 29.6 million units of Prilosec; in 2002, AstraZeneca had U.S. sales of 33 million units of Nexium and Prilosec combined (an 11.4% increase). During this same time period, however, the number of prescriptions written for the relevant conditions increased by more than 30%. Thus, AstraZeneca had *less* U.S. sales of Nexium and Prilosec combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition). As AstraZeneca knew when it decided to engage in its scheme, the product switching caused AstraZeneca to lose the momentum from its prior Prilosec detailing and advertising efforts.

66.    In addition to this loss of sales, AstraZeneca also incurred enormous out-of-pocket expenses in order to effect the product switch from Prilosec to Nexium.  These enormous expenses, calculated in the billions of dollars, include (but are not limited to) the costs of research and development to produce and obtain FDA approval for Nexium, incremental detailing and marketing expenses, stocking allowances paid to retailers to induce them to carry Nexium, and returned goods allowances paid to wholesalers and other direct purchasers in connection with the return of unused shipments of Prilosec.

67.    AstraZeneca incurred these enormous costs in order to introduce a product that was no better than Prilosec and to make *less* sales of Nexium and Prilosec combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition).  AstraZeneca's product-switching strategy made no economic sense absent its effect of impairing generic competition for Prilosec.  Astra-Merck's then-chief executive officer admitted, "If we had left it to R&D, Nexium would not have been developed.  The project was driven by the marketing people."

## DEFENDANTS PREVENTED COMPETITION FROM DEFEATING THEIR PRODUCT-SWITCHING SCHEME

68.    When manufacturers entered the market with generic omeprazole, beginning in December 2002 and thereafter, AstraZeneca's conduct prevented them from competing effectively for all unit sales of omeprazole/esomeprazole.  Thus, consumers could not and cannot rely on a well-functioning market to defeat AstraZeneca's scheme to overcharge them more than $11.5 billion for a drug (Nexium) that offers no clinical benefits over Prilosec.

69.    The generic manufacturers' inability to compete effectively for all relevant unit sales has at least three sources:  (1) AstraZeneca's use of the switching-scheme to exploit

23

the "price disconnect" in the market and cause doctors to switch prescriptions to Nexium, a product with no relative clinical benefits but a much higher price (see Paragraph 70 to 89 below); (2) AstraZeneca's deceptive campaign of distortions and misdirections to doctors and consumers regarding the alleged superiority of Nexium to Prilosec (see Paragraphs 90 to 95 below); and (3) action taken by AstraZeneca that caused health insurers to reimburse consumers for Nexium but not for generic Prilosec (see Paragraphs 96 to 105 below).

### Defendants' Successful Conversion of the Market to Nexium, A Product With No Relative Clinical Benefits

70.    As noted in detail above, 18 months before the introduction of generic omeprazole, AstraZeneca began using its detail force to switch Prilosec prescriptions to Nexium prescriptions.  AstraZeneca detailers stopped providing Prilosec samples and affirmatively told doctors that Nexium was superior to Prilosec.  No generic omeprazole products had yet been approved for marketing by the FDA, so there were no "counter-detailers" to provide samples of generic Prilosec or to negate AstraZeneca's claims of Nexium superiority.  By the time that the first generic product was approved in December 2002, AstraZeneca had already converted more than 10 million units from Prilosec to Nexium.

71.    Nor could the generic manufacturers effectively compete for those 10 million units once those manufacturers entered the market.  As noted in detail above, generic manufacturers are economically precluded from employing large detailing forces.  As also noted in detail above, doctors who have been persuaded to prescribe a branded product such as Nexium generally will not begin prescribing a generic version of a competing product once the generic becomes available, regardless of price or relative efficacy.  Thus, the economic realities of the

pharmaceutical marketplace meant that those 10 million units remained beyond effective competition from generic omeprazole.

72.    AstraZeneca devised and implemented this product-switching scheme without regard to whether Nexium was clinically superior to Prilosec or would result in more sales than Prilosec had.  In fact, AstraZeneca knew that Nexium was not clinically superior to Prilosec and that, absent its effect of impairing generic competition, the introduction of Nexium made no economic sense.

73.     In 1999, Astra Zeneca applied for FDA approval to market Nexium for various indications.  AstraZeneca sought FDA approval to market Nexium for:  (1) treatment of symptomatic gastroesophageal reflux disease ("GERD"), or common heartburn; (2) treatment of erosive esophagitis ("EE"); and (3) maintenance of healing of EE.  The vast majority of prescriptions for Nexium and other proton-pump inhibitors are written for GERD, or common heartburn.  While an estimated 60 million Americans -- more than 40 percent of adults -- experience symptoms of GERD, less than 2 percent suffer from EE, a condition that cannot even be diagnosed without a doctor performing an invasive endoscopy.

74.    AstraZeneca conducted and submitted the results of fourteen clinical studies to the FDA as part of its effort to obtain FDA approval for the sale and marketing of Nexium.  Several of the clinical trials compared Nexium to a placebo.  These placebo-controlled studies were conducted and submitted in order to demonstrate Nexium's efficacy.  Such placebo-controlled studies can alone be sufficient to obtain FDA approval for a new drug.

75.    AstraZeneca also commissioned several "active-controlled" studies comparing Nexium to Prilosec.  Although AstraZeneca executives believed it was unlikely that Nexium would demonstrate any improvement over Prilosec in the treatment of heartburn -- the

most common condition for which Nexium and Prilosec are prescribed -- the executives hoped that Nexium would demonstrate some small advantage over Prilosec in the treatment of the rarer condition EE.

76.    To that end, in 1997, AstraZeneca commissioned three active-controlled clinical trials comparing Nexium to Prilosec in the healing of EE.  Each trial was very expensive for AstraZeneca costing, at least, tens of millions of dollars.  Indeed, these trials were particularly expensive for AstraZeneca because -- in an attempt to capture any statistically significant difference, no matter how slight and no matter whether the statistical difference would amount to any actual clinical significance -- AstraZeneca commissioned studies with an exceptionally large number of subjects.  For example, in the two *placebo*-controlled clinical trials in maintenance of healing of EE submitted to the FDA, AstraZeneca studied 318 and 375 patients.  These numbers are fairly typical.  However, in the three *active*-controlled studies comparing Nexium to Prilosec, AstraZeneca recruited 1,960, 1,148 and 1,176 patients.  These numbers are extremely large.  AstraZeneca did this because it believed that only such a large sample size gave it any hope of finding any statistically significant (but not necessarily clinically significant) difference between Nexium and Prilosec.

77.    In the end, however, AstraZeneca's expensive endeavor was a failure. The studies comparing Nexium to Prilosec did not support a conclusion that Nexium was an improvement over Prilosec even in the healing of EE.  As set forth in detail below, all of the data: (a) affirmatively showed no superiority of Nexium over Prilosec; (b) *at most* showed that any improved results are dose-related (*i.e.,* the result of simply increasing the dosage) rather than related to any differences in the drugs; and/or (c) are, according to the FDA, insufficient to justify any claim that Nexium is superior to Prilosec.

78.     AstraZeneca conducted two clinical trials comparing 20 mg of Nexium to 20 mg of Prilosec for the treatment of EE.  Each test categorized the results three different ways: (1) results at four weeks and eight weeks; (2) a distinction between the "ITT population," *i.e.,* all of the people who entered the clinical trial, and the "Per Protocol population," *i.e.*, those people who entered the clinical trial and followed its protocols throughout; and (3) a measure of statistical significance based on the "log-rank" test or the "Wilcoxon" test.  The two clinical trials thus provided 16 data points to show whether 20 mg Nexium was statistically significantly superior to 20 mg Prilosec in treating EE.  Of those 16 data points, 15 of them showed no superiority of Nexium.  Even the one result that showed statistical significance did so only with respect to the ITT population, *not* the population of those who followed the treatment protocol, and did so only under one of two alternative ways of determining statistical significance.  The results are summarized here:

AZ Study 172  N=1,960

|  | Log-rank | Wilcoxon |
|---|---|---|
| ITT Pop | 4-week NS<br>8-week *S | 4-week NS<br>8-week NS |
| PP Pop | 4-week NS<br>8-week NS | 4-week NS<br>8-week NS |

AZ Study 174  N=1,176

|  | Log-rank | Wilcoxon |
|---|---|---|
| ITT Pop | 4-week NS<br>8-week NS | 4-week NS<br>8-week NS |
| PP Pop | 4-week NS<br>8-week NS | 4-week NS<br>8-week NS |

The abbreviation "NS" means not statistically significant, reflecting that the results obtained with Nexium did not differ in a statistically significant way from the results obtained with Prilosec.

79.    With respect to results for GERD-related symptoms, Study 172 found a statistically significant result in favor of 20 mg Nexium over 20 mg Prilosec for heartburn-free nights, but not for heartburn resolution, time to first resolution of heartburn, time to sustained resolution of heartburn, percentage of heartburn-free days, regurgitation, dysphagia, or epigastria pain. Study 174 found no statistically significant result in favor of 20 mg Nexium over 20 mg Prilosec for any of these symptoms, but found such a difference *in favor of 20 mg Prilosec* with respect to dysphagia at week 4.

80.    Some of AstraZeneca's studies compared a much larger dose of Nexium -- 40 mg -- to 20 mg of Prilosec. Clinical trial No. 172 showed, for the treatment of EE, a small therapeutic gain (9.7% at 4 weeks and 6.2% at 8 weeks) as between 40 mg of Nexium and 20 mg of Prilosec. But the statistical difference did not meet AstraZeneca's own parameters (*i.e.,* a 10% difference) to establish a significant therapeutic gain. The results also showed a slight statistically significant difference in favor of 40 mg Nexium in heartburn resolution percentage at the four-week mark, but that difference disappeared by the eight-week mark.

81.    Clinical trial No. 173 compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of EE. Not only did this trial fail to show a significant therapeutic gain under AstraZeneca's own criterion (10%), it found no statistically significant gain at all. There was no statistically significant gain for Nexium 40 mg over Prilosec 20 mg in the healing of EE in either the ITT or PP populations at either four or eight weeks. Nor were

28

there any significant differences in time to first resolution of heartburn, time to start of sustained resolution of heartburn, or percentage of heartburn-free days or nights.

82.    AstraZeneca performed three additional supportive trials comparing Nexium to Prilosec in the treatment of heartburn:  one comparing each of 40 mg and 20 mg of Nexium with 20 mg of Prilosec, another comparing 40 mg of Nexium with 20 mg of Prilosec, and a third comparing 20 mg of Nexium with 20 mg of Prilosec.  All three studies failed to show a statistically significant difference as between the use of Nexium and Prilosec to treat heartburn.

83.    AstraZeneca knew, however, that even very small gains in efficacy can be detected if a clinical trial enrolls a large number of patients.  AstraZeneca therefore decided to conduct yet another clinical trial -- trial No. 222 -- that enrolled 2,425 patients, as compared to the 1,148 patients enrolled in Study No. 173.  The results of trial No. 222 showed a moderate difference in healing rates of EE in favor of 40 mg Nexium over 20 mg Prilosec.

84.    AstraZeneca intentionally did not submit any data to the FDA comparing 40 mg Nexium to 40 mg of Prilosec in the treatment of EE.  AstraZeneca's plan was to market 40 mg Nexium as being superior to 20 mg of Prilosec for the treatment of EE, and to tell doctors who inquired that the comparison of unequal doses was appropriate because Prilosec had not been FDA-approved at 40 mg for EE.  The lack of FDA approval for 40 mg Prilosec to treat EE was not a legal bar to conducting such studies -- studies may include both approved and non-approved dosages.  But AstraZeneca knew that the results of any such trial would not show an advantage in favor of Nexium.  AstraZeneca knew that head-to-head clinical trials of 20 mg Nexium versus 20 mg Prilosec showed no advantage for Nexium.  And AstraZeneca knew that the gains shown even by the huge trial No. 222 for 40 mg Nexium versus 20 mg Prilosec were

29

no greater than the gains routinely shown in much smaller studies comparing 40 mg Prilosec to 20 mg Prilosec.

85.    The FDA Medical Officer who reviewed the entire set of clinical studies discussed above concluded that "**superiority** of NEXIUM over omeprazole **was not demonstrated**."  According to the FDA Medical Officer's Review, "a superiority claim of NEXIUM over omeprazole is NOT SUPPORTED by either the comparison of [Nexium 20 mg] vs. [Prilosec 20 mg] or the comparison of [Nexium 40 mg] vs. [Nexium 20 mg]."  Summarizing the complete set of studies, the Review concluded, "There are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically."

86.    In summarizing the medical review, the reviewer noted in a report dated September 21, 2000 that "the sponsor's conclusion that [Nexium] has been shown to provide a significant clinical advance over omeprazole in the first-line treatment of patients with acid-related disorders **is not supported by data**."  In the reviewer's conclusion, he reiterated that "it is recommended not to allow the sponsor to claim that esomeprazole magnesium has any significant clinical advantage over omeprazole in the first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted."

87.    In short, the studies comparing 20 mg Nexium to 20 mg Prilosec definitively showed no superiority of Nexium.  Of the studies comparing 40 mg Nexium to 20 mg Prilosec, some showed a slight superiority for the 40 mg Nexium while others did not.  Those that showed a small gain in the 40 mg Nexium did not show any greater gain than is routinely shown in studies comparing 40 mg Prilosec to 20 mg Prilosec.  Thus, the possible gains in 40 mg Nexium versus 20 mg Prilosec are the result of increased dosage, not of any inherent attributes of esomeprazole versus omeprazole.

30

88.     In fact, AstraZeneca knew that there is a dose-response relationship (up to an optimal maximum dose of 30-40 mg) in *all* proton pump inhibitors. By 1996, there were published studies comparing the efficacy of 40 mg Prilosec vs. 20 mg Prilosec for the treatment of EE. And AstraZeneca had itself conducted a number of additional such studies. These studies established an improved healing rate for the 40 mg Prilosec, as compared to 20 mg Prilosec, that was at least as great as the improved rate possibly shown in Study No. 222 comparing 40 mg of Nexium to 20 mg of Prilosec. Moreover, AstraZeneca in fact obtained regulatory approval to market 40 mg Prilosec for the treatment of EE in other countries, including for example, Canada, the United Kingdom, and Sweden.

89.     In order to support the approval of 40 mg Nexium for the treatment of EE in the United States, the FDA did not require AstraZeneca to show that Nexium 40 mg was superior to 20 mg Prilosec or even 20 mg Nexium. The FDA required AstraZeneca to show only a superiority to a placebo. Moreover, the FDA accepted the reviewer's recommendation and did not permit AstraZeneca to assert that Nexium provides a significant clinical advance over Prilosec. In negotiations between the FDA and AstraZeneca concerning the labeling for Nexium, AstraZeneca agreed that the clinical trials did not support any claim that Nexium is superior to Prilosec. In a meeting on February 6, 2001, AstraZeneca's Vice President specifically informed the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole." AstraZeneca's product Director specifically asserted that AstraZeneca wanted to include the results of the trials in Nexium's product label in order "to make physicians understand that Nexium is not superior to omeprazole." In reliance on these assurances, the FDA approved the Nexium product label and the inclusion of the trial results in the label. The label specifically provides, however, that, "By acting specifically on the proton pump,

esomeprazole blocks the final step in acid production, thus reducing gastric activity. *This effect is dose-related* up to a daily dose of 20 mg to 40 mg and leads to inhibition of gastric acid secretion." (Emphasis added)

### **Defendants' Deceptive Campaign of Distortions and Misdirections**

90.    Notwithstanding the FDA's conclusion and its own concession that the clinical data did not support a claim of superiority of Nexium over Prilosec, AstraZeneca launched a massive advertising and detailing campaign designed to persuade doctors and consumers that Nexium was a significant improvement over Prilosec. This deceptive campaign of distortions and misdirections was devised by AstraZeneca to impair generic competition to its most profitable product. AstraZeneca conducted this campaign, despite the enormous cost, in order to reinforce the effectiveness of its product-switching scheme and to put even more sales beyond effective generic competition.

91.    For example, AstraZeneca directed its sales force to tell doctors who work for managed care organizations that "Nexium is the first [proton pump inhibitor] to demonstrate a significant clinical advantage over other PPIs;" that Nexium has "significantly greater healing and symptom resolution rates for EE patients;" that Nexium has a "clinical advantage" over Prilosec; that the alleged clinical advantage "is demonstrated in longer term maintenance therapy, as well as in the initial healing stage;" that "more Nexium patients are symptom free;" that Prilosec has a "higher number of treatment failures;" that "Nexium has been shown to have a clinical advantage over omeprazole;" that "Nexium has a greater clinical advantage for more severe patients;" that  Nexium is "a better PPI;" and that Nexium is "expected to positively affect other associated outcomes such as patient satisfaction, [quality of life] and productivity." Upon

information and belief, AstraZeneca trained and directed its entire Nexium sales force to make these and comparable misrepresentations to all doctors on whom they called.

92.    Similarly, in printed advertisements directed to doctors and patients, AstraZeneca claimed, for example, that "we've captured the essence of Prilosec and created a new PPI . . . introducing Nexium the powerful new PPI from the makers of Prilosec."  The ads asserted that, "In erosive esophagitis studies compared with Prilosec" Nexium had "[p]roven efficacy in short-term healing (4-8 weeks)" and "[p]roven symptom control," and was an "effective first-line PPI therapy."  Yet another ad asserted that "In erosive esophagitis studies compared with Prilosec (omeprazole)," Nexium will "Stop the heartburn -- Start the HEALING." The context of these ads, and the reference to "in [EE] studies *compared* with Prilosec" falsely suggests that Nexium is *more* "powerful" than Prilosec; that Nexium has *more* efficacy in healing, *more* symptom control, and *more* effectiveness as a first-line therapy; and that Nexium is *better than* Prilosec in stopping heartburn and starting healing.  In advertisements directed to consumers, AstraZeneca asserted, for example, that Nexium "has been shown to be clinically superior to Prilosec."

93.    The claims made by AstraZeneca to doctors and consumers were distortions and misdirections, and were known and intended by AstraZeneca to be so, in the following particulars:

a.    AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that the FDA did not approve any claim of superiority of Nexium over Prilosec, and that in order to obtain FDA approval AstraZeneca assured the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole";

33

b.  AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that AstraZeneca's own set of studies showed no statistically significant difference in healing rates between Nexium and Prilosec for the most common indication, *i.e.,* common heartburn;

c.  AstraZeneca claimed the superiority of Nexium over Prilosec with respect to healing EE, but that claim was not supported by the set of studies submitted by AstraZeneca to the FDA, (or by any other set of studies) and, in fact, the studies were included in the product label "to make physicians understand that Nexium is not superior to omeprazole";

d.  AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without limiting the claims to superiority of 40 mg of Nexium as compared to 20 mg of Prilosec, when in fact AstraZeneca had no study showing clinical superiority of 20 mg of Nexium over 20 mg of Prilosec;

e.  AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without disclosing that most studies did not support that claim and that the one study that could have done so was based solely upon a comparison of 40 mg of Nexium to 20 mg of Prilosec;

f.  When doctors have inquired, AstraZeneca has asserted that comparing 40 mg of Nexium to 20 mg Prilosec is appropriate because the FDA has not approved 40 mg Prilosec for treatment of erosive esophagitis,

34

while withholding the facts that: (1) AstraZeneca knew that the gains from 40 mg Nexium versus 20 mg Prilosec are no greater than those from 40 mg Prilosec versus 20 mg Prilosec; and (2) AstraZeneca has refused to conduct a head-to-head clinical trial of 40 mg Nexium versus 40 mg Prilosec because AstraZeneca knows that the results would not favor Nexium.

94.    This campaign's disastrous effects on American consumers was noted by, among others, the administrator of the Federal Centers for Medicare & Medicaid Services.  At a physicians convention in 2003, he told attendees that, "You should be embarrassed if you prescribe Nexium" because it provides no increased medical benefits.  Instead, "The fact is, Nexium is Prilosec. . . .  It is the same drug.  It is a mirror compound."  Contrasting Nexium to truly innovative pharmaceuticals, he concluded that, "Nexium is a game that is being played on the people who pay for drugs."

95.    Most of the doctors who prescribe Nexium and Prilosec are general practitioners, not gastroenterologists or other specialists.  These general practitioners cannot be expected to be, and typically are not, familiar with the studies on omeprazole and esomeprazole, which show that Nexium is not superior to Prilosec.  Even specialists have been adversely affected by AstraZeneca's campaign of distortions.

**Defendants' Scheme to Prevent Insurance Reimbursement
For Generic Prilosec**

96.    AstraZeneca was not content merely to switch the market to Nexium and let the manufacturers of generic Prilosec fight for the few Prilosec prescriptions that might

continue to be written. Instead, AstraZeneca implemented a plan to cause insurers not to reimburse patients for the cost of generic Prilosec.

97.    More than 70% of all U.S. consumers have health coverage provided by managed care organizations ("MCOs") that pay for some or all of the costs of prescription pharmaceuticals. AstraZeneca knew that it is the policy of MCOs covering the vast majority of consumers to discontinue providing coverage for prescription pharmaceuticals when an over-the-counter ("OTC") version of a prescription product becomes available. Thus, AstraZeneca could cripple the efforts of manufacturers of generic Prilosec to compete against Nexium by introducing an OTC version of Prilosec. Because insurers would no longer cover generic Prilosec, consumers who needed prescription Prilosec or Nexium would have a strong financial incentive to choose Nexium even though generic Prilosec costs a fraction of Nexium.

98.    On January 27, 2000, AstraZeneca and its OTC marketing partner, Procter & Gamble, jointly applied to the FDA for approval to market Prilosec OTC. The quantity of active ingredient in OTC Prilosec (for short-term use) and prescription Prilosec 20 mg (for longer-term use) is the same.

99.    On June 20, 2003, the FDA approved the sale of Prilosec OTC. The FDA awarded AstraZeneca three years of exclusivity in the OTC market because of safety studies performed and submitted by AstraZeneca. Thus, AstraZeneca was the only source of OTC omeprazole until at least June 2006.

100.    AstraZeneca (through its distributor, Procter & Gamble) began selling Prilosec OTC in September 2003, approximately ten months after the launch of generic Prilosec.

101.    As AstraZeneca knew and intended, upon the introduction of Prilosec OTC in September 2003, MCOs covering the vast majority of consumers refused to provide

36

coverage for prescription Prilosec because of the availability of the OTC version. As AstraZeneca also knew and intended, the MCOs also stopped providing coverage for *generic* Prilosec. And as AstraZeneca further knew and intended, the MCOs did so even though OTC Prilosec was recommended for use only for 14 days or less.

102.    AstraZeneca advises patients who begin therapy on OTC Prilosec, but who need longer-term treatment, to consult their physicians to obtain an appropriate prescription. As a result of AstraZeneca's conduct, however, patients who consult their physicians and their MCOs will learn that there is no coverage for prescription Prilosec, whether brand or generic. The chemically closest product to OTC Prilosec (other than the non-covered brand or generic Prilosec) is, of course, Nexium. Thus, a physician writing a prescription for a patient who has started therapy on OTC Prilosec is likely to write the prescription for Nexium. Moreover, because most MCOs no longer cover prescription Prilosec, the physician can confer a financial benefit on the patient by prescribing Nexium rather than advising the patient to continue taking Prilosec OTC or writing a prescription for Prilosec, both of which would have to be paid for out of the patient's own pocket.

103.    Thus, by obtaining FDA approval to market OTC Prilosec, AstraZeneca simultaneously: (1) caused MCOs not to cover branded Prilosec; (2) caused MCOs not to cover generic Prilosec; and (3) drove patients who otherwise would have received less-expensive generic Prilosec to receive instead a prescription for much more expensive branded Nexium. AstraZeneca then exacerbated the anticompetitive consequences of this aspect of its scheme by providing an insufficient supply of Prilosec OTC to meet the market demands. Throughout the three-year term of AstraZeneca's OTC market exclusivity, the market was beset with "shortages" of the Prilosec OTC supply. AstraZeneca was responsible for these artificial shortages. In fact,

the foreseeable effect of these shortages was to drive Prilosec OTC patients to see their physicians and obtain a prescription for Nexium.

104.    The success of this aspect of AstraZeneca's scheme is again seen in the data on unit sales.  In 2003, the combined U.S. sales of branded and generic Prilosec were 15.9 million units.  In 2004, after the initiation of AstraZeneca's Prilosec OTC scheme in September 2003, the combined sales of branded and generic prescription Prilosec declined to just 9 million units, and further declined in 2005 to less than 8.4 million.  A substantial portion of those lost units is accounted for in increased unit sales of Nexium, which increased from 18.8 million in 2003 to 20.6 million in 2004, and to 22.8 million in 2005.

105.    Unfortunately, the introduction of OTC Prilosec has not been financially beneficial for consumers in any respect.  While AstraZeneca and its marketing partner originally priced a 30-day supply of OTC Prilosec below the cost of generic Prilosec, beginning in June 2004 -- only nine months after the launch of OTC Prilosec -- AstraZeneca and its marketing partner have priced a 30-day supply of OTC Prilosec at substantially *above* the same supply of generic Prilosec.  In fact, as of March 2006, AstraZeneca and its marketing partner have priced OTC Prilosec at *more than twice* the price of generic Prilosec.

106.    The combined effect of the circumstances and conduct alleged in Paragraphs 68 through 105 above was to prevent generic Prilosec from effectively competing for all of the relevant unit sales.  In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of 29.6 million units of Prilosec.  Absent the conduct alleged in Paragraphs 68 through 105, by 2005 generic Prilosec would have captured at least 85% of those units -- more than 25 million units annually.  Instead, by 2005 generic Prilosec had annual sales of less than 7.4 million units. Consumers could not and cannot count on a well-functioning market to protect them from

AstraZeneca's overcharges on Nexium because AstraZeneca has shielded the vast majority of unit sales from effective generic competition.

### Relevant Market

107.    The relevant product market is the sale of prescription pharmaceutical products containing the omeprazole/esomeprazole molecule -- *i.e.*, Prilosec, Nexium and any AB-rated generic equivalent of either -- or more narrow markets therein.  The relevant geographic market is the United States.  A firm that was the only seller of such products in the United States could and would impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by AstraZeneca's ability to profitably charge supracompetitive prices.

108.    From the time it introduced Prilosec until December 2002, AstraZeneca had a 100% share of the relevant market.  Thereafter, and solely because of the exclusionary conduct alleged above, AstraZeneca has maintained a monopoly share of the market -- currently greater than 70%.  But for the exclusionary conduct alleged above, AstraZeneca would have been forced to lower its prices to the price charged for generic omeprazole or its market share after December 2002 would have fallen precipitously to less than 20%.  AstraZeneca has maintained this monopoly share, after generic entry, despite the fact that (a) Nexium is a slight variant of and provides no clinical benefits over Prilosec and its generics; and (b) Nexium is priced very substantially above those generics.

109.    At all relevant times AstraZeneca has maintained an ability to price its omeprazole/esomeprazole prescription products very substantially above its costs of production.  Its manufacturing costs have been approximately 10% of its price.  Yet AstraZeneca continues to  make sales of those products in the billions of dollars.

110.    AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge these monopoly prices.

## Effects of Defendants' Unlawful Conduct

111.    Defendants' exclusionary conduct has impaired the sale of generic omeprazole in the United States, and has unlawfully enabled Defendants to sell the omeprazole/esomeprazole molecule at monopolistic, artificially inflated prices.  By engaging in such conduct, Defendants have harmed the competitive process and have perpetuated their ability to extract supracompetitive prices from purchasers.  But for Defendants' illegal conduct, KudCo and other generic competitors would have been able to compete for all sales of the chemical beginning in December 2002, and Plaintiffs and other purchasers would have benefited from that competition by substituting lower-priced generic omeprazole for their purchases of higher-priced Nexium.

112.    There are no procompetitive justifications for Defendants' conduct.  The conduct alleged above created no efficiency gains or increases in consumer welfare.  On the contrary, Defendants' conduct substantially decreased or eliminated the efficiency gains that would otherwise have occurred through the successful introduction of a less expensive generic version of Prilosec that could be substituted at the pharmacy counter for branded Prilosec -- efficiency gains that Congress and State legislatures intended to bring about when they enacted the Hatch-Waxman Act and State generic substitution laws.

113.    As a result of Defendants' unlawful and exclusionary conduct, Plaintiffs continued to purchase branded omeprazole/esomeprazole from Defendants at monopoly prices rather than generic omeprazole from a generic manufacturer at lower prices.  Plaintiffs continue

40

to be overcharged by paying higher prices for the drug than would have prevailed in the absence of Defendants' unlawful conduct.

## Count I
## Monopolization (15 U.S.C. § 2)

114. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 111 above.

115. At all relevant times, AstraZeneca has possessed monopoly power in the relevant market.

116. During the relevant period, AstraZeneca willfully and unlawfully maintained its monopoly power by, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to prevent generic competitors from competing for all sales of the omeprazole/esomeprazole molecule; (b) intentionally not conducting and/or reporting clinical studies comparing the use of 40 mg Prilosec to the use of 40 mg Nexium in the treatment of EE, for the purpose of facilitating the deceptive campaign of distortions and misdirections regarding the superiority of Nexium; (c) engaging in a massive advertising and promotional campaign of distortions and misdirections to switch patients from Prilosec to Nexium; and (d) engaging in a unified scheme, including but not limited to all of the conduct alleged above, to impair generic competition to Prilosec.

117. Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have had precisely the intended effect.

118. Plaintiffs have been injured in their business and property by reason of Defendants' unlawful monopolization. Plaintiffs' injury consists of paying higher prices for

drugs containing omeprazole/esomeprazole than would have been paid in the absence of

Defendants' illegal conduct.  Plaintiffs' injury is injury of the type that the antitrust laws were

designed to prevent and flows from that which makes Defendants' conduct unlawful.

119.    Defendants' violations threaten continuing loss and injury to Plaintiffs

unless enjoined by this Court.

## Count II
## Attempt to Monopolize (15 U.S.C. § 2)

120.    Plaintiffs incorporate by reference the allegations contained in paragraphs

1 through 117 above.

121.    At all relevant times, AstraZeneca has possessed monopoly power in the

relevant market or there has been a dangerous probability of its achieving monopoly power.

122.    During the relevant period, AstraZeneca willfully engaged in

exclusionary, anticompetitive conduct designed to impair competition on the merits, including,

*inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than

Prilosec, solely to prevent generic competitors from competing for all sales of the

omeprazole/esomeprazole molecule; (b) intentionally not conducting and/or reporting clinical

studies comparing the use of 40 mg Prilosec to the use of 40 mg Nexium in the treatment of EE,

for the purpose of facilitating the deceptive campaign of distortions and misdirections regarding

the superiority of Nexium; (c) engaging in a massive advertising and promotional campaign of

distortions and misdirections to switch patients from Prilosec to Nexium; and (d) engaging in a

unified scheme, including but not limited to all of the conduct alleged above, to impair generic

competition to Prilosec.

123.    At all relevant times, AstraZeneca has had a specific intent to achieve or maintain a monopoly in the relevant market.

124.    Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have had precisely the intended effect.

125.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful attempted monopolization.  Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct.  Plaintiffs' injury is injury of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

126.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    A judgment for three times the damages actually sustained by Plaintiffs, as determined by a jury;

B.    A declaration that Defendants have violated the antitrust laws in the ways described above;

C.    Permanent injunctive relief which enjoins Defendants from continuing their illegal conduct, and requires them to take affirmative steps to dissipate the effects of their prior violations;

D.    The costs of this suit, including a reasonable attorneys' fee; and

E.    Such other and further relief as the Court deems just and proper.

43

**<u>Jury Demand</u>**

Plaintiffs demand a trial by jury of all issues so triable.

<div style="margin-left:50%">

s/ Robert D.W. Landon, III_____

Robert D.W. Landon III

KENNY NACHWALTER P.A.

1100 Miami Center

201 South Biscayne Boulevard

Miami, FL  33131

Telephone: (305) 373-1000

Facsimile:  (305) 372-1861

*Attorneys for Plaintiffs*

</div>

OF COUNSEL:

Richard Alan Arnold

Scott E. Perwin

Lauren C. Ravkind

KENNY NACHWALTER P.A.

1100 Miami Center

201 South Biscayne Boulevard

Miami, FL 33131

Tel.: (305) 373-1000

Fax: (305) 372-1861

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed by

CM/ECF and will be served in the same manner on  February 28, 2007.

<div style="margin-left:50%">

   s/ Robert D.W. Landon, III

</div>

288093