**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————— X

| | | |
|---|---|---|
| Walgreen Co., et al., | : | |
| Plaintiffs, | : | |
| v. | : | **Civil Case Number:** |
| AstraZeneca Pharmaceuticals L.P, et al. | : | **1:06-cv-02084-RWR** |
| Defendants. | : | |

———————————————————————— X

| | | |
|---|---|---|
| Rite Aid Corporation, et al. | : | |
| Plaintiffs, | : | |
| v. | : | **Civil Case Number:** |
| AstraZeneca Pharmaceuticals L.P., et. al, | : | **1:06-cv-02089-RWR** |
| Defendants. | : | |

———————————————————————— X

| | | |
|---|---|---|
| Louisiana Wholesale Drug Co., Inc., | : | |
| Plaintiff, | : | |
| v. | : | **Civil Case Number:** |
| AstraZeneca Pharmaceuticals L.P., et al., | : | **1:06-cv-02157-RWR** |
| Defendants | : | |

———————————————————————— X

| | | |
|---|---|---|
| Burlington Drug Company, Inc., et al., | : | |
| Plaintiffs, | : | |
| v. | : | **Civil Case Number:** |
| AstraZeneca Pharmaceuticals L.P., et al., | : | **1:07-cv-00041-RWR** |
| Defendants | : | |

———————————————————————— X

| | | |
|---|---|---|
| Meijer, Inc., et al., | : | |
| Plaintiffs, | : | |
| v. | : | **Civil Case Number:** |
| AstraZeneca Pharmaceuticals L.P., et al., | : | **1:06-cv-02155-RWR** |
| Defendants | : | |

———————————————————————— X

**PLAINTIFFS' STATEMENT OF POINTS OF AUTHORITY
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dated:  May 21, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 5

STANDARD OF REVIEW .......................................................................................... 11

ARGUMENT ............................................................................................................... 13

I.    THE PRODUCT REDESIGN SCHEME IS EXCLUSIONARY UNDER THE
      RULE OF REASON ............................................................................................ 13

      A.    The Design Change is Exclusionary Under the Rule of Reason As Applied in
            Microsoft II ................................................................................................ 15

      B.    The Product Redesign Scheme Is Unlawful Under Berkey Photo ...................... 21

            1.    The Price Disconnect Prevents Free Consumer Choice ........................... 22

            2.    AstraZeneca's Head Start Prevented Free Consumer Choice................... 26

            3.    AstraZeneca's Deceptive Detailing Prevented Free Consumer Choice ... 27

            4.    The Absence of Insurance Prevented Free Consumer Choice................. 28

II.   THE DESIGN CHANGE IS UNLAWFUL UNDER THE PROFIT
      SACRIFICE TEST............................................................................................... 29

III.  THE FDA'S AUTHORITY TO APPROVE NEW DRUGS DOES NOT EXEMPT
      ASTRAZENECA'S CONDUCT FROM ANTITRUST SCRUTINY ............................ 33

IV.   PLAINTIFFS' ALLEGATIONS OF DECEPTIVE DETAILING AND
      ADVERTISING ARE SUFFICIENTLY PLED.................................................. 35

      A.    Even if Rule 9(b) Applies, Plaintiffs' Allegations Satisfy It ................................ 36

      B.    AstraZeneca's Misrepresentations Are Exclusionary Under Section 2................ 38

            1.    AstraZeneca's statements were "clearly false"......................................... 40

2.    The advertising and detailing at issue were not "mere puffery" ............... 41

3.    AstraZeneca made the statements to buyers without knowledge and to doctors without incentive ..................................................................... 41

4.    The statements are not susceptible to neutralization and other offset ...... 42

C.    The Deceptive Detailing and Advertising Campaign Is Not Shielded by FDA Regulations ................................................................................................ 43

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

\* *Abbott Lab. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) ..................... *passim*

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139 (4th Cir. 1990) ........ 19

*Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250 (D.D.C. 2004) ................................................ 38

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ................................... 1

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ............................. 13, 30

*AstraZeneca LP v. Tap Pharm. Prod., Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006) ........................ 45

*Avery Denn. Corp. v. Acco Brands*, 2000 WL 986995 (C.D. Cal. Feb. 22, 2000) ....................... 42

*Balaco, Inc. v. Upjohn Co.*, 1992 WL 131150 (E.D. Pa. June 3, 1992) ....................................... 19

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) .................... 2, 21, 22, 26

*Billing v. Credit Suisse First Boston, Ltd.*, 426 F.3d 130 (2d Cir. 2005) ..................................... 34

*Biovail Corp. Int'l v. Hoechst Aktien.*, 49 F. Supp. 2d 750 (D.N.J. 1999) ................................... 35

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007) ................................... 36

*Bridon Am. Corp. v. Mitsui & Co, Inc.*, 1983 WL 1987 (D.D.C. Nov. 7, 1983) ................... 36, 37

*C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340 (Fed. Cir. 1998) .......................................... 17

*Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295 (D. Utah 1999) ................................. 17, 39

*Calif. Comp. Prod. v. IBM*, 613 F.2d 727 (9th Cir. 1979) ........................................................... 30

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) .......................................................... 41

\* *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................. 13, 35

*Covad Comm'n v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ........................... 19, 31, 32

*Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451 (1992) .............................. 14, 19

*Eli Lilly & Co. v. American Cyanamid Co.*, 2001 WL 30191 (S.D. Ind. Jan. 8, 2001) ................. 1

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)...................................................... 38

*Geneva Pharm. Tech. Corp., Inc. v. Barr Lab. Inc.*, 386 F.3d 485 (2d Cir. 2004)........................ 8

*High v. McLean Fin. Corp.*, 659 F. Supp. 1561 (D.D.C. 1987) ...................................................... 36

*ILC Periph. Leas. Corp. v. IBM*, 458 F. Supp. 423 (N.D. Cal. 1978) ........................................ 30

*In re Buspirone Antitrust Litig.,* 208 F.R.D. 516 (S.D.N.Y. 2002)................................................. 1

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) ...................... 34, 35

*In re IBM Periph. EDP Devices Antitrust Litig.*, 481 F. Supp. 965 (N.D. Cal. 1979) ................ 17

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) ................................................. 19

*In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) ...................................................... 1

*In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004) ........................................... 34

*In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D.D.C. May 9, 2000) ................................ 37

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000).................................... 19, 45

*J.S. McCarthy Co., Inc. v. Brausse Die. & Conv. Equip. Inc.*, 340 F. Supp. 2d 54
  (D. Me. 2004).......................................................................................................................... 38

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir.1997) ............ 11, 21

*Ledwick v. AstraZeneca Pharmaceuticals*, Los Angeles County Superior Court of
  California, Case No. BC 324518 ..................................................................................... 38, 44

*Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563 (1925) ........................................... 14

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich*, 63 F.3d 1540 (10th Cir. 1995) ..... 25

*[1] National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988) ........... 37, 39, 45

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986)....................................... 30, 32

*Nobody in Part. Presents, Inc. v. Clear Channel Comm., Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004)................................................................................. 34

---

[1] As required under the local rules, Plaintiffs have placed an asterisk before the cases upon which they principally rely.

*Northeastern Tel. Co. v. AT & T*, 651 F.2d 76 (2d Cir. 1981)......................................... 30

*Park v. Hyatt Corp.*, 436 F. Supp. 2d 60 (D.D.C. 2006) .............................................. 12

*Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*, 2005 WL 2993937
  (D. Del. Nov. 8, 2005), *appeal pending* No. 05-05340 (3d Cir.)............................... 44

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ......................................................... 13

*Resp. of Carolina, Inc. v. Leasco Resp., Inc.*, 537 F.2d 1307 (5th Cir. 1976) ............... 30

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................. 11

*Spirit Airlines, Inc. v. Northwest Air., Inc.*, 431 F.3d 917 (6th Cir. 2005) ................... 31

*Stand Energy Corp. v. Col. Gas Trans. Corp.*, 373 F. Supp. 2d 631 (S.D.W. Va. 2005) ........... 34

*United States ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003) ................... 38

*United States ex. rel. McCready v. Col./HCA Health. Corp.*, 251 F. Supp. 2d 114
  (D.D.C. 2003) ......................................................................................... 38

*United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956) ......................... 12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).................................................. 12

*United States v. Microsoft Corp.*, 1998 WL 614485 (D.D.C. Sept. 14, 1998) ............... 15

*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998)......................... 15, 16

*United States v. Microsoft*, 84 F. Supp. 2d 9 (D.D.C. 1999) ..................................... 16

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)........................... 13

* *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (*en banc*)................... *passim*

*Verizon Comm's Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) ............... 14, 30, 33

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................. 36

*Z-Tel Comm., Inc. v. SBC Comm., Inc.*, 331 F. Supp. 2d 513 (E.D.Tex. 2004) ........................ 38

## **Statutes**

21 U.S.C. § 355.......................................................................................... 8, 34

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417 (1984)..................................................................................................................... 8

Medicare Modernization Act, Pub. L. No. 108-173 § 1112 ......................................... 35

## Rules

Federal Rule of Civil Procedure 9(b)................................................................. 4, 36, 38

## Other Authorities

P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 773 (Supp. 2006)............................. 30

 IIA P. Areeda, H. Hovenkamp & J. Solow, ANTITRUST LAW ¶ 411 (2d ed. 2002).................... 23

III P. Areeda & D. Turner, ANTITRUST LAW, ¶ 738a (1978)....................................... 40

III P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 651a (2d ed. 2002) ..................................... 14

IIIA P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 781e (2d ed. 2002)........................... 15, 39

R. Bork, THE ANTITRUST PARADOX 144 (1978).......................................................... 31

Drug Product Selection, Staff Report to the FTC  (Jan. 1979)................................. 3, 22

"Financial Conflicts of Interest in Physicians' Relationships with the Pharmaceutical Industry," New England Journal of Medicine, Vol. 351, No. 18 (Oct. 28, 2004)...................................... 23

"Health Industry Practices that Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers," Journal of the American Medical Association, Vol. 295, No. 4 (Jan. 25, 2006), at 430............................................................................................ 23

* H. Hovenkamp, et al., IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, (Supp. 2007) ............................................................. 3, 25, 26

July 22, 2003 testimony of Janet Woodcock, M.D., Dir., Center for Drug Evaluation and Research, FDA, before the Senate Special Committee on Aging ........................................... 45

A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS (FTC 1985) .................... 7, 22

2 Moore's Federal Practice § 9.03 (3d ed. 2006)......................................................... 36

J. Ordover & R. Willig, An Economic Definition of Predation: Pricing and Product Innovation, 91 YALE L.J. 8, 22 (1981) ............................................................. 31, 32

Pharmaceutical Price Controls in OECD Countries, U.S. Dep't of Commerce,

Int'l Trade Admin. (Dec. 2004) ................................................................. 34

"Prescription Drugs, FDA Oversight of Direct-to-Consumer Advertising Has Limitations,"
U.S.G.A.O., GAO-03-177, October 2002 .............................................. 45

*Sales Manager is Fired After Comments Hit Web*, Philadelphia Inquirer, Apr. 7, 2007, at E01 . 23

S. Salop, *Exclusionary Conduct, Effect on Consumers and the Flawed Profit-Sacrifice
Standard*, 73 ANTITRUST L.J. 311 (2006) ............................................... 31

*U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --
Industry Hopes to Hook Doctors, Patients Through Costly Giveaways,*
Wall Street Journal, July 20, 2000, at 24 ................................................. 23

Plaintiffs[1] submit this opposition to AstraZeneca's motion to dismiss their claims under Section 2 of the Sherman Act alleging that AstraZeneca's product-redesign scheme unlawfully maintained its monopoly power and substantially impaired generic competition.

## INTRODUCTION

Over the last decade, manufacturers of brand-name pharmaceuticals have developed a series of "evergreening" techniques - techniques used to impair competition from generic drugs. These techniques include paying generic manufacturers not to enter, filing sham lawsuits and frivolous "citizen's petitions," making false "Orange Book" listings, and tying up sources of necessary ingredients.[2] This case involves yet another way in which brand manufacturers invest in erecting barriers to generics rather than in improving medicines for consumers.

Faced with imminent generic competition to its blockbuster drug Prilosec, AstraZeneca tweaked the product's design and gave it a different name, Nexium. The redesigned product brought no medical or other benefits of any kind to consumers. But it was enormously profitable for AstraZeneca because it prevented generic Prilosec from being substitutable at the pharmacy counter for the redesigned product, and thus impaired the generics companies' most cost-efficient (and only commercially feasible) means of competing. AstraZeneca's refrain that

---

[1] This memorandum is submitted on behalf of all plaintiffs in these actions: *Walgreen Co. et al. v. AstraZeneca Pharm., et al.*, No. 06-cv-02084; *Rite Aid Corp. et al. v. AstraZeneca Pharm. et al.*, No. 06-cv-02089; *Meijer, Inc. et al. v. AstraZeneca Pharm., et al.*, No. 06-cv-02155; *Louisiana Wholesale Drug Co., Inc. et al. v. AstraZeneca Pharm. et al.*, No. 06-cv-02157; and *Burlington Drug Co., Inc. et al. v. AstraZeneca Pharm.. et al.*, No. 07-cv-00041. For the Court's convenience, as all plaintiffs' Complaint are substantively identical, all citations shall be to the Walgreen First Amended Complaint ("Compl."). Unpublished opinions and selected other materials cited herein are included in Plaintiffs' Appendix (the "Appendix") submitted herewith.

[2] *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001); *In re Relaf. Antitrust Lit..*, 218 F.R.D. 337 (D. Mass. 2003); *In re Buspirone Antitrust Lit..*, 208 F.R.D. 516 (S.D.N.Y. 2002); *Eli Lilly v. Amer. Cyan. Co.*, 2001 WL 30191 (S.D. Ind. Jan 8, 2001).

redesigning Prilosec offered consumers another choice of product (Def. Br. at 17) rings hollow: the redesign brought *no benefits* to consumers, but had the intended effect of *preventing millions of consumers from choosing* far less expensive generic Prilosec.

In the face of these allegations that the product design change brought no consumer benefits and significantly impaired competition, AstraZeneca urges this Court to adopt a new and unprecedented antitrust rule - that *all* product design changes made by a monopolist are *per se* lawful. AstraZeneca urges that design changes be deemed lawful without inquiry as to whether they resulted in a product improvement, or whether any alleged improvement is outweighed by any anticompetitive consequences.

The D.C. Court of Appeals, in an *en banc* decision, expressly rejected that proposed rule, holding instead that whether product design changes are exclusionary under Section 2 of the Sherman Act is determined under the rule of reason. *See United States v. Microsoft*, 253 F.3d 34, 65-66 (D.C. Cir. 2001) (*en banc*) ("*Microsoft II*"). The Complaints here easily state a *prima facie* case of consumer harm under the rule of reason. By impairing the generic rivals' only effective means of competing, AstraZeneca prevented the generics from making (and preserved for itself) more than 17 million unit sales annually. This results in *a loss to consumers of more than $11.5 billion.* Moreover, any alleged offsetting procompetitive justifications are not properly considered on a motion to dismiss (they are factual issues). And, the Complaints allege there are none - the design change brought no therapeutic or other benefits to consumers.

AstraZeneca's design change is exclusionary even under *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir. 1979), upon which AstraZeneca relies. That case recognized that design changes can be exclusionary when the market or the monopolist's own conduct prevents "free consumer choice" from selecting the superior product - in this case, the clinically

equivalent but far less expensive drug.  The prescription drug market is very different from other markets because the consumer does not choose which product to buy - a doctor does.  Therefore, "[t]he basic problem is that the forces of competition do not work well in a market where the consumer who pays does not choose, and the physician who chooses does not pay."  Drug Product Selection, Staff Report to the FTC (Jan. 1979) at 2-3. As detailed below, AstraZeneca's design change, and its massive campaign of blanketing doctors' offices with free samples of Nexium and deceptive claims of clinical superiority of Nexium over Prilosec, were intended to exploit this basic problem in the market and substantially impair "free consumer choice."

A recent decision held that the *Microsoft II* rule of reason analysis governs pharmaceutical product design changes because "the nature of the pharmaceutical drug market, as described in Plaintiffs' allegations" - including the fact that doctors, rather than consumers, select which product to purchase - undermines free consumer choice. *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006).  The leading academic authority on intellectual property and antitrust issues has reached exactly the same conclusion.  H. Hovenkamp, et al., IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, at § 12.5 at 12-45 - 12-48 (Supp. 2007) ("IP AND ANTITRUST").

Antitrust scrutiny is particularly appropriate here, not only because of the "nature of the pharmaceutical drug market," but also because of AstraZeneca's own conduct that magnified the anticompetitive effect of its product redesign scheme.  It began switching Prilosec prescriptions to Nexium 18 months before generic Prilosec even entered the market.  By the time the generics entered, AstraZeneca had already switched over 10 million unit sales from Prilosec to Nexium, putting these units beyond effective generic competition.  Both before and after generic Prilosec entered, AstraZeneca's army of nearly 8,000 detailers made deceptive and misleading statements

to doctors regarding the supposed superiority of Nexium over Prilosec.  And its introduction of non-prescription Prilosec ("Prilosec OTC") had the intended effect of causing managed care organizations to stop providing insurance coverage for generic Prilosec - even though generic prescription Prilosec cost less than half of Prilosec OTC and a fraction of prescription Nexium.

Moreover, the Complaints here also allege that AstraZeneca's conduct is exclusionary under the far more forgiving (of the monopolist) "profit sacrifice" test.  AstraZeneca's multi-billion dollar investment in its product redesign scheme was profitable to AstraZeneca *solely* because the scheme had the effect of impairing generic competition.  AstraZeneca made no new sales or profits from Nexium except those that it made by impairing generic competition.  No court has ever held that a product design change that is alleged to fail the profit sacrifice test is nevertheless lawful under Section 2.

AstraZeneca makes a last effort to avoid antitrust scrutiny by invoking the FDA's regulatory authority to approve new drugs.  But the FDA approves New Drug Applications based on whether the drug is *safe* and *effective,* not whether it is an improvement or whether its introduction will have anticompetitive consequences.  Thus, courts have unanimously rejected the argument that the FDA's limited regulatory authority can preclude antitrust scrutiny.

Finally, Plaintiffs' allegations regarding AstraZeneca's representations to doctors and consumers that Nexium was superior to Prilosec are not subject to Federal Rule of Civil Procedure 9(b) because the representations are not alleged as a stand-alone fraud claim, but as part of an overall anti-competitive product-redesign scheme.  Even if Rule 9(b) did apply, the allegations satisfy the Rule by quoting the statements and identifying by, when, and to whom they were made.  Nor were the misrepresentations supported by the studies in the FDA-approved Nexium label - those studies showed definitively that Nexium is *not* superior to Prilosec, and

AstraZeneca expressly conceded that fact to the FDA in negotiations over the label's contents.

## STATEMENT OF FACTS

Prilosec is a proton pump inhibitor used to treat heartburn and related conditions.  Compl. at ¶ 42.  In 1999, Prilosec was the top-selling drug in the world, with U.S. sales of more than $4 billion.  *Id.*  The patent on the active ingredient in Prilosec was slated to expire in October 2001, leaving Prilosec vulnerable to competition from generic drugs.  *Id.* at ¶ 43.

AstraZeneca responded to this imminent threat by making a small change in the chemical composition of Prilosec, and encouraging doctors to prescribe the new composition rather than the old.  This design change brought no medical benefits to consumers, but did shield the vast majority of sales from generic substitution.  AstraZeneca executives admitted that, of the dozens of plans for replacing the anticipated lost Prilosec sales, this plan was the worst one for consumers.  *Id.* at ¶ 47.  A former chief executive acknowledged that, based purely on medical merits, Nexium "would not have been developed."  *Id.* at ¶ 67.  Nexium was developed not for its ability to heal patients, but solely for its ability to impair generic competition.  *Id.*

### The Absence of Consumer Benefit

The active ingredient in Prilosec, omeprazole, is a chiral molecule, which means it is an equal-parts mixture of an S-enantiomer and R-enantiomer. (This chemistry is explained in detail in the Complaints.  Compl. at ¶¶ 52-54).  Omeprazole, whether the mixture or either enantiomer alone, is only a prodrug, *i.e.*, the compound itself is inactive, and the active drug is formed only after it is ingested into the body.  The active drug, cyclic sulfenamide, is not a chiral compound, so there is no reason to believe that a dose of one enantiomer of omeprazole would interact with the body's proton pumps any differently than would an equal dose of the mixture.  *Id.* at ¶ 54.

AstraZeneca's redesigned drug, Nexium, is simply the S-enantiomer of omeprazole, *i.e.*,

esomeprazole. And, in fact, numerous studies, including those that AstraZeneca submitted to the FDA, clearly show that Nexium provides no clinical benefit over an equal dose of Prilosec. *Id.* at ¶ 78. Although AstraZeneca implies otherwise in its brief, *the Complaints repeatedly allege that the product design change brought no benefits of any kind to consumers* - it "created no efficiency gains or increases in consumer welfare." *Id.* at ¶ 112; *see also, e.g., id.* at ¶ 55 ("compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers").

## The Nature of Pharmaceutical Markets

AstraZeneca's product redesign scheme worked because of, and was designed to exploit, the unusual nature of pharmaceutical markets. Usually, the hallmark of consumer choice is the selection of a product based on a balancing of quality and price. Pharmaceutical markets, however, are characterized by a "price disconnect." A doctor, rather than a consumer, selects which product to buy. This is significant because, as studies have shown, doctors are price-insensitive, *i.e.,* they select which drugs to prescribe based on factors other than price. *Id.* at ¶ 21. Thus, price plays a negligible role in product selection as between branded pharmaceuticals. *Id.* at ¶¶ 20-21. This has resulted in AstraZeneca obtaining very substantial market power, including the ability to price its omeprazole/esomeprazole prescription products at more than 10 times its manufacturing costs while making sales in the billions of dollars. *Id.* at ¶ 109.

Brand companies such as AstraZeneca exploit the price disconnect by heavily promoting their brand products to doctors, primarily through "detailing," *i.e.,* personal sales calls. *Id.* at ¶ 21. A generic company, however, cannot profitably promote a *generic* product to doctors because a pharmacist could easily substitute some other company's generic version of the same drug. *Id.* at ¶ 22. Unable to exploit the price disconnect by detailing doctors, generic companies increase sales by offering low prices to pharmacies. *Id.*

When the system works as intended, the availability of a generic alternative puts the price/quality balancing choice back in consumers' hands. This results in much lower prices for prescription drugs. The first generic typically enters at a price at least 30% below that of the brand. *Id.* at ¶ 28. The price discount grows - often to 90% - as more generics enter, and generics rapidly take the vast majority of unit sales. *Id.* This is an unalloyed boon for consumers.

In order to promote this quality/price choice for consumers, all 50 states and the District of Columbia enacted Drug Product Selection ("DPS") laws that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever the consumer consents. *Id.* at ¶ 24. These DPS laws *are premised on the economic fact that brand companies exploit the price disconnect by promoting to doctors and that generic companies are unable to do so, and thus promote their products by offering low prices to pharmacies.* An FTC report concluded:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices. *That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists. Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.*

*Id.* (quoting A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS at 7 (FTC 1985) ("FTC Generic Subst. Rep.") (emphasis added)); *see also* Compl. at ¶¶ 26-27 (describing other FTC, FDA, and State efforts to promote generic substitution).

DPS laws "shift the choice of [product] for most prescriptions from the physician to the pharmacist." *Id.* at ¶ 25 (quoting FTC Generic Subst. Rep.). The FTC noted, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons - the pharmacist and the patient - to select drug products on the basis of price." *Id.*

Under the Hatch-Waxman Act[3] and State regulatory regimes, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug.   In order to receive an AB rating, a generic drug must be: (1) therapeutically equivalent to its brand-name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength and safety and efficacy profile, and (2) bioequivalent to its brand-name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.  *See id.* at ¶ 39.  The need to obtain FDA approval and an AB rating is a significant barrier to generic entry in the pharmaceutical industry.  *See Geneva Pharm. Tech Corp., Inc. v. Barr Lab. Inc.*, 386 F.3d 485, 499 (2d Cir. 2004).

**The Anti-Competitive Effect of AstraZeneca's Product Design Change**

The price disconnect and the regulatory barriers to entry provided fertile ground for AstraZeneca's product-redesign scheme.  In the pharmaceutical market *the critical determinant* of the success of a generic product is its AB rating, *i.e.,* substitutability at the pharmacy counter.  Compl. at ¶ 39.  A medically insignificant redesign of the brand product, such as AstraZeneca engineered here, destroys that substitutability and significantly impairs the rival's only commercially viable means of competing.  *Id.* at ¶ 40. Also, unlike the usual market, a brand drug company's design change automatically invokes a regulatory barrier to entry, with any generic firm unable to compete for all of the relevant sales unless it begins the FDA-approval process anew and face a likely minimum 30-month delay *after* successfully redesigning its own product to match the redesigned brand product.  *Id.* at ¶ 38; 21 U.S.C. § 355(j)(5)(B)(iii).

Thus, as compared to the usual market, the pharmaceutical marketplace increases both the opportunity and incentive for brand companies to redesign their products with an

---

[3] The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417 (1984), codified at 21 U.S.C. §§ 355, 360cc and 35 U.S.C. §§ 156, 271, 282.

anticompetitive intent and effect.  AstraZeneca did exactly that.  Nexium provides no medical or other benefits to consumers as compared to Prilosec.  Compl. at ¶ 55.  But Nexium is *different from* Prilosec, and generic Prilosec thus is not AB rated to Nexium.  *Id.* at ¶ 46.  By redesigning Prilosec, AstraZeneca prevented generic Prilosec from being AB rated to the redesigned product, impaired generic manufacturers' only viable means of competing for all sales, and thus prevented consumers from making the price/quality choice at the pharmacy counter.

Moreover, AstraZeneca knew that doctors, being price-insensitive, would not switch their patients back to Prilosec - even after generic Prilosec became available - if AstraZeneca could get them to switch from Prilosec to Nexium before the generics entered. *Id.*. at ¶ 56. Therefore, 18 months before the generics entered, AstraZeneca began converting as many Prilosec prescriptions as possible to Nexium.  Using its existing army of 6,600 detailers, plus an additional 1,300 new hires, AstraZeneca bombarded doctors' offices with pleas to switch prescriptions from Prilosec to Nexium.  *Id.* at ¶ 59.  As part of this billion-dollar campaign, AstraZeneca's detailers blanketed doctor's offices with literature, promotional material, and free samples of Nexium.  *Id.* at ¶¶ 59-61.

No one was there to dissuade the doctors from switching.  Generic manufacturers are economically precluded from detailing, and in any event they were still 18 months away from even having their products approved.  *Id.* at ¶¶ 22, 62.  And the maker of branded Prilosec - AstraZeneca -  was deliberately not singing its praises.  Instead, AstraZeneca completely stopped detailing and promoting Prilosec, even though it would not face generic competition for another 18 months.  *Id.* at ¶ 62.  AstraZeneca even began comparing Prilosec unfavorably to Nexium, in order to weaken demand for the anticipated generic versions of Prilosec.  *Id.*  Consequently, before generic Prilosec was even approved for marketing, AstraZeneca had succeeded in

reducing annual unit sales of Prilosec from 29.6 million to 19.6 million, while increasing the annual unit sales of Nexium from 0 to 13.4 million. *Id.* at ¶ 63.

AstraZeneca made its product redesign scheme more effective by deceiving doctors and consumers about the relative medical efficacy of Nexium and Prilosec. In an ad campaign directed to consumers, AstraZeneca misrepresented that, as compared to Prilosec, Nexium is more powerful; has more efficacy in healing and symptom control; is more effective as a first-line therapy; is better in stopping heartburn and starting healing; and has been shown to be clinically superior. *Id.* at ¶ 92. AstraZeneca also trained and directed its entire Nexium sales force to make a series of misrepresentations to all doctors on whom they called. These included the false assertions that Nexium demonstrated a significant clinical advantage over Prilosec; has a greater healing and symptom resolution rate for erosive esophagitis patients; is superior in long-term maintenance as well as in initial healing; results in more symptom-free patients; has a lower number of treatment failures; has a greater clinical advantage for more severe patients; and is a better proton pump inhibitor. *Id.* at ¶ 91. All of these statements were false and misleading. *Id.* at ¶ 93. Most doctors to whom these misrepresentations were directed are not specialists who might be familiar with studies showing that in fact Nexium is not superior to Prilosec. *Id.* at ¶ 95. And even specialists were adversely affected by AstraZeneca's deceptive campaign. *Id.*

AstraZeneca also shielded its products from effective generic competition by causing managed care organizations ("MCOs") not to cover the cost of generic Prilosec. AstraZeneca knew it was the policy of MCOs covering the vast majority of consumers to stop covering a prescription pharmaceutical (both the brand and generic versions) when an over-the-counter version of that product becomes available. *Id.* at ¶ 97. AstraZeneca therefore introduced Prilosec OTC in September 2003. *Id.* at ¶ 101. A 30-day supply of Prilosec OTC costs more

than twice the price of generic Prilosec. *Id.* at ¶ 105. But the interests of MCOs and consumers are fundamentally misaligned in this respect - MCOs avoid paying for any omeprazole (whether brand, generic, or OTC) by declining to cover prescription Prilosec on the ground that it is available over-the-counter. *Id.* at ¶ 103. And for those consumers who require a prescription proton pump inhibitor for long-term use (the label for Prilosec OTC indicates it should not be taken for more than 14 days), the MCOs' policy has the perverse effect of causing Nexium, but not the far less expensive generic Prilosec, to be covered by insurance. *Id.* at ¶¶ 98, 102.

**The Consumer Welfare Loss**

The product redesign scheme was profitable for AstraZeneca *solely* because the change had the effect of impairing generic competition. AstraZeneca had fewer U.S. sales of Nexium and Prilosec combined than if it had sold only Prilosec, absent the effect of impairing generic competition. *Id.* at ¶ 65. Nexium made no new sales or profits other than those made by impairing generic competition. *Id.*

But the design change was wildly profitable for AstraZeneca because it was wildly successful in impairing generic competition. The design change and related conduct prevented generic companies from taking 17 million unit sales away from AstraZeneca annually. *Id.* at ¶ 106. This translates into a loss of more than $11.5 billion to consumers. *Id.* at ¶ 64.

### STANDARD OF REVIEW

On a motion to dismiss, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974). Accordingly, a court must accept all the allegations in a plaintiff's Complaint as true and construe them in the light most favorable to the plaintiff. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027 (D.C. Cir.1997). "In light of these liberal pleading requirements, a Compl. should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 64 (D.D.C. 2006).

Plaintiffs must plead two elements to state a claim of monopolization under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In its motion, AstraZeneca does not dispute its monopoly power, which is "the power to control prices or exclude competition." *United States v. E.I. duPont de Nem. & Co.*, 351 U.S. 377, 391 (1956). In fact, it has been able to profitably raise prices substantially above the competitive level. *See* Compl. at ¶¶ 107-109.

Thus, the only issue raised by AstraZeneca's motion is whether Plaintiffs adequately alleged that AstraZeneca willfully maintained its monopoly power by impeding generic competition. Contrary to AstraZeneca's view that Plaintiffs advocate an unprecedented extension of antitrust law (Def. Br. at 19), two vitally important cases have found unlawful monopolization based on product design changes analogous to that alleged here. *See Microsoft II*, 253 F.3d at 65-66 (Microsoft unlawfully maintained monopoly by redesigning its software to impair competition); *Abbott*, 432 F. Supp. 2d at 420-24 (denying motion to dismiss where product design change impaired generic competition). These cases, among many others, flatly refute AstraZeneca's contention that product design changes are *per se* lawful under Section 2.

And, contrary to AstraZeneca's attempt to analyze each aspect of its product- redesign scheme in isolation,[4] its conduct: (a) must be analyzed as a whole within the context of the

---

[4] In particular, AstraZeneca analyzes Plaintiffs' allegation of a misleading detailing and marketing campaign as if it were a separate false-advertising claim; Plaintiffs instead allege that the campaign was one aspect of the overall product redesign scheme. *See* Compl. at ¶ 46.

economic and regulatory context in which it occurs; and (b) can be unlawful even if some of the individual elements of the scheme are not independently unlawful under Section 2. *Cont'l Ore Co. v. Union Carb. & Carb. Corp.*, 370 U.S. 690, 698-99 (1962) (related factual allegations under Section 2 must be considered as a whole, not dismembered and viewed in their separate parts); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 44 (D.D.C. 2000) ("only when the separate categories of conduct are viewed, as they should be, as a single, well-coordinated course of action does the full extent of the violence that Microsoft has done to the competitive process reveal itself"), *aff'd, Microsoft II*, 253 F.2d at 34; *Abbott,* 432 F. Supp. 2d at 428 ("acts as a group [may] have an anticompetitive effect even if the acts taken separately do not").

## ARGUMENT

### I.    THE PRODUCT REDESIGN SCHEME IS EXCLUSIONARY UNDER THE RULE OF REASON

The touchstone for determining whether conduct is exclusionary, and therefore unlawful under Section 2, is the effect of that conduct on consumers.  The Sherman Act is a "consumer welfare prescription."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979).  Thus, conduct is unlawfully exclusionary if it "either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen High. Skiing Corp.*, 472 U.S. 585, 604 n.32 (1985) (quoting III P. Areeda & D. Turner, Antitrust Law 78 (1978)).  Stated differently, improper exclusion is "exclusion not the result of superior efficiency."  *Id.* at 603.

Applying these principles, the *en banc* Court of Appeals in *Microsoft II* adopted the "rule of reason" approach to Section 2 liability.  This approach, which is similar to the rule of reason analysis in Section 1 cases, proceeds through a series of steps:

> First, to be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect."  That is, it must harm the competitive *process* and thereby harm consumers . . . .

> Second, the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect . . . .
>
> Third, if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a "procompetitive justification" for its conduct.  If the monopolist asserts a procompetitive justification . . . then the burden shifts back to the plaintiff to rebut that claim.
>
> Fourth, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit . . . .

*Microsoft II*, 253 F.3d at 58-59 (citations omitted); *see also* III P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 651a, at 72 (2d ed. 2002) (exclusionary conduct is conduct reasonably capable of prolonging monopoly power and does "not benefit consumers at all" or is "unnecessary for the particular consumer benefits" or "produce[s] harm[] disproportionate to the resulting benefits").

There is no place in this analysis for formalistic rules like AstraZeneca's proposal that product design changes be deemed *per se* lawful.  Instead, courts focus on economic effects and evaluate the substance of the challenged conduct rather than its form.  *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 467 (1992) (court must "resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record'") (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925)).  As the Supreme Court explained in that case, "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."  *Id*. at 466-67.

The economic effect of conduct can be determined only by a fact-intensive inquiry that is attuned to the "economic context," including the "particular structure and circumstances of the industry at issue."  *Verizon Comm's Inc. v. Law Off. of C. V. Trinko*, 540 U.S. 398, 411 (2004).  Moreover, otherwise permissible conduct may be exclusionary when practiced by a monopolist.

*United States v. Microsoft Corp*., 1998 WL 614485 at *23 (D.D.C. Sept. 14, 1998). The context

and specific facts here clearly reveal the anticompetitive effect of AstraZeneca's product

redesign scheme.

### A.  The Design Change is Exclusionary Under the Rule of Reason As Applied in Microsoft II

Invoking the truism that innovation is an important part of competition, AstraZeneca asks

the Court to adopt a new antitrust rule that a monopolist's product design changes are *per se*

lawful.  Def. Br. at 20.  AstraZeneca apparently intends that a product redesign be exempt from

antitrust scrutiny even if the design change does not improve the product, and regardless of its

adverse effect on consumer welfare.[5]  The Court of Appeals, however, has expressly rejected a

rule of *per se* legality, and instead subjects a monopolist's design changes to the rule of reason.

AstraZeneca's assertion of *per se* legality is similar to the Court's analysis in *United*

*States v. Microsoft Corp.,* 147 F.3d 935 (D.C. Cir. 1998) (*Microsoft I*).  There, the Government

asserted that Microsoft violated the terms of a prior consent decree by creating a technological

integration between its operating software and its Internet browser.  The Court declined to weigh

the alleged benefits of the integration against its anticompetitive effects, holding that Microsoft

need only ascribe "facially plausible benefits" to the integration.  *Id.* at 950. The Court held,

---

[5] AstraZeneca supports its proposed new rule by citing to "IIIA P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 781e (2005)" for the proposition that "all product innovation should be lawful, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing." Def. Br. at 20.  The volume of this treatise that AstraZeneca purports to quote does not exist.  A Second Edition of Volume IIIA was published in 2002.  That edition, (a copy of the relevant portion is in the Appendix), states as follows:  "[A]ll product innovation should be lawful *in the absence of bundling*, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing…." (emphasis added). The reference to "bundling" is to "technological tying," *i.e.,* the monopolist's strategic redesign of the product in order to impair competition from complementary products (addressed in ¶ 776 of the treatise).  Thus, AstraZeneca excised from the "quote" the very part relevant here, and, as shown below, the 2007 Hovenkamp IP/Antitrust treatise, not the general antitrust treatise, specifically applies these principles to design changes to pharmaceutical products.  *See infra* at Section I.B.1.

"[t]he question is not whether the integration is a *net* plus but merely whether there is a plausible claim that it brings some advantage." *Id.* The Court was careful to note, however, that this test was required by the terms of the consent decree, not by antitrust law. *See id.* at 950 & n.14. Judge Wald rejected adoption of a "plausible benefit" standard, instead asserting that, "the courts are certainly capable of determining whether a particular integration offers any synergistic benefit at all and whether these benefits are minimal, significant, or great." *Id.* at 959 (Wald, J., concurring in part and dissenting in part).

The *Microsoft I* "plausible benefit" standard - which in any event does not support AstraZeneca's assertion of *per se* legality - is not the antitrust law of this Circuit. The Court of Appeals, *en banc*, later held that conduct unlawful under Section 2 is that "which reduce[s] social welfare," as measured under the rule of reason. *Microsoft II,* 253 F.3d at 58. Importantly, the Court expressly held that the rule of reason determines whether product design changes are exclusionary. *Id.* at 59.

In *Microsoft II*, an opinion issued on appeal after a full trial, the Government asserted that three of Microsoft's design changes were exclusionary under Section 2. Microsoft changed its operating software to exclude its Internet browser from the "add/remove" utility program; designed the operating system to override the user's choice of any rival browser as the "default" browser; and intermingled browsing and other code so that the user's attempt to delete Microsoft's browser would disable the operating system. 253 F.3d at 64-65.[6] The Court of Appeals noted that courts are "properly very skeptical" of claims that design changes have harmed competition. *Id.* at 65. But the Court then expressly rejected the contention, repeated by

---

[6] When Microsoft made these design changes, it did not remove its old product from the market. Consumers therefore had a choice between the old and redesigned products. *See United States v. Microsoft,* 84 F. Supp. 2d 9, 21, 26-27, 56 (D.D.C. 1999).

AstraZeneca here, that such design changes are *per se* lawful.  Citing numerous other cases, the

Court held that, "[j]udicial deference to product innovation, however, does not mean that a

monopolist's product design decisions are per se lawful."  *Id.*

Microsoft aggressively urged the Court of Appeals to adopt a more lenient (for the

monopolist) standard, arguing, for example, that "design changes that improve a product cannot

violate Section 2."[7]  The Court rejected that contention, and held that product design changes are

subject to a straightforward application of the rule of reason.[8]  The Government met its initial

burden by proving that all three of the design changes were anticompetitive because they had the

effect of reducing the usage share of rival browsers, thereby protecting Microsoft's operating

system monopoly.  *Id.* at 65-66.  The burden then shifted to Microsoft to establish a business

justification for the design changes, and "Microsoft proffer[ed] no justification for two of the

three challenged actions."  *Id.* at 66.  Although Microsoft made "some general claims regarding

the benefits" of the design changes, it "neither specifie[d] nor substantiate[d] those claims."  *Id*.

Because the government made out a *prima facia* case of harm to competition, and Microsoft

failed to substantiate its alleged procompetitive justifications, those two design changes

constituted exclusionary conduct violative of Section 2.  *Id.* at 67.

As to the third design change, Microsoft demonstrated "valid technical reasons" for the

change - that "it was necessary" to design the product as it had.  *Id.*  The Government did not

rebut the proffered justification, or show that the anticompetitive effect of the design change

---

[7] *See* Microsoft's Reply Brief in *Microsoft II*, (relevant portion included in Appendix).

[8] Other courts have similarly applied the rule of reason to allegations of exclusionary product design changes. *See*, *e.g.*, *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1382-83 (Fed. Cir. 1998) (jury entitled to reject proffered procompetitive justifications as pretextual); *Caldera Inc. v. Microsoft Corp.*, 72 F. Supp. 1295, 1313 (D. Utah 1999) (court must consider effects on competitors and consumers and whether product was improved); *In re IBM Periph. EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1003 (N.D. Cal. 1979) (same).

outweighed its procompetitive benefits, so Microsoft was not liable for the third change.  *Id.*

In this case, we are still at the pleading stage, and AstraZeneca has not even alleged (much less proven) any procompetitive justifications for its conduct.  Moreover, the market at issue in *Microsoft II* had no significant imperfections impairing free consumer choice and no regulatory barriers to entry.  Here, product interchangeability (*i.e.,* the AB rating) is *the critical determinant* of generic rivals' success.  The *only* commercially viable means for generic manufacturers to market their products is through generic substitution at the pharmacy counter.  Compl. at ¶ 22.  A medically insignificant redesign of the brand product that prevents an AB rating, such as AstraZeneca engineered, destroys that substitutability and eliminates the generic rivals' only commercially viable means of competing.  And unlike the situation in the usual market, a design change in the pharmaceutical market automatically invokes a *regulatory barrier to entry* - the generic firm must develop a new AB rated version, begin the FDA approval anew, and then face *a likely minimum* additional 30-month delay.  Compl. at ¶¶ 39-40; *see also Abbott*, 432 F. Supp. 2d at 415-17.  As compared to other markets, the *specific facts* in this *particular market* increase both the opportunity and incentive for the monopolist to redesign products with an anticompetitive purpose and effect.  Thus, AstraZeneca's plea for a more lenient standard has even less plausibility than the similar plea rejected in *Microsoft II.*

*Microsoft II* governs this case, and Plaintiffs clearly alleged a *prima facia* case of consumer harm under that analysis.  The design change scheme prevented generic competitors' FDA-approved products from being "AB rated" to, and substituted at the pharmacy counter for, the redesigned product.  Compl. at ¶ 41.  Absent the change, generic Prilosec would have gained at least 85% of the unit sales in the market - over 25 million units a year. *Id.* at ¶ 106.  As a result of the design change, however, annual sales of the generic were less than 7.4 million units.  *Id.*

This reduction in generic sales has and will cost purchasers of omeprazole/esomeprazole *more than $11.5 billion. Id.* at 64. These increased costs to purchasers are the quintessence of anticompetitive harm. *See Eastman Kodak*, 504 U.S. at 478 (exclusionary conduct resulting in higher prices "is facially anticompetitive and exactly the type of harm that the antitrust laws aim to prevent"); *In re Warfarin Sod. Antitrust Litig.,* 214 F.3d 395, 397, 401 (3d Cir. 2000) (allegation that brand company "disabled [generic's] market penetration" is a "formidable demonstration of an antitrust injury"). Under *Microsoft II*, Plaintiffs' *prima facia* showing of anticompetitive harm shifts the burden to AstraZeneca to establish a procompetitive justification for the design change. *Microsoft II*, 253 F.3d at 59.

But, the law is clear that on a motion to dismiss, the court cannot consider a defendant's proffered justifications. *See Covad Comm'n v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (business justification cannot be resolved on a motion to dismiss). Thus, the rule of reason inquiry (for the moment) is at an end, and AstraZeneca's motion to dismiss must be denied. *Id.*[9]

In any event, the Complaints here make abundantly clear that there are no procompetitive justifications for AstraZeneca's design change. The Complaints allege that the design change brought *no benefits of any kind to consumers* - it "created no efficiency gains or increases in consumer welfare." Compl. at ¶ 112; *id.* at ¶ 55 ("As compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers").[10]

_____

[9] *See also Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.,* 910 F.2d 139, 145 (4th Cir. 1990) (on motion to dismiss, court must deem pro-competitive justifications to be unproved); *In re K-Dur Antitrust Litig.,* 338 F. Supp. 2d 517, 533 (D.N.J. 2004) (same); *Balaco, Inc. v. Upjohn Co.,* 1992 WL 131150, at *2 (E.D. Pa. 1992) ("a factual determination of the actual competitive effects is not appropriate on a motion to dismiss").

[10] *See also* Compl. at ¶ 41 ("Nexium was not a medical improvement over Prilosec" but was only "a slight chemical variant"); *id.* at ¶ 46 ("AstraZeneca did not care whether Nexium was clinically superior to Prilosec, and in fact knew that it was not"); *id.* at ¶ 47 ("Nexium

(continued...)

The clinical studies comparing 20 mg of Nexium to 20 mg of Prilosec definitively show no superiority of Nexium. *Id.* at ¶ 78. A few studies show a slight clinical advantage for a *double dose* (40 mg) of Nexium versus 20 mg of Prilosec. *Id.* at ¶ 80. However, the Complaints allege that any therapeutic gain for the double dose of Nexium is no more than the gain routinely shown for a double dose of Prilosec, *id.* at ¶ 47; that any gains result solely from the increased dosage, *id.*; and AstraZeneca knew there is such a dose-response relationship for all proton pump inhibitors, *id.* at ¶ 88. Indeed the Nexium label provides that the effective action of esomeprazole "is *dose-related* up to a daily dose of 20 mg to 40 mg." *Id.* at ¶ 89.

AstraZeneca tries to negate these allegations, asserting throughout its brief that Nexium is an "incremental but important improvement[]," Def. Br. at 23, that the "research provide[d] a sound scientific basis for regarding [Nexium] . . . as an improvement," and that omeprazole is "less attractive [than Nexium] to consumers and doctors," *id.* at 20, 24. AstraZeneca also asserts that *Plaintiffs' own Complaints* allege only that Nexium is "not much better than" Prilosec, *id.* at 21, and that Nexium was not a "significant enough improvement[]," *id.* at 24.[11] As shown

_____

(continued...)

brought no medical benefit to consumers as compared to generic Prilosec"); *id.* at ¶ 52 (AstraZeneca introduced Nexium "for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec"); *id.* at ¶ 64 ("as compared to Prilosec, Nexium provides no medical benefits to consumers"); *id.* (Astra-Merck's CEO admitted that "if we had left it to our R&D, Nexium would not have been developed"); *id.* at ¶ 72 ("AstraZeneca knew that Nexium was not clinically superior to Prilosec"); *id.* at ¶ 77 ("studies comparing Nexium to Prilosec did not support a conclusion that Nexium was an improvement over Prilosec even in the healing of EE"); *id.* at ¶ 87 ("studies comparing 20 mg Nexium to 20 mg Prilosec definitively show no superiority of Nexium"); *id.* at ¶ 108(a) ("Nexium is a slight variant of and provides no clinical benefits over Prilosec and its generics").

[11] AstraZeneca quotes the Complaints to the effect that Nexium did not represent a "*significant* clinical advance over omeprazole in the *first line* treatment of patents." Def. Br. at 18, quoting Compl. at ¶86 (AstraZeneca's emphasis). But that allegation was coupled with those shown above alleging Nexium provided *no medical or other benefit* as compared to Prilosec.

above, this characterization is directly rebutted by the Complaints' express allegations.  On a motion to dismiss, AstraZeneca is not entitled to contradict Plaintiffs' allegations or to alter them to its liking.  *Jungquist*, 115 F.3d at 1027.

*Microsoft II* requires application of the rule of reason to AstraZeneca's design change; Plaintiffs have clearly alleged a *prima facie* case of consumer harm; procompetitive justifications cannot be considered on this motion to dismiss; and the Complaints negate any justifications that could be offered.  AstraZeneca's motion should be denied.

### B.  The Product Redesign Scheme Is Unlawful Under *Berkey Photo*

AstraZeneca entirely ignores the dispositive holding in *Microsoft II* and instead invites this Court to apply the analysis articulated by the Second Circuit in *Berkey Photo,* 603 F.2d 263. *See* Def. Br. at 19.  Even if *Berkey Photo* were applied here, it too would compel the denial of AstraZeneca's motion.

In *Berkey Photo*, the plaintiff-competitor asserted that Kodak unlawfully used its monopoly in film to make sales of cameras and processing services.  603 F.2d at 278.  Kodak designed its new 110 camera so that it could be used only with the new Kodacolor II film, and, for a period of 18 months, Kodak made Kodacolor II film only for the 110 camera.  Plaintiff asserted that, by linking together the 110 camera and the widely advertised Kodacolor II film, Kodak made camera sales at plaintiff's expense, even though plaintiff contended the film was not necessary to produce good 110 photographs.  *Id.* at 286.  The Court rejected that contention, noting that the evidence *at trial* showed that Kodacolor II film was inferior to its predecessor, Kodacolor X, in some respects and superior in others. *Id.*[12]  Whether one or the other was superior was therefore "a matter of individual taste."  *Id.* at 287.  Accordingly, the court held that

---

[12] As in *Microsoft II*, in *Berkey,* the issues were decided after a *trial*, not a motion to dismiss.

the market was able to determine the products' relative superiority "so long as the free choice of consumers is preserved." *Id.; see also id.* ("it is of no importance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion").

Plaintiffs' painstaking allegations here make clear that, in this particular market, the "free choice of consumers" (in *Berkey Photo*'s phrase) cannot defeat AstraZeneca's scheme to overcharge purchasers $11.5 billion for a slight chemical variant of Prilosec.

### 1. The Price Disconnect Prevents Free Consumer Choice

The Complaints make clear that free consumer choice cannot sort the relative merits of omeprazole and esomeprazole because *consumers do not choose which branded product to purchase.* Unlike the vast majority of markets, the pharmaceutical marketplace is characterized by a "price disconnect." Doctors, not consumers, choose which product will be purchased. Compl. at ¶ 19. Doctors typically are not aware of the relative cost of branded pharmaceuticals and, even when they are, they are nevertheless insensitive to price differences because they do not have to pay for the products. *Id.* at ¶ 21.

Consumers in this market do not make the quality/price comparison between products that is the *sine qua non* of "free consumer choice." As the FTC found, "[t]he basic problem is that the forces of competition do not work well in a market where the consumer who pays does not choose, and the physician who chooses does not pay. Patients have little influence in determining which products they will buy and what prices they must pay for prescriptions." Drug Product Selection, Staff Report to the FTC (Jan. 1979) at 2-3; *see also* FTC Generic Subst. Rep. at 5 ("[T]he institutions of the prescription drug market are markedly different from those in most other product markets. For prescription drugs, it has not been the consumer who has made the choice among brands; it has been the physician"); Compl. at ¶¶ 18-25.

Moreover, doctors' price insensitivity makes them particularly susceptible to "detailing" and free samples from brand companies' sales representatives. *Id.* at ¶ 56. This is an extreme instance of what economists call an "agency problem" - where "one market participant is represented by an agent whose personal incentives diverge from its principal's goals." IIA P. Areeda, H. Hovenkamp, et al., ANTITRUST LAW ¶ 411, at 48 (2d ed. 2002).

The price disconnect in the pharmaceutical industry, and the brand manufacturers' exploitation of it by detailing doctors, creates a notorious agency problem. Brand manufacturers direct 90% of their $21 billion marketing budgets to "detailing" and other marketing to doctors.[13] There is a growing concern that doctors' "professional judgment about the welfare of the patients may be inappropriately influenced by a secondary interest - in this case, the personal gain derived from relationships with pharmaceutical companies."[14]

Doctors who have been "detailed" and have become accustomed to prescribing product A will not begin prescribing product B even if the generic version of product B becomes available and is much less expensive than product A - and even where, as here, product A is simply a

_____

[13] "Health Industry Practices That Create Conflicts Of Interest: A Policy Proposal For Academic Medical Centers," *Journ. of the Amer. Med. Ass'n*, Vol. 295, No. 4 (Jan. 25, 2006), at 430 ("JAMA"). Reflective of AstraZeneca's views of detailing doctors are the observations of a now-former sales manager in an internal newsletter: "There is a big bucket of money sitting in every office. Every time you go in, you reach your hand in the bucket and grab a handful." Phila. Inquirer, Apr. 7, 2007, at E1, *Sales Manager Is Fired After Comments Hit Web*.

[14] "Financial Conflicts of Interest in Physicians' Relationships with the Pharmaceutical Industry," *New England Journal of Medicine*, Vol. 351, No. 18 (Oct. 28, 2004), at 1891. "Drug companies also know that samples help build brands and can be directly linked to increased prescriptions for the drugs. The pharmaceutical industry heavily distributes freebies for its newest drugs and usually curtails or eliminates them for products about to go off patent." *U.S. Consumer Groups Question Use Of Free Samples by Drug Makers - Industry Hopes to Hook Doctors, Patients Through Costly Giveaways,* Wall Street Journal at 24, July 20, 2000. Studies show that "even a small gift is a powerful influence on people's behavior. Individuals receiving gifts are often unable to remain objective; they reweigh information and choices in light of the gift." JAMA at 431.

slight chemical variant of product B and provides no medical benefits over product B.  Compl. at ¶ 56.  To suggest in these circumstances (as AstraZeneca does) that free consumer choice will determine whether Nexium is superior to Prilosec is simply to close one's eyes to reality and, more importantly, to the allegations in the Complaints.

Based on the commercial reality of the pharmaceutical marketplace, courts and commentators have concluded that there is no "free consumer choice" in this market.  In *Abbott*, 432 F. Supp. 2d 408, the court denied Abbott's motion to dismiss a Section 2 claim asserting that Abbott's product design changes were exclusionary.  Abbott redesigned its drug, Tricor, from a capsule to a tablet, and slightly reduced the amount of active ingredient.  Plaintiffs there (who are many of the same plaintiffs here) asserted that Abbott changed the formulation "not to improve the product but simply to prevent generic formulations from becoming AB-rated for substitution with Tricor."  *Id.* at 415.  The court in *Abbott* noted that *Berkey Photo* applies only when the relevant products compete "in an open market," and that, "in the absence of free consumer choice, the basis for judicial deference [to design changes] is removed."  *Id.* at 421.

The *Abbott* court held that "the nature of the pharmaceutical drug market, as described in Plaintiffs' allegations, persuades me that the rule of reason approach should apply here."  *Id.* at 422.  Plaintiffs' allegations there included a description of the "price disconnect" described above, including that doctors, not consumers, select which product to buy.  The market cannot determine which product is superior when the brand company is detailing the redesigned product to doctors and is *not* detailing and providing free samples of the original product.  The *Abbott* court also noted that the monopolist had removed the original product from the market. *Id.* at 423.  The principal significance of the removal of the product was that no one was detailing or

providing free samples of it.[15]  Here, AstraZeneca not only stopped detailing and providing free

samples of the original product, like the monopolist in *Abbott,* but also instructed its Nexium

detailers to compare Prilosec unfavorably to Nexium.  Compl. at ¶ 62.

   In theory, of course, generic companies could detail doctors on the virtues of the original

product, and try to offset the monopolist's detailing of the redesigned product.  *Abbott,* 432 F.

Supp. 2d at 423 (generic firms could "market their own branded versions of the old Tricor

formulations").  But detailing by generic companies is *not commercially feasible*.  *See* Compl. at

¶¶ 22, 71.  The *commercially viable* means of selling generic products is through generic

substitution in the pharmacy, not detailing to doctors.  *Id.*; *see also Abbott,* 432 F. Supp. 2d at

423.  By changing the product design, the brand company impairs the generic companies' "cost-

efficient means of competing in the pharmaceutical drug market" and thus prevents the market

from determining which product is superior.  *Id.* at 423; *see also id.* (for conduct to be unlawful,

"Competitors need not be barred 'from all means of distribution' if they are barred 'from the

cost-efficient ones'" (quoting *Microsoft II*, 253 F.3d at 64)); *Multistate Legal Stud., Inc. v. Harc.

Brace Jov.*, 63 F.3d 1540, 1553 n.12 (10th Cir. 1995) (raising rivals' cost can be anticompetitive

conduct if the defendant cannot demonstrate a legitimate business justification for it).

   The leading IP/Antitrust treatise reaches the same conclusion as the *Abbott* court.  *See* IP

---

[15] The physical removal of the original product would not prevent a doctor from writing a prescription for it, which could then be filled with a generic.  Therefore, the primary significance of the removal of the original product from the market was that the brand manufacturer would no longer detail it or provide free samples.  As AstraZeneca admits, what matters in this market is whether "doctors [have] chosen to prescribe Prilosec instead of Nexium."  Def. Br. at 11.  Of course, merely stopping detailing and providing free samples is not necessarily exclusionary conduct under Section 2.  But whether or not exclusionary, that conduct clearly prevents the free and open competition assumed in *Berkey Photo.*

AND ANTITRUST § 12.5, at 12-45 - 12-48.[16]  Because of "regulatory barriers" and "[t]he nature of the pharmaceutical drug market," a design change can prevent generic manufacturers from "tak[ing] advantage of state generic substitution laws."  *Id.* at 12-46 (quoting *Abbott*, 432 F. Supp. 2d at 422).  Such design changes, which Hovenkamp characterizes as "product-hopping," "seem[ ] clearly to be an effort to game the rather intricate FDA rules to anticompetitive effect."  *Id.* at 12-45.  Under the *Microsoft II* test, a pharmaceutical design change will be unlawfully exclusionary if the "product change . . . lacks substantial medical benefits."  *See id.*  Although courts may be reluctant to "delve into the technical details of the product change," it is "an inquiry that must be made in a Section 2 case once market power has been proven."  *Id.* § 12.3e, at 12-26 – 12-27.  That inquiry will eventually be necessary here, but Plaintiffs' allegation that AstraZeneca's design change produced *no* medical benefits is dispositive of the present motion.

### 2.  AstraZeneca's Head Start Prevented Free Consumer Choice

Free consumer choice is impaired here not only by the economic realities of the pharmaceutical marketplace, but also by AstraZeneca's specific conduct.  Eighteen months before the first generic manufacturer received FDA approval, AstraZeneca began its massive effort to convert as many Prilosec prescriptions to Nexium as possible.  Compl. at ¶ 59.  The Court in *Berkey Photo* held that such a "head start" by an entrenched monopolist can interfere with free consumer choice.  603 F.2d at 287 n.39 (no consumer choice if Kodak shifted all its film production from old film to new before other photo finishers could process new film); *id.* at 288 (Kodak arguably interfered with consumer choice by making new film available only for its own camera for 18 months).

The Complaints here allege that AstraZeneca's 18-month head start allowed it to convert

---

[16] A copy of the relevant pages are included in the Appendix.  As noted in the excerpt, one of the authors, Mark Lemley, represented one of the plaintiffs in *Abbott Labs*.

10 million units in annual sales from Prilosec to Nexium before generic Prilosec was even approved for marketing.  Compl. at ¶ 63.  Moreover, once doctors switched from Prilosec to Nexium, the generic manufacturers had no commercially feasible means of getting them to switch back to Prilosec.  *Id.* at ¶ 56.  Thus, "the economic realities of the pharmaceutical marketplace meant that those 10 million units remained beyond effective competition from generic omeprazole."  *Id.* at ¶ 71.

**3.  AstraZeneca's Deceptive Detailing Prevented Free Consumer Choice**

The free consumer choice required to justify deference to product design changes under *Berkey Photo* was also precluded here by AstraZeneca's deceptive detailing and ad campaign. As shown below in Section IV, AstraZeneca reinforced the effectiveness of its product-redesign scheme by training and directing its entire Nexium sales force to falsely assert to doctors that Nexium was superior to Prilosec.  *See* Compl. at ¶ 91. Regardless of whether the deceptive campaign is independently actionable (*see* Section IV), the Complaints allege that *it in fact prevented the market from defeating AstraZeneca's product-redesign scheme*. *See* Compl. at ¶ 68.

Markets can overcome false and deceptive advertising only to the extent that rivals have the means of countermanding it.  *See National Ass'n of Pharm. Mfrs. v. Ayerst Laboratories*, 850 F.2d 904, 916 (2d Cir. 1988) (one factor to consider in determining whether misleading advertising has anticompetitive effects is whether it is "readily susceptible to neutralization or other offset by rivals").  Here the Complaints allege that no competing manufacturer had the incentive or means to countermand AstraZeneca's deceptive campaign against Prilosec. AstraZeneca, the manufacturer of branded Prilosec, had no incentive to countermand its own deceptive detailing; manufacturers of generic Prilosec had no effective means of countermanding the deceptive detailing.  Consequently, "there were no 'counter-detailers' to provide samples of

generic Prilosec or to negate AstraZeneca's claims of Nexium superiority."  Compl. at ¶ 70.

### 4.  The Absence of Insurance Prevented Free Consumer Choice

Finally, consumers do not have free choice here because AstraZeneca caused MCOs to stop providing reimbursement to consumers for purchases of Prilosec (whether branded or generic).  A free market can hardly be deemed to have chosen Nexium in preference to Prilosec when there is insurance coverage for Nexium but not for the far less expensive generic Prilosec.

MCOs covering the vast majority of consumers stop providing coverage for prescription pharmaceuticals when an OTC version of the product becomes available.  Compl. at ¶ 97.  When AstraZeneca introduced Prilosec OTC in September 2003, 10 months after the launch of generic Prilosec, MCOs stopped providing coverage for generic as well as branded Prilosec. *Id.* at  ¶ 101.

After the introduction of Prilosec OTC, the combined sales of branded and generic prescription Prilosec declined from 15.9 million units in 2003 to less than 8.4 million units in 2005.  *Id.* at ¶ 104.  This occurred despite the fact that *AstraZeneca's price for OTC Prilosec is more than twice the price of generic Prilosec.  Id.* at ¶ 105.

Regardless of whether AstraZeneca's introduction of Prilosec OTC was independently anticompetitive,[17] it clearly resulted in the absence of the open competition between Nexium and generic Prilosec that is contemplated by *Berkey Photo*.  Consumers had insurance coverage for Nexium but not for generic Prilosec.  AstraZeneca's assertion that MCOs had no contractual obligation to AstraZeneca to stop covering generic Prilosec (Def. Br. at 25)  is irrelevant.  Regardless of any contractual obligation, MCOs *in fact* stopped covering generic Prilosec, and that is all that is relevant under *Berkey Photo.*

---

[17] AstraZeneca asserts that Plaintiffs allege that the introduction of Prilosec OTC was itself anticompetitive.  Def. Br. at 24.  The Complaints make no such allegation.

AstraZeneca seems to suggest *Berkey Photo* applies here because *doctors* and *MCOs* have choice.  Def. Br. at 25-26.  But the Complaints clearly allege that doctors and MCOs are not proxies for consumers.  Lacking the obligation to pay for prescription products, doctors are price-insensitive and heavily influenced by detailing.  Compl. at ¶ 21.  And the interests of MCOs and consumers are misaligned.  *Generic Prilosec is half the price of Prilosec OTC* (which has the same active ingredient and efficacy).  *Id*. at ¶ 105.  But by announcing and enforcing a policy of not covering the prescription version of a product that is available OTC, the MCOs avoid paying for *any* form of omeprazole, whether OTC, generic, or brand.  For the consumer, Prilosec OTC costs twice as much as generic Prilosec; for the MCO, Prilosec OTC costs $0.

The further, perverse result of this misalignment of interests is that when a consumer needs a prescription product (Prilosec OTC is indicated for only 14-day usage), the consumer finds that the far more expensive Nexium is covered and the far less expensive generic Prilosec is not.  *Id*. at ¶ 103.  Far from "sav[ing] money with Nexium" as AstraZeneca cynically asserts (Def. Br. at 13), consumers ultimately pay for the high price of Nexium in the form of higher insurance premiums.

## II.    THE DESIGN CHANGE IS UNLAWFUL UNDER THE PROFIT SACRIFICE TEST

In this Circuit, product design changes are analyzed under the *Microsoft II*  rule of reason test, and AstraZeneca's motion should be denied under that standard.  But Plaintiffs have stated a claim even under the much more permissive (for the monopolist) "profit sacrifice" test.  None of the cases cited by AstraZeneca dismissed a product design case where plaintiffs had alleged that the change failed the profit sacrifice test; many of those cases indicate that such allegations are

sufficient to state a claim under Section 2.[18]

The rule of reason asks whether the benefits of the design change to *consumers* are greater than the losses *to consumers.* The profit sacrifice test asks whether the benefits of the design change *to the monopolist* (*i.e.*, additional sales and profits), absent the effect of maintaining the monopoly, are greater than the *costs to the monopolist.* The profit sacrifice test is, in essence, an economic test for determining that the monopolist's *sole* motive was to impair competition. If a profit-maximizing firm engages in conduct that would not be economically rational (*i.e.*, maximally profitable) absent a reduction in competition, then it can be inferred that the firm was motivated solely by a desire to cause the reduction in competition. *See, e.g.,* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 773 at 367 (Supp. 2006) (a refusal to deal is unlawful if it is "'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival").[19]

---

[18] *See, e.g., Northeastern Tel. Co. v. AT & T*, 651 F.2d 76, 94-95 (2d Cir. 1981) (properly instructed jury could reasonably find that monopolist designed product in order to impede competition); *Calif. Comp. Prod. v. IBM*, 613 F.2d 727, 743-44 (9th Cir. 1979) (IBM was entitled to redesign its products to make them less expensive and more efficient; no proof that redesign failed profit sacrifice test); *Resp. of Carolina, Inc. v. Leasco Resp., Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976) (technological tying cases are "limited to those instances where the technological factor tying the hardware to the software has been designed for the purpose of tying the products, rather than to achieve some technologically beneficial result"); *ILC Periph. Leas. Corp. v. IBM*, 458 F. Supp. 423, 439-41 (N.D. Cal. 1978) (no liability where "there was no evidence that IBM was sacrificing present profits with the expectation of recouping its losses with subsequent price increases"). In none of these cases did the court attempt to resolve the defendant's liability on a motion to dismiss. The D.C. Circuit has used the profit sacrifice test in certain types of Section 2 cases not involving product design changes. *See Covad Comm's*, 398 F.3d at 675 (refusal to deal); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986) (sham patent litigation).

[19] *See also Aspen Skiing*, 472 U.S. at 610-11 (the defendant "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival"); *Trinko*, 540 U.S. at 408 (evidence in *Aspen Skiing* reflected "a willingness to forsake short-term profits to achieve an anticompetitive end"); *Covad Comm's*, 398 F.3d at 676 (predatory practice "is one in which a firm sacrifices short-term profits in order to drive out of

(continued...)

Professors Ordover and Willig explored the application of the profit sacrifice test to product design changes. J. Ordover & R. Willig, *An Economic Definition of Predation: Pricing and Product Innovation*, 91 YALE L.J. 8, 22 (1981) ["Ordover"]. They note that even "technological superiority" of the new product does not prevent finding exclusionary conduct:

> [T]he technological superiority of a new system does not preclude a finding of predatory product innovation. . . . Under this standard, a new system is immune from a finding of predation if and only if the value to consumers of the new system relative to the preexisting system is greater than the required development costs.

*Id.* at 49.[20] The allegations in the Complaints easily withstand a motion to dismiss, even if this Court applied the profit sacrifice test instead of the rule of reason test required by *Microsoft II.*

*First,* "AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to interfere with competition from generic Prilosec." Compl. at ¶ 47; s*ee also id.* at ¶ 46 ("AstraZeneca did not care whether Nexium was clinically superior to Prilosec, and in fact knew that it was not"); *id.* at ¶ 117 ("AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge . . . monopoly prices"). In the words of Astra-Merck's then-chief executive, "If we had left it to R&D, Nexium

_____

(continued...)

the market or otherwise discipline a competitor").

[20] *See also Spirit Air., Inc. v. Northwest Air., Inc.*, 431 F.3d 917, 953 (6th Cir. 2005) (Moore, J., concurring) (predation claims are based on the theory that "an incumbent seeks to retain monopolist control in the future by ceasing to engage in economically rational behavior in the present in an effort to drive potential rivals from the market"); S. Salop, *Exclusionary Conduct, Effect on Consumers and the Flawed Profit-Sacrifice Standard*, 73 ANTITRUST L.J. 311, 318-19 (2006) (profit-sacrifice test "examines the profitability of the defendant's conduct relative to a hypothetical market outcome" in which it  has no ability to raise prices after the conduct occurs); R. Bork, THE ANTITRUST PARADOX 144 (1978) (test is used to identify business practices that "would not be considered profit-maximizing except for the expectation either that (1) rivals will be driven from the market, leaving the predator with a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to abandon competitive behavior the predator finds inconvenient or threatening").

would not have been developed.  The project was driven by the marketing people."  *Id.* at ¶ 67.
These allegations establish that AstraZeneca's sole motive was to impair generic competition,
not to improve its product.  *See Neumann*, 786 F.2d at 427 (predation "involves the deliberate
seeking of monopoly power by means other than superior efficiency").

 *Second*, Plaintiffs alleged that the design change was profitable only because it allowed
AstraZeneca to maintain its monopoly power by impairing generic competition:

> •  "AstraZeneca knew that, *absent the adverse effects on sales of generic
> Prilosec*, Nexium was a losing business proposition for AstraZeneca - the
> costs of research, development and marketing of Nexium would not be
> justified by Nexium sales."Compl. at ¶ 47;

> •  "Absent the adverse effect on sales of generic Prilosec, AstraZeneca's
> development and marketing of Nexium made no economic sense." *Id.*;

> •  "AstraZeneca's product-switching from Prilosec to Nexium was profitable
> for AstraZeneca only because the strategy had the effect of impairing
> generic competition to Prilosec.  Absent that effect, engaging in the
> product switch would have made no economic sense for AstraZeneca." *Id.*
> ¶ 65.

 These allegations defeat AstraZeneca's motion.  Indeed, merely alleging that the conduct
is "predatory" can "suffice[ ] to withstand a motion to dismiss because, in the vernacular of
antitrust law, a 'predatory' practice is one in which a firm sacrifices short-term profits in order to
drive out of the market or otherwise discipline a competitor."  *Covad Comm's*, 398 F.3d at 676.

 *Third*, the Complaints support these claims with specific economic facts.  Under the
profit sacrifice test, a design change "is immune from a finding of predation if and only if the
value to consumers of the [change] relative to the preexisting [product] is greater than the
required development costs."  Ordover, at 49.  In 2000, before Nexium entered, AstraZeneca had
U.S. sales of 29.6 million units.  Compl. at ¶ 65.  In 2002, it had U.S. sales of 33 million units of
Prilosec and Nexium combined, an 11.4% increase.  *Id.*  In that period, however, the number of
prescriptions for the relevant conditions increased over 30% (twice that of Prilosec/Nexium).  *Id.*

Thus, there is no basis to ascribe *any* consumer value to the design change.  Nexium caused AstraZeneca to *lose sales* (except those kept by impairing generic competition). *Id.* at ¶¶ 63, 65.

AstraZeneca incurred massive R&D and marketing costs to switch the market to a product with fewer sales.  This strategy was profitable *only* because of its effect of impairing competition from generic Prilosec.  AstraZeneca made its R&D and marketing investments not to increase sales by improving a product, but to impair generic Prilosec. This is classic predation.

## III.    THE FDA'S AUTHORITY TO APPROVE NEW DRUGS DOES NOT EXEMPT ASTRAZENECA'S CONDUCT FROM ANTITRUST SCRUTINY

Relying on *Trinko*, AstraZeneca asserts that the Court should dismiss Plaintiffs' claims because the FDA regulates the entry of branded pharmaceuticals.  Def. Br. at 21-24.  While quoting snippets from *Trinko*, AstraZeneca ignores its context as well as its analysis.

The *Trinko* Court determined whether a particular regulatory regime justified creating an exception to the general rule that a monopolist has no duty to aid competitors.  540 U.S. at 411. Plaintiffs here complain not of a failure to *aid* rivals, but of AstraZeneca's billion-dollar investment made solely to *harm* competitors and competition.  Even as to failures to aid competitors, the *Trinko* Court held that the existence of a regulatory scheme counsels against antitrust scrutiny only where the regulations are "designed to deter and remedy anticompetitive harm."  *Id.* at 412.  In contrast, where there is "nothing built into the regulatory scheme which performs the antitrust function . . . the benefits of antitrust are worth its sometimes considerable disadvantages."  *Id.* (citation omitted).  Thus, courts applying *Trinko* have held that the existence of a regulatory regime counsels against antitrust scrutiny only when that regime "performs the antitrust function" by deterring and remedying anticompetitive harm.  *See, e.g., Billing v. Cred. Suisse First Bost.*, 426 F.3d 130, 172 (2d Cir. 2005); *Stand Energy Corp. v. Col. Gas Trans. Corp.*, 373 F. Supp. 2d 631, 641 (S.D.W. Va. 2005); *Nobody in Part. Presents, Inc. v. Clear*

*Chann. Comm., Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004).

The FDA's review process for new drug products examines the product's safety and efficacy (as compared to placebo) for the preferred indication. 21 U.S.C. § 355(a), (b). The FDA has no authority to deny approval based on the competitive effect of a new drug, or whether it is an improvement over existing drugs. *See* 21 U.S.C. § 355(d).[21] Thus, courts routinely entertain antitrust claims against brand manufacturers for thwarting generic competition. *See, e.g., Abbott,* 432 F. Supp. 2d 408; *In re Remeron Antitrust Litig*., 335 F. Supp. 2d 522 (D.N.J. 2004); *In re Cardizem CD Antitrust Litig*., 105 F. Supp. 2d 618, 663-64 (E. D. Mich. 2000).

For example, the defendant in *Remeron* relied on *Trinko* to argue that the Hatch-Waxman Act and FDA's "Orange Book" regulations "should override the Sherman Act, thereby barring Plaintiffs' late listing antitrust claim." *Remeron*, 335 F. Supp. 2d at 530. Rejecting that argument, the court noted that *Trinko* involved "a complete regulatory scheme that grants regulators significant power to enforce rules and to issue penalties." *Id.* In contrast, the regulatory regime for drug approvals contemplates that competition issues will be resolved by the courts, "and not the FDA." *Id.* at 530-31. Accordingly, "[n]o authority has been cited to support the proposition that the antitrust laws have been superseded by the Hatch-Waxman Act or by FDA regulations. *Trinko* does not bar the instant antitrust claims." *Id.* at 531.

Similarly, in *Cardizem*, the court held that the antitrust laws were applicable where Andrx agreed with the brand company to abandon launch of generic Cardizem in return for a

---

[21] The FDA's inability to deny approval based on competition concerns is in stark contrast to the regulatory regimes in other industrialized nations. Many other governments regulate the prices of drugs and place restrictions on the approval of new drugs based on their therapeutic gains over existing products. *See generally Pharmaceutical Price Controls in OECD Countries*, U.S. Dep't of Commerce, Int'l Trade Admin. (Dec. 2004). The FDA has no comparable authority to regulate entry based on competition concerns.

multi-million dollar payment.[22]   Neither the Hatch-Waxman Act nor the FDA drug-approval regulations shielded that conduct from antitrust scrutiny because the conduct "was not mandated by the Hatch-Waxman Act, and was not adequately reviewed by any federal agency."  105 F. Supp. 2d at 663.  The court concluded that "no court has held that the sixteen year old Hatch-Waxman Amendments provide immunity from the antitrust laws or have repealed the Sherman Act, and Defendants have not persuaded this Court that it should be the first to do so."  *Id.; see also Biovail Corp. v. Hoechst Aktien.*, 49 F. Supp. 2d 750, 764-66 (D.N.J. 1999) (fact that FDA found drug safe and effective had no bearing on whether defendants' acts were anticompetitive).

That Congress left the regulation of pharmaceutical competition to the antitrust laws is confirmed by recent amendments to the Medicare Prescription Drug Improvement and Modernization Act of 2003.  That act mandates that agreements between brand and generic companies settling Hatch-Waxman litigation must be submitted to the *antitrust agencies* for review under the *antitrust laws.  See* Medicare Modernization Act, Pub.L. No. 108-173, § 1112.

## IV.    PLAINTIFFS' ALLEGATIONS OF DECEPTIVE DETAILING AND ADVERTISING ARE SUFFICIENTLY PLED

Plaintiffs have alleged a multifaceted product-redesign scheme, one aspect of which is AstraZeneca's misrepresentations made to consumers and doctors regarding the alleged superiority of Nexium to Prilosec.  AstraZeneca treats these allegations of misrepresentations as if they were an independent claim of false advertising.  They are not; they are one aspect of the overall product redesign scheme and should be analyzed as such.  *See Continental Ore*, 370 U.S. at 698-99; *Microsoft,* 87 F. Supp. 2d at 44; *Abbott,* 432 F. Supp.2d at 428.  Regardless of whether AstraZeneca's misrepresentations are independently unlawful, they are appropriately

---

[22] Although decided before *Trinko*, the *Cardizem* court applied analysis later endorsed by *Trinko.*

considered together with all of AstraZeneca's conduct in determining whether the overall product-redesign scheme is exclusionary.

Even if the misrepresentations are improperly viewed in isolation as AstraZeneca argues, and not as part of a scheme, the allegations (1) satisfy Rule 9(b); (2) allege exclusionary conduct under Section 2; and (3) are not shielded from antitrust scrutiny by the FDA-approved label.

### A.  Even if Rule 9(b) Applies, Plaintiffs' Allegations Satisfy It

The pleading requirements in Federal Rule of Civil Procedure 9(b) do not apply here because the misrepresentations alleged are just one aspect of a multifaceted, unified scheme to impair generic competition.  Courts have applied Rule 9(b) to antitrust claims only where the alleged fraud is the gravamen of or pervades the *entire* anticompetitive scheme.  *See Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 507 (7th Cir. 2007) (appellants' "brief is riddled with references to fraud, showing that this theory pervades their entire case"); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (as  to two defendants, the "entirety of [the] Compaint." was comprised of allegations of a "unified fraudulent course of conduct").

But Plaintiffs' allegations are clearly sufficient even if Rule 9(b) applies.  Rule 9(b) must be read in harmony with Rule 8's requiriment that "pleadings should contain a 'short and plain statement of the claim and or defense' and that each averment should be 'simple concise and direct.'"  *Bridon Am. Corp. v. Mitsui & Co*, 1983 WL 1987 at * 4 (D.D.C. Nov. 7, 1983); *High v. McLean Fin'l Corp.*, 659 F. Supp. 1561, 1566 (D.D.C. 1987); *see also* 2 Moore's Federal Practice § 9.03, at 9-36 (3d ed. 2006).  Moreover, "the general rule requiring specific allegations of time, place and content is 'relaxed somewhat as to matters peculiarly within the adverse party's knowledge' or 'where the issues are complex, or the transactions involved cover a long period of time'."  *Bridon Am. Corp.*, 1983 WL 1987 at * 5 (citation omitted); *see also In re*

*Vitamins Antitrust Litig.*, 2000 WL 147505 at * 3 (D.D.C. May 9, 2000).

Plaintiffs have alleged with particularity the misleading statements. During the late 1990s and early 2000s, Plaintiffs allege AstraZeneca trained and directed *its entire Nexium sales force* to assert to *all doctors on whom they called* that, as compared to Prilosec, Nexium:

- "demonstrates a significant clinical advantage;"

- has "significantly greater healing and symptom resolution rates for [Erosive Esophagitis] patients;"

- has a clinical advantage "demonstrated in longer term maintenance therapy, as well as in the initial healing stage;"

- has more symptom-free patients;

- has a lower number of treatment failures;

- "has a greater clinical advantage for more severe patients;"

- is "a better PPI;" and

- is "expected to positively affect other associated outcomes such a patient satisfaction; [quality of life] and productivity."

Compl. at ¶ 91. The Complaints allege that not one of these representations is true - that, as compared to Prilosec, Nexium "offers no therapeutic or other benefits to consumers." *Id.* at ¶ 55; *see also id.* at ¶ 112 (Nexium offers "no efficiency gains or increases in consumer welfare").

In print ads and a direct-to-consumer ad campaign, AstraZeneca asserted that in studies *comparing it with* Prilosec, Nexium:

- had "[p]roven efficacy in short-term healing (4-8 weeks);"

- had "proven symptom control;"

- was an "effective first-line PPI therapy;" and

- will "Stop the heartburn - Start the HEALING."

*Id.* at ¶ 92. Because the ads said that they were based on studies comparing Nexium to Prilosec,

reasonable readers would believe they meant Nexium had *better* short-term healing and symptom control than Prilosec; was a *better* first-line therapy than Prilosec; and stopped heartburn and started healing *faster* than Prilosec. *Id.* Each assertion is false. *See id.* at ¶¶ 55, 112.

These detailed allegations have provided Defendants with ample notice of the basis for Plaintiffs' claim that Defendants engaged in a campaign of distortions and misdirections. The allegations include quotations as to what was said, identify the context in which it was said (detailing and print ads), and state to whom it was said (consumers and the doctors on whom the Nexium sales force called).[23] No more is required. *United States ex rel. McCready v. Col./HCA Health. Corp.,* 251 F. Supp. 2d 114, 116 (D.D.C. 2003); *United States of America, ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 7-8 (D.D.C. 2003).

### B. AstraZeneca's Misrepresentations Are Exclusionary Under Section 2

A monopolist's misrepresentations as to the quality or attributes of its (or a competitor's) product clearly can be exclusionary under Section 2. *See, e.g., Microsoft II*, 253 F.3d at 77 (finding Section 2 liability because misrepresentations achieve advantage based on neither "the superiority of the [monopolist's product] [n]or . . . the acumen of its makers"); *Z-Tel Comm., Inc. v. SBC Comm., Inc.*, 331 F. Supp. 2d 513, 530 (E.D. Tex. 2004) ("advertising that creates barriers to entry may constitute exclusionary conduct"); *Caldera, Inc. v. Microsoft Corp.*, 72 F.

---

[23] Even if *arguendo*, Rule 9(b) applies and the Complaints were found not to satisfy the rule, dismissal with prejudice without permitting discovery is not appropriate. *See J.S. McCarthy, Co. Inc. v. Brausse Die. & Conv. Equip., Inc.,* 340 F. Supp. 2d 54 (D. Me. 2004) (denying motion to dismiss, allowing discovery on time, place, and content of alleged fraud); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud"); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (where complaint does not satisfy Rule 9(b), "the court should freely grant leave to amend"). Indeed, a court has already refused to dismiss a claim involving AstraZeneca's fraudulent promotion of Nexium. *See Ledwick v. AstraZeneca Pharm.*, L.A. County Superior Court of California, case no. BC 324518 (copy in the Appendix). If the Court determines the Complaints are deficient in this regard, Plaintiffs request that they be permitted discovery on the relevant issues and to amend the Complaints.

Supp. 2d 1295, 1319 (D. Utah 1999) (deceptive communications "viewed in context with other alleged anticompetitive behavior may give rise to a § 2 violation").

AstraZeneca nevertheless argues that the Court should *presume* its campaign of distortions had a *de minimis* effect on competition, and cannot be exclusionary as a matter of law.  Def. Br. at 31.  This argument is undermined by the very authorities that it cites.

In *Ayerst Laboratories*, 850 F.2d at 916 (Def. Br. at 31), an association of generic companies claimed that the brand company violated Section 2 by sending a letter to pharmacists that was "false and misleading because it effectively told pharmacists that [the brand drug] was therapeutically superior to [the generic drug], and that [the generic drug] should not be dispensed for any indications."  Although the Court discussed the *de minimis* presumption, it *reversed the grant of the motion to dismiss*, explaining, plaintiff "should be allowed to go forward with the discovery process to substantiate its claim that the Letter was clearly false, clearly material, and clearly likely to induce reasonable reliance."  *Id.*  The Court further explained that "the several factors we have noted above cannot be adequately evaluated until the discovery process has moved forward to a greater extent than it has thus far."  *Id.* at 917.

Likewise, the treatise on which AstraZeneca relies (Def. Br. at 32), states, "misrepresentations and organized deception by a dominant firm may have § 2 implications when used against a nascent firm just as it is entering the market.  Such a firm has no established customer base and typically lacks the resources to answer the dominant firm's deception effectively."  IIIA P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 782b (2d ed. 2002); s*ee Z-Tel Comm.*, 331 F. Supp. 2d at 531-32 (denying motion to dismiss in situation  described in treatise).

For well over a decade, AstraZeneca was the only marketer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.  It was not until

December 2002 that the first generic Prilosec entered the market. By that time, however, defendants were well on their way to effecting their product redesign scheme by switching the market from Prilosec to Nexium. This is a textbook case of a dominant firm engaging in organized deception just as a new firm is entering the market. Indeed, unlike the usual situation addressed by Hovenkamp, here the nascent rivals, who are economically precluded from detailing, had no effective means of combating AstraZeneca's campaign, even after they entered. Compl. at ¶ 71. The presumption of a *de minimis* effect simply does not apply here.

Even if the *de minimis* presumption were applicable, Plaintiffs clearly overcome it under the six-factor test invoked by AstraZeneca.[24] AstraZeneca concedes the allegations satisfy two of the four criteria, and AstraZeneca's assertions regarding the other four are wrong.

### 1. AstraZeneca's statements were "clearly false"

Plaintiffs identified a series of statements made to doctors and consumers regarding an alleged superiority of Nexium over Prilosec. AstraZeneca asserts that "plaintiffs never dispute the truth" of those statements. Def. Br. at 33. But Plaintiffs *have* disputed their truth by alleging Nexium is *not* superior to Prilosec *in any respect. See, e.g.,* Compl. at ¶¶ 55, 112.

Nor can AstraZeneca avoid this conclusion by asserting that its statements were merely "true but misleading." *See* Def. Br. at 33. AstraZeneca asserted "X" (*e.g.,* that Nexium has "significantly greater healing and symptom resolution rates for EE patients," Compl. at ¶ at 91); Plaintiffs assert "not X" (*e.g.*, studies definitively show no such advantages for Nexium, *id.* at ¶ 78, and Nexium "offers no therapeutic or other benefits to consumers," *id.* at ¶ 55).

---

[24] The six-factor test, first set forth by Professors Areeda and Turner, queries whether the representations were "(i) clearly false, (ii) clearly material, (iii) clearly likely to induce reasonable reliance, (iv) made to buyers without knowledge of the subject matter, (v) continued for prolonged periods of time, and (vi) not readily susceptible of neutralization or offset by rivals." III P. Areeda & D. Turner, ANTITRUST LAW, ¶738a, at 278-79 (1978).

### 2.  The advertising and detailing at issue were not "mere puffery"

For similar reasons, AstraZeneca's misrepresentations cannot be passed off as "mere puffery."  *See* Def. Br. at 34.  The very cases relied on by AstraZeneca, for example *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3d Cir. 1993), hold that advertisements are not "mere puffery" where, as here, "the claim is both specific and measurable by comparative research," or "seeks to substantiate its claims of superiority by reference to testing."

As shown above, AstraZeneca touted Nexium as an improvement over Prilosec, asserting, for example, that it has "significantly greater healing and symptom resolution rates for EE patients;" that the clinical advantage "is demonstrated in longer term maintenance therapy, as well as in the initial healing stage;" that it has a lower number of treatment failures; and has "a greater clinical advantage for more severe patients."  Compl. at ¶ 91.  AstraZeneca *specifically cited alleged comparative studies with Prilosec* and falsely asserted that they showed Nexium was more powerful, had better efficacy in healing, better symptom control, and was more effective as a first-line therapy.  *Id.* at ¶ 92.  The studies negate each of those claims.  *Id.* at ¶ 78.  These are the kind of "specific and measurable" claims, verifiable (indeed, already disproven) by "comparative research," which the courts have held do not constitute "mere puffery."

### 3.  AstraZeneca made the statements to buyers without knowledge and to doctors without incentive

The *de minimis* test asks whether the misrepresentations were made to a *buyer* without knowledge of the subject matter.  The idea is that a buyer with such knowledge will have the incentive and ability to overcome the defendant's false representations. Plaintiffs clearly satisfy these criteria to the extent that AstraZeneca made misrepresentations to consumers.  Consumers are the buyers of the pharmaceutical products, and they lack the specialized medical knowledge necessary to overcome the misrepresentations.

To the extent that AstraZeneca made misrepresentations to doctors and MCOs, they are *not the buyer* of the products and thus lack the incentive and/or ability to overcome the misrepresentations. As shown above, doctors do not pay for pharmaceuticals and thus are not price sensitive. And the MCOs' interests here were not aligned with those of consumers. *See supra* Section I.B.4. Here the actual buyer, the consumer, lacks sufficient knowledge to defeat the misrepresentations, and doctors and MCOs are not the buyer and therefore lack the incentive (or, in the case of MCOs, the incentive and/or ability) to defeat the misrepresentations.

This reality is highlighted by AstraZeneca's massive campaign to promote the use of Nexium over Prilosec, amassing a sales force of nearly 8,000 and spending approximately $1 billion on detailing and advertising in the first two years on the market. This conduct would have been irrational if AstraZeneca thought that the effect on doctors and MCOs would be *de minimis*. As one court succinctly stated, "This Court agrees with [plaintiff's] inference that if the buyers were knowledgeable, then [defendant] would not make these presentations to them." *Avery Denn. Corp. v. Acco Brands*, 2000 WL 986995 (C.D. Cal. 2000) (issue of fact precluded summary judgment as to whether plaintiff had "overcome the de minimis presumption to establish that [defendant's] sales campaign is anticompetitive conduct").[25]

### 4.  The statements are not susceptible to neutralization and other offset

Nor were the misrepresentations neutralized by detailers "from the makers of the other PPIs that treat the same conditions (Prevacid, Protonix and Aciphex)." Def. Br. at 36. The misrepresentations were designed to switch the market *from Prilosec* to Nexium, thereby impairing generic competition. Compl. at ¶ 90. AstraZeneca produced both Prilosec and Nexium,

---

[25] Focusing on statements of one individual (described in the Complaint) AstraZeneca argues *all* doctors knew the truth - that Nexium was *no* improvement over Prilosec. Def. Br. at 36. But Plaintiffs allege most doctors who prescribe Nexium are general practitioners unfamiliar with the studies, and even many specialists were misled. Compl. at ¶ 95.

so there were no "counter-detailers" to dissuade doctors from switching from Prilosec to Nexium. There is no basis (on a motion to dismiss) to credit the fanciful suggestion that other PPI manufacturers had an incentive to, or did, counter AstraZeneca's detailing *against Prilosec.*

### C. The Deceptive Detailing and Advertising Campaign Is Not Shielded by FDA Regulations

Citing 21 C.F.R. § 314.125(b)(6), AstraZeneca asserts that the FDA ensures that labels are not false or misleading. Def. Br. at 38. But Plaintiffs do not claim that the Nexium *label* was false and misleading. The label includes the test results which Defendants told the FDA showed Nexium is not superior to Prilosec. Compl. at ¶ 78. Rather, Plaintiffs claim AstraZeneca's *representations to consumers and doctors* were false and misleading and contrary to its promise to the FDA that it would not claim that Nexium was superior to Prilosec. *Id.* at ¶¶ 91-93, 89.

AstraZeneca makes a vague assertion that its representations were in some undefined way "supported by FDA-approved labels." Def. Br. at 38. But the studies definitively show no superiority of Nexium. Compl. at ¶ 78. The FDA Medical Officer who reviewed the entire set of clinical studies submitted to the FDA regarding Nexium specifically concluded that "[t]here are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically." *Id.* at ¶ 85. Moreover, AstraZeneca's Vice President specifically informed the FDA at a meeting on February 6, 2001, that "AstraZeneca is not stating that Nexium is better than omeprazole." *Id.* at ¶ 89. Indeed, AstraZeneca asked the FDA to include the studies in the label in order "to make physicians understand that Nexium is not superior to omeprazole." *Id.* AstraZeneca's claims of superiority are therefore not "supported by" the label.[26] *See id.* at ¶ 93.

---

[26] AstraZeneca cites a case dismissing a claim against it under a state consumer protection law - not the Sherman Act. *Penn. Empl. Benefit Trust Fund v. Zeneca, Inc.* No. 05-075-SLR, 2005 WL 2993937 (D. Del. Nov. 8, 2005) *appeal pending* No. 05-05340 (3d Cir.). That court did not have before it the allegation that AstraZeneca expressly told the FDA it was

(continued...)

Ultimately, AstraZeneca retreats to limited evidence in some of the studies (contradicted by other studies) that a *double dose* of Nexium (40 mg) may have some clinical advantage as compared to a single dose (20 mg) of Prilosec. *See* Def. Br. at 39. Even assuming that all of the studies as a whole could be read to support that conclusion (the Complaints allege they cannot be), the label still would not support AstraZeneca's representations of superiority. AstraZeneca asserted that *Nexium* is superior to *Prilosec*. It did not limit its representations to a claim that *40 mg* Nexium is superior to *20 mg* Prilosec. Nor did AstraZeneca's representations disclose that the multiple studies comparing 20 mg Nexium to 20 mg Prilosec showed no superiority for Nexium. *See* Compl. at ¶ 78. The blanket assertions that Nexium *as such* is superior to Prilosec *as such* are clearly not "supported by" the label. *See id.* at ¶ 93.

It is true, as AstraZeneca notes, that the FDA has authority to disapprove manufacturers' written marketing materials. *See* Def. Br. at 22. But the FDA is not the comprehensive marketing "watchdog" that AstraZeneca pretends. Given the significant growth of drug advertising and the strain on FDA resources, the FDA is ill-equipped to police all manufacturers' DTC advertising let alone to police the daily activities of tens of thousands of detailers. According to a GAO report, in 2002, only five FDA staff members review DTC advertisements. "Prescription Drugs, FDA Oversight of Direct-to-Consumer Advertising Has Limitations," at 17

───────────────────

(continued...)

including the studies in the label to demonstrate that Nexium is, in fact, no better than Prilosec. *See* Compl. at ¶ 89. Defendants focus heavily on that opinion, yet ignore the California Superior Court decision, which held that its claims of superiority of Nexium over Prilosec may be challenged as deceptive advertising, despite the FDA approval of the label, because "the court cannot fathom[] how Nexium's labeling affirmatively supports defendants' claim that Nexium is superior to Prilosec." *Ledwick v. AstraZeneca* L.A. Super. Ct, BC 324518 , at 10,.

Also unpersuasive is the citation to *Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products*, 71 Fed. Reg. 3922 (Jan. 24, 2006); its Preamble notes that FDA labeling decisions should "preempt" contrary or conflicting *state laws concerning the failure to warn* product liability plaintiffs about the medical dangers of a drug.

& n.26, U.S.G.A.O., GAO-03-177, Oct. 2002. Another handful of reviewers review materials prepared for doctors.[27] Additionally, drug companies do not submit their detailing plans, scripts or other materials used to train their representatives in how to discuss their products with doctors.

In any event, AstraZeneca has little basis to argue that the FDA has the *exclusive* authority to determine whether its promotional materials are false or misleading. In *AstraZeneca LP v. Tap Pharm. Prod., Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006), AstraZeneca itself sought a declaration *from a court* that its 2004-2005 DTC advertising campaign comparing Nexium to PPIs (other than Prilosec) was not false or misleading. Having invoked the authority of the federal courts on that subject, it should not be heard to suggest that the authority does not exist.

AstraZeneca's concession that courts have authority to review pharmaceutical marketing is consistent with other cases that similarly exercised that authority. *See Warfarin Sodium*, 214 F.3d at 397 (antitrust standing exists in claim that brand company "orchestrated a campaign disparaging generic substitutes"); *Ayerst*, 850 F.2d 904 (reversing dismissal of Section 2 claim based on claim that brand company sent deceptive letters to pharmacists). That the FDA had disapproved the misrepresentations in these cases (*see* Def. Br. at 39) is irrelevant. The courts did not tie their holdings to that fact, and nothing in the law or logic supports such a limitation.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[27] July 22, 2003 testimony of Janet Woodcock, M.D., Dir., Center for Drug Evaluation and Research, FDA, before the Senate Special Committee on Aging (In 2003, DDMAC was staffed with about 40 staff members, "20 are primary reviewers and 5 are secondary reviewers (team leaders). The review staff currently has six review groups. Four are Professional Review Groups, each with two review teams, who review materials prepared for health care professionals.") (available at http://www.hhs.gov/asl/testify/t030722b.html).

By: _____/S/_____

Robert D.W. Landon III  (D.C. Bar 441571)
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
(305) 373-1000
(202) 372-1861 (fax)

*Attorneys for Walgreen Plaintiffs*

Steve D. Shadowen
Joseph T. Lukens
HANGLEY ARONCHICK SEGAL &
PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
(215) 568-0300 (fax)

*Attorneys for Rite Aid Plaintiffs*

By: _____/S/_____

David U. Fierst (D.C. Bar 912899)
STEIN, MITCHELL & MEZINES LLP
110 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (fax)

Bruce E. Gerstein
Barry S. Taus
Brett Cebulash
Kevin S. Landau
Archana Tamoshunas
Elena K. Chan
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055
(212) 764-6620 (fax)

J. Gregory Odom
Stuart E. Des Roches
Charles F. Zimmer
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
(504) 522-0077
(504) 522-0078 (fax)

Daniel Berger
David F. Sorensen
Eric Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3010
(215) 857-4671 (fax)

David P. Smith
W. Ross Foote
PERCY, SMITH & FOOTE LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
(318) 445-4480
(318) 487-1741 (fax)

Brent B. Barriere
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130
(504) 584-9210
(504) 568-9130 (fax)

Adam Moskowitz
Alexander S. Bokor
KOZYAK TROPIN & THROCKMORTON,
P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33131-2335
(305) 372-1800
(305) 372-3508 (fax)

*Attorneys for Louisiana Wholesale Drug Co.,
Inc.; Burlington Drug Company, Inc.; Dik
Drug Company; and King Drug Company of
Florence, Inc. on behalf of themselves and all
others similarly situated*

By: _____/S/_____
Linda P. Nussbaum
Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (fax)

Joseph M. Vanek
David Germaine
VANEK, VICKERS & MASINI, P.C.
111 S. Wacker Drive, Suite 4050
Chicago, IL 60606
(312) 224-1500
(312) 224-1510 (fax)

Paul E. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 641-3200
(312( 641-6492 (fax)

*Attorneys for Meijer, Inc. and Meijer
Distribution, on behalf of themselves and all
others similarly situated*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ X

Walgreen Co., et al.,
               Plaintiffs,                       :
                                           :
               v.                           :        **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P, et al.       :        **1:06-cv-02084-RWR**
               Defendants.                   :
_____ X

Rite Aid Corporation, et al.
               Plaintiffs,                       :
                                           :
               v.                           :        **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et. al,     :        **1:06-cv-02089-RWR**
               Defendants.                   :
_____ X

Louisiana Wholesale Drug Co., Inc.,
               Plaintiff,                       :
                                         :
               v.                           :        **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,     :        **1:06-cv-02157-RWR**
               Defendants                     :
_____ X

Burlington Drug Company, Inc., et al.,
               Plaintiffs,                       :
                                       :
               v.                           :        **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,     :        **1:07-cv-00041-RWR**
               Defendants                     :
_____ X

Meijer, Inc., et al.,
               Plaintiffs,                       :
                                       :
               v.                           :        **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,     :        **1:06-cv-02155-RWR**
                Defendants                     :
_____ X

## [PROPOSED] ORDER

       Upon consideration of the Defendants' Motion to Dismiss, Plaintiffs' opposition(s), Defendants' reply, and oral argument on the matter, it is hereby,

ORDERED that Defendants' Motion to Dismiss is DENIED in its entirety.

SO ORDERED this _____ day of _____, 2007:


_____
Richard W. Roberts
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— X

Walgreen Co., et al.,                                       :
        Plaintiffs,                                 :
        v.                                             :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P, et al.           :    **1:06-cv-02084-RWR**
        Defendants.                                :

———————————————————————— X

Rite Aid Corporation, et al.                           :
        Plaintiffs,                                 :
        v.                                             :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et. al,        :    **1:06-cv-02089-RWR**
        Defendants.                                :

———————————————————————— X

Louisiana Wholesale Drug Co., Inc.,               :
        Plaintiff,                                   :
        v.                                             :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,        :    **1:06-cv-02157-RWR**
        Defendants                                 :

———————————————————————— X

Burlington Drug Company, Inc., et al.,            :
        Plaintiffs,                                 :
        v.                                             :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,        :    **1:07-cv-00041-RWR**
        Defendants                                 :

———————————————————————— X

Meijer, Inc., et al.,                                        :
        Plaintiffs,                                 :
        v.                                             :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,        :    **1:06-cv-02155-RWR**
        Defendants                                 :

———————————————————————— X

**APPENDIX IN SUPPORT OF**
**PLAINTIFFS' STATEMENT OF POINTS OF AUTHORITY**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dated:  May 21, 2007

**DOCUMENT**                                                                                        **TAB**

*Avery Denn. Corp. v. Acco Brands*, 2000 WL 986995
  (C.D. Cal. Feb. 22, 2000) ........................................................................................ 1

*Balaco, Inc. v. Upjohn Co.*, 1992 WL 131150 (E.D. Pa. June 3, 1992) ......................... 2

*Bridon Am. Corp. v. Mitsui & Co, Inc.*, 1983 WL 1987 (D.D.C. Nov. 7, 1983) ........... 3

*Eli Lilly & Co. v. American Cyanamid Co.*, 2001 WL 30191 (S.D. Ind. Jan. 8, 2001) ................. 4

*In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D.D.C. May 9, 2000) ................... 5

*Ledwick v. AstraZeneca Pharmaceuticals*, Los Angeles County Superior Court of California,
  Case No. BC 324518 ............................................................................................... 6

*Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*, 2005 WL 2993937
  (D. Del. Nov. 8, 2005), *appeal pending* No. 05-05340 (3d Cir.) ............................... 7

*United States v. Microsoft Corp.*, 1998 WL 614485 (D.D.C. Sept. 14, 1998) .............. 8

*Excerpt of Reply Brief of Microsoft Corp., United States v. Microsoft,*
  Nos. 00-5212 and 00-5213 (D.C. Cir. Jan. 29, 2001) .............................................. 9

Excerpts from P. Areeda & H. Hovenkamp, ANTITRUST LAW ................................... 10

Drug Product Selection, Staff Report to the FTC  (Jan. 1979) .................................... 11

Excerpts from H. Hovenkamp, et al., IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST
  PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW ......................................... 12

A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES:
  ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS (FTC 1985) ........ 13

*Sales Manager is Fired After Comments Hit Web*, Philadelphia Inquirer, Apr. 7, 2007, at E01 . 14

*U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --*
  *Industry Hopes to Hook Doctors, Patients Through Costly Giveaways,*
  Wall Street Journal, July 20, 2000, at 24 ............................................................... 15

Tab 1

**Westlaw.**

Not Reported in F.Supp.2d                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

Avery Dennison Corp. v. Acco Brands, Inc.
C.D.Cal.,2000.

United States District Court, C.D. California.
AVERY DENNISON CORPORATION, Plaintiff,
v.
ACCO BRANDS, INC., a Delaware corporation,
Acco World Corporation, a Delaware corporation,
Fortune Brands, Inc., a Delaware corporation, May
Tag & Label Co., a New York corporation and Does
1-10, Defendants.
ACCO BRANDS, INC., et al., Counter-plaintiffs,
v.
AVERY DENNISON CORPORATION, a Delaware
corporation, Counter-defendant.
**No. CV99-1877DT(MCX).**

Feb. 22, 2000.

ORDER GRANTING IN PART AND DENYING IN
PART AVERY'S MOTION FOR SUMMARY
JUDGMENT
TEVRIZIAN, J.

I. *Background*

A. Factual Summary

**\*1** This action is brought by Plaintiff Avery Den-
nison Corporation ("Avery") against Defendants
Acco Brands, Inc., Acco World Corporation. Fortune
Brands, Inc. and May Tag & Label Co. (collectively,
"Acco") for: (1) infringement of trade dress (15
U.S.C. § 1125(a)); (2) infringement of federally re-
gistered Avery trademarks (15 U.S.C. § 1114(1)); (3)
infringement of federally registered SKU trademarks
(15 U.S.C. § 1114(1)); (4) infringement of SKU
trademarks (15 U.S.C. § 1125(a)); (5) false or mis-
leading advertising (15 U.S.C. § 1125(a)); (6) federal
dilution (15 U.S.C. § 1125(c)); (7) false advertising
(Cal. Bus. & Prof.Code § 17500); (8) unlawful busi-
ness practices and false advertising (Cal. Bus. &
Prof.Code § 17200, et seq.); and (9) dilution (Cal.
Bus. & Prof.Code § 14330).

The following facts are for general background pur-

poses and are undisputed: FN1

> FN1. Additional facts are addressed below
> throughout the discussion as pertinent to the
> determination of the claims.

Avery is a manufacturer of office supplies, including
a line of self-adhesive labels intended for use with,
among other things, laser or ink jet computer printers.
"Machinable labels" are mailing labels that are used
with computer laser and ink jet printers. Some in the
label market consider those mailing labels that are
used with copiers to be in the category of
"machinable labels." Avery has Federal Registrations
for Avery's SKU trademarks 5160, 5161, 5162, 5163
and 5660 (the "Federal SKU Marks").

In early 1998, Acco Brands began offering a premi-
um line of self-adhesive labels intended for use with,
among other things, laser or ink jet computer printers,
under the Wilson Jones brand.

On October 12, 1999, this Court granted Acco's Mo-
tion for Summary Judgment on Avery's First, Second,
Third, Fourth, Sixth, Eighth and Ninth Claims for Re-
lief, which included allegations for state and federal
trademark infringement, trade dress infringement and
state and federal dilution. In this Court's Order,
entered on October 12, 1999 ("October Order"), this
Court ruled that Acco's use of Avery's trademarks
qualified under the nominative fair use doctrine. As a
result, only two of Avery's claims remain-for false
advertising under federal and state law.

B. Procedural Summary

On February 23, 1999, Avery filed its Complaint. On
March 11, 1999, this case was transferred to this
Court since it involved the same or substantially the
same parties as another case pending before this
Court, *Avery Dennison Corporation v. Acco USA,
Inc., Acco World Corporation. Fortune Brands, Inc.,*
Case No. CV 98-3345 DT (Mcx).

On March 31, 1999, Acco filed an Answer to Com-
plaint, Affirmative Defenses and Counterclaims.
Acco asserts the following Counterclaims: (1) request

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

for declaratory judgment of non-infringement and no dilution of Avery's alleged trademarks; and (2) cancellation of the federal registration for the federal SKU marks.

On April 20, 1999, Avery filed a Motion to Dismiss Counterclaims Pursuant to Rule 12(b)(6) Fed.R.Civ.P. and First Affirmative Defense Pursuant to Rule 12(f) Fed.R.Civ.P. On May 24, 1999, this Court entered an Order Denying Avery's Motion to Dismiss Counterclaims Pursuant to Rule 12(b)(6) Fed.R.Civ.P. and First Affirmative Defense Pursuant to Rule 12(f) Fed.R.Civ.P.

*2 On May 17, 1999, Acco filed a First Amended Answer to Complaint, Affirmative Defenses and Counterclaims.

On May 17, 1999, at the Mandatory Status Conference, this Court set the discovery cut-off date of November 11, 1999; the pre-trial conference date of January 18, 2000; and the trial date of February 29, 2000.

On May 17, 1999, Acco filed a Motion for Summary Judgment on All Plaintiff's Federal and State Claims for Relief for Trademark Infringement and Dilution, Trade Dress Infringement, False and Misleading Advertising, and Unfair Competition. On May 24, 1999, Avery filed a Response to Motion for Summary Judgment and Application Pursuant to Rule 56(f) to Refuse the Motion for Summary Judgment or to Continue for Further Discovery.

On May 27, 1999, Avery filed an Answer to Defendants' First Amended Counterclaims.

On June 2, 1999, this Court entered, among other things, the following orders: (1) granting Avery's motion for relief under Fed.R.Civ.P. 56(f) and (2) continuing Acco's Motion for Summary Judgment to October 12, 1999.

On June 4, 1999, Avery filed a First Amended Complaint, adding May Tag & Label Co. as a defendant and making additional allegations.

On June 14, 1999, Acco filed an Answer, Affirmative Defenses and Counterclaims to Avery's First

Amended Complaint. Acco asserted the counterclaims set forth below ("Counterclaims"), which are the subject of this motion.

On June 25, 1999, Avery filed an Answer to Acco's Second Amended Counterclaims.

On June 4, 1999, Avery filed a Motion for Preliminary Injunction, and on June 15, 1999, Acco filed a Motion for Preliminary Injunction. On July 7, 1999, this Court entered an Order Granting in Part and Denying in Part Plaintiff Avery Dennison Corporation's Motion for Preliminary Injunction FN2 and an Order Denying Defendants and Counter-Plaintiffs Acco Brands, Inc., Acco World Corporation and Fortune Brands, Inc. and May Tag and & Label Co.'s Motion for Preliminary Injunction. On July 12, 1999, this Court entered a Supplemental Order Granting in Part and Denying in Part Plaintiff Avery Dennison Corporation's Motion for Preliminary Injunction ("Supplemental Order").

> FN2. Specifically, this Court found that Avery was not entitled to a preliminary injunction with respect to its trademark infringement claims; that Avery was not entitled to a preliminary injunction with respect to its trade dress infringement claims; and that Avery was entitled to a preliminary injunction with respect to its false advertising claims.

On August 13, 1999, Acco filed a Motion for Continuance of the Pretrial Conference and Related Dates. On August 16, 1999, Acco filed an Ex Parte Application and Memorandum for an Extension of Time to Complete Discovery and for a Continuance of the Pretrial Conference and Trial Dates. On August 19, 1999, this Court denied Acco's Ex Parte Application.

On August 16, 1999, Acco filed a Motion for Review and Reconsideration of Magistrate Judge McMahon's Order of August 3, 1999. On September 8, 1999, this Court entered an Order Denying Acco's Motion for Review and Reconsideration of Magistrate Judge McMahon's Order of August 3, 1999.

On September 3, 1999, Acco filed an Amended Mo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

tion for Summary Judgement on Plaintiff's First, Second, Third, Fourth, Sixth, Eighth and Ninth Claims for Relief. On October 13, 1999, this Court entered an Order Granting Acco's Amended Motion for Summary Judgment on Plaintiff's First, Second, Third, Fourth, Sixth, Eighth and Ninth Claims for Relief.

**\*3** On September 13, 1999, this Court ordered the parties to attend a mandatory settlement conference before Charles Bakaly.

On September 28, 1999, Avery filed a Motion to Sever and Stay Discovery on Antitrust Counterclaim, which this Court denied on October 25, 1999.

On November 19, 1999, Avery filed a Motion for Summary Judgment. Pursuant to ex parte applications by both parties, on November 24, 1999, this Court issued an order taking this motion for summary judgment off calendar without hearing to be reset for a hearing after (1) Defendants' motion to compel is decided by the Magistrate Judge; and (ii) a decision by this Court on any motions for reconsideration, if filed by either party.

On November 19, 1999, Acco filed a Motion to Dissolve Preliminary Injunction. On December 14, 1999, this Court entered an Order Denying Acco's Motion to Dissolve Preliminary Injunction.

On December 10, 1999, Avery filed a Motion to Bar Sherri Matteo and MWA Consulting. On January 12, 2000, this Court entered an Order Denying Avery's Motion to Bar Sherri Matteo and MWA Consulting.

On January 18, 2000, this Court held the pre-trial conference.

On January 24, 2000, Avery filed a Notice of Resetting and Briefing Schedule on its Motion for Summary Judgment, resetting this motion for this date.

## II. *Standard*

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514 (1986)*. If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *Id.; see* Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986)*. Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Anderson, 477 U.S. at 250-51, 106 S.Ct. at 2511*. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)*. Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. *Harper v. Wallingford, 877 F.2d 728 (9th Cir.1989); California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.1987), cert. denied, 484 U.S. 1006 (1988)*.

## III. *Analysis*

**\*4** Acco asserts the following Counterclaims against Avery: (1) request for declaratory judgment of non-infringement and no dilution of Avery's alleged trademarks; (2) cancellation of the federal registrations for the Federal SKU Marks; (3) false or misleading advertising (15 U.S.C. § 1125(a)(1)(B)); (4) false advertising (California Business and Professions Code § 17500); (5) unlawful business practices and false advertising (California Business and Professions Code § 17200 et seq.); (6) interference with prospective economic advantage; and (7) unlawful monopolization and attempt to monopolize (15 U.S.C. § 2). Avery seeks summary judgment as to Counts I, II, VI

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

and VII of Acco's Counterclaims. Avery also seeks summary judgment as to Counts III, IV, V, VI and VII to the extent these counts are based on the "cease and desist letters" sent by Avery's counsel.[FN3]

> [FN3.] Avery does not seek summary judgment on Acco's false advertising claims-Counts III, IV and V-except to the extent they are based on the Bohrer Letters. Acco's false advertising claims are also based on Avery's sales and promotional materials.

### A. *Avery Is Not Entitled to Summary Judgment as to Count I (Declaratory Judgment of Non-Infringement and No Dilution)*

Avery seeks summary judgment as to Count I contending that Count I of Acco's Counterclaim is moot and must be dismissed. Specifically, it states that Acco's request for a declaration stating that it did not infringe and dilute the trademarks and trade dress at issue in this case is moot now that this Court has dismissed Avery's trademark and trade dress infringement claims.

Acco agrees that Count I is the mirror image of its defenses to Avery's claims of trademark infringement and dilution, on which this Court granted summary judgment in Acco's favor. However, it disagrees that Avery is therefore entitled to summary judgment with respect to this counterclaim.

This Court finds that dismissal of Count I of Acco's Counterclaim is warranted but that summary judgment in favor of Avery is not warranted with respect to this claim. As Avery correctly states, courts have held that where both the plaintiff's claim and a defendant's counterclaim seeking declaratory relief raise identical factual and legal issues, the counterclaim is redundant and will become moot upon dismissal of the plaintiff's claim and must be dismissed. *See Aldens, Inc. v. Packel, 524 F.2d 38, 51-52 (3d Cir.1975).* It does not follow, however, that Avery should be granted summary judgment with respect this claim. Rather, as Acco acknowledges, the claim should be dismissed. Accordingly, this Court denies Avery's motion for summary judgment with respect to Count I of Acco's Counterclaim and instead dis-

misses with prejudice Count I of Acco's Counterclaim.

### B. *Avery Is Entitled to Summary Judgment as to Count II (Cancellation of Avery's SKU Marks)*

In Count II, Acco seeks cancellation of the registration of Avery's Federal SKU Marks based upon the allegedly fraudulent declaration submitted by its counsel, Mr. Moore, to the Patent and Trademark Office ("PTO") in support of the application to register these marks. Avery contends that Acco cannot satisfy its burden of establishing that the registrations of the Federal SKU Marks were procured by fraud.

**\*5** To obtain cancellation of Avery's registered Federal SKU Marks on the basis of fraud, Acco must prove: (1) a false representation regarding a material fact; (2) Avery's knowledge or belief that the representation is false; (3) Avery's intent to induce reliance upon the misrepresentation; (4) reasonable reliance thereon; and (5) damages approximately resulting from the reliance. *Robi v. Five Platters, Inc., 918 F.2d 1439, 1444* (9th Cir.1990). The burden of proving that a party fraudulently procured a trademark registration is heavy. *See id.*

Avery argues that Acco fails to satisfy the first and second elements of fraudulent procurement-that Mr. Moore made false representations in his declaration or that Mr. Moore knew or believed these representations were false.

#### 1. Mr. Moore did not make false representations

Acco contends that Avery made a false statement when Mr. Moore, Avery's Chief Patent Counsel, submitted a sworn declaration to the PTO stating that the use of Avery's numerical marks in a "comparative advertising" sense was "unobjectionable to Avery." Acco claims that Mr. Moore later testified that the phrase "comparable to" on Acco's packaging was the type of "comparative advertising" referred to in Mr. Moore's statement.

At the outset, this Court notes that this alleged false statement must be read in context. The paragraph from which this statement at issue is extracted provides as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

Labels as sold under Avery's five numerical marks have achieved significant commercial success (e.g., sales during the period 1990-1996 of more than $100,000,000), and competitors have on occasion attempted to copy and misappropriate these marks to the detriment of Avery, and with resulting potential customer confusion and dilution of the distinctiveness of the marks. Avery has acted promptly to quell these improper uses of the marks. Competitors have uniformly discontinued such uses, and have instead agreed to refer only to the marks in a "comparative advertising" sense which is unobjectionable to Avery. For example ...

b. A competitor called MACO (May Tag & Label Corporation) in Hillside, New Jersey, agreed to discontinue copying of Avery's numerical marks, and to use the marks only in a comparative-advertising sense in which the marks were stated to be those of Avery.

(*See* Moore PTO Decl. ¶ 3, Exh. 16 to Chung Decl.) Thus, Mr. Moore was making a broad, generalized statement that competitors have discontinued improper uses of Avery's marks and have instead agreed to refer to these marks in a comparative advertising sense which is unobjectionable to Avery. Mr. Moore did not specify which types of comparative advertising were deemed unobjectionable. He did not state that any comparative advertising by any party would be unobjectionable. Certainly, at the time Mr. Moore made the statement, he did not, and could not, refer to Acco's use of Avery's marks as "unobjectionable." Thus, Acco cannot show that Avery made a false representation as a matter of law.

**2. Avery did not know that these representations were false**

**\*6** This Court further concludes that even if Mr. Moore's statement was false, Acco cannot show that Avery knew that its representations were false. In support of its claim that Avery knew that its representations were false, Acco argues that Avery sued Acco and challenged Acco's comparative use of Avery's Trademarks despite Avery's representations to the PTO that comparative references were unobjectionable. Again, as stated above, Avery's statement was a broad, generalized statement. It was not a spe-

cific statement that Avery would not challenge any uses of its marks. Indeed, Avery did not foreclose its right to object to uses of its marks which it deems not to be proper comparative advertising. Mr. Moore testified that he had submitted his declaration to the PTO to point out that Avery "had carried the trademark owner's obligation to defend and police its rights, which is a factor in registerability." (*See* Moore Depo., pp. 170-171, Exh. 31 to Chung Decl.) Mr. Moore further explained that the examples listed in his declaration regarding Avery's prior policing efforts were included to show that Avery was not giving "carte blanche" approval to other companies' comparative advertising uses, but that Avery would only agree to comparative advertising which is legally proper. (*See id.* at pp. 166-69.)

In sum, Acco has failed to sustain its heavy burden of showing fraud by Avery on the PTO in procuring the registrations of its Federal SKU Marks. Acco has not shown the existence of a genuine issue for trial. Contrary to Acco's arguments, a reasonable jury could not infer that Avery committed fraud from a showing that Avery's statements are inconsistent with its conduct in bringing suit against Acco. Accordingly, this Court grants Avery's motion for summary judgment with respect to Count II of Acco's Counterclaim.

**C. Avery Is Entitled to Summary Judgment as to Count III (False or Misleading Advertising in violation of Lanham Act) To the Extent Count III Is Based on Bohrer Letters**

In Count III of its Counterclaims, Acco asserts a claim for false or misleading advertising pursuant to Section 43(a) of the Lanham Act, [15 U.S.C. § 1125(a)(1)(B)]. Specific to the arguments here, Acco claims that Avery's outside counsel, David Bohrer, sent letters to Acco's customers which contained false and misleading statements about Avery's claims in this litigation ("Bohrer Letters" or "Letters"). (*See* Counterclaim, ¶ 39.) To the extent that this claim is based upon the Bohrer Letters, Avery seeks summary judgment.

Section 43(a) of the Lanham Act prohibits the use of "any false designation of origin, false or misleading description of fact, or false or misleading representa-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

tion of fact" in "commercial advertising or promotion." *See* 15 U.S.C. § 1125. The elements of a Section 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is material in that they are likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement. *Cook, Perkiss and Liehe, Inc. v. N. Calif Collection Serv. Inc., 911 F.2d 242, 244 (9th Cir.1990).*

**\*7** Avery contends that this claim fails as a matter of law to the extent it relies on the Bohrer Letters because: (1) the letters are not false; (2) the letters did not deceive or have a tendency to deceive the audience; and (3) the letters are not commercial advertisements. This Court addresses Avery's third argument-that the letters are not commercial advertisements since summary judgment is warranted on this basis.

### 1. The Bohrer Letters are not commercial advertisements

While the Lanham Act proscribes misrepresentation of another's goods or services in "commercial advertising or promotion," neither the Act's legislative history nor the Act itself defines "advertising." *Coastal Abstract Service v. First American Title, 173 F.3d 725, 734 (9th Cir.1999).* As such, the Ninth Circuit has recognized four criteria for determining whether representations constitute "commercial advertising or promotion" for purposes of Section 43(a): (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. *Id. at 735.*

### a. The Letters do not constitute commercial speech

It is clear that speech which merely proposes a commercial transaction falls within the boundaries of

commercial speech. *United Reporting Pub. v. California Highway Patrol, 146 F.3d 1133, 1137 (9th Cir.1998).* The Supreme Court has also "indicated that it would regard as commercial speech any 'expression related solely to the economic interests of the speaker and its audience.' " *Id.* (citing *Central Hudson Gas and Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1990)).* In sum, "[t]he Supreme Court has abstained from creating bright-line rules in this area and so should we." *Id.* Thus, the Ninth Circuit has directed the Court to examine the disputed communication in light of its surrounding circumstances to determine whether it is entitled to the qualified protection accorded to commercial speech. *Id.*

Acco contends that the Bohrer Letters are commercial speech. In support of this contention, it relies on three factors: (1) whether the communication is an advertisement; (2) whether it refers to a specific product or service; and (3) whether the speaker has an economic motivation for the speech. This Court is not persuaded by Acco's argument that the Letters constitute an advertisement. Acco claims that false representations made in private letters from one company to another are sufficient to constitute advertisements. It cites to *North Shore Med. Center, Ltd. v. Evanston, 1993 WL 141717 (N.D.Ill.1993).* First, this Court notes that this unpublished opinion is not binding precedent on this Court. In any event, the Court in *North Shore* did not hold that private letters from one company to another are sufficient to constitute advertisements. In fact, in determining the motion to dismiss, the court explicitly did not address "commercial advertising." *Id. at* [*]3. Rather, it found that the plaintiff had stated a claim since the alleged misrepresentations were within the reach of Section 43(a) of the Lanham Act. *Id.*

**\*8** Similarly, Acco relies on a case, *Pearson Indus., Inc. v. Pet Friendly, Inc., 33 F.Supp.2d 1322, 1325 (M.D.Ala.1999),* in support of its argument that protest letters used as a sales and marketing tool to discourage customers and prospective customers from buying a competitor's product also constitute advertisements. Assuming that this Court agreed with the reasoning behind this holding, this holding is inapplicable to the facts of this case. Specifically, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

facts in *Pearson* show that the protest letters were given to the defendant company's director of sales and marketing. *Id.* at 1324. The director testified that he was instructed to use them as a sales and marketing tool-as "show-and-tell" devices in customer presentations to convince them to buy its company's products. *Id.* He further testified that he gave the letter to at least four brokers in the industry and repeated the substance of those letters in conversations with various buyers from various retail chains. *Id.*

In this case, Acco has not presented any evidence that the Bohrer Letters were used as a sales and marketing tool to discourage customers and prospective customers from buying a competitor's product. The Letters did not ask the recipients not to buy Acco's products; rather, they asked the recipients not to use the allegedly infringing packaging in their catalogs. In fact, as admitted by Acco, these customers were already customers of both Avery and Acco. From a reading of the content of the Bohrer Letters, it is clear that these letters consisted of "cease and desist" language rather than any marketing or sales pitch. As this Court previously observed in its Order denying Acco's motion for preliminary injunction, a company would not allow its attorney to send such letters to current customers for the purpose of influencing them to buy just Avery products.

As such, this Court concludes that the Bohrer Letters do not constitute an advertisement as a matter of law. Furthermore, in examining the disputed communication in light of its surrounding circumstances, this Court concludes that the Letters do not constitute commercial speech. As Avery argues, the central message of the Letters was that Avery believed its legal rights were being violated and that it did not want the recipients of the letters to continue that violation.

b. The purpose of the Letters was not to influence customers to buy Avery's goods

Avery contends that the purpose of the Letters was not to influence customers to buy Avery's goods or services. It argues that one would not generally select an attorney's letters as a means of currying favor with customers. Acco, on the other hand, contends that

Avery's purpose in distributing the Letters was to leave consumers with just one choice-Avery for "premium" machinable labels.

As mentioned above, Avery would not urge its attorney to send letters threatening lawsuits against its own customers as a way to promote Avery's own business. On their face, the Letters seek only to inform the customers of the allegations of the lawsuit and to stop the catalog companies from promoting or publishing Acco's goods in the allegedly infringing or false advertising packaging. Additionally, these customers were already customers of both Avery and Acco. As such, this Court concludes that the purpose of these Letters was not to influence customers to buy Avery's products.

2. Summary

**\*9** Avery has sustained its burden to show that Acco cannot establish that the Bohrer Letters are commercial advertising. Acco has failed to create a genuine issue as to this aspect of its claim. Because Acco cannot satisfy an element of its Section 43(a) false advertising claim, its claim fails as a matter of law, and this Court grants Avery's motion for summary judgment as to Count III.

D. Avery Is Entitled to Summary Judgment as to Counts IV, (False Advertising in Violation of [Sections 17200](#)), V (False Advertising in Violation of [Section 17500](#)) and VI (Interference With Prospective Economic Advantage) To the Extent These Counts Are Based on the Bohrer Letters

In Count IV, Acco asserts a counterclaim for false advertising under [California Business & Professions Code § 17200](#). In Count V, Acco asserts a counterclaim for unlawful business practices and false advertising under [California Business and Professions Code § 17500](#) et seq. In Count VI, Acco asserts a counterclaim for interference with prospective economic advantage. Avery contends that these claims fail as a matter of law to the extent that they are based on the Bohrer Letters. Specifically, it argues that the litigation privilege bars these claims.

In California, the "litigation privilege" applies to any "publication or broadcast" made in any judicial pro-

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

ceeding. *See* Cal. Civ.Code § 47. This privilege ap-
plies to any communication (1) made in judicial or
quasi-judicial proceedings; (2) by litigants or other
participants authorized by law; (3) to achieve the ob-
jects of the litigation; and (4) that have some connec-
tion or logical relation to the action. *Kimes v. Stone,
84 F.3d 1121, 1127 (9th Cir.1996)* (*citing Silberg v.
Anderson (1990) 50 Cal.3d 205*.) This privilege ap-
plies whether or not the publication is made in the
courtroom or in court pleadings, and whether or not
any function of the court or its officers is involved.
*Rothman v. Jackson (1996) 49 Cal.App. 4th 1134,
1140*.

Acco argues that Avery is precluded from arguing
that the Bohrer Letters were disseminated in good
faith contemplation of litigation. Specifically, it
claims that Avery refused to provide discovery re-
garding the bases for the statements in the Bohrer
Letters and whether it actually ever seriously contem-
plated suing Acco's customers. It concludes that
Avery should be precluded from arguing that the Let-
ters were sent out in good faith. It further concludes
that Avery's refusal to cooperate in discovery sup-
ports an adverse inference-that Avery did not send
out the Letters in good faith. In addition, Acco claims
that certain circumstances indicated that Avery never
intended to sue Avery's own customers.

This Court concludes that the litigation privilege ap-
plies to the Bohrer Letters. The Letters achieve the
objects of litigation and have some connection or lo-
gical relation to the instant action. "The requirement
that the communication be in furtherance of the ob-
jects of the litigation is, in essence, simply part of the
requirement that the communication be connected
with, or have some logical relation to, i.e., that it
that it not be extraneous to the action." *Silberg, 50
Cal.3d at 220*. The statements in the Letters directly
discuss the current litigation. They inform the recipi-
ents of the claims in the pending litigation and of the
bases for these claims. "[T]he communicative act-be
it a document filed with the court, a letter between
counsel or an oral statement-must function as a ne-
cessary and useful step in the litigation process and
must serve its purposes." *Rothman, 49 Cal.App. 4th
at 1146*. Here, the Letters to the customers function
as at least a useful step in the litigation process by in-

forming these customers of potential liability.

**\*10** For these same reasons, this Court declines to
make any adverse inferences from the parties' discov-
ery disputes. The good faith requirement relates to
contemplation of a lawsuit. Here, the lawsuit against
Acco was more than just contemplated-it was already
filed. With respect to Acco's claim that Avery is
highly unlikely to initiate litigation against its own
customers, the California Supreme Court has stated,
"[t]he 'furtherance' requirement was never intended
as a test of a participant's motives, morals, ethics or
intent." *Silberg, 50 Cal.3d at 220*. It is enough if the
statements have "some reasonable relevancy to the
subject matter of the action." [FN4] *Id.*

> FN4. This Court also disagrees with Acco's
> assertions that Avery did not contemplate
> litigation against Avery's own customers in
> light of the facts that Acco had tried to make
> changes to the packaging and that Avery
> knew that Acco's comparability claims were
> true. These "facts" are the very subject of
> this litigation which Avery discussed in the
> Letters it sent to the customers. Thus, they
> are not evidence that Avery never contem-
> plated litigation.

Furthermore, as this Court previously noted, a finding
that the litigation privilege applies to the Letters sup-
ports the policies which underlie the litigation privi-
lege. "The principal purpose of section 47(2) is to af-
ford litigants and witnesses ... the utmost freedom of
access to the courts without fear of being harassed
subsequently by derivative tort actions." *Id.* at 213. If
this Court were to impose tort liability based on the
Letters, then it would inhibit trademark holders from
attempting to protect the rights granted it under the
Lanham Act. In addition, the litigation privilege
"further promotes the effectiveness of judicial pro-
ceedings by encouraging attorneys to zealously pro-
tect their clients' interests." *Id.* at 214. These Letters
can be said to be products of attorneys who are zeal-
ously protecting Avery's interests. Thus, this Court
concludes that the Letters further the objects of the
litigation and fall within the scope of the litigation
privilege as a matter of law.

Accordingly, Acco's state law claims are barred to the extent that they are based on the Bohrer Letters. Indeed, the purpose of the litigation privilege is to afford litigants utmost freedom of access to courts without fear of being harassed subsequently by derivative tort actions. *Aronson v. Kinsella* (1997) 58 Cal.App. 4 th 254. Accordingly, this Court grants Avery's motion for summary judgment as to Counts IV and V to the extent those counts are based on the Bohrer Letters and grants Avery's motion for summary judgment as to Count VI. FN5

> FN5. The only basis for Count VI-intentional interference with prospective economic advantage-appears to be the Bohrer Letters.

E. Avery Is Not Entitled to Summary Judgment as to the Unlawful Monopolization Claim of Count VII

Under Count VII, Acco brings claims for unlawful monopolization and attempt to monopolize under Section 2 of the Sherman Act, 15 U.S .C. § 2. Acco alleges that Avery has engaged in anticompetitive conduct with the intent of destroying Acco's ability to effectively compete with Avery in the machinable label market and thereby maintain its 80 percent market share of the commercial market for machinable labels. (*See* Counterclaim, ¶ 90.)

Section 2 of the Sherman Act prohibits monopolies, attempts to form monopolies, and combinations and conspiracies to do so. *See* 15 U.S.C. § 2. To prevail on a monopolization claim, the plaintiff must prove that the defendant: (1) possessed monopoly power in the relevant market; (2) willfully acquired or maintained that power through exclusionary conduct; and (3) caused antitrust injury. *American Professional Testing Serv. v. Harcourt Brace Jovanovich,* 108 F.3d 1147, 1151 (9 th Cir.1997).

1. Triable issues exist with respect to whether Avery possesses monopoly power in the relevant market

**\*11** "Monopoly power," or market power, is the "power to control prices or exclude competition in a relevant market." *Image Tech. Serv., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9 th Cir.1997), cert. denied, 523 U.S. 1094 (1998) (citation omitted).

Monopoly power may be proven by either direct or circumstantial evidence. *Id.* To demonstrate monopoly power, a plaintiff must: (1) define the relevant market; (2) show that the defendant has a dominant share of that market; and (3) show that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run. *Id.* (citation omitted).

a. Defining the relevant market

The relevant market is the field in which meaningful competition is said to exist. *Id.* The relevant market is defined in terms of product and geography. "Ultimately, what constitutes a relevant market is a factual determination for the jury." *Id.* at 1203.

(i) *relevant product market*

Acco contends that the relevant product market is the sale of machinable labels to commercial customers. Commercial customers consist of commercial stationers who sell office supplies directly to businesses through sales representatives and/or catalogs. Avery argues that this market definition is artificially restrictive in several respects. It first asserts that label manufacturers or suppliers such as Avery and Acco sell or potentially can sell to various types of distributors (i.e., resellers). It further asserts that the fact that different distributors may focus their principal marketing efforts on different retail customers does not create separate relevant markets for the different channels of distribution because there is increasing overlap and consolidation among resellers. Finally, Avery argues that Acco entirely ignores a critical required element of market definition analysis, supply-side substitution.

This Court concludes that Acco has set forth sufficient evidence to create a triable issue with respect to the relevant product market. There is no dispute that the relevant product market is at least machinable labels. The issue is whether this market should be further defined as machinable labels to commercial customers. Within a broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962). Rel-

Not Reported in F.Supp.2d                                                          Page 10
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

evant considerations include "industry or public re-cognition of the submarket as an economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Acco presents evidence that the market for machinable labels is characterized by separate distribution channels that sell into the commercial and retail markets. (*See* Exh. 10, Weisman Depo., p. 28.) The evidence also shows that different products are offered in the commercial market as opposed to the retail markets, and that the customers in the commercial market are different from those in the retail market. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 9.) It further shows that there is a low cross-elasticity of demand between machinable labels sold through the commercial channel and those sold through other channels. (*See id.* at ¶ 28.) Finally, Acco also shows that the pricing and packaging configuration of Wilson Jones machinable labels were specifically fo-cused on the commercial distribution channels, and that the Wilson Jones name is a brand that is recog-nized within the commercial office products environ-ment. (*See* Exh. 13, Fingerhut Depo., pp. 479-82.) In light of this evidence, a jury could find that the com-mercial distribution channel for machinable labels is a different market from other distribution channels.

**\*12** Avery argues that Acco does not account for sup-ply-side substitutability. Acco responds that its expert has considered the possibility of supply-side substitu-tion but has concluded it does not impact this analys-is. This Court agrees that Acco does consider supply elasticity in its relevant product market inquiry. Ac-cording to Acco, manufacturers of unrelated products are precluded by high barriers to entry in the machin-able label market from providing substitute supply of office label products. (*See* Exh. 46, Weinstein Second Supp. Rpt., ¶ 10.) Thus, drawing all inferences in fa-vor of Acco, a jury could find Acco's definition of the relevant market to be correct.

(ii) *relevant geographic market*

Avery claims that the relevant geographic market is at least North America and should include Europe. Acco, on the other hand, claims that the relevant geo-graphic market is the United States.

Again, this Court concludes that a triable issue of fact exists. According to Acco's expert, the United States is a proper geographic market given that paper, ad-hesives, face and backing materials usually are provided by domestic suppliers. (*See* Exh. 46, Wein-stein Second Supp. Rpt., ¶ 15.) He further claims that Unites States commercial stationers have concen-trated on serving the commodity office supply needs of large businesses in the United States. (*See id.*) Acco argues that Avery's expert errs when he claims that "offshore producers in Europe could ship into the U.S. should prices rise to supra-competitive levels" since Avery's expert fails to recognize the existing barriers that preclude the production and sales of machinable labels across countries, especially between Europe and North America. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 37; *see* Exh. 46, Weinstein Supp. Rpt., ¶ 16.) It also argues that label manufac-turers would have to incur extra transportation costs and marketing costs if they were to attempt to penet-rate foreign markets. (*See id.*)

Avery responds that Acco itself ships labels for dis-tribution from its New Jersey production facility throughout North America, including Mexico. (*See* Weisman 2/4/00 Depo., p. 20.; Haske Depo., p. 51, Exh. F to LaPointe Decl.) It argues that this in itself establishes the feasibility of label shipments throughout North America. (*See* Keeley Supp. Decl., ¶ 23.) It concludes that there are no substantial barri-ers to foreign producers selling into North America. Avery further concludes that since European firms can and do sell economically to the U.S. market, and since U.S. customers can and do turn to such firms, North America and Europe should be considered the relevant geographic market.

In light of the above conflicting evidence and expert opinions, this Court may not weigh the evidence as presented by the parties. The inferences to be drawn from the parties' evidence could weigh in favor of either party.

b. Avery's market share

**\*13** A plaintiff must show that the defendant owned a "dominant share" of the market. *Image Tech., 125 F.3d at 1206.* Courts have generally found that a 65%

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

market share establishes a prima facie case of market power. *Id.* While market share alone does not determine monopoly power, "market share is perhaps the most important factor to consider in determining the presence or absence of monopoly power." *Movie 1 & 2 v. United Artists Communications,* 909 F.2d 1245, 1254 (9th Cir.1990). As the Ninth Circuit explained: Calculation of the market share allows for a proper understanding of the defendant's influence and relative power in the relevant market. A dominant share of the market often carries with it the power to control output across the market, and thereby control prices.

*Image Tech.,* 125 F.3d at 1206.

Acco contends that Avery has at least a 75% share of the market for the sale of machinable labels to commercial customers in the United States. Avery, on the other hand, claims that the appropriate way to measure its market share is to include the capacitites of actual and potential label suppliers in the relevant marktet. It relies on the results of the Freedonia Group, an industrial research firm which consults to the label business. The Freedonia Group measures the sales of finished labels and provides data from which an appropriate measure of Avery's market share can be derived, and according to the Freedonia Group, Avery's share of the market for finished pressure sensitive labels is 10%. Producers of pressure sensitive labels are the label producers who could most easily expand production into machineable office labels (a type of pressure sensitive label) should it become profitable to do so. Avery further states that even if one were to restrict the market to sales of labels for mailing and other functions made to offices and consumers, Avery's sales of business labels comprise only 30% of that market.

This Court agrees with Acco that Avery's share of some market other than the relevant product market is irrelevant to the determination of market share. Avery creates a market which includes the capacities of actual and potential label suppliers. This Court fails to see why these latter categories should be taken into account. Here, the parties agree that the relevant product market is machineable labels. As Acco's evidence suggests, Avery has at least a 75%

share of the market for the sale of machineable labels to commercial customers in the United States. (*See* Exh. 46, Weinstein Second Supp. Rpt. ¶ 12.) Indeed, Avery's own documents show its market share to be at least 75%. (*See, e.g.,* Exh. 17, AVE 9443). Even if the definition of the relevant market is different, Avery's share is still high. According to Avery's own documents, it has the following shares in the following categories:

(1) 79-90% of all office labels in all channels (*See* Exh. 16, AVE 045512; *see* also Exh. 46, Weinstein Seccond Supp. Rpt., Ex. C);

**\*14** (2) 75-80% of all office labels to commercial customers (*See* Exh. 16, AVE 045512);

(3) 90% of machineable labels in all channels (*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. C).

Thus, this Court concludes that Acco's evidence of a 75% market share by Avery is enough to establish a genuine issue of material fact regarding market share and creates a strong inference as to the presence of monopoly power. *See Movie 1 & 2,* 909 F.2d at 1254.

c. Barriers to entry and output capacity restrictions

A Section 2 plaintiff must show that new competitors face high market barriers to entry and that current competitors lack the ability to expand their output to challenge a monopolist's high prices. *Id.* at 1208. Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale. *Id.* Barriers to entry are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427 (9th Cir.1993). "Even if [defendant] has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion." *American Professional Testing,* 108 F.3d at 1154.

Avery contends that no barriers to entry exist here. It

argues that Acco's evidence with respect to barriers is insufficient to withstand summary judgment.

Acco contends that the following are entry barriers: (1) entrenched buyer preferences; (2) Avery's ties with its commercial customers; (3) agreements between Avery and software manufacturers; (4) high capital costs; (5) Avery's ability to foreclose needed materials and to benefit from economies of scale; (6) Avery's intellectual property rights; and (7) barriers to expansion. This Court concludes that Acco has presented sufficient evidence, as discussed below, to withstand summary judgment on the issue of entry barriers and output capacity restrictions.

### (1) *Entrenched buyer preferences*

Acco contends, and this Court agrees, that entry barriers exist due to product differentiation and price differentiation based on brand recognition and brand loyalty. *See* *Image Tech, Servs., 125 F.3d at 1208; U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 704 (Fed.Cir.1988).* Brand loyalty to Avery and brand recognition of Avery cannot be disputed by Avery. Indeed, Avery has touted its own brand name recognition: "Avery's fundamental strategy: to build on brand, you must be first to market, so that your brand will stand for the category." (*See* Exh. 18, AVE 9438 (emphasis in original).) In presentations, Avery cited its "brand name awareness" and "consumer brand recognition" as reasons to buy its labels instead of Wilson Jones' labels. (*See* Exh. 19, AVE 9440.) As Acco claims, one could infer that because of this brand name recognition, new entrants to the market face costs that Avery did not, such as costs associated with persuading customers to try their brand or to switch from the standard. (*See* Exh. 8, Weinstein Supp. Rpt., ¶¶ 62-63.) As Avery itself states, "[C]reating a premium brand, however, is difficult, expensive, and not an effort [Acco is] likely to sustain for too many money-losing years." (*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. O.)

**\*15** Avery argues that Acco's ability to secure placement in major commercial catalogs suggests that brand name recognition is not a barrier to entry. However, as Acco asserts, Acco secured those placements because it paid millions of dollars in conver-

sion or slotting fees that Avery was not required to pay. (*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. P.) These payments evidence entry barriers. Avery further argues that various firms, such as Xerox, 3M, NCR, Hewlett Packard, Kodak and IBM, could enter, and some have entered, the machinable label business. However, Avery does not mention the success of these entries and whether these companies sustained additional costs that Avery did not. Again, barriers to entry consist of factors in the market that deter entry.

### (2) *Avery's ties with its commercial customers*

Acco contends that Avery entered into deals with its commercial customers specifically to erect barriers to entry and foreclose competition. As examples of Avery's anticompetitive conduct, it lists the following:

The $6 million deal at [Corporate Express] is about more than Acco, thus there's more to make it a worthwhile investment. We would get label exclusivity in 1999, thus five HP SKUs would come out immediately. We would block [Hewlett Packard], Xerox, and all others from entering labels at [Corporate Express] (and thus setting off the potential chain reaction described above) for three years.

(*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. K.)While I don't want to waste money, I would rather err on the side of overkill now rather than playing too conservatively and failing to block the entry.

(*See id.* at Ex. O.) Acco also points to evidence that Avery entered exclusive agreements with major commercial distributors, including Corporate Express, BT, BPGI, and S.P. Richards, to have its label products listed exclusively in their catalogs. (*See* Exh. 46, Weinstein Second Supp. Rpt. ¶ 23.) Prior to 1999, Avery was not required to make any payments for these agreements to the commercial distributors. (*See* Exh. 21, 10/20/99 Mikolasy Depo., pp. 84-89.) However, when Avery faced competition in 1999, it paid millions to retain exclusive marketing rights agreements and raised the marketing cost for its competitors. (*See id.* at 78-79.) Acco had to pay $2.25 million and $4 million, respectively, to have Wilson Jones labels even appear in the Boise Cascade and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

Corporate Express catalogs. (*See* Exh. 46, Weinstein Second Supp. Rpt., Exs. P-Q.)

Avery argues that its "marketing strategy" had nothing to do with Acco's payments to Boise and Corporate Express. It claims that Boise approached Acco and that Corporate Express played Avery and Acco against each other to maximize their own benefit. While these may true, a jury could still infer that higher payments incurred by entrants, along with the evidence of the exclusivity payments, are barriers to entry.

### (3) *Agreements between Avery and software manufacturers*

**\*16** Acco argues that Avery's alliances with computer software manufacturers pose a significant barrier to entry in the label industry. This Court is not persuaded that this is a significant barrier to entry in the label industry. As Avery points out, Wilson Jones labels are listed in both Microsoft Word 2000 and Corel Word Perfect 2000, which are two of the most widely-used word processing software programs with label templates. (*See* Karrenbrock Decl., ¶¶ 3-5, Exh. 15 to Chung Decl.) Acco does not allege that Avery's arrangements with software manufacturers are exclusive to Avery or that the payments are different between new entrants and Avery. Indeed, Avery claims that it does not have agreements with software publishers restricting these publishers from listing other label suppliers. (*See* Karrenbrock 6/28/99 Decl. ¶ 9, Ex. 15 to Chung Decl.; Karrenbrock Depo., pp. 57, 69, Ex. 6 to Chung Decl.) Avery also points to the fact label makers may create overlays for third-party software or write their own label software, as Avery did, and make it available over the Internet and/or through other distribution channels. (*See* Keeley Decl., ¶ 36.)

### (4) *High capital costs*

Acco claims that substantial costs must be incurred to enter the market at a sizable scale of output. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 57.) It contends that as Avery's fixed assets in plants and machinery become fully amortized, potential entrants are placed at a substantial cost disadvantage. (*See* Exh. 44, Wein-

stein Rpt., ¶ 30; Ex. 8.) It also contends that to successfully enter the commercial market for machinable labels, a potential competitor to Avery would require significant research, design, and development capabilities. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 63, Ex. 18.) It concludes that in view of the risks, the ability to finance the necessary effort on favorable terms would be significant factor acting against a potential competitor. (*See id.* at ¶ 65.)

Avery responds that firms wishing to produce machinable labels do not have to enter the business de novo-they can use the existing capacity of firms already in the label business in terms of both manufacturing the self-adhesive base label stock material and converting. It also claims that another option for firms not currently in the label business is to subcontract with existing converters, as is done with private labels. It concludes that because of the existence of many firms already in label production, there are virtually no sunk costs associated with entering the machinable label business.

This Court finds that Acco's evidence of high capital costs is sufficient to permit an inference that such costs form a barrier to potential entrants. Avery's argument that there are virtually no sunk costs with entering the machinable label business is largely irrelevant since it bases this argument on the assumption that firms "do not have to enter the business de novo." While this may be true, it is not the current situation before this Court. With respect to entering the commercial market for machinable labels anew, Avery recognized the importance of capital costs as a barrier to entry: "*Creating a premium brand, however, is difficult, expensive, and not an effort they are likely to sustain for too many money-losing years.*" (*See* Exh. 46, Weinstein Second Supp. Rpt ., Ex. W) (emphasis in original). It further stated that to switch production a competitor has to "pump money" into "up-front trade monies, packaging, promotions, R & D software alliances, testing, etc., etc." (*See id.* at Ex. O.)

### (5) *Avery's ability to foreclose needed materials and to benefit from economies of scale*

**\*17** Acco contends that Avery has vertically integ-

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

rated and now produces labels as well as components needed to make labels. It claims that Avery has used this vertical integration to its advantage by foreclosing certain materials, such as high-grade adhesives, from potential competitors. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 71.) It concludes that this vertical integration and the resulting economies scale impose a significant barrier for would-be competitors.

Avery states that Acco's expert testified that he has no reason to believe that Avery's competitors would have any difficulty sourcing label supplies. (*See* Weinstein Depo., p. 71; Weisman 2/4/00 Depo., p. 11.) It also claims that in launching the Wilson Jones labels, Acco claimed that they use a "revolutionary patented adhesive" from Acco's supplier, MacTac, and "superior label stock." (*See* Weisman 9/2/99 Depo., p. 305-08; Weisman 2/4/00 Depo., p. 132.)

This Court agrees with Avery that Acco's own evidence with respect to this entry barrier is in conflict. As such, Acco has failed to establish this as an entry barrier.

### (6) *Avery's intellectual property rights*

As Acco contends, the fact that competitors must incur costs to design around Avery's patents, pay license fees, or give up the market by not offering the product evidences entry barriers. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 58 and Ex. 15.)

### (7) *Barriers to expansion*

Acco contends that the same forces that block entry into the market also serve to preclude expansion by incumbents in response to Avery's attempts to restrict output and/or raise prices. Acco points to two companies-3M and Esselte-which competed with Avery in the mid-1980s and early 1990s and have since exited the machinable label market. It claims that Hewlett Packard tried and failed to compete with Avery in the machinable labels business. Avery responds that these companies' exist from the machinable label segment as evidence of entry barriers is pure conjecture. It relies on the case of *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1426 (9 th Cir.1993). In that case, however, the plaintiff did not even suggest, let alone point to evidence which

suggested, that withdrawal of two competitors was in any way attributable to the defendant's competitive conduct or any market conditions. *Id.* Here, Acco claims that the fact that Avery continues to enjoy exceptionally high gross margins for machinable labels shows that the ability of potential competitors to enter or expand in the market is minimal. (*See* Exh. 36, Weinstein Second Supp. Rpt., ¶ 20.) As Acco deduces, had it been easy for potential competitors to enter the market, they would have done so already, rather than exit the market, like 3M, Essette and Hewlett Packard. (*See* Exh. 8, Weinstein Supp. Rpt.)

Avery also argues that Acco's claim of high entry barriers is completely undermined by Acco's own experience with their Wilson Jones labels. It claims that although Acco had never before sold or tried to sell labels under the Wilson Jones name, Acco was able with introduction of its Wilson Jones labels in 1998 to enter many label segments and in some instances displace Avery from the catalogs of Boise Cascade and Corporate Express. However, as the court explained in *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1440 (9 th Cir.1995):

**\*18** If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power.... Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals.

Avery's witnesses have testified that Avery has not responded to new competition in the market by lowering its prices. (*See, e.g.,* Exh. 12, Alm Depo. at 281:14-282:4; Exh. 11, Knop Depo. at 74:10-17; Exh. 24, Bakken Depo. at 296:6-18, 55:13-56:20-22.)

### 2. Triable issues exist with respect to Avery's anti-competitive conduct

The second element of a Section 2 monopoly claim is the "conduct element," which is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Image Tech.,* 125 F.3d at 1208.

Acco contends that Avery's anticompetitive attack includes a range of illegal conduct that falls generally

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

into six categories: anticompetitive exclusivity agreements to keep Wilson Jones labels out of commercial catalogs; rebate programs designed to preclude competition in the sale of machinable label products; trade promotions to deter conversion to Wilson Jones labels; anticompetitive pricing strategies; disparagement of the Wilson Jones labels by the Avery sales force; and this baseless litigation, filed to raise costs to Acco and drive it from the market. This Court concludes that, as discussed below, Acco has made a sufficient showing to establish a genuine issue of fact with respect to the existence of anticompetitive conduct by Avery.

### a. Avery's exclusivity payments

Acco presents evidence of Avery's exclusivity payments. Avery responds that Acco engages in this same conduct which is the competitive reality.

A jury could infer from Acco's evidence that "the competitive reality" was created by Avery's initial anticompetitive conduct. Acco claims that an aspect of Avery's strategy to prevent Wilson Jones' entry into the commercial market was to keep Acco from "gain[ing] branded or 2nd tier distribution in any Superstore, MegaDealer or Wholesaler." (*See* Exh. 27, AVE 04951-52.) It points to the fact that Avery paid millions of dollars to obtain exclusivity agreements with customers. (*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. M.) For example, Avery paid $2 million to obtain a three-year exclusive agreement with Corporate Express covering the years 1999-2001.FN6 (*See id.* at ¶ 31.) One could infer that Avery used this agreement to eliminate "all existing competitive products where Avery has a matching label product." (*See id.* at Ex. V.) In a similar deal, Avery paid United Stationers $2 million for exclusivity in the premium label segment. (*See id.* at ¶ 36.) Avery also entered into exclusivity agreements with other commercial distributors, including BT, BPGI and S.P. Richards. (*See id.* at ¶ 23.) Avery budgeted $3 million that it planned to use in future negotiations with Boise Cascade to shut Wilson Jones out of that catalog as well. (*See id.* at Ex. NN.)

FN6. Acco obtained placement at Corporate Express beginning in 2000 after Corporate

Express reopened negotiations for the later years. (Exh. 28 at 698.)

**\*19** Viewing this evidence in a light favorable to Acco, one could infer that Avery's exclusivity payments were part of its anticompetitive conduct. Avery itself recognized that it would reap the benefits: "We will use the time bought through multiyear agreements to build an Avery consumer franchise fortress. The Consumer leverage we develop will allow us to renegotiate better backend deals upon the termination of the multiyear deals." (*See* Exh. 29.)

### b. Customer rebate programs

Acco provides evidence that Avery has used anticompetitive rebates and promotions. Avery again responds that both parties have selectively used targeted rebates and promotions.

Acco presents evidence that Avery decided that it would not reduce prices and provide savings to the end-user (the consumer), but would instead give rebates to its customers in order to prevent them from supporting Wilson Jones labels. In Avery's own words, its strategy was to:
*Go on the attack in ways that we can withdraw from if and when we are successful, so that the higher level of cost to the business has a chance of not being permanent.* Specifically, this means [ ... ] avoid invoice price roll-backs and instead escalate our defenses in the form of marketing and sales actions ... temporary rebates, promotions, premiums, special packs and offers, spiffs and incentives, advertising, new products, etc., etc.

(*See* Exh. 46, Weinstein Second Supp. Rpt., ¶ 34, Ex. W.) (emphasis in original.) Specifically, Avery's rebate programs include bundling rebates offered on a full line of office products with additional amounts for customers who agree to be exclusive in labels. (*See id.* ¶ 35, Exh Z.) Avery also created other rebate programs. It gave Boise Cascade a 5% "stop-the-conversion" rebate on laser and ink jet labels and cards from July through December 1999. (*See id.* ¶ 37, Exh. CC.) Avery's 2000 plan for BT and Corporate Express also includes an additional 5% rebate on laser, ink jet and core products. (*See id.* at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 16
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

Exh. OO.) Avery has the resources to sustain short term losses on its rebate programs because in the long run, Avery will be able to recoup losses by discontinuing the rebates and continuing to charge its supracompetitive prices. (*See id.* at ¶ 35.) As explained by Avery's Vice President of Sales and Marketing: "My guess is that the all out marketing and sales war could cost between $5 million and $10 million per year and would be somewhat scalable, while a serious 20% roll back could cost $25 million per year and would be very difficult ever to recoup." (*Id.* at ¶ 34, Exh. W.) Avery's stated objective is to continue its programs until Acco can no longer afford to compete and is driven from the market:I cannot imagine Acco continuing to pump money into the Wilson Jones labels initiative ... for more than 18 months without seeing real success. Our strategy, therefore, should be to blunt them now and force them into resorting back to low price/profit positions which will ultimately prove to be not a 'whole new ballgame' but rather the same old ballgame.

**\*20** (*See id.* at Exh. W.)

c. Avery's trade promotions

Acco points to evidence that Avery uses trade promotions which are payments of millions of dollars in financial incentives to commercial customers. Avery budgeted approximately $2 million for this plan to "blunt" the entry of Wilson Jones in the commercial channel. (*See id.* at ¶ 38, Ex. EE.) Avery also decided to punish those dealers who supported Wilson Jones, as described in the following E-mail:
*Go to war in the marketplace in support of dealers that support Avery machinables and against dealers that do not.* Since [Corporate Express] is the only dealer at present that has decided to make [Wilson Jones] labels exclusive, we need to incentivize other dealers to see share gain opportunities for them against [Corporate Express]. The best way to do this is to use promotional monies and price discounts.

(*See id.* at ¶ 39, Ex. FF.) (Emphasis in original.) Avery further believed the following: "Now however I think the market has to know we consider this a war, and those who work with us can gain at the expense of those who work against us." (*See id.*) Another Avery document tells one way it could punish customers who support other brands: "We will reduce backend deals for those Customers that elect to reduce Avery share of the Labels category." (*See* Exh. 30, AVE 04556-57.) This Court concludes that this evidence supports a finding of anticompetitive conduct.

d. Avery's pricing strategies

Acco contends that Avery uses an anticompetitive price umbrella strategy intended to prevent Acco from improving its margins on its economy line (i.e., Maco brand) labels. A 1999 strategy document shows that Avery continued a price umbrella strategy to constrain competition: "The trade is motivated to grow the economy labels segment because of a significant margin incentive. Since our competitors will push this segment more than we will, we must continue selling economy label products to minimize economy label segment growth." (*See* Exh. 32.) Acco points to evidence that Avery has a pricing strategy designed to play its non-competitive and competitive SKUs off each other. Avery developed a plan to use a "bait and switch" tactic with which it proposed to lower the price of its key SKU numbers by approximately 15% and then raise the price of its non-competitive SKU numbers to match the decreases. (*See* Exh. 46, Weinstein Second Supp. Rpt., ¶ 40, Ex. GG.) One internal Avery document states: "Acco [is] highly vulnerable to Avery price reductions" because Acco has made "significant investment in capital equipment and trade commitments" and there is "[p]otential for Avery to marginalize Maco and Wilson Jones brands." (*See id.* and Exh. KK.) Avery knew the power of this pricing strategy: "[I]nvoice price reductions on key SKUs [will] remove economic payoff for new entrants." (*See id.* and Exh. JJ.)

e. Avery's sales campaign

**\*21** Acco contends that to ensure that Wilson Jones would be unable to establish itself with Avery customers, Avery launched a false and misleading advertising campaign against Acco and its Wilson Jones labels. Specifically, Acco claims that Avery prepared and provided its sales representatives with a range of materials containing false and misleading statements

Not Reported in F.Supp.2d                                                      Page 17
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

about the parties' labels. Acco concludes that as a result of these presentations, customers decided not to promote the Wilson Jones labels and even to switch their end-users back to Avery labels.

Avery argues that Acco cannot satisfy the legal criteria to show that false and misleading advertising constituted exclusionary conduct. "To prove that ... false and misleading advertising constituted exclusionary conduct, the disparagement must overcome a presumption that the effect on competition of the [advertisements] was de minimis." *American Professional Testing, 108 F.3d at 1152.* This requires "cumulative proof that the representations were: (1) clearly false; (2) clearly material; (3) clearly likely to induce reasonable reliance; (4) made to buyers without knowledge of the subject matter; (5) continued for prolonged periods; and (6) not readily susceptible of neutralization or other offset by rivals." *Id.* (citation omitted). A plaintiff "must satisfy all six elements to overcome [the] de minimis presumption." *Id.* (emphasis in original).

Avery argues that Acco cannot show that the advertisements were made to buyers without knowledge of the subject matter. It also argues that there is no evidence that the distribution of the promotional flier "continued for prolonged periods" and that Acco could not readily counter Avery's alleged false advertising.

Acco responds that in addition to making misleading comparative statements about the performance attributes of the parties' labels, Avery falsely claimed that Wilson Jones has no toll-free number, no software support, no website, and has little experience in making labels. (*See* Exh. 43.) This Court agrees with Acco's inference that if the buyers were knowledgeable, then Avery would not make these presentations to them. With respect to the time period, Acco argues that over 100 presentations by Avery's sales people have taken place (*see* Exh. 38) and that the flyer has not been retracted or recalled. Finally, Acco claims that it is unable to neutralize or offset this false advertising because of the preliminary injunction. Construing this evidence in the light most favorable to Acco, this Court finds that triable issues exist with respect to whether Acco has overcome the de minimis

presumption to establish that Avery's sales campaign is anticompetitive conduct.

f. This lawsuit

Acco contends that Avery brought this suit against Acco as part of Avery's anticompetitive strategy to eliminate Acco as a competitor. Avery responds that under the Noerr-Pennington doctrine, Avery's filing of this lawsuit is immune from antitrust liability unless Acco can prove that the lawsuit was filed solely as a "sham." It argues that Acco cannot meet the high burden of proof required to overcome Avery's immunity.

*22 The Noerr-Pennington [FN7] doctrine provides broad antitrust protection for those who "petition the government for a redress of grievances." *City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 378 (1991).* Immunity from antitrust liability is lost only if a party engages in "sham" litigation. The Supreme Court has established a two-part definition of "sham litigation." First, the lawsuit must be "objectively baseless." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 60 (1994)* ("PRE"). Second, the lawsuit must have been brought with the intention of directly interfering with a competitor's business through the use of the litigation process rather than the outcome of that process. *Id. at 60-61.* The court may examine the litigant's subjective motivation, the second prong, only after concluding that the challenged litigation is objectively baseless. *Id.*

> FN7. See *Eastern R.R. Presidents Conf. v. Noerr Motor Freight,* Inc., 365 U.S. 127 (1961) (Noerr); *United Mine Workers of America v. Pennington,* 381 U.S. 657 (1965) (Pennington).

Acco argues that Avery's current suit against Acco is but another in the string of baseless lawsuits aimed at allowing Avery to maintain its monopoly power. It claims that the alleged anticompetitive behavior here is the filing of a series of lawsuits, and therefore, "the question is not whether any one of them has merit-some may turn out to, just as a matter of chance-but whether they are brought pursuant to a policy of start-

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

ing legal proceedings without regard to the merits and for the purpose of injuring a market rival." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512 (1972). It concludes that the *PRE* test does not apply here because it only applies to anticompetitive behavior consisting of a single action.

With respect to Acco's contention of a "series of lawsuits," this Court concludes that Acco has failed to support this contention. Acco claims that "Avery has a long history of using litigation to bully would-be competitors in the labels market" and offers a list of 5 companies which Avery apparently sued, including Maco. It also references a settlement into which Continental Datalabel "was bullied." These blanket statements, without more, fail to establish "a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival" as a matter of law. *Id.* Without any information regarding the merits of the lawsuits, this Court cannot determine "whether the legal filings [were] made, not out a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment." *USS-Posco Indust. v. Contra Costa Cty. Bldg. & Const.,* 31 F.3d 800, 811 (9 th Cir.1994).

Acco further argues that even if this lawsuit is considered alone, Avery's anticompetitive conduct still does not warrant protection under Noerr-Pennington. Avery, on the other hand, argues that Acco cannot prove that this lawsuit is objectively baseless. It relies on the fact that this Court has preliminarily ruled that Avery is likely to succeed on its false advertising claims. It claims that this fact alone demonstrates that Avery has not pursued "claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." *PRE,* 508 U.S. at 61.

**\*23** This Court concludes that Acco cannot show that this lawsuit is "objectively baseless." The Supreme Court has explained "objectively baseless" to mean that "no reasonable litigant could realistically expect success on the merits." *PRE,* 508 U.S. at 61. While Acco points to the fact that this Court has already granted summary judgment on seven of Avery's nine claims, "the Supreme Court has forbidden us to equate loss on the merits with objective unreason-

ableness." *FilmTec Corp. v. Hydranautics,* 67 F.3d 931, 938 (Fed.Cir.1995). Moreover, Acco fails to address Avery's remaining claims upon which this Court preliminary granted injunctive relief. *See Omni Resource Dev. Corp. v. Conoco,* 739 F.2d 1412, 1414 (9th Cir.1984) (suit cannot be baseless where, although outcome unknown, plaintiffs were successful in securing preliminary injunction). In light of this Court's preliminary determination, this Court cannot find that Avery's pursuit of its claims is so baseless that no reasonable litigant could realistically expect to secure favorable relief. As such, since an objective litigant could conclude that this suit is reasonably calculated to elicit a favorable outcome, this suit is immunized under the Noerr-Pennington doctrine.

Acco's antitrust counterclaim also rests in part on Avery's dissemination of the Bohrer Letters. Avery contends that these letters are also immunized from antitrust immunity by Noerr-Pennington. Acco disagrees and contends that the Bohrer Letters are not entitled to immunity.

This Court concludes that the Bohrer Letters are immune under the Noerr-Pennington doctrine. *See Cardtoons v. Major League Baseball Players Ass'n,* 182 F.3d 1132, 1136-37 (10th Cir.1999) (antitrust defendant's threat of litigation against third-party printer for participating in plaintiff's alleged infringement enjoys same level of antitrust immunity as litigation itself); *Matsushita Elec. Corp. V. Loral Corp.,* 974 F.Supp. 345, 359 (S.D.N.Y.1997) (acts incidental to protected litigation, such as policing letters sent to suspected patent infringers, are entitled to antitrust immunity).[FN8] As such, the two-part sham test of *PRE* applies. Acco has failed to overcome, the first part by showing that the Bohrer Letters are objectively baseless. Consistent with this Court's discussion above, the Letters were related to the present litigation and sent for the purpose of informing the customers about the current litigation. Accordingly, neither this lawsuit nor the Bohrer Letters can form a basis for showing Avery's anticompetitive conduct.

FN8. As Acco points out, the Ninth Circuit has not yet determined whether the Noerr-Pennington immunity attaches to the mere threat of a lawsuit. However, other circuits

Not Reported in F.Supp.2d                                                                Page 19
Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

(11 th, 1 st, 5 th and 10 th) have determined this issue. This Court agrees with their legal and policy rationales in support of the holding that prelitigation threats of suit enjoy the same immunity as litigation itself, so long as the threats are not shams. *See Cardtoons, 182 F.3d at 1136.*

3. Triable issues exist with respect to antitrust injury

Avery contends that its conduct has not caused antitrust injury. It argues that while Acco may complain that Avery's activities have caused loss of certain catalog sales or delayed Acco's longer-term marketing plans, evidence of injury to competition generally is entirely lacking.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).*

**\*24** Acco contends that Avery's anticompetitive conduct has harmed Acco's newly established customer relationships for its Wilson Jones labels by calling into question Acco's viability in the market, disparaging the quality of Acco's products and threatening Acco's customers. It further contends that Avery's anticompetitive conduct also harms competition in general in the machinable labels market in several ways.

This Court concludes that Acco has set forth sufficient facts to create a genuine issue for trial with respect to antitrust injury. Injury to Acco is probative of harm to competition. *See Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1040* (9 th Cir.1988). In response to Avery's actions, Acco's customers have expressed concerns about carrying Wilson Jones labels. (*See* Exh. 41, Bloch Decl., ¶¶ 10-13.) Acco lost sales through commercial distributors. (*See* Exh. 8, Weinstein Supp. Rpt. ¶ 75.) *See Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F.Supp.2d 1218, 1235 (E.D.Cal.1999)* (holding antitrust injury from anticompetitive acts could be established by evidence of, inter alia, loss of business as a result of monopolist's

statements to plaintiff's customers regarding quality of its services). With respect to harm to competition in general, Acco submits evidence that Avery's conduct makes it very difficult for competitors to establish themselves, to expand sales, and to introduce new products in any part of the commercial market for machinable labels:

(1) An Avery internal study observed that "Xerox decided not to launch into office products channel" because it was "hard to dislodge Avery in [the] commercial channel [and] it would have difficulty in retail office products channel." (*See* Exh. 46, Weinstein Second Supp. Rpt., Ex. R.)

(2) Avery expected that "five HP SKUs would come out immediately" and Avery would block "HP, Xerox and all others" at CE through its exclusive agreement with Corporate Express. (*See id .* at Ex. R.)

(3) Avery also tried to block the entry of Xerox laser labels. When Avery's negotiations with Xerox's distributor Staples failed in 1999, Avery then planned to "[m]onitor [the] situation and possibly produce Xerox for Staples" for the year 2000. The cost of its plan to block the entry of Xerox is estimated to be $700,000. (*See id.* at ¶ 42 and Ex. MM.)

In addition, without effective competition, Avery will continue to possess a dominant market share and exercise monopoly power through exclusive agreements with its customers, precluding would-be competitors from establishing themselves in the market. (*See* Exh. 45, Weinstein Second Supp. Rpt., ¶ 33.) Avery's threats precludes the commercial distributors from providing alternatives to Avery's higher-priced products. Avery's higher contract prices result in higher retail prices for end users. (*See* Exh. 8, Weinstein Supp. Rpt., ¶ 79.)

4. Summary

Acco has sustained it burden to show that genuine issues remain for trial as to the elements of its unlawful monopolization claim. Accordingly, this Court denies Avery's motion for summary judgment with respect to Acco's counterclaim for unlawful monopolization under Count VII.

F. Avery Is Not Entitled to Summary Judgment as to the Attempted Monopolization Claim of Count VII

**\*25** Avery contends that the same factors that warrant summary rejection of Acco's monopolization claim require rejection of their attempted monopolization claim.

To prevail on an attempted monopolization claim the plaintiff must establish: (1) a specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. *Image Tech. Serv., 125 F.3d at 1202* (citation omitted). "In addressing this issue, it is appropriate to bear in mind the admonition that summary judgments are most disfavored in antitrust cases where, ..., 'motive and intent play leading roles.' " *Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1057* (9 th Cir.1983) (citing *California Steel & Tube,* 650 F.2d at 1003).

As set forth above, this Court concludes that Acco has created genuine issues for trial with respect to whether Avery has market power and whether Avery's conduct has caused antitrust injury. Thus, this Court must look at the remaining elements: specific intent and the dangerous probability of achieving monopoly power.

1. Triable issues exist with respect to whether Avery had specific intent to monopolize

Acco can satisfy the specific intent requirement through direct evidence or by inference from evidence of anticompetitive conduct. *Northrop Corp., 705 F.2d 1030 at 1050.* As set forth above, Acco has sufficiently set forth facts to create a genuine issue with respect to Avery's market power and anticompetitive conduct. From this same evidence, a jury could reasonably infer that Avery had specific intent to monopolize.

2. Triable issues exist with respect to whether a dangerous probability that Avery will achieve monopoly power exists

A dangerous probability of success may be inferred from evidence of conduct alone, provided that the conduct is also the sort from which specific intent can be inferred. *William Inglis Etc. v. ITT Continental Baking Co., 668 F.2d 1014, 1029* (9 th Cir.1981). "[T]his sort of conduct must fall into two categories: either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary." *Id.* at n. 11. In addition, proof of market power may be relevant in establishing the requisite unreasonable conduct. *Id.*

As discussed above, Acco has provided sufficient evidence that Avery possesses a dominant share of the machinable labels market, that barriers to entry exist and that these barriers prevent potential competitors from entering or expanding in the market. As such, a jury could infer that Avery's conduct shows a dangerous probability of monopolization.

In light of the foregoing, this Court concludes that Acco has presented sufficient evidence to avoid summary judgment as to its attempted monopolization claim under Section 2 of the Sherman Act. Accordingly, this Court denies Avery's motion for summary judgment as to the attempted monopolization claim of Count VII.

III. *Conclusion*

**\*26** This Court grants in part and denies in part Avery's Motion for Summary Judgment as follows:
1. Denies as to Count I and dismisses with prejudice Count I-request for declaratory judgment of non-infringement and no dilution;
2. Grants as to Count II-cancellation of federal registration for the Federal SKU Marks;
3. Grants as to Count III-federal false advertising-to the extent it is based on the Bohrer Letters;
4. Grants as to Count IV-state false advertising-to the extent it is based on the Bohrer Letters;
5. Grants as to Count V-unlawful business practices and false advertising-to the extent it is based on the Bohrer Letters;
6. Grants as to Count VI-interference with prospective economic advantage;
7. Denies as to Count VII-unlawful monopolization and attempt to monopolize. FN9

Not Reported in F.Supp.2d, 2000 WL 986995 (C.D.Cal.), 2000-1 Trade Cases P 72,882
**(Cite as: Not Reported in F.Supp.2d)**

> FN9. As a result, it appears that the follow-
> ing counterclaims remain: Counts III
> (federal false advertising based on Avery's
> sales and promotional materials), IV (state
> false advertising based on Avery's sales and
> promotional materials), V (state unlawful
> business practices and false advertising
> based on Avery's sales and promotional ma-
> terials) and VII (unlawful monopolization
> and attempted monopolization).

IT IS SO ORDERED.

C.D.Cal.,2000.
Avery Dennison Corp. v. Acco Brands, Inc.
Not Reported in F.Supp.2d, 2000 WL 986995
(C.D.Cal.), 2000-1 Trade Cases P 72,882

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 2

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1992 WL 131150 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Balaco, Inc. v. Upjohn Co.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
BALACO, INC.
v.
The UPJOHN COMPANY and Lil' Drug Store
Products, Inc.
**Civ. A. No. 92-0113.**

June 3, 1992.

Marc M. Orlow, Furman & Halpern, Bala Cynwd, Pa., Mark S. Halpern, Furman & Halpern, P.C., Bala Cynwd, Pa., for plaintiff.
Ira P. Tiger, Schnader, Harrison, Segal & Lewis, Thomas M. Kittredge, Morgan Lewis & Bockius, Philadelphia, Pa., for defendants.

*MEMORANDUM*
WALDMAN, District Judge.

### I. BACKGROUND

*1 Plaintiff brings this antitrust action against The Upjohn Company ("Upjohn") and Lil' Drug Store Products, Inc. ("Lil' Drug") for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiff alleges that Upjohn entered into an exclusive distribution agreement with Lil' Drug to sell Motrin IB 200 milligram caplets in "2 in a pack" form. Upjohn is the sole manufacturer of this product. Because of the agreement, Upjohn has refused to sell the product to plaintiff.

Presently before the court is Upjohn's Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted.[FN1]

### II. LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. *Sturm v. Clark,* 835 F.2d 1009, 1111 (3d Cir.1987). In deciding a motion to dismiss for failure to state a cognizable claim, the court must "accept as true all the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party. *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). Dismissal is not appropriate unless it clearly appears that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Robb v. Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). A complaint may be dismissed when the facts pled and the reasonable inferences therefrom are legally insufficient to support the relief sought. *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173 179 (3d Cir.1988).

### III. DISCUSSION

#### A. *Sherman Act Claim*

Plaintiff alleges that Upjohn's exclusive distribution agreement with Lil' Drug violates the Sherman Act, 15 U.S.C. § 1.[FN2] Exclusive dealing agreements are governed by a Rule of Reason analysis pursuant to which the court must balance various factors to determine whether a particular practice is "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1, 65 (1911). *See also, Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284 (1985).

To state a rule of reason claim under Section 1, plaintiff must allege: 1) that there was a contract, combination or conspiracy; 2) which produced adverse anti-competitive effects within the relevant product and geographic markets; 3) with the objects of the conduct pursuant to such contract or conspiracy being illegal; and 4) an injury to the plaintiffs as a proximate result of the combination or conspiracy. *See J.F. Fesser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1541 (3d Cir.1990), *cert. denied,* 111 S.Ct. 1313 (1991); *International Logistics Group, Ltd. v. Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir.1989), *cert. denied,* 494 U.S. 1066 (1990); *Arnold Pontiac-GMC, Inc. v. General Motors Corp.,* 786 F.2d 564,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1992 WL 131150 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

572 (3d Cir.1986).

**\*2** Upjohn contends that plaintiff has failed to allege even the bare elements of a Section 1 violation. In satisfaction of the first requirement, plaintiff has alleged the existence of a contract between the defendants pursuant to which Upjohn distributes the product in question to Lil' Drug only.

Second, plaintiff alleges that this contract produced an anti-competitive effect. Plaintiff, however, has completely failed to define the relevant geographic and product markets in which the alleged anti-competitive effect is to be assessed. Prior to discovery, however, the allegations of unreasonable restraints on the distribution of the product in question are adequate, if not ideal, given the liberal pleading requirements.

Plaintiff satisfies the fourth criteria by adequately alleging injury. The Complaint avers that the "restrictive distribution method prevents [plaintiff] from dealing in the Product and substantially lessens competition ..." Complaint, ¶ 12. Defendant's contention that some vertical restrictions can have a pro-competitive effect is not relevant at this stage in the litigation. While defendant's statement may be accurate, a factual determination of the actual competitive effects is not appropriate on a motion to dismiss.

Plaintiff fails to satisfy the third element under Section 1. Plaintiff has not alleged any illegal motive or purpose underlying the exclusive agreement between Lil' Drug and Upjohn. "A refusal to deal becomes unlawful when it produces an unreasonable restraint on trade, i.e. if there is an anticompetitive purpose or effect in selecting those with whom one will deal." Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1113, 1115 (5th Cir.1979). At a bare minimum, plaintiff must set forth allegations to notify defendants of the illegal purpose they have been accused of pursuing through the exclusive agreement.[FN3]

Plaintiff correctly articulates the general principle of liberal pleading set forth in Fed.R.Civ.P. 8. This principle, however, does not eliminate plaintiff's duty to plead the elements of an antitrust violation. See Quinonez v. National Asso. of Secur. Dealers, Inc.,

540 F.2d 824, 828 (5th Cir.1976) (Complaint "must comprehend a so-called *prima facie* case"). Moreover, "[c]onclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief." Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 995 (11th Cir.1983). The court cannot "assume that plaintiff can prove facts not alleged or that defendants violated the anti-trust laws in ways not alleged. Id. (citing Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). Because plaintiff failed to plead any illegal object of the contract between defendants, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" on his Section 1 Sherman Act claim. Conley v. Gibson, 355 U.S. 41, 47 (1957).

**\*3** Because it is conceivable that plaintiff may be able to amend its complaint to set forth a cognizable claim under Section 1 of the Sherman Act, that claim will be dismissed without prejudice to file an amended complaint.

### B. *Clayton Act Violation*

Incorporating the same allegations discussed above, plaintiff alleges that defendant's conduct violated Section 3 of the Clayton Act, 15 U.S.C. § 14.[FN4] Plaintiff's Section 3 claim also is governed by the Rule of Reason. See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961).

The Clayton Act generally is regarded as imposing tighter restraints on exclusive dealing agreements than Section 1 of the Sherman Act. See American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1253 (3d Cir.1975); Kellam Energy, Inc. v. Duncan, 668 F.Supp. 861, 883 (D.Del.1987). Initially, plaintiff must allege an exclusive dealing contract. "An exclusive dealing arrangement is one in which the seller will only deal with the buyer if the buyer agrees to purchase all of its requirements from the seller." Satellite Financial Planning Corp. v. First Nat. Bank, 643 F.Supp. 449, 452 (D.Del.1986). Plaintiff satisfies

this criteria by alleging that Upjohn is the sole manu-
facturer of the product and that it has agreed to sell
the product only to Lil' Drug.

Not all exclusive dealing arrangements are illegal.
The Supreme Court has established a three part test to
determine whether such an agreement violates Sec-
tion 3 of the Clayton Act. First, the relevant product
market must be identified to measure the effects on
competition. Second, the relevant geographic market
must be identified. Finally, plaintiff must demon-
strate that the "competition foreclosed by the con-
tract" constitutes "a substantial share for the relevant
market." *Tampa Electric, 365 U.S. at 327-28*. The
court must

weigh the probable effect of the contract on the relev-
ant area of effective competition, taking into account
the relative strength of the parties, the proportionate
volume of commerce involved in relation to the total
volume of commerce in the relevant market area, and
the probable immediate and future effects which pre-
emption of that share of the market might have on ef-
fective competition therein.

*American Motor Inns, 521 F.2d at 1250* (quoting
*Tampa Electric, 365 U.S. at 329)*. This so called
"qualitative substantiality" test "requires the court ac-
tually to evaluate the restrictiveness and the econom-
ic usefulness of the challenged practice in relation to
the business factors extant in the market." *Id.* at 1252.

Such a fact specific inquiry generally precludes resol-
ution on a motion to dismiss. *Id.* ("[M]arket defini-
tion is generally regarded as a question of fact ...").
*See also Lansdale v. Philadelphia Electric Co., 692
F.2d 307, 311 (3d Cir.1982)* (Definition of a geo-
graphic market is a question of fact); *Martin B.
Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72,
82, n. 18 (3d Cir.1977)* (The determination of a relev-
ant geographic market is a factual one). Based on the
Complaint, the court cannot conclude that there is no
possibility that plaintiff can prevail on its Section 3
Clayton Act claim.

## IV. CONCLUSION

*4 Plaintiff's complaint satisfies the minimum re-
quirements for setting forth a claim under section 3 of

the Clayton Act. Because plaintiff has failed to aver
any illegal motive or objective in Upjohn's exclusive
arrangement with Lil' Drug, the court will dismiss the
complaint to the extent that it purports to state a
cause of action under Section 1 of the Sherman Act.
Because it appears that plaintiff might be able to state
a cause of action under the Sherman Act, the court
will dismiss this claim without prejudice to amend
the Complaint.

An appropriate order will be entered.

### ORDER

AND NOW, this 20th day of June, 1992, upon con-
sideration of defendant Upjohn Company's Motion to
Dismiss the Complaint and plaintiff's Response
thereto, consistent with the accompanying memor-
andum, IT IS HEREBY ORDERED that said Motion
is GRANTED in part in that plaintiff's cause of action
pursuant to 15 U.S.C. § 1 is DISMISSED without
prejudice to file an amended complaint within twenty
(20) days hereof, and otherwise is DENIED.

FN1. Lil' Drug answered the Complaint and
does not join in this motion.

FN2. 15 U.S.C. § 1 provides in pertinent
part:
Every contract, combination ... or conspir-
acy, in restraint of trade or commerce among
the several states ... is declared to be illegal
...

FN3. For example, defendants cannot know
whether the illegal motive imputed to them
is attempting to acquire a monopoly in a par-
ticular market, to fix prices, to aid in the en-
forcement of unlawful resale price restric-
tions or territorial allocations, to enforce a
boycott or to promote predatory practices.

FN4. Section 3 of the Clayton Act, 15
U.S.C. § 14, provides in pertinent part:
It shall be unlawful for any person engaged
in commerce in the course of such com-
merce, to lease or make a sale or contract for
sale of goods ... for use, consumption, or re-
sale within the United States ... on the condi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 131150 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

       tion, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

E.D.Pa.,1992.

Balaco, Inc. v. Upjohn Co.

Not Reported in F.Supp., 1992 WL 131150 (E.D.Pa.)

END OF DOCUMENT

Tab 3

Not Reported in F.Supp.    Page 1

Not Reported in F.Supp., 1983 WL 1897 (D.D.C.), 1983-2 Trade Cases P 65,696

**(Cite as: Not Reported in F.Supp.)**

Bridon American Corp. v. Mitsui & Co. (U. S. A.), Inc.

United States District Court, District of Columbia.
**Bridon** American Corp., et al.
**v.**
**Mitsui** & Co. (U. S. A.), Inc. and **Mitsui** Bussan Kabushiki Kaisha.
**Civil Action No. 83-1234**

83-1234

Filed November 7, 1983

GASCH, J.

**Memorandum**

**\*1** Defendants have moved the Court pursuant to Rules 11 and 9(b) of the Federal Rules of Civil Procedure ('FRCP') to dismiss the complaint or, alternatively, to strike plaintiffs' allegation of fraudulent concealment set forth in Paragraph 14 of the complaint.

*Background*

Plaintiffs are six United States companies competing with one another in the manufacture and sale of steel wire rope. Defendant Mitsui & Co. (U. S. A.), Inc. ('Mitsui'), wholly owned by defendant Mitsui Bussan Kabushiki Kaisha, a major Japanese trading company, imports and sells steel wire rope in the United States in competition with plaintiffs. Mitsui also imports and sells in the United States steel products other than steel wire rope. Since October 15, 1973, steel products imported by Mitsui, including steel wire rope, have been the subject of an antidumping order issued by the Secretary of the Treasury.

The allegations of the complaint at issue in this motion to dismiss are as follows:
12. Since October 15, 1973, Defendants have engaged in a pattern and practice of violating the antitrust laws of the United States regulating interstate trade and commerce in steel wire rope. The objectives of the conspiracy agreed to by the defendants and co-conspirators were to avoid and evade the Antidumping Order relating to imports of steel wire rope

from Japan and thereby restrain and monopolize trade in steel wire rope and injure U. S. producers of steel wire rope. This conspiracy has included, *inter alia*, the following acts and practices on the part of Defendants:

a. Creating and submitting false statements involving resale price, payment terms and country of origin to the Customs Service in connection with the importation of steel wire rope;

b. Falsifying certain documents required by law to be submitted to the Customs Service in connection with importations for the purpose of making false representations as to the price of imported steel wire rope;

c. Conspiring with customers in the United States, both distributors and enduse customers, to import such steel wire rope at less than fair value, or at substantially less than the actual market value or wholesale price of such articles, by falsifying documentation such as invoices to reflect higher prices than those actually paid;

d. Creating and using double invoices so as to reflect a false price charged for imported steel wire rope above the real price actually collected from the customer in the United States;

e. Lowering resale prices paid for imported steel wire rope by means of a pre-arranged device for honoring false claims that the goods were damaged in shipment;

f. Lowering resale prices paid for steel wire rope by splitting the difference between the price charged for the product based upon a nominal exchange rate (between the Japanese yen and the U. S. dollar) and the actual exchange rate based on calculations made after importation of the product, and then rebating such adjustment to the customer in the United States;

**\*2** g. Making payments of false fictitious contract cancellation penalties to Defendants' steel wire rope customers in the United States;

h. Making payments of rebates, dumping duty rebates, kickbacks, or credits against falsely inflated resale invoice prices to Defendants' steel wire rope customers in the United States;

i. Creating and submitting false statements to the Customs Service regarding tonnages actually imported so as to make it falsely appear that the invoiced

price for steel wire rope was for a smaller quantity than actually shipped;

j. Making payments of false and fictitious secret commissions to foreign parent companies of U. S. steel wire rope customers of Defendants.

k. Conspiring to establish a 'window' plant in Texas as a scheme to sell Japanese-made steel wire rope as American manufactured steel wire rope;

1. Using various other schemes to deceive the Customs Service as to the true terms of transactions;

13. All of the acts and practices described in Paragraph 12, *supra*, resulted in Defendants' customers in the United States being charged prices for steel wire rope at less than fair value as contemplated by [19 U. S. C. § 160](#) and [19 U. S. C. § 1673](#), less than actual market value or wholesale price in the country of origin as contemplated by [15 U. S. C. § 72](#), and less than the price of competitive products manufactured by domestic producers, including Plaintiffs, all to the intentional injury of Plaintiffs and detriment of interstate trade and commerce in steel wire rope.

14. The acts and practices alleged in Paragraph 12, *supra*, were fraudulently concealed by Defendants from the Customs Service and Defendants' competitors, including Plaintiffs, and Plaintiffs did not discover these acts and practices until defendant Mitsui, two of its employees and an employee of defendant MBK were indicted on or about July 20, 1982, in the United States District Court for the Northern District of California in Criminal Action No. 82-410 for various acts of customs fraud to which Mitsui subsequently pled guilty on July 21, 1982.

The allegations of Paragraph 12 constitute the gravamen of the complaint. Defendants argue that they 'transparently lack any basis in fact' and that, therefore, [FRCP 11](#) requires dismissal of the complaint. Alternatively, defendants argue that the allegations in Paragraph 12, and the allegation of fraudulent concealment in Paragraph 14, are legally insufficient under [FRCP 9(b)](#) and must be stricken.[FN1]

FN1 Defendants argue further that if the allegations in Paragraph 12 are stricken pursuant to [FRCP 9(b)](#), the entire complaint must be dismissed because these allegations constitute the gravamen of the complaint. Because the Court finds the allegations suffi-

cient under [FRCP 9(b)](#), it need not address this issue.

[*Government Cases*]

It is conceded that the allegations of Paragraph 12 are substantially similar to, with one significant distinction, and patterned upon the allegations contained in a criminal indictment brought by the United States against Mitsui on July 20, 1982. The significant distinction is that the indictment concerned steel strand and other steel products imported by Mitsui, but not steel wire rope.[FN2] Mitsui pleaded guilty to the indictment. In addition, it entered into a related civil settlement withthe United States Customs Service (the "Customs Service'). A fact sheet prepared in connection with the civil settlement states:

> FN2 Steel strand is wound together to produce steel wire rope. The allegations of the complaint, however, concern steel wire rope that Mitsui imports into the United States as a finished product.

**\*3** The civil violations include the same acts and practices which were the subject of criminal indictments brought by a Federal Grand Jury in San Francisco on July 20, 1982. The violations involved false reporting of prices, terms of sale, and in addition other fraudulent practices with the intent to circumvent Customs reporting requirements and the Trigger Price Mechanism by which the Government monitors prices of imported steel to determine whether to impose antidumping duties. The falsities involved rebates, false damage claims, indirect commission payments, unreported price adjustments, substitution of higher quality products, and falsification of contract dates.

The fact sheet specifically states that one of the products involved in the civil settlement was steel wire rope.

*Discussion*

1. *[Rule 11 of the Federal Rules of Civil Procedure](#)*

[FRCP 11](#) provides in pertinent part:

The signature of an attorney constitutes a certificate by him that . . . to the best of his knowledge, informa-

Not Reported in F.Supp.                                                              Page 3
Not Reported in F.Supp., 1983 WL 1897 (D.D.C.), 1983-2 Trade Cases P 65,696
**(Cite as: Not Reported in F.Supp.)**

tion, and belief there is good ground to support [the complaint] . . . .

By signing a complaint, an attorney warrants that he has a reasonable basis for making the allegations contained therein. *Miller v. Schweickart,* 413 F. Supp. 1059, 1061 (S. D. N. Y. 1976). Failure to comply with FRCP 11 may require striking the complaint. See *Freeman v. Kirby,* 27 F. R. D. 395 (S. D. N. Y. 1961). But no such dramatic step is required here. In fact, the frivolous nature of defendants' FRCP 11 claim was demonstrated when defendants' counsel neglected to raise it at oral argument.

Defendants argue, in essence, that plaintiffs' reliance on a criminal indictment to frame the allegations of the complaint somehow taints these allegations. Although the indictment may not have concerned steel wire rope, the related civil settlement did.[FN3] Because the indictment, and Mitsui's subsequent guilty plea, were the product of plea bargaining, the Court isunable to conclude that plaintiffs had no reasonable basis for their belief that the illegal activity charged in the indictment was also practiced in connection with Mitsui's importation of related steel products like steel wire rope.

> FN3 Plaintiffs' counsel apparently filed the complaint before seeing the fact sheet describing Mitsui's civil settlement with the Customs Service. Affidavit of Stephen M. Creskoff at 7. Nevertheless, before filing, plaintiffs' council confirmed with Customs Service officials the fact that ' 'steel wire rope transactions were involved in the criminal investigation of Mitsui' and were part of the criminal case against Mitsui until shortly before the plea bargain was struck. *Id.* at 6. The civil settlement confirms these facts and supports the conclusion that there is a sufficient basis for plaintiffs' allegations.

Moreover, plaintiffs also relied on the affidavit of a special Customs Service agent prepared in connection with the Customs Service's investigation that led to the indictment of Mitsui. This affidavit describes specific illegal acts involving steel wire rope allegedly committed by Mitsui that fall within certain

of the categories of illegal activity alleged in Paragraph 12 of the complaint. Affidavit of Thomas M. Yasueda at 7, 9, 21-26. In addition, this affidavit specifically identifies steel wire rope as one of the steel products with respect to which Mitsui is 'engaged in a conspiracy, practice and policy to defraud the . . . Custom Service by submitting false documentation to hide the true value, true price and true origin' of suchproducts. *Id.* at 40-41. Finally, plaintiffs' counsel states in an affidavit that he has had extensive discussions with Customs Service officials regarding the Mitsui investigation and the data developed regarding steel wire rope. Affidavit of Stephen M. Creskoff at 6-7.

**\*4** FRCP 11 does not require counsel to be convinced beyond a shadow of a doubt as to the truth of the allegations of a complaint. A reasonable basis for the allegations is all that is required and that standard is more than satisfied in the instant case.

2. *Rule 9(b) of the Federal Rules of Civil Procedure*

Defendants also challenge the allegations of Paragraph 12 of the complaint as insufficient under FRCP 9(b). FRCP 9(b) provides that '[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity.' Plaintiffs argue that FRCP 9(b) is not applicable to antitrust claims, but only to claims sounding in fraud. The Court need not decide this issue, however, because FRCP 9(b) is fully satisfied here.[FN4]

> FN4 In addition to the antitrust counts, the complaint alleges an intentional tort and violations of 15 U. S. C. § 72 (of the 'Anti-Dumping Act') and 18 U. S. C. §§ 1962 and 1964 (of the 'Racketeer Influenced and Corrupt Organizations Act' ('RICO')). Of these, only the RICO count could be said to sound in 'fraud.' Despite the apparent lack of case law on the subject, the Court notes that FRCP 9(b), on its face, does not seem limited to claims sounding in 'fraud,' but, because the dictates of FRCP 9(b) are satisfied here, the Court need not exhaustively address this issue. See generally *Clayton v. Prudential Insurance Co.,* 554 F.

Not Reported in F.Supp., 1983 WL 1897 (D.D.C.), 1983-2 Trade Cases P 65,696
**(Cite as: Not Reported in F.Supp.)**

Supp. 628, 632 (S. D. Tex. 1982); *Ekco Products, Inc. v. Dare Plastics, Inc.*, 173 U. S. P. Q. 664, 666 (S. D. Ohio 1972).

The United States Court of Appeals for the District of Columbia Circuit recently discussed the purpose and effect of FRCP 9(b):
Rule 9(b) of the Federal Rules of Civil Procedure mandates that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.' It cannot be doubted that '[n]ormally this means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud.' The rule serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude. . . . And because "fraud" encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response.
\* \* \*
Rule 9(b) is not, however, to be read in isolation from other procedural cannons. As Professor Moore notes, '[t]he requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives in subdivisions (a) and (e) of Rule 8 that the pleadings should contain a 'short and plain statement of the claim or defense' and that each averment should be 'simple concise and direct.''

*United States ex rel. Joseph v. Cannon*, 642 F. 2d 1373, 1385-86 (D. C. Cir. 1981), cert. denied, 455 U. S. 999 (1982) (footnotes omitted).

**\*5** Applying *Cannon* to the instant case, it is clear that Paragraph 12 does not state precisely the time or place of Mitsui's alleged false statements to the Customs Service. It does, however, state generally the content of such false statements - understatement of the value of steel wire rope imported and sold in the United States - and the time period over which they were made. Also, in light of Mitsui's indictment and its civil settlement, it cannot be seriously argued that this is a frivolous suit brought only for nuisance value or that defendants lack sufficient information to prepare a response.

Moreover, the general rule requiring specific allegations of time, place and content is 'relaxed somewhat as to matters peculiarly within the adverse party's knowledge' or 'where the issues are complex, or the transactions involved cover a long period of time.' 2A Moore's Federal Practice P 9.03 at 9-26, 9-28. Here, the complaint concerns Mitsui's importing and sale of steel wire rope in the United States since 1973; and the antitrust and fraud allegations of Paragraph 12 are complex. In addition, the acts and practices complained of are peculiarly within defendants' own knowledge. They allegedly engaged in a pattern of behavior to deceive the Customs Service and thereby avoid the assessment of antidumping duties. There is no way the exact facts and circumstances of such behavior could be known to plaintiffs, particularly where they are not the ones directly deceived. It is hard to imagine how they could have alleged much more than they did.

*Paramount Film Distributing Corp. v. Jaffurs*, 11 F. R. D. 437 (W. D. Pa. 1951), is apposite here. This case interpreted FRCP 9(b) as requiring "sufficient particularity as to fraudulent acts to inform defendants of what ' plaintiffs' claim was. *Id.* at 439. The claim in *Paramount* generally alleged false reporting by defendants of gross receipts from the exhibition of various movies, licensed from plaintiffs, over a period of several years. In finding the allegations of the complaint satisfied FRCP 9(b), the Court held:
They give notice of the nature and basis of the claim asserted sufficient to enable the defendants to frame a responsive pleading. Perhaps . . ., if only one fraudulent act were relied on, more details as to time and place would be appropriate. However, here such detail would unduly lengthen the [complaint] in violation of Rule 8(a).

*Id.* at 439. Here, plaintiffs allege defendants have been falsifying their reports to the Customs Scrvice every year since 1973. As in *Paramount*, holding plaintiffs to the standard of specificity urged by defendants would unduly and unacceptably lengthen the complaint.

[*Fraudulent Concealment*]

Defendants also ask this Court to strike the allegation

Not Reported in F.Supp., 1983 WL 1897 (D.D.C.), 1983-2 Trade Cases P 65,696
**(Cite as: Not Reported in F.Supp.)**

of fraudulent concealment in Paragraph 14 of the complaint. Although allegations of fraudulent concealment are unquestionably subject to the requirements of FRCP 9(b), see *Dayco Corp. v. Goodyear Tire & Rubber Co.* [1975-2 TRADE CASES P 60,483], 523 F. 2d 389, 394 (6th Cir. 1975); *General Aircraft Corp. v. Air America, Inc.* [1979-1 TRADE CASES P 62,033], 482 F. Supp. 3, 8 (D. D. C. 1979); *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority,* 1978-2 TRADE CASES (CCH) P 62,133 at 74,996 (D. D. C. 1978), that rule is satisfied here.

**\*6** Paragraph 14 alleges that '[t]he acts and practices alleged in Paragraph 12, *supra*, were fraudulently concealed by Defendants from the Customs Service and Defendants' competitors, including plaintiffs . . . .' To determine the sufficiency of this allegation under FRCP 9(b), it must be read in conjunction with the allegations of Paragraph 12. The allegations of Paragraph 12 'adequately [set] forth activities which from their general nature may be presumed to be secret and which could qualify as means of concealment. ' *Chambers & Barber, Inc. v. General Adjustment Bureau, Inc.* [1973-2 TRADE CASES P 74,638], 60 F. R. D. 455, 458 (S. D. N. Y. 1973). Paragraph 14 is an allegation that the acts and practices alleged in Paragraph 12 were conducted secretly and, thus, eluded discovery by plaintiffs prior to the indictment of Mitsui in 1982. As the Court held in *Chambers & Barber, Inc. v. General Adjustment Bureau, Inc.* [1973-2 TRADE CASES P 74,638], 60 F. R. D. at 459 n. 7:

Certain techniques of concealment could hardly come to the notice of competitors, which indicates that to expect specificity in a complaint regarding secret techniques of concealment is to expect more than Rule 9(b) requires.

*Conclusion*

Whether plaintiffs can prove the allegations of Paragraph 12, or that the acts and practices alleged therein were fraudulently concealed from them remains to be seen. The Court is quite satisfied, however, that these allegations are sufficient to allow defendants adequately to respond. Defendants' motion to dismiss the complaint or, alternatively, to strike the allegation

of fraudulent concealment in Paragraph 14 of the complaint is denied.

Bridon American Corp. v. Mitsui & Co. (U. S. A.), Inc.
Not Reported in F.Supp., 1983 WL 1897 (D.D.C.), 1983-2 Trade Cases P 65,696

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 4

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
(Cite as: 2001 WL 30191 (S.D.Ind.))

H

Only the Westlaw citation is currently available.

United States District Court, S.D. Indiana, Indiana-
polis Division.

ELI **LILLY** AND COMPANY !, Plaintiff and Coun-
terclaim Defendant,
v.
AMERICAN CYANAMID COMPANY !, Defendant
and Counterclaim Plaintiff !,
Biocraft Laboratories Inc n/k/a Teva Pharmaceuticals
Inc*, Zenith Laboratories,
Inc !, Defendant and Counterclaim Plaintiff*,
Biochimica Opos, SpA*, Roussel Corporation*, Rou-
sell UCLAF SA*, Rugby
Laboratories Inc*, Teva Pharmaceuticals USA Inc*,
Defendants.
No. IP95-0536-C-B/S.

Jan. 8, 2001.

Paul H. Berghoff, McDonnell, Boehnen, Hulbert &
Berghoff, Chicago, IL.

John R. Schaibley III, Baker & Daniels, Indianapolis,
IN.

Thomas G. Slater Jr., Hunton & Williams, Rich-
mond, VA.

Paul F. Ware Jr., Goodwin, Proctor & Hoar, LLP,
Boston, MA.

Stephen E. Arthur, Harrison & Moberly, Indianapol-
is, IN.

William L. Mentlik, Lerner, David, Littenberg,
Krumholz & Mentlik, Westfield, NJ.

Keith E. Rounsaville, Stearns, Weaver, Miller,
Weissler, Alhadeff & Sitterson, Tampa, FL.

Jay B. Shapiro, Stearns, Weaver, Miller, Weissler,
Alhadeff & Sitterson, Miami, FL.

ENTRY ON MOTION TO DISMISS COUNTER-
CLAIMS
BARKER.

*1 This cause is before the Court on the motion of
plaintiff/counter-defendant Eli Lilly and Company
("Lilly") entitled Eli Lilly's Rule 12(b)(6) Motion to
Dismiss Zenith's First and Second Counterclaims and
Fifth Defense of Patent Misuse for Failure to State a
Claim upon Which Relief May Be Granted. The mo-
tion is fully briefed, as are two related motions to
strike. The Court, being duly advised, DENIES
Lilly's motion to dismiss in its entirety and DENIES
AS MOOT the motions to strike. [FN1]

> FN1. Zenith filed a motion to strike certain
> portions of Lilly's Reply Brief; Lilly respon-
> ded by filing a motion to strike Zenith's mo-
> tion to strike. Because the Court has con-
> sidered all of Lilly's Reply Brief and still
> rules in favor of Zenith, it is unnecessary for
> the Court to consider either motion to strike.

BACKGROUND

This patent infringement action involves the antibiot-
ic cefaclor, which Lilly markets under the brand
name Ceclor®. Lilly owns several patents related to
cefaclor: United States Patent No. 3,925,372 ("the
'372 Patent"), which claimed the invention of cefaclor
and which expired in December 1992; United States
Patent No. 4,064,343 ("the '343 Patent"), which
claimed the nucleus of the cefaclor molecule and
which expired in December 1994; and United States
Patents No. 4,160,085 ("the '085 Patent"), No.
4,346,218 ("the '218 Patent"), and No. 4,226,986
("the '986 Patent") (collectively "the Process Pat-
ents"), which relate to methods for manufacturing ce-
faclor. In its Second Amended Complaint, Lilly as-
serts that an Italian company, Biochimica Opos
S.p.A. ("Opos"), which is wholly owned by the
French company Roussel UCLAF, S.A. ("Roussel"),
manufactured cefaclor using a process "that if per-
formed in the United States would infringe one or
more claims of each of the [Process Patents]." Second
Amended Complaint at ¶ 20. Lilly further asserts that
defendant/counter-claimant Zenith Laboratories, Inc.,
("Zenith") purchased this infringing cefaclor from
Roussel and imported it into the United States in viol-
ation of U.S. patent law. [FN2] Zenith admits that it
purchased bulk cefaclor from Opos and that it sold

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
**(Cite as: 2001 WL 30191 (S.D.Ind.))**

dosage forms of cefaclor in the United States, but denies that by doing so it infringed upon any of Lilly's patents.

> FN2. The additional defendants named in the Second Amended Complaint, including Opos and Roussel, have since been dismissed.

### The Amended Counterclaim

At issue in the instant motion to dismiss is Zenith's amended counterclaim, [FN3] in which Zenith alleges that Lilly "unreasonably restrained trade and commerce in the market for cefaclor in the United States in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." Amended Counterclaim at ¶ 68. Specifically, Zenith alleges that "in anticipation of the expiration of its ['372 Patent and '343 Patent] in the early 1990's, Lilly began developing strategies to identify potential generic manufacturers of cefaclor and then to prevent them from producing cefaclor." Id. at ¶ 16. According to Zenith, Lilly identified several European companies--ACS Dobfar, S.p.A. ("Dobfar"), Biochemie-Gema ("Biochemie"), Antibioticos-Lark ("Antibioticos"), Gist-Brocades, N.V. ("Gist"), and Opos--as "having a high probability of becoming involved in the manufacture of bulk cefaclor." Id at ¶ 17. Zenith then alleges that

> FN3. Lilly's motion also purports to address Zenith's fifth amended defense, which asserts that the patents Lilly alleges were infringed "are unenforceable based upon Lilly's misuse of such patents and unclean hands, as more fully described in Zenith's Counterclaims...." However, a defense is not a "claim for relief" and therefore may not be subject to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). While Lilly parenthetically describes Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860 (Fed.Cir.1997), cert. denied, 525 U.S. 815 (1998), as "dismissing plaintiff's patent misuse defense," the procedural posture of that case in fact was the appellate review of a jury verdict.

Using this information, Lilly began implementing a

strategy of "outsourcing" the production of cefaclor intermediates under the guise that Lilly lacked sufficient manufacturing capacity to satisfy its projected demand for cefaclor in 1992, 1993, 1994, and 1995. The purpose and effect of Lilly's outsourcing program was to tie up the manufacturing capacity of potential manufacturers of bulk cefaclor so that they could not or would not produce cefaclor for sale in competition with Lilly, particularly in Lilly's most profitable market, the United States.

*2 Id. at ¶ 18. With the exception of Opos, Lilly entered into confidentiality agreements with each of the companies named above and an additional company, Ciba-Geigy ("Ciba"), pursuant to which Lilly obtained access to the company's confidential manufacturing processes. Id. at ¶ 20. Lilly contracted with Gist to produce exomethylene, a cefaclor intermediate, for Lilly, and contracted with Dobfar to produce 7ACCA, the cefaclor nucleus, for Lilly; Zenith alleges that most of the 7ACCA was stockpiled and never used to produce cefaclor because Lilly "never had demand for cefaclor in any market that cost justified its payments for the production of these intermediates by Gist and Dobfar." Id. at ¶¶ 22, 23, 25, and 26. [FN4]

> FN4. Zenith alleges that Lilly ultimately determined that Ciba, Biochemie, and Antibioticos "presented no threat to become a manufacturer of generic cefaclor." Id. at ¶ 28.

In addition to its agreements with the European companies discussed above, Zenith alleges that Lilly also entered into a joint venture with an Indian company, Ranbaxy Laboratories, Ltd. ("Ranbaxy"), to produce the Ranbaxy cefaclor nucleus, known as the "zwitterion nucleus," for Lilly. In turn, Dobfar converted the zwitterion nucleus into bulk cefaclor, which was transferred to a Lilly subsidiary in Switzerland. Id. at ¶ 30-31. Zenith alleges that this resulted in an "enormous stockpile" of cefaclor intermediates, as well as a large quantity of cefaclor produced by Dobfar from the Ranbaxy nucleus, for which there was no market or demand. Id. at ¶ 33. Zenith further alleges that Lilly's outsourcing arrangements with Ranbaxy, Dobfar, and Gist, as well as arrangements it made with a Japanese company, Shionogi & Co., Ltd.,

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
**(Cite as: 2001 WL 30191 (S.D.Ind.))**

("Shionogi") regarding cefaclor, "had the purpose and effect of dividing the world market for cefaclor among Lilly and its 'partners,' reserving the United States market for Lilly, and preempting Lilly's potential competitors capable of manufacturing bulk cefaclor, except Opos, from supplying generic drug companies in the United States." *Id.* at ¶ 35.

Zenith alleges that it was injured by Lilly's anti-competitive activities because they prevented Zenith from entering the generic cefaclor market in the United States until April 27, 1995, approximately five months after Lilly's patents expired. Zenith began seeking a supplier of bulk cefaclor in 1992 so that it could market generic cefaclor in the United States upon expiration of Lilly's patents. *Id.* at ¶ 36. Zenith approached Dobfar, Ranbaxy, and, through an intermediary, Lilly itself, but none of those companies were willing to sell Zenith bulk cefaclor. *Id.* at ¶¶ 37-38. Opos, which had refused to enter into any agreements with Lilly, did agree to sell Zenith bulk cefaclor. *Id .* at ¶ 41. However, the FDA did not approve Opos's Abbreviated Antibiotic Drug Application ("AADA") until March 1, 1995, approximately one year after Dobfar's AADA was approved. [FN5] *Id.* at ¶¶ 39, 42. In fact, Dobfar was the only generic manufacturer of bulk cefaclor that had FDA approval to supply bulk cefaclor in the United States when Lilly's '343 patent expired in December 1994. *Id.* at ¶ 39.

> FN5. The FDA's approval of an AADA is necessary before a drug company legally can sell an antibiotic drug in the United States. Both the bulk cefaclor and the dosage form cefaclor made from it had to be approved for sale by the FDA.

**\*3** In addition to preventing Dobfar from selling bulk cefaclor to Zenith, Zenith alleges that Lilly took various actions to try to prevent Opos and Zenith from manufacturing and selling generic cefaclor, including filing this patent infringement action in bad faith and "falsely stat[ing] to customers and potential customers of cefaclor that Zenith and generic suppliers of cefaclor would not have a sufficient supply of cefaclor to meet their requirements during flu season, because Opos had capacity to manufacture only 30%

of the anticipated United States demand for cefaclor" and that the cefaclor marketed by Zenith was of inferior quality to Lilly's generic cefaclor. *Id.* at ¶¶ 60 and 61.

Zenith alleges that all of these actions by Lilly constituted an unreasonable restraint of trade in violation of § 1 of the Sherman Act, which in turn caused injury to Zenith. Zenith further alleges that the same actions constituted unfair competition under New Jersey law.

### DISCUSSION

Lilly moves to dismiss Zenith's amended counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it fails to state a claim upon which relief may be granted. This motion may be granted only if it is clear that Zenith could not prove any set of facts consistent with its allegations that would support its claim for relief. *See Holman v. Indiana,* 211 F.3d 399, 402 (7th Cir.2000), *cert. denied,* 121 S.Ct. 191. In ruling on the motion, the Court must accept as true all facts alleged in the amended counterclaim and draw all reasonable inferences from them in Zenith's favor. *Id.* The Court must also consider facts alleged in Zenith's brief in opposition to the motion to dismiss, as long as they are consistent with the amended counterclaim. *See Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 439-40 (7th Cir.1994).

### Has Zenith Adequately Alleged an Antitrust Injury Caused by Lilly?

Lilly first alleges that Zenith's amended counterclaim fails to state a claim because Zenith fails to allege that it suffered an "antitrust injury" as a result of Lilly's antitrust violation. Lilly argues that Zenith's "conclusory allegations of injury fail to explain what Zenith's alleged injury is, how any alleged antitrust violation was the cause-in-fact of such alleged injury, how any alleged antitrust violation proximately caused such alleged injury, or how such alleged injury is an 'antitrust injury.' " Lilly's Brief at 6. However, Lilly's protest that Zenith's allegations are conclusory is not well-taken in the context of a Rule 12(b)(6) motion to dismiss, inasmuch as a party is not required to plead the facts relevant to its claim, but may plead conclusions. *Jackson v. Marion County,* 66 F.3d 151, 153 (7th Cir.1995) (citing Federal Rule

of Civil Procedure 8(a)(2)); *see also, e.g.,* *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967, 976 (7th Cir.1995); *Palmer v. Board of Educ.,* 46 F.3d 682, 688 (7th Cir.1995); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1995), *cert. denied,* 516 U.S. 1159 (1996). Indeed, the Seventh Circuit has noted expressly that a party's failure to allege antitrust injury, or "injury caused by the kind of conduct that the antitrust laws seek to prevent" is not sufficient ground to grant a Rule 12(b)(6) motion to dismiss because "a complaint need not go into such detail ." *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 782 (7th Cir.1994). Zenith has alleged that Lilly violated Section 1 of the Sherman Act and that it suffered injury to its business and property as a result of this violation. This is sufficient to satisfy the notice pleading required by Federal Rule of Civil Procedure 8(a).

**\*4** However, while a party need not plead facts, if it chooses to do so it runs the risk of "pleading itself out of court" by alleging facts that demonstrate that it has no claim. *Jackson,* 66 F.3d at 153. Lilly next argues that Zenith has done just that. In Lilly's view, "the specific facts that Zenith alleges clearly establish that it has suffered no injury attributable to any alleged antitrust violation," Lilly's Brief at 7 (emphasis in original), because Zenith's counterclaim alleges that it did obtain a supply of bulk cefaclor from Opos and ultimately was approved by the FDA to produce and market generic cefaclor in dosage form on April 27, 1995. Zenith counters that, absent Lilly's anticompetitive activities, Dobfar would have been able to supply Zenith with bulk cefaclor and Zenith would have been able to sell generic cefaclor in the United States as soon as Lilly's patent expired in December 1994, because Dobfar obtained its FDA approval to supply bulk cefaclor in the United States in April 1994. Instead, Zenith had to wait until April 1995 before entering the U.S. bulk cefaclor market, after Opos obtained its FDA approval.

Lilly argues that Zenith's assertion that Dobfar would have sold it bulk cefaclor, thus enabling it to enter the generic cefaclor market earlier, is "sheer speculation," and notes that Zenith

does not alleges that it would have used Dobfar,

rather than Opos, as a bulk cefaclor supplier but for Dobfar's decision ... does not allege that, had Dobfar or Ranbaxy been willing to supply bulk cefaclor to Zenith, Zenith's choice of supplier would have been any difference ... [and does not allege] that it preferred Dobfar to Opos, whether on the basis of price, quality, availability of bulk cefaclor, or any other basis.

Lilly's Reply Brief at 5. This is all true; however, Zenith's counterclaim need not contain such extensive allegations. Rather, the question is whether Zenith can prove any set of facts, consistent with its counterclaim, that would entitle it to relief. *See Sanjuan,* 40 F.3d at 251 (citation omitted) ("At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.") It is not outside the realm of possibility that Zenith will be able to prove that but for Lilly's agreement with Dobfar, Zenith would have purchased bulk cefaclor from Dobfar rather than Opos and would have entered the U.S. generic cefaclor market sooner than late April 1995.

Lilly also argues that Zenith failed to allege that Dobfar or Ranbaxy [FN6] would have been able to supply it with bulk cefaclor that did not infringe upon Lilly's or another company's patent. Again, notice pleading did not require Zenith to include such specific allegations in its counterclaim. Further, Zenith has not pled itself out of court with the factual allegations that it did make in its amended counterclaim. Lilly is correct that Zenith alleges that there were three patents covering three different routes for synthesizing cefaclor. However, that does not dictate the conclusion that Lilly urges--that Zenith could not have obtained bulk cefaclor from Dobfar without infringing upon a valid patent.

> FN6. Zenith's complaint also alleges that it approached Lilly as a potential source of bulk cefaclor and that Lilly refused to deal with Zenith. Lilly argues that this refusal could not constitute an antitrust violation because Lilly was merely exercising its right to enforce its patent. The Court need not address this argument, inasmuch as Zenith expressly "does not contend ... that Lilly was not free to decide unilaterally to refuse to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
**(Cite as: 2001 WL 30191 (S.D.Ind.))**

deal with Zenith." Zenith's Brief at 9, n. 4.

**\*5** Lilly finally argues that any delay in Zenith's entry into the generic cefaclor market was proximately caused by the slow FDA approval process, not by any action of Lilly; in other words, but for the time it took the FDA to approve Opos's and Zenith's AADAs, Zenith would have been able to enter the U.S. cefaclor market when Lilly's patent expired. However, Dobfar's AADA to sell bulk cefaclor was approved in April 1994, and Zenith may be able to prove that its AADA more likely than not would have been approved sooner had its application sought to use Dobfar's bulk cefaclor, rather than Opos's, to produce its generic cefaclor. There is, then, at least one set of facts which, if proved, will demonstrate that Zenith was injured by Lilly's alleged actions. The allegations contained in Zenith's amended counterclaim are not inconsistent with that set of facts; therefore, Zenith has not pled itself out of court, and Lilly's motion to dismiss on that ground must be denied.

### Has Zenith Adequately Alleged a Relevant Market Which Has Suffered Antitrust Injury?

Lilly argues that Zenith has failed to identify the relevant market in which trade was restrained by Lilly's alleged actions. This argument is without merit; Zenith's amended counterclaim clearly defines the relevant market as "the market for cefaclor in the United States." Amended Counterclaim at ¶ 68. Lilly also argues that Zenith fails to allege an injury to competition in the relevant market. Zenith argues that it ultimately will not be required to prove such an injury, because its allegations demonstrate that Lilly's actions constituted horizontal restraints on the market, and therefore constitute a per se violation of Section 1 of the Sherman Act. The Court need not determine at this stage whether the complaint sets forth horizontal or vertical restraints, however, as Zenith's brief sets forth an alleged injury to the market:

> [T]he reduced supply of bulk cefaclor after expiration of Lilly's patent in December, 1994, had the effect of keeping prices for cefaclor to U.S. consumers higher than they would have been if generic drug manufacturers had been able to enter the U.S. market immediately. Instead, for the first five months after expiration of Lilly's patents, U.S. con-

sumers could purchase only Lilly's branded Ceclor® and Lilly's generic cefaclor marketed by Mylan Laboratories at uncompetitively-high prices. Zenith's Brief at 9. It is true that Zenith did not include these facts in its amended counterclaim. Again, however, Zenith was not required to plead with specificity, and this Court can consider factual allegations set forth in Zenith's brief, as long as they are not inconsistent with the allegations contained within the amended counterclaim. *See Highsmith,* 18 F.3d at 439-40 (plaintiff may raise essential new facts to survive a motion to dismiss even on appeal); *Hrubec v. National R.R. Passenger Corp.,* 981 F.2d 962, 963 (7th Cir.1992) (facts needed to survive motion to dismiss need not be contained in complaint, but may be set forth in brief). The facts alleged in Zenith's brief clearly are consistent with the allegations contained in Zenith's amended counterclaim, and if Zenith is able to prove them, it will have proven an injury--higher prices--to the relevant market. Accordingly, Lilly's motion to dismiss for failure to allege injury to competition in the relevant market is denied.

### Has Zenith Stated a Claim for Unfair Competition under New Jersey Common Law?

**\*6** In addition to its antitrust claims, Zenith's amended counterclaim includes a claim for unfair competition under New Jersey common law. In this claim, Zenith alleges that the actions Lilly took to prevent generic competition for cefaclor in the United States--the same actions that Zenith alleges violated the Sherman Act--constitute unfair competition. Lilly argues that Zenith's allegations fail to state a claim for the tort of unfair competition because New Jersey law limits that tort "to various forms of misappropriation of property of commercial value, such as 'passing off' and 'unprivileged imitation.' " Lilly's Reply Brief at 12.

The Court carefully has examined the cases cited by Lilly and determined that New Jersey courts do not so limit the tort of unfair competition. For example, while the court in *New Jersey Optometric Assoc. v. Hillman-Kohan Eyeglasses, Inc.,* 144 N.J.Super. 411, 427, 365 A.2d 956, 965 (Ch. Div.1976), *aff'd,* 160 N.J.Super. 81, 388 A.2d 1299 (App.Div.1978), notes that the tort "[g]enerally ... consists of the misappropriation of one's property by another," it does not

Case 1:06-cv-02084-RWR    Document 37-3    Filed 05/21/2007    Page 42 of 62

hold that misappropriation of property is an essential element of the tort, but rather acknowledges that "it is impossible to categorize all acts which constitute unfair competition." Similarly, Lilly cites *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1062 (3rd Cir.1980), for the proposition that "New Jersey common-law 'unfair competition' encompasses: (1) passing off one's goods and services as those of another; and (2) unprivileged imitation." However, the *SK & F, Co.* court actually noted that "there are two *relevant* torts of unfair competition"--passing off and unprivileged imitation--not that those were the only two possibilities under New Jersey law. *SK & F, Co.*, 625 F.2d at 1062 (emphasis added). [FN7]

> FN7. Lilly is correct that *Hoffman-La Roche, Inc. v. Genpharm, Inc .*, 50 F.Supp.2d 367, 380 (D.N.J.1999), and *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 494 (D.N.J.1998), support its argument that misappropriation is required for an unfair competition claim under New Jersey law. However, the court in *Genpharm* cited only to *New Jersey Optometric Assoc.* in support of that proposition, while the *Roussel Corp.* court cited to that case and *Columbia Broadcasting Sys., Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 376, 341 A.2d 348, 352 (App.Div.1975). Neither *New Jersey Optometric Assoc.* nor *Columbia Broadcasting Sys.* dictates such a narrow definition of the tort of unfair competition. Further, the Court notes that Lilly itself argued for a liberal view of the tort in the *Roussel Corp.* case. *See* Lilly's Consolidated Memorandum in Opposition to the Defendants' Motions to Dismiss, which was filed in *Roussel Corp.*, Exhibit J to Lilly's Reply Brief. This Court finds that argument persuasive, even though the New Jersey District Court did not.

On the other hand, in *Columbia Broadcasting Sys., Inc., v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 376, 341 A.2d 348, 352 (App.Div.1975), the court noted that "the essence of unfair competition is fair play," and held that the common law tort of unfair competition was not limited to those actions enumer-

ated in New Jersey's unfair competition statute. Instead, it is appropriate under the common law for the courts to concern themselves with "business or commercial conduct, which is injurious and otherwise unfair, improper and wrongful." *Id.*, 134 N.J.Super. at 375, 341 A.2d at 352. This is consistent with the case of *United Stations of New Jersey v. Getty Oil Co.*, 102 N.J.Super. 459, 246 A .2d 150 (Ch. Div.1968), in which the court entered judgment in favor of the plaintiff, a gas station owner, on his claim for unfair competition under New Jersey common law against his competitors for using an illegal game of chance to attract customers. Also supporting a broader view of the tort of unfair competition than that urged by Lilly is *Feiler v. New Jersey Dental Assoc.*, 191 N .J.Super. 426, 467 A.2d 276 (Ch. Div.1983), *aff'd*, 199 N.J.Super. 363, 489 A.2d 1161 (App.Div.1984), *cert. denied*, 99 N.J. 162, 491 A.2d 673, in which a dental association alleged that an individual dentist had engaged in fraudulent billing practices which enabled him to offer patients reduced costs, thereby taking business away from dentists who did not engage in fraudulent billing. The court found in favor of the dental association on its claim for "unfair and dishonest competition." *See also*, *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F.Supp.2d 750, 776 (D.N.J.1999), citing *Restatement (Third) of Unfair Competition* § 1 cmt. g (1995) (summarily denying motion to dismiss unfair competition claim because "having found that the conduct alleged by Biovail constitutes, at least on the pleadings, federal anti-trust violations, it is fair to say that the conduct states a claim under the much broader common law tort of unfair competition"); *Seatrax, Inc., v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 367-68 (5th Cir.2000) (citation omitted) ("The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.").

**\*7** For the reasons set forth above, the Court determines that the tort of unfair competition under New Jersey common law is not limited to claims of passing off or unprivileged imitation, but rather encompasses broader claims of unfair business practices which injure another's business, including those

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
**(Cite as: 2001 WL 30191 (S.D.Ind.))**

alleged by Zenith in this case. Accordingly, Lilly's motion to dismiss Zenith's claim for unfair competition is denied.

*Does Zenith's Amended Counterclaim Relate Back to Its Original Counterclaim?*

Zenith filed its original counterclaim on June 16, 1995. Its amended counterclaim was filed on May 4, 2000, almost five years later. Lilly's final argument is that all, or at least most, of Zenith's amended counterclaim is barred by the four-year statute of limitations for Sherman Act claims provided in 15 U.S.C. § 15b and the six-year statute of limitations for unfair competition claims provided in N.J.S.A. 2A:14-1. Zenith responds that its amended counterclaim relates back to its original counterclaim pursuant to Federal Rule of Civil Procedure 15(c)(2) and therefore its claims are not time barred.

Rule 15(c)(2) provides that an amended pleading relates back to the date of the original pleading if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." "Even if the statute of limitations has run, if the original pleading gives fair notice of the general fact situation out of which the claim or defense arises, an amendment that 'changes only the legal theory of the action, or adds another claim arising out of the same transaction or occurrence,' will relate back." *Johnson v. Artim Transp. Sys., Inc.,* 826 F.2d 538, 547 (7th Cir.1987), *cert. denied,* 486 U.S. 1023 (1988) (quoting 3 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 5.15 (2d ed.1995)).

> [A]mendments that merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the Rule 15(c) test and will relate back. Thus, amendments that do no more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within Rule 15(c).

6A Charles Alan Wright, et al., 6A *Federal Practice and Procedure* § 1497 (2d ed.1987) (footnotes omitted).

Lilly points to the following factual allegations contained in Zenith's amended counterclaim which it as-

serts "find no basis whatsoever" in the original counterclaim:

- Lilly studied potential manufacturers of cefaclor in 1988-89 (Amended Counterclaim at ¶ 17)
- Lilly implemented an "outsourcing" strategy for cefaclor (*Id.* at ¶ 18)
- Lilly approached six potential suppliers of a cefaclor intermediate in 1989-91 (*Id.* at ¶ 19)
- Five potential suppliers entered into confidentiality agreements with Lilly (*Id.* at ¶ 20)
- Opos refused to sign a confidentiality agreement with Lilly (*Id.* at ¶ 21)
**\*8** • Opos told Lilly it could make cefaclor without infringing Lilly's patent rights and proposed supplying Lilly with bulk cefaclor (*Id.* at ¶ 21)
- Lilly and Gist entered into an agreement (*Id.* at ¶ 22)
- Lilly analyzed cefaclor intermediates from Gist and Dobfar (*Id.* at ¶ 24)
- Lilly decided that a cefaclor intermediate made by Gist would be delivered to Dobfar (*Id.* at ¶ 25)
- Lilly's payments to Gist and Dobfar were not cost justified (*Id.* at ¶ 26)
- Lilly's negotiations with Ciba, Biochemie and Antibioticos did not result in agreements (*Id.* at ¶ 28)
- Lilly's awareness of Ranbaxy's manufacture of small quantities of cefaclor (*Id.* at ¶ 29)
- Lilly's agreements to have Dobfar convert Ranbaxy "zwitterion" into bulk cefaclor (*Id.* at ¶¶ 31-32)
- Lilly had a stockpile of cefaclor and cefaclor intermediates in 1994 and no market or demand for those products (*Id.* at ¶ 33)
- Lilly's manufacturing capacity for cefaclor was underutilized (*Id.* at ¶ 34)
- Lilly's agreements had the purpose and effect of dividing the world market for cefaclor among Lilly and its "partners" (*Id.* at ¶ 35)
- Zenith's efforts to obtain bulk cefaclor (*Id.* at ¶¶ 36-41)
- Lilly's campaign against Opos and its customers (*Id.* at ¶¶ 44-48)
- Lilly told customers that the cefaclor sold by Zenith was inferior in quality to Lilly's generic cefaclor (*Id.* at ¶ 61)
- Lilly permitted "bundling" of products by Mylan

Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)
**(Cite as: 2001 WL 30191 (S.D.Ind.))**

(*Id.* at ¶ 62)
Lilly's Brief at 21-22.

It is true that none of these factual allegations were expressly set out in the original counterclaim. This is not fatal to Zenith's claim, however. The "new allegations" to which Lilly points simply set forth with greater specificity the claims contained in Zenith's original counterclaim. For example, in the original counterclaim Zenith alleged generally that Lilly made "various attempts ... to 'lock up' other suppliers of bulk cefaclor so as to preclude the supply of that drug to generic manufacturers, such as Zenith," Original Counterclaim at ¶ 7(a), and specifically that Lilly "induced Ranbaxy to refrain from supplying bulk cefaclor to [generic drug companies] ... by entering into a joint venture with Ranbaxy to distribute Lilly's drug portfolio in India," "induced Dobfar to refrain from supplying bulk cefaclor to [generic drug companies] ... by entering into an exclusive supply agreement with Dobfar," and "attempted to induce Opos to refrain from supplying bulk cefaclor to [generic drug companies]." *Id.* at ¶¶ 19-21. Most of the "new allegations" about which Lilly complains simply describe in greater detail these actions by Lilly. Others expound upon paragraphs 28-30 in the original counterclaim, in which Zenith alleged that Lilly "commenced a campaign of misrepresentations in the marketplace to wrongfully dissuade customers from purchasing lower priced generic cefaclor." The remainder of the "new allegations" can most fairly be characterized as facts that support Zenith's allegation in the original counterclaim that Lilly's actions were for the purpose of and had the effect of eliminating (or at least delaying) generic competition.

**\*9** Because the new facts alleged in Zenith's amended counterclaim merely expand upon and add detail to the allegations contained in the original counterclaim, the amended counterclaim relates back to the original, and none of Zenith's claims are barred by the statute of limitations. Lilly's motion to dismiss the amended counterclaim on that ground is therefore denied.

## CONCLUSION
For the reasons set forth above, Lilly's motion to dismiss is DENIED in its entirety.

Not Reported in F.Supp.2d, 2001 WL 30191 (S.D.Ind.)

END OF DOCUMENT

Tab 5

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**



United States District Court, District of Columbia.
In re: **VITAMINS** ANTITRUST LITIGATION,
**No. MISC 99-197(TFH).**

May 9, 2000.

MEMORANDUM OPINION Re: Motions To Dismiss

HOGAN, J.

**\*1** Pending before the Court are numerous motions to dismiss fraudulent concealment claims and motions to dismiss for failure to state a claim or alternatively to sever claims involving choline chloride and Vitamin B-3 or niacin. While these motions have been filed by different defendants [FN1] against different plaintiffs [FN2] and although each was individually considered by the Court, all the motions raise nearly identical factual and legal issues and will thus be addressed together in this opinion.

FN1. The defendants whose fully briefed motions to dismiss are covered by this opinion include: Degussa-Huls Corporation; EM Industries, Inc; Reilly Industries, Inc.; Chinook Group, Inc.; Chinook Group Ltd.; Lonza, Inc.; UCB, Inc.; E.I. DuPont de Nemours and Co.; ConAgra, Inc.; Akzo Nobel, Inc.; DuCoa, L.P.; and DCV, Inc.

FN2. The plaintiffs whose complaints are being challenged by these motions include: the Vitamin B-3 class, NBTY, Perrigo, Natural Alternatives, Leiner Health Products, Tyson Foods, Blue Seal Feeds, Cactus Operating, Southern States, Marshall Durbin Farms, Quaker Oats, Cargill, Kellogg, Hormel Foods, Proctor & Gamble, Meijer, Publix, and Nutra-Blend.

I. BACKGROUND

The complaints filed in this litigation describe a massive, long-running international conspiracy among defendants and their co-conspirators to artificially inflate the prices of certain vitamins and vitamin products, allocate shares of the vitamin market among the defendants and their co-conspirators, predetermine sales volume in the vitamin industry, eliminate competition, limit supply, and commit other practices constituting per se violations of Section 1 of the Sherman Act. Plaintiffs allege that defendants conspired to control the global market for vitamins and vitamin pre-mixes between at least 1990 and 1998. *See NBTY, et al.* Consolidated Amended Complaint (alleging conspiracy span of at least January 1988 to September 1998); *Tyson, et al.* Complaints (alleging conspiracy from at least January 1990 through February 1999); First Consolidated Amended Vitamin B-3 Class Action Complaint (alleging a ten-year conspiracy). Plaintiffs further allege that defendants successfully avoided detection of the conspiracy, for approximately ten years, through a scheme of concealment which included: discussing and agreeing upon the prices, volume of sales, and markets in covert meetings and conversations; limiting knowledge of the conspiracy to high level personnel; deliberately refraining from creating documents; destroying records; refraining from submitting bids and submitting falsified bids; issuing agreed-upon price announcements and price quotations; formulating and rehearsing a cover story denying the vitamin cartel activity in an attempt to avoid further government investigation; and engaging in other activities designed to keep the existence of the conspiracy hidden. *See* Class Action Vitamin B-3 Complaint at ¶¶ 41, 42, 49; Exhibits 1-7 of Direct Action Plaintiffs Consolidated Opposition (copies of factual allegations from all direct action complaints which support fraudulent concealment claims); *NBTY, et al.* Complaint ¶ 89.

II. APPLICABLE LAW

A complaint may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the complaint] which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The Court must accept the allegations of the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Croixland Properties Ltd. Partnership v. Corcoran,* 174 F.3d 213, 215 (D.C.Cir.), *cert denied,* 120 S.Ct. 53 (1999). This rule is particularly signific-

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

ant in antitrust cases, where the proof is largely in the hands of the alleged conspirators. *Hospital Bldg. Co. v. Trustees of the Rex Hosp.,* 425 U.S. 738, 744 (1976), cert denied, 464 U.S. 904 (1983).

### III. FRAUDULENT CONCEALMENT MOTIONS TO DISMISS

**\*2** The statute of limitations for violations of the antitrust laws is four years. 15 U.S.C. § 15(b) (1997). Unless the statute of limitations is tolled, plaintiffs are estopped from alleging conduct by defendants or claiming damages for injuries occurring more than four years before the date that the original complaints were filed. Plaintiffs claim that the statute of limitations was tolled by the defendants' "fraudulent concealment" of the alleged conspiracy.

In order to prevail on a claim for fraudulent concealment under federal antitrust laws, [FN3] a plaintiff must plead with sufficient particularity (1) that the defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) the plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence. *Larson v. Northop Corp.,* 21 F.3d 1164, 1172 (D.C.Cir.1994).

> FN3. The requirements for claims of fraudulent concealment under the relevant state antitrust laws will be discussed later in this opinion.

*1. Adequacy of Concealment Pleadings Under Federal Antitrust Laws*

Allegations of fraudulent concealment must meet the pleading requirements of Rule 9(b), which should be read in conjunction with Rule 8(a). *Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 959 (D.C.Cir.1985). A plaintiff alleging fraudulent concealment "cannot rely upon conclusory statements to avoid the bar of limitations." *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F .2d 248, 250 (9 th Cir.1978). Instead, the plaintiff must "plead with as much particularity as possible ... the dates and circumstances constituting fraudulent concealment." *Bergen v. Rothschild,* 648 F.Supp. 582, 587 (D.D.C.1986). In essence, the rules only require that the "circumstances of fraud be pled

with enough particularity to put the party on notice as to the nature of the claim." *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1489 (6 th Cir.1991); *see also Jones v. Meridian Towers Apts. Inc.,* 816 F.Supp. 762, 769 n. 7 (D.D.C.1993) ("As an initial matter, the Court rejects defendants' argument that plaintiffs have not asserted sufficiently particular allegations of fraudulent concealment to meet the requirements of Fed.R.Civ.P. 9(b). Rule 9 is to be read in tandem with the Rule 8 requirement of simplicity in drafting and flexibility in reviewing pleadings.").

Some courts have recognized the "self-concealing conspiracy" doctrine, which allows plaintiffs to satisfy the "concealment" prong by alleging "some misleading, deceptive, or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action." *Hobson v. Wilson,* 737 F.2d 1, 34 (D.C.Cir.1984), cert. denied, 470 U.S. 1084 (1985). However, several courts have reserved that doctrine for bid-rigging cartels and have declined to apply it to price-fixing cases. *See Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 123-24 (4 th Cir.1995) (price fixing generally not self-concealing, although bid-rigging might be). Other courts have ruled that "affirmative acts" of concealment must be pled in tandem with the allegations of conspiracy. *See Richards v. Mileski,* 662 F.2d 65, 70 (D.C.Cir.1981) ("Under the law of the District of Columbia, fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any word or act tending to suppress the truth is enough."); *see also State of Texas v. Allan Const. Co.,* 851 F.2d 1526, 1528 (5 th Cir.1988). There is no requirement that these affirmative acts of concealment be independent of the conspiracy. *In re Catfish,* 826 F.Supp. 1019, 1031 (N.D.Miss.1993). "Fraudulent concealment can be shown where the acts of concealment are intertwined with the acts of price fixing. *Id.* Under either the self-concealing standard or the affirmative act standard, plaintiffs' allegations are sufficient to satisfy the fraudulent concealment pleading requirements.

**\*3** In this case, secrecy was plainly integral to the

Not Reported in F.Supp.2d    Page 3
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

formation and implementation of this world-wide conspiracy. Plaintiffs' allegations include numerous affirmative acts of concealment, such as submission of false bids, issuing price announcements for vitamins so as to create the illusion of competitive pricing, instructing members of the conspiracy not to divulge the existence of the conspiracy to any non-participants, the convening of secret meetings, confining the conspiracy plan to a small group of key officials at each company, avoiding references in documents or the creation of documents which would reveal these antitrust violations, destroying documents, using codes to conceal the identity of co-conspirators, and providing false information to law enforcement authorities. [FN4] These allegations are clearly sufficient to meet plaintiffs' pleading burden under Rule 9(b). *See In re Catfish*, 826 F.Supp. at 1031-32 ("clandestine meetings and telephone conversations" are sufficient); *In re Nine West Antitrust Litig.*, 2000 U.S. Dist. LEXIS 256 at *35; *Commercial Explosives*, 1997-1 Trade Cas. (CCH) ¶ 71,723 at 79, 117 (plaintiffs' lack of knowledge of conspiracy and defendants' efforts to keep conspiracy secret, including confining knowledge to a limited group of core officers, are sufficient affirmative acts).

> FN4. These allegations appear in all relevant complaints. *See* Class Action Vitamin B-3 Complaint at ¶¶ 41, 42, 49; Exhibits 1-7 of Direct Action Plaintiffs' Consolidated Opposition (copies of factual allegations from all Direct Action Complaints which support fraudulent concealment claims); *NBTY, et al.* Complaint ¶ 89.

The court also rejects defendants' argument that plaintiffs have not alleged any affirmative acts of concealment attributable to specific companies. "[W]here the original conspiracy contemplates concealment, or where the concealment is in furtherance of the conspiracy, affirmative acts of concealment by one or more conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations." *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C.Cir.1989). Concealment is generally susceptible to industry-wide proof and need not be established on a victim-by-victim basis. *In re Plywood Antitrust Litig.*, 76 F.R.D. 570

(E.D.La.1976). Thus, "[a]cts by different antitrust co-conspirators in furtherance of the conspiracy merely carry out the conspirators' agreement to restrain trade, and once a party takes the affirmative step of entering into an illegal conspiracy, that party is responsible for all the acts and consequent injury caused in furtherance of the conspiracy." *Pinney Dock & Transport Co. v. Penn Central Corp.*, 991 F.Supp. 908, 911 (N.D.Ohio 1998), *aff'd*, 196 F.3d 617 (6 th Cir.1999).

To survive a motion to dismiss, a complaint need only contain allegations from which one could reasonably infer concerted action. *Crimpers Promotions, Inc. v. Home Box Office*, 554 F.Supp. 838 (S.D.N.Y.), *aff'd*, 724 F.2d 290 (2d Cir.1983), *cert. denied*, 467 U.S. 1252 (1984). There is no requirement that a plaintiff plead with particularity every overt act allegedly committed by each defendant in furtherance of a conspiracy or the precise role played by each alleged conspirator. *Barr v. Dramatists Guild, Inc.*, 573 F.Supp. 555, 559 (S.D.N.Y.1983); *Bridon American Corp. v. Mitsui & Co. (U.S.A.)*, 1983 WL 1897 at *5-6 (D.D.C. Nov. 7, 1983) ("the general rule requiring specific allegations of time, place and content is relaxed somewhat as to matters peculiarly within the adverse party's knowledge or where the issues are complex or the transactions involved cover a long period of time."). In finding that the allegations of the complaint in *Bridon* satisfied the requirements of Rule 9(b), the Court held: "They give notice of the nature and basis of the claim asserted sufficient to enable the defendants to frame a responsive pleading. Perhaps ..., if only one fraudulent act were relied on, more details as to time and place would be appropriate. However, here such detail would unduly lengthen the [complaint] in violation of Rule 8(a)." *Id.* Like *Bridon*, this case is unusually complex and the burden is on plaintiffs to plead with particularity matters peculiarly within the adverse party's knowledge. Since the Court finds that the complaints at issue provide sufficient factual allegations to put defendants on notice of the claims against them, the Court finds that plaintiffs have adequately alleged concealment.

*2. Due Diligence Requirement*

**\*4** In this Circuit, where defendants have actively

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

concealed the wrong, the statute is generally tolled until the wrong is actually discovered. *Foltz v. U.S. News and World Report,* 627 F.Supp. 1143, 1150 (D.D.C.1986) ("In such a situation, the plaintiff need not exercise due diligence to avail himself of the doctrine of equitable tolling.") In the case of self-concealing wrongs, the requirement of due diligence is essential. *Id.* However, the doctrine of fraudulent concealment has no applicability at all if the plaintiffs were on notice of the alleged conspiracy. *Id.* Notice includes both actual and inquiry notice. *Id.*

Since the standard of due diligence is an objective one, based upon the knowledge that would put a reasonable person on notice to inquire, the due diligence requirement can be met without proof that the plaintiffs engaged in any specific inquiry. *See Supermarket of Marlington, Inc.,* 71 F.3d at 128; *Sterlin,* 154 F.3d at 1201 ("[A]lthough a plaintiff has an obligation of diligence, the plaintiff need not show the actual exercise of diligence in order to toll the limitations period. Rather in deciding whether the statute should be tolled, it must be determined whether a reasonably diligent plaintiff would have discovered the fraud.") Defendants claim that the Supreme Court has recently made it clear that proof of actual due diligence is required. *See Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 186, 194-96 (1997) ("reasonable diligence does matter and a plaintiff who is not reasonably diligent may not assert 'fraudulent c oncealment.' "). [FN5] However, the language in the *Klehr* opinion supports plaintiffs' position that actual proof of an investigation is not required, because the test, as articulated by the Supreme Court in that case, is whether a reasonable person exercising due diligence would have discovered the claims earlier. *Id.* at 195 ("the concealment requirement is satisfied only if the plaintiff shows that he neither knew, nor, in the exercise of due diligence, *could reasonably have known* of the offense.") (emphasis added). [FN6]

> FN5. In a Supplemental Memorandum, defendants point to the recent Supreme Court decision in *Rotella v. Wood* as further support for their position. *See* Supplemental Memorandum in Support of Defendant's Reply; *see also Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075 (2000) (attached to de-

fendants' memorandum). However, the Court finds *Rotella* to be inapposite. In *Rotella,* plaintiff did "not deny that he knew of his injury ... when it occurred, or that his civil RICO claim was complete and subject to suit at that time"; he merely claimed that the clock should not start until he discovered the pattern of predicate acts. *Id.* at 1083. The Supreme Court referred to *Klehr* as a rejection of this "last predicate act rule." *Id.* at 1080. By contrast, in the Vitamins Antitrust Litigation, plaintiffs do not claim that they were aware of their injury earlier; in fact, they specifically allege that they were not aware of it earlier and that they could not reasonably have discovered it before they did due to defendants' affirmative acts of concealment. Therefore, this is a different case from that facing the Supreme Court in *Rotella.*

> FN6. Significantly, the Supreme Court specifically refers to the due diligence requirement as a "fact-based question." *Klehr,* 521 U .S. at 196.

In the Vitamins Antitrust cases, the Complaints allege that plaintiffs could not have uncovered defendants' conspiracy earlier than they did, because defendants and their co-conspirators affirmatively concealed the existence of the combination and conspiracy from plaintiffs by submitting prearranged, complementary losing bids; allocating among themselves contracts for the sale and volume of vitamins; issuing price announcements to create the illusion of competitive pricing; confining the conspiracy plan to a small number of key officials at each company and instructing the members of the conspiracy not to divulge the plan to outsiders; conducting covert, secret meetings; avoiding references to the conspiracy in documents; destroying documents implicating the conspiracy; using code names and numbers to conceal the conspirators' identities; and providing false information to law enforcement authorities. *See* Class Action Vitamin B-3 Complaint at ¶¶¶ 41, 42, 49; Exhibits 1-7 of Plaintiffs' Consolidated Opp. (copies of factual allegations from all direct action complaints); *NBTY, et al.* ¶ 89. In pleading that due diligence

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

would not have uncovered the conspiracy earlier due to these affirmative, deceptive, and secretive acts of the defendants, the Complaints adequately plead due diligence to survive a motion to dismiss. *In re Nine West Shoes Antitrust Litig.,* 2000 U.S. Dist. LEXIS 256, at *36 (S.D.N.Y.2000) (finding that plaintiffs had adequately pled due diligence where the complaint alleges that "[p]laintiffs and other class members could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants....").

**\*5** Some defendants suggest that market trends, such as price increases and output reductions, should have put these plaintiffs on notice of their claims. However, notice in the context of fraudulent concealment is close to actual notice, not "the kind of notice-based on hints, suspicions, hunches or rumors--that requires a plaintiff to make such inquiries in the exercise of due diligence, but not to file suit." *Hobson,* 737 F.2d at 35. Moreover, market trends as a matter of law do not constitute notice that particular defendants were engaged in acts of price fixing. *King & King Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1156 (10 th Cir.1981), *cert denied,* 454 U.S. 1164 (1982) ("Mere knowledge that [defendant] was raising and lowering prices does not provide knowledge that [defendant] was agreeing with other members of the gasoline industry to fix prices.... The evidence pertaining to price fixing points to concealment of those activities.").

The principle cases upon which defendants rely are inapposite. First, many are rulings on motions for summary judgment, rather than motions to dismiss. *See Bender v. Rocky Mountain Drilling Assocs.,* 648 F.Supp. 330, 336 (D.D.C.1986); *Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1527 (5 th Cir.1988); *In re Aluminum Phosphide Antitrust Litig.,* 905 F.Supp. 1457 (D.Kan.1995). Second, the cases are distinguishable on their facts. For example, in *Pocahontas Supreme Coal Co. v. Bethelem Steel Corp.,* 828 F.2d 211, 218 (4 th Cir.1987) and *Bender,* 648 F.Supp. at 336, the information that plaintiffs claimed was concealed was publicly available long before they filed their complaints. And in *Aluminum Phosphide,* the Court granted summary judgment on the issue of

fraudulent concealment because plaintiffs devoted only one sentence in the complaint to their claim of fraudulent concealment, they could not point to any specific act of concealment in response to defendant's motion for summary judgment, and deposition testimony revealed that the class representative's president had previously conducted a marketing and purchasing survey which led to the conclusion that "something was seriously wrong in the market." *Aluminum Phosphide,* 905 F.Supp. at 1471. In fact, the Eleventh Circuit reversed one of the authorities upon which defendants rely, because defendants had pointed to no facts putting the plaintiffs on notice that an antitrust conspiracy was afoot until one of the defendants pled guilty to fixing the wholesale price of milk, even though other defendants had previously pled guilty to rigging bids for milk sold to schools in cases that had been publicized for several years. *See Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 834 (11 th Cir.1999). In this case, the Court is satisfied that plaintiffs have exercised due diligence and that the alleged conspiracy could not have been discovered earlier due to defendants' acts of concealment. [FN7]

> FN7. The Court finds it significant that the complaints describe a series of surreptitious acts of the co-conspirators, including: intentional falsification to make collusive bids appear competitive, convening secret meetings in hotels and other places to avoid detection, instructing co-conspirators to destroy any documents pertaining to meetings among conspirators, using codes to identify conspirators, and fabricating and rehearsing a cover story for Dr. Kuno Sommer to relate to the DOJ denying the existence of a vitamin cartel in an attempt to quell the government's suspicions. *See* Class Action Vitamin B-3 Complaint at ¶¶ 41, 42, 49; Exhibits 1-7 of *Tyson, et al.* Plaintiffs' Consolidated Opp. (copies of factual allegations from direct action complaints); *NBTY, et al.* ¶ 89.

*3. Adequacy of Pleadings Under State Antitrust Laws*

*a. Fraudulent Concealment Under Michigan's Antitrust Reform Act*

Not Reported in F.Supp.2d                                                           Page 6
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

**\*6** In Count II of the *NBTY, et al.* Complaint, plaintiff Perrigo alleges an antitrust claim under the Michigan Antitrust Reform Act ("MARA"), Mich. Comp. Laws § 445.772 et seq. MARA permits any person injured directly or indirectly in his business or property by a contract or combination in restraint of trade to bring an action for damages and injunctive relief. Mich. Comp. Laws § 445.772(2) & 445.778(8)(2).

The statute of limitations for an antitrust claim in Michigan is four years. Mich. Comp. Law § 445.781. When interpreting Michigan antitrust statutes, Michigan state courts give deference to federal courts' interpretations of comparable federal antitrust statutes. *Little Caesars Enterprises, Inc. v. Smith,* 895 F.Supp. 884, 898 (E.D.Mich.1995). To adequately plead Michigan antitrust claims beyond the statutory period, plaintiffs must allege that (1) defendants wrongfully concealed their actions; (2) plaintiffs failed to discover the operative facts underlying the basis of the cause of action within the applicable limitations period; and (3) that plaintiffs exercised due diligence until the discovery of the facts. *Id.*

Defendants argue that the MARA claim does not allege the specific conduct by which defendants concealed their conspiracy. However, paragraph 89 of the *NBTY, et al.* Complaint, which is incorporated by reference into Count II, expressly and specifically alleges affirmative conduct by which defendants concealed their conspiracy, including the submission of "prearranged, complementary losing bids ....; providing false information to law enforcement authorities ....; destroying documents ....; [and] instructing members of the conspiracy not to [talk]...." Federal courts in Michigan have found identical allegations to satisfy the pleading requirements for fraudulent concealment under MARA. *See, e.g., State of Michigan v. McDonald Dairy Co.,* 905 F.Supp. 447 (W.D.Mich.1995) (price fixing case against dairies and their executives in which district court held that allegations of "submitting prearranged complementary losing bids to give the illusion of competition; ... providing false information to law enforcement authorities regarding their involvement in the bid rigging; destroying documents before as well as after the conspiracy was detected; ... and affirmatively instructing other conspirators not to divulge the exist-

ence of the conspiracy" were sufficient to meet the requirements to plead affirmative acts of wrongful concealment under MARA and Sixth Circuit law. *Id.* at 452; *see also State of Michigan v. C.R. Equipment Sales, Inc.,* 898 F.Supp. 509, 513 (W.D.Mich.1995) (allegations that "defendants submitted complementary, prearranged losing bids to give the illusion of competition, destroyed documents, and concealed public records" adequately plead affirmative acts of concealment in price fixing case under MARA).

Plaintiffs allegations of due diligence in the MARA claim are also legally sufficient. In *McDonald Dairy,* the court concluded that plaintiffs' allegations that they could not uncover the conspiracy because of defendants' fraudulent conspiracy and that their system of sealed bids was designed to avoid collusive bids satisfied the due diligence pleading requirement. 905 F.Supp. at 453. Like the claimants in *McDonald Dairy,* plaintiffs plead that they were unaware of the conspiracy until the criminal information and plea were unsealed, that plaintiffs could not have discovered the conspiracy despite due diligence because of defendants' affirmative acts of concealment, and that plaintiffs used a purchasing system which made them believe in good faith that they were receiving competitive prices for vitamins. Thus, plaintiffs' allegations under MARA are sufficient to survive dismissal.

*b. Fraudulent Concealment under California's Cartwright Act*

**\*7** In Count III of the *NBTY, et al.* Complaint, plaintiffs Leiner, NAI, Nutraceutical and Makers of Kal allege an antitrust claim under California's Cartwright Act, Cal. Bus. & Prof. § 16726 et seq. The Cartwright Act also contains a four-year statute of limitations. *Id.* It permits any person who dealt directly or indirectly with a defendant or co-conspirator, and was injured in his business or property by reason of an unlawful trust of which defendant or a co-conspirator was a member, to sue for treble damages and injunctive relief. Cal. Bus. & Prof.Code §§ 16702 & 16726.

In order to establish fraudulent concealment under California law, plaintiffs must show: "(1) when the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 7
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

fraud was discovered; (2) the circumstances under which it was discovered; (3) and that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Baker v. Beech Aircraft Corp.,* 39 Cal.App.3d 315 (Cal.App.1974). Plaintiffs must also show "that in the exercise of reasonable diligence, the facts could not have been discovered at an earlier date." *Id.*

These facts are all alleged in plaintiffs' Consolidated Amended Complaint. In paragraph 87, plaintiffs allege that they discovered the conspiracy on March 2, 1999, when the Lonza criminal information was unsealed, and that they were not aware of the conspiracy until that time. In paragraph 90, plaintiffs allege that they did not and could not have discovered the conspiracy earlier through the exercise of due diligence because of defendants' fraudulent concealment. Paragraph 89 then lists in detail ten specific affirmative acts of fraudulent concealment that explain why plaintiffs could not have discovered the conspiracy earlier. Therefore, the Court finds that plaintiffs have adequately pled their fraudulent concealment claims under the Cartwright Act.

*c. Fraudulent Concealment Under New York's Donnelly Act*

In Count IV of the Consolidated Amended Complaint, plaintiffs NBTY, Twin Laboratories and Cambr f/k/a Solgar allege an antitrust claim under Section 340 of New York's antitrust statute, the Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq. New York's Donnelly Act also has a four-year statute of limitations. *Id.* at § 340(5). The Donnelly Act permits any person who has been injured directly or indirectly by reason of a contract, agreement, or combination in restraint of trade, such as a price fixing agreement, to sue for damages. Antitrust plaintiffs must allege that (1) defendants concealed from plaintiffs the facts of the cause of action; (2) plaintiffs remained in ignorance of these facts until some point outside the four-year statute of limitations; and (3) plaintiffs' continuing ignorance was not attributable to the lack of diligence on their part. *New York Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988).

Defendants claim that plaintiffs do not allege affirmative acts of concealment in Count IV. However, paragraph 89 alleges ten separate affirmative acts undertaken by defendants to fraudulently conceal the existence of the conspiracy from plaintiffs. These allegations are incorporated into plaintiffs' Donnelly Act claim through paragraph 114 in Count IV. The allegations in paragraph 89 are equivalent to those upheld in *State of New York v. Hendrickson, Inc.,* 840 F.2d 1065 (2d Cir.), *cert denied,* 488 U .S. 848 (1988) (court ruled that the submission of complementary losing bids, the removal of documents, the agreement among conspirators not to talk, the destruction of documents, and the giving of false testimony were affirmative acts of concealment under the fraudulent concealment doctrine). *Id.* at 1084.

**\*8** The Court in *Hendrickson* further held that the plaintiff did not have notice of defendants' bid-rigging conspiracy and could not be faulted for not detecting the conspiracy because they used a method of purchasing that led it to believe that it was receiving non-collusive bids. *Id.* at 1085. Paragraphs 88 and 90 of plaintiffs' Complaint contain similar allegations. Therefore, plaintiffs' allegations under the Donnelly Act are sufficient to survive dismissal.

*4. Appropriateness of these Motions to Dismiss*

This court agrees with the many courts which have held that the issues of fraudulent concealment and due diligence are questions of fact that should not be decided on a motion to dismiss. *See Klehr,* 521 U.S. at 196 (due diligence is a "fact-based question"); *In re Catfish,* 826 F.Supp. at 1031; *Arthur v. E.I. DuPont,* 798 F.Supp. 367, 370 (S.D.W.Va.1992) (fraudulent concealment is an issue for the jury); *King & King,* 657 F.2d at 1156 (where there is a dispute as to the existence of fraudulent concealment, question is one for the jury). In fact, this Circuit has noted the "inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense" in the context of fraudulent concealment. *See Richards v. Mileski,* 662 F.2d 65, 73 (D.C.Cir.1981) ("We do not suggest that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 8
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense."); *see also Jones v. Rogers Memorial Hospital, 442 F.2d 773, 775 (D.C.Cir.1971)* (statute of limitations defense cannot be decided on a motion to dismiss "unless it appears beyond doubt" that plaintiff can prove no set of facts to entitle him to relief).

In conclusion, this Court cannot find that it appears beyond doubt that plaintiff can prove no set of facts to entitle him to relief. Plaintiffs have sufficiently placed these defendants on notice as to the types of claims alleged and the grounds upon which they rest. Therefore, the pleadings are sufficient to meet the requirements of Rule 9(b). Furthermore, the Court finds that the issue of the plaintiffs' due diligence was adequately alleged and that ultimate resolution of the merits of this claim requires findings of fact and is thus not suitable for determination on a motion to dismiss.

## IV. MOTIONS TO DISMISS/MOTIONS TO SEVER

### A. Motions to Dismiss for Failure to State a Claim

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley, 355 U.S. at 45-46.* To survive a motion to dismiss, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory. *In re Nasdaq Market-Makers Antitrust Litigation, 894 F.Supp. 703, 709 (S.D.N.Y.1995)* (citing *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7 th Cir.1984)*). A short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules. *Nagler v. Admiral Corp., 248 F.2d 319, 322-23 (2d Cir.1957)* ("it is quite clear that the federal rules contain no special exceptions for antitrust cases"). Moreover, in "antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample op-

portunity for discovery should be granted sparingly." *Hospital Bldg Co., 425 U.S. at 746.*

### 1. Sufficiency of Plaintiffs Federal Antitrust Allegations

**\*9** To withstand a motion to dismiss, the plaintiff in a Sherman Antitrust conspiracy claim must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce. *American Ad Management, Inc. v. GTE Corp., 92 F.3d 781, 784 (9 th Cir.1996); In re Nasdaq, 894 F.Supp. at 710.* Defendants do not argue that these are not the elements; instead, they argue that the elements have not been sufficiently alleged. Specifically, defendants claim that (1) plaintiffs have not defined the relevant market, (2) they have not sufficiently linked each individual defendant to the overall conspiracy, and (3) the plaintiffs' allegations do not provide defendants with fair notice of the claims against them.

### a. Relevant Market

In the Vitamins Antitrust Litigation, plaintiffs allege that all defendants joined and participated in a single conspiracy not to compete on the sale of vitamins to plaintiffs and others, in per se violation of Section 1 of the Sherman Act. *See, e.g., NBTY, et al.* Complaint ¶¶ 1, 81-94; *Blue Seal Feeds* Complaint ¶¶ 61-78; *Cargill* Complaint ¶¶ 44-58; *Nutra-Blend* Complaint ¶¶ 35-48; *Proctor & Gamble* Complaint ¶¶ 49-54; *Kellogg* Complaint ¶¶ 32-47; *Publix* Complaint ¶¶ 59-63. Specifically, these complaints allege that the Vitamins Inc. cartel not only set the prices charged for vitamins, but also regulated which members could sell what products to which customers and in what amounts. *Id.* The complaints further allege that defendants met regularly to exchange pricing information, set sales volumes, and divide market shares at the country, regional, and global levels, as well as to facilitate and implement the conspiracy in other respects. *Id.* According to these complaints, each member of the cartel helped enforce the conspiracy by strictly controlling the sale and transfer of the raw ingredients necessary to make vitamins, and a cartel member that stepped out of line ran the risk of having the other conspirators cut off critical supplies. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-02084-RWR    Document 37-3    Filed 05/21/2007    Page 54 of 62    Page 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

Plaintiffs' allegations of horizontal price-fixing and market allocation are per se violations of the Sherman Act. *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 607-08 (1972). Alleging a per se violation of Section 1 of the Sherman Act obviates the need to define a relevant market. *Id.* Therefore, market definition and market power play no role in the per se analysis. *FTC Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 432-36 (1990) (per se rules impose antitrust liability without regard to market power); *In re Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181, 189 (S.D.N.Y.2000) ("when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.... We have never required proof of market power in such a case.") (citing *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 109-10 (1984)); *see also MCM Partners v. Andrews-Bartlett & Assoc.,* 62 F.3d 967, 979 (7 th Cir.1995) ("To state a claim for relief under section 1, a plaintiff must allege *either* that the contract, combination, or conspiracy resulted in a per se violation ... *or* that it unreasonably restrained competition in a relevant market") (emphasis added). The reasoning is that "[v]ery few firms that lack power to affect market prices will be sufficiently foolish to enter into conspiracies to fix prices. Thus, the fact of agreement defines the market." R. Bork, *The Antitrust Paradox* 269 (1978).

**\*10** The cases upon which defendants rely to support their contention that plaintiffs' Section 1 claims require more detailed or different allegations about the market are inapposite because they do not relate to this kind of conspiracy. Most of the cases involve Section 2 claims [FN8] or Section 2 claims coupled with Section 1 claims where the Section 1 claim depends upon the existence of monopoly power or requires a "rule of reason" analysis; [FN9] others involve Section 1 claims or claims under the Clayton Act that require a rule of reason analysis. [FN10] And still others either are not price fixing cases [FN11] or are double-jeopardy cases. [FN12]

FN8. *See United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377 (1956); *United States v. Eastman Kodak Co.,* 63

F.3d 95 (2d Cir.1995); *Twin Lab, Inc. v. Weider Health & Fitness,* 900 F .2d 566, 570 (2d Cir.1990); *National Communications Ass'n v. AT & T Co.,* 808 F.Supp. 1131, 1134 (S.D.N.Y.1992).

FN9. *See, e.g. Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3 rd Cir.1997) (Section 2 claim, tying arrangement, exclusive dealing arrangement); *Lee v. Life Ins. Co. of North America,* 23 F.3d 14 (1 st Cir.1994) (tying arrangement); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715 (3 rd Cir.1991); *Nifty Foods Corp. v. Great Atlantic & Pac Tea Co.,* 614 F.2d 832, 834 (2d Cir.1980) (monopolization); *Berkeley Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979).

FN10. Per se cases do not require a rule of reason analysis. Therefore, cases such as *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 (1961) are inapposite.

FN11. *See TV Communications Network, Inc. v. Turner Network Television,* 964 F.2d 1022 (10 th Cir.1992) (boycott claim); *Collins Associated Pathologists, Ltd.,* 844 F.2d 473, 480 (7 th Cir.1988) (tying claim); *Genetic Sys. Corp. v. Abbott Lab,* 691 F.Supp. 407, 417 (D.D.C.1988) (vertical boycott).

FN12. *See United States v. Sargent Electric Co.,* 758 F.2d 1123 (3d Cir.1986); *United States v. Ashland-Warren, Inc.,* 537 F.Supp. 433 (M.D.Tenn.1982).

Moreover, there is no requirement that the scope of an illegal conspiracy coincide with the scope of the relevant market. Horizontal antitrust conspiracies commonly include sellers in more than one relevant market. *Topco,* 405 U.S. 596 (finding per se violation of Section 1 even though defendants never competed in the same market); *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 357 (1982) (holding illegal per se a horizontal price fixing conspiracy among physicians representing approximately sev-

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

enty percent of the physicians in Maricopa County, Arizona where the conspiracy included a wide variety of non-competing medical practices, such as surgery, anesthesiology, and psychiatry); *see also Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46 (1990) (condemning as illegal per se a horizontal agreement between two competing providers of bar-review courses by which one provider agreed not to compete with the other in Georgia and, in exchange, the latter agreed not to compete with the former in the other 49 states).

In this case, as in *Topco, Maricopa County,* and *Palmer,* the alleged conspiracy allocated shares of an overall market among the conspirators. In fact, the inference to be drawn from the plaintiffs' allegations is that the lack of competition among defendants for particular products or particular geographic areas was the direct result of their agreement to eliminate such competition. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599 (7 th Cir.1997) (reversing summary judgment in case alleging horizontal, industry-wide conspiracy among sellers of thousands of different brand name prescription drugs, where the conspiracy covered approximately 200-300 separate product markets). Therefore, the Court finds that plaintiffs have adequately alleged a per se violation of Section 1 of the Sherman Act.

*b. Linking Defendants to this Conspiracy*

Defendants' claim that the allegations are insufficient to link each of them to the conspiracy is also without merit. An antitrust conspiracy complaint is adequate as long as there are allegations "from which an inference of an unlawful agreement can be drawn." *Brett v. First Savings & Loan Assoc.,* 461 F.2d 1155, 1158 (5 th Cir.1972). "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement." *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604 (2d Cir.1979); *see also In re Nasdaq,* 894 F.Supp. 713 ("The theory of conspiracy is thus adequately alleged although the factual support at this stage in the proceeding rests primarily on inference, press reports, and circumstantial evidence.").

**\*11** Moreover, defendants' contention that plaintiffs must specifically allege acts committed by each defendant to show its involvement in the conspiracy is baseless. "An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits." *In re Nasdaq,* 894 F.Supp. at 712 ("The flaw with this complaint is *not* that there is no specific act attributed to each defendant, but that there is no notice as to which stocks the plaintiffs believe are the objects of the conspiracy.") (emphasis added).

Finally, the Court rejects the notion that the guilty pleas and cooperation agreements and the class settlements foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention. *See Principles of Federal Prosecution,* United States Department of Justice, § 9-27.400 ("readily provable charges" may be dropped or bargained away "because the United States' Attorney's Office is particularly overburdened, the case would be time-consuming to try, and proceeding to trial would significantly reduce the number of cases disposed of by the office."). The antitrust statutes expressly recognize that private plaintiffs may allege a conspiracy different in some respects from the conspiracy previously alleged by the government. 15 U.S.C. § 16(i) ("Suspension of Limitations"); *Leh v. General Petroleum Corp.,* 382 U.S. 54, 65-66 (1965) (section 16(i) applied even though conspiracy alleged in private action was different in time period, geographic scope and identity of participants than conspiracy previously alleged by the government).

Moreover, the class settlements and the accompanying pleadings are not evidence of the scope of the conspiracy involved in this litigation. In evaluating defendants' motions to dismiss, the Court must consider only plaintiffs' allegations in those cases in which the motions are filed and may not refer to pleadings filed in other cases which are not presently before this Court. [FN13] The class settlements represent a compromise of contested claims; plaintiffs here have alleged a broader conspiracy and at this point, the Court is bound to accept plaintiffs' allega-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 11
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

tions as true. It would be improper for the Court to reach the merits of plaintiffs' claims at this time.

> FN13. Defendants argue that since plaintiffs attached the governments' indictments and plea bargains to their pleadings, they are somehow bound by these documents. The Court disagrees. There is no legal requirement that plaintiffs be bound by the scope of all documents attached to their pleadings. It is perfectly acceptable for the government and plaintiffs to take different views of the scope of this conspiracy, even if plaintiffs refer to the government's documents to support their claims of the defendants' involvement in the alleged activities. Moreover, the Court has no evidence of the government's view of the scope of this conspiracy; the fact that the government chose to divide the conspiracy into separate parts does not in any way support the defendant's position that there could not have been a single overarching conspiracy. It is fully understood that the government may undertake plea bargains in order to achieve certain strategic objectives and these goals may be different from those of private litigants.

*c. Fair Notice*

The plaintiffs have alleged that all defendants participated in a single conspiracy not to compete on the sale of vitamins to plaintiffs and others. The complaints identify the defendants and the specific products sold by each pursuant to the conspiracy. Plaintiffs state in their complaints that several of these alleged conspirators have already pleaded guilty to criminal charges of conspiring not to compete on the sale of particular products that fall within the overall conspiracy and that another defendant was accepted into the DOJ's Corporate Leniency Program in exchange for agreeing to cooperate in the DOJ's ongoing investigation. All of the *Tyson, et al.* Complaints and the *NBTY, et al.* Complaint allege that the named defendants: (a) agreed to exchange and did exchange current and future price information about vitamins; (b) agreed to coordinate and did coordinate price levels and price movements of vitamins; (c)

agreed on prices and price levels of vitamins; (d) agreed to fix, maintain and/or increase, and did fix, maintain and/or increase, prices and price levels of vitamins; (e) agreed to allocate and did allocate vitamin customers and sales volumes; (f) agreed to allocate and did allocate market share in each market; (g) agreed to control or reduce, and did control or reduce, output; and (h) agreed to stabilize and/or increase the price of vitamins sold outside the United States in order to stabilize and/or increase the price of vitamins sold in the United States. These allegations clearly provide defendants with fair notice of plaintiffs' claims. *See In re Nine West, 80 F.Supp .2d at 191* (holding that plaintiffs adequately alleged illegal conspiracy by identifying parties to the conspiracy, giving "some detail about how this conspiracy operated," and alleging that the conspiracy forced them to pay higher prices).

**\*12** Pleading of the evidence is not required and is on the whole undesirable at this stage in the litigation. *Nagler, 248 F.2d at 326* ("It is a matter for the discovery process, not for allegations of detail in the complaint. The complaint should not be burdened with possibly hundreds of specific instances; and if it were, it would be comparatively meaningless at trial where the parties could adduce further pertinent evidence if discovered. They can hardly know all their evidence, down to the last detail, long in advance of trial.").

The cases upon which defendants rely involve blatantly deficient complaints with absolutely no factual allegations whatsoever. *See Continental Orthopedic Appliances, Inc. v. Health Insurance Plan, 956 F.Supp. 367, 373 (E.D.N.Y.1997)* (dismissing complaint where entire complaint was based on nothing more than the fact that one defendant terminated its contracts with the plaintiff and signed an exclusive contract with another defendant); *Canady v.. Providence Hospital,* 903 F.Supp. at 125 (D.D.C.1995) (plaintiff failed to allege that more than one entity had engaged in anti-competitive behavior, thus failing to plead the concerted action requirement of Section 1); *International Adiotext Network, Inc. v. American Telephone & Telegraph Co.,* 893 F.Supp. 2107 (S.D .N.Y.1994) (plaintiff failed to allege any concerted action); *In re Nasdaq, 894 F.Supp. at 703*

Not Reported in F.Supp.2d                                        Page 12
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

(dismissing the complaint with leave to amend because plaintiffs had not identified the specific stocks that were allegedly the subject matter of the conspiracy); *Mountain View Pharmacy v. Abbott Laboratories,* 630 F.2d 1383 (10 th Cir.1980) (dismissing complaint that "used statutory language to describe the alleged antitrust violations without including any factual allegations whatsoever.").

In contrast to these cases, plaintiffs' allegations identify all plaintiffs and defendants, describe the terms of the illegal agreement and the actions taken to maintain this agreement, and allege antitrust injury to plaintiffs. [FN14]

> FN14. Pursuant to Rule 12(e), UCB, Inc. seeks a more definite statement of the allegations against it in the event the Court denies its motion to dismiss. The Court finds that plaintiffs' allegations provide UCB, Inc. with fair notice of the claims against it and adequately allege antitrust injury. Nothing more is required at this stage in the process. *See Hospital Bldg Co., 425 U.S. at 745.* Therefore, UCB's alternative motion for a more definite statement is denied.

## 2. Sufficiency of State Antitrust Allegations in NBTY, et al., Publix and Meijer

Plaintiffs in the *NBTY, et al.* action originally filed their cases in three different federal jurisdictions and included statutory antitrust claims under Michigan, California, and New York law in addition to their federal claims. In addition, in the *Tyson, et al.* action, plaintiff Publix Supermarkets, Inc. included a Michigan statutory antitrust claim, and plaintiff Meijer, Inc. plead a Florida statutory antitrust claim. The moving defendants argue that the state antitrust statutes are patterned after the Sherman Act and thus if the Court dismisses plaintiffs' Sherman Act claims, then it should also dismiss the state antitrust claims. Plaintiffs contend that California's Cartwright Act is interpreted more broadly than the Sherman Act. Defendants also argue that plaintiffs' state law claims are not sufficiently specific, and a few defendants argue that the New York and Florida claims do not cover all of plaintiffs' vitamin purchases.

### a. Michigan's Antitrust Reform Act

**\*13** *NBTY, et al.* plaintiff Perrigo and *Tyson, et al.* plaintiff Meijer both allege antitrust claims under the Michigan Antitrust Reform Act (MARA), Mich. Comp. Laws § 445.772 et seq. The Act permits any person injured directly or indirectly in his business or property by a contract or combination in restraint of trade to bring an action for damages and injunctive relief. *Id.* at § 445.772(2) & 445.778(8)(2).

Defendants contend that plaintiffs' state antitrust allegations fail to state a claim under MARA for the same reasons that, they argue, this complaint fails to state a claim under the Sherman Act. *Sportwear Design, Inc. v. Canstar Sports USA, Inc.,* 70 F.3d 116 n. 2 (6 th Cir.1995) ("There can be no liability under the Clayton Act if the Sherman Act has not been violated and Michigan law explicitly tracks federal antitrust law"); *DXS Inc. v. Siemens Med. Sys. Inc.,* 991 F.Supp. 859, 865 (E.D.Mich.1997) ("Court examining claims under [MARA] apply the same legal analysis as courts examining claims under the Sherman Act"). For the reasons discussed above in the analysis of the adequacy plaintiffs' pleadings under the Sherman Act, this Court finds that plaintiffs' allegations are sufficiently detailed and provide fair notice of the claims against defendants to survive dismissal. *See American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 619 (6 th Cir.1999) ("Because Michigan antitrust law follows federal precedents, our reasoning regarding the federal antitrust claims applies equally to the [Michigan] antitrust claims") (citing M.C.L.A. 445, 784(2)).

### b. California's Cartwright Act

In Count III of the *NBTY, et al.* complaint, plaintiffs Leiner, NAI, Nutraceutical, Makers of Kal, and Weider allege an antitrust claim under California's Cartwright Act, Cal. Bus. & Prof. § 16726 et seq. The Cartwright Act permits any person who dealt directly or indirectly with a defendant or co-conspirator, and was injured in his business or property by reason of an unlawful trust of which a defendant or a co-conspirator was a member, to sue for treble damages and injunctive relief. Cal. Bus. & Prof.Code §§

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16750(a), 16720 & 16726.

Section 16756 of the Cartwright Act sets forth the minimum pleading requirements for a claim under this Act:

> In any ... complaint for an offense named in this chapter, it is sufficient to state the purpose or effects of the trust or combination, and that the accused is a member, or acted with, or in pursuance of it, or aided or assisted in carrying out its purposes without giving its name or description, or how, when and where it was created.

Plaintiffs' Complaint easily satisfies these pleading requirements. Paragraph 109 in Count III defines the unlawful "trust"; paragraph 110 alleges the purposes of the trust; paragraphs 109, 110, and 112 allege that defendants are members of the trust, and paragraphs 111 and 112 allege that defendants acted with or pursuant to the trust. [FN15] In fact, plaintiffs' allegations extend beyond the requirements of Section 16756 and allege when the trust began, its minimum duration, the identity of specific products subject to this conspiracy, the existence of meetings or discussions among defendants or their co-conspirators in furtherance of the conspiracy, and the effect of the conspiracy. *See NBTY, et al.* Complaint ¶¶¶¶ 82, 91, 95, 98, 100. Allegations such as these have been deemed sufficient to establish a claim under the Cartwright Act. *See Cellular Plus, Inc. v. Superior Court,* 14 Cal.App.4th 1224, 1238 (Cal.Ct.App.1993) (upholding the following allegations: that defendants conspired or agreed to fix prices at which cellular radio service is sold in interstate commerce at wholesale in the San Diego County market, that such agreement is an unlawful trust under sections 16720 and 16726, that in furtherance of the conspiracy defendants had meetings or discussions between themselves for the purpose of insuring that the price that was charged for cellular service at wholesale was the same, and that in furtherance of the conspiracy defendants used their best efforts to insure that the prices charged at wholesale in the San Diego County market were the same to the customers of each carrier).

> FN15. Antitrust injury and damages are also alleged in paragraphs 98 and 99, which are specifically incorporated into Count III in

paragraph 105.

**\*14** Defendants argue that the Cartwright Act imposes a higher standard of pleading than the Sherman Act. While this appears to be correct, [FN16] the Court finds that plaintiffs have met both standards is this case. In *Cellular Plus,* the court stated that a plaintiff need only allege "certain facts in addition to the elements of the alleged unlawful acts so that defendant can understand the nature of the alleged wrong and discovery is not merely a blind 'fishing expedition' for some unknown wrongful acts." 14 Cal.App.4th at 1236. Plaintiffs have surely satisfied their burden in this case. The cases cited by defendants are inapposite because they either arise at a much later procedural stage when the parties are required to support their allegations with evidence [FN17] or, unlike plaintiffs in this case, the claimants failed to allege a specific element of the Cartwright Act claim. [FN18]

> FN16. In *Cellular Plus,* the court noted that the California Supreme Court in *Chicago Title Ins. Co. v. Great Western Financial Corp.,* 69 Cal.2d 305, 315-328 (1968) required "more factually specific pleadings for Cartwright Act claims...." 14 Cal.App.4th at 1236.

> FN17. *See Galardo v. AMP, Inc.,* 1982 WL 1791 (N.D.Cal.1982) (directed verdict).

> FN18. *See G.H.I.I. v. MTS, Inc.,* 147 Cal.App.3d 256 (Cal.Ct.App.1983) (dismissing claim for horizontal restraint because complaint did not include allegation of horizontal conspiracy and dismissing claim for vertical restraint because complaint did not include allegation of coercion or combination); *Truta v. Avis Rent-A-Car System, Inc.,* 193 Cal.App.3d 802, 822-23 (Cal.Ct.App.1987) (dismissing claim because complaint was "devoid of any facts supporting conspiracy claim").

*c. New York's Donnelly Act*

In Count IV, plaintiffs NBTY, Twin Laboratories and Cambr f/k/a Solgar allege an antitrust claim arising

Case 1:06-cv-02084-RWR    Document 37-3    Filed 05/21/2007    Page 59 of 62

Not Reported in F.Supp.2d                                                              Page 14
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
(Cite as: 2000 WL 1475705 (D.D.C.))

under Section 340 of New York's antitrust statute, the Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq. The Donnelly Act permits any person who has been injured directly or indirectly by reason of a contract, agreement or combination in restraint of trade to sue for damages and injunctive relief.

A party asserting a violation of the Donnelly Act must: (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy or reciprocal relationship between two or more entities. *Great Atlantic & Pacific Tea Co. v. Town of East Hampton,* 997 F.Supp. 340, 352 (E.D.N.Y.1998). These elements are specifically alleged in Count IV of the *NBTY, et al.* complaint. Paragraph 115 alleges that vitamins (a term defined in the pleading) constitute the relevant product market; paragraphs 91 through 94 and 98 (which are incorporated into Count IV) and paragraph 117 allege the nature and effect of the conspiracy; paragraphs 94 and 98 (which are incorporated into Count IV) and paragraphs 116 and 117 allege how the economic impact of the conspiracy restrains trade in the market in question; and paragraphs 91 through 93 (which are incorporated into Count IV) allege a conspiracy between two or more entities.

One defendant, Degussa-Huls Corp., also argues that plaintiffs lack standing to assert an indirect purchase claim under the Donnelly Act for vitamin purchases that occurred before December 23, 1998, the date when the statute was amended to allow indirect purchaser actions. Plaintiffs offer three responses: (1) the question of which of plaintiffs' indirect purchases are covered by the Donnelly Act is fact-dependent and not properly decided on a motion to dismiss; (2) plaintiffs' allegations span the period both before and after December 23, 1998, and defendant does not challenge plaintiffs' right to recover under the Act for indirect purchases that occurred after that date; and (3) Section 340(6) of the Donnelly Act which provides a damage remedy for indirect purchases should be construed retroactively to cover plaintiffs' indirect vitamin purchases predating December 23, 1998, because remedial statutes are to be interpreted retroactively under New York law.

*15 Under New York law, "[g]enerally, an amendment will have prospective application only, and will have no retroactive effect unless the language of the statute clearly indicates that it shall receive a contrary interpretation." New York Statutes Law § 52 (McKinney 1971); *see also* *Burns v. Volkswagen of America, Inc.,* 460 N.Y.S.2d 410, 412 (N.Y.Sup.Ct.1982) ("statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears."). In Section 2, the amendment provides that "[t]his act shall take effect immediately." McKinney's Session Laws, 1998 Regular Session, Ch. 653, A. 4775 (Dec. 23, 1998). "[A] provision in an amendatory statute that "this act shall take effect immediately" has been held to exclude the idea that it should be retroactive. New York Statutes Law § 52, Comment (McKinney 1971); *see also* *In re Spencer's Estate,* 145 N.Y.S.2d 397, 400 (Sur.Ct.1995) ( "[W]here a statute by its terms directs that it is to take effect immediately ... the idea that it is to have any retroactive operation or effect is excluded.").

Therefore, the NBTY plaintiffs' claims for damages for indirect purchases prior to December 23, 1998 should be dismissed.

*d. Florida's Deceptive Trade Practices Act*

Defendants DuCoa L.P. and DCV, Inc. argue that *Tyson, et al.* plaintiff Publix, as an indirect purchaser, lacks standing to maintain a claim under Florida's Deceptive Trade Practices Act ("DTPA"), Fla. Stat. § 501.201. First, defendants argue that plaintiffs lacks standing under the DTPA for the same reason that it allegedly lacks standing under the federal antitrust laws, i.e. "it has suffered no injury." Second, defendants argue Publix should be denied standing under the DTPA because it is an indirect purchaser. Finally, these defendants contend that Publix is not a "consumer" and thus lacks standing under the former DTPA to sue for damages arising prior to June 30, 1993.

Although indirect purchasers do not have standing to sue under federal antitrust laws, [FN19] they do have standing to make claims for damages under the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 15
Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

DTPA. *Mack v. Bristol-Myers Squibb Co.,* 673 So.2d 100, 104 (holding that federal standing rules do not preclude Florida consumers who are indirect purchasers from having standing to pursue claims under the Florida DTPA). The Florida DTPA expresses a primary policy "[t]o protect the consuming public ... from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," § 501.202(2), Florida Statutes (1993), and as a rule of construction, provides that the act "shall be construed liberally to promote [such] policies...." § 501.202, Fla.Stat. (1993). Florida courts have interpreted this statute to allow claims by both direct and indirect purchasers. *Mack,* 673 So.2d at 105 ("A fair reading of section 501.211 reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only.") Therefore, defendants' argument that Publix lacks standing to sue under the DTPA because it is an indirect purchaser fails.

> **FN19.** *See Illinois Brick Company, et al. v. Illinois, et al.,* 431 U.S. 720 (1977) (limiting federal antitrust standing to direct purchasers).

**\*16** Next, the Court must consider defendants' argument that Publix cannot recover damages for transactions that occurred prior to 1993. Prior to 1993, the DTPA defined "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of goods, a consumer service, or an intangible to an individual for purposes that are primarily personal, family or household...." Fl. Stat. § 501.203(1) (1987). Courts have held that the former DTPA applies only to consumer transactions. *See United Pacific Insurance Co. v. Berryhill,* 620 So.2d 1077 (Fla.App. 5 Dist.1993) (no cause of action under DTPA because sales at the wholesale level were not consumer transactions). Therefore, defendants contend that plaintiffs' claims for damages arising prior to June 30, 1993, the effective date of the new act, should be dismissed. By contrast, Publix argues that the continuing tort doctrine applies and since its cause of action did not accrue until after June 30, 1993, its claim is governed by the current DTPA.

The continuing tort doctrine is recognized by Florida state law. *See Halkey-Robert Corp. v. Mackal,* 641 So.2d 445 (Fla. Ct.App.2d Dist.1994) ( "The continuing tort doctrine is recognized under our state law," *citing Seaboard Air Line v. Holt,* 92 So.2d 169 (Fla.1956)). Under this continuing tort doctrine, a cause of action does not accrue until "... the final act in a series of events or course of conduct [accrues]." *Fletcher v. Florida,* 858 F.Supp. 169 (M.D.Fla.1994). Publix argues that because defendants' conduct went unabated until the conspiracy was uncovered in March 1999, Publix's cause of action did not accrue until that time. Therefore, under plaintiffs' theory, its claims would fall under the amended version of the DTPA. However, none of the cases cited by Publix in support of application of the continuing tort doctrine involve antitrust claims. It is generally understood that "when a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of defendants." *Florida Municipal Power Agency v. Florida Power & Light Co.,* 81 F.Supp.2d 1313, 1321 (M.D.Fla.1999) (applying accrual rule to both Florida and federal antitrust claims); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."); *In re Nine West,* 80 F.Supp.2d at 191 (in price fixing case, antitrust claim accrues each time sale is made to plaintiff at inflated price). The "commission of a new overt act does not permit the plaintiff to recover for the injury caused by the old overt acts outside the limitations period." *Klehr,* 521 U.S. at 189 (reviewing antitrust case law in determining appropriate accrual rule for RICO cases); *see also* 35 Fla.Jur.2d, Limitations and Latches § 62 (1996) (Under the doctrine of continuing or repeated tortious acts, "the fact that successive claims would arise out of the several unlawful acts does not mean that the period of limitation as to earlier acts done and injuries caused, is thereby extended; rather, each of these causes of action accrues on the doing of the wrongful act to which it relates."). Therefore, Publix may not claim damages for injuries incurred prior to 1993.

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

B. Motions to Sever

**\*17** Claims against different parties can be severed for trial or other proceedings, under Fed.R.Civ.P. 20(b), 21, and 42(b), if the Court determines in its discretion that the interests of justice would be served by doing so. *See State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc., 856 F.Supp. 1229, 1240 (S.D.Ohio 1994)* ("permissive joinder rests with the sound discretion of the trial court").

The defendants claim that there are really three distinct conspiracies here: (1) bulk vitamins, (2) choline chloride, and (3) niacin. By contrast, plaintiffs claim that this is really one worldwide conspiracy in which the defendants not only set the prices charged for vitamins but also regulated which members could sell what products to which customers and in what amounts. Plaintiffs argue that the fact that the moving defendants entered into negotiated pleas limited to particular vitamins does not show that their violations consisted of separate conspiracies distinct from the overall conspiracy. Moreover, plaintiffs contend that the class settlements also cannot prove the existence of separate conspiracies and should be interpreted as no more than a tactical move to achieve a rapid settlement of their claims.

The Court finds that it would be improper at this time to prejudge the scope of the conspiracy that plaintiffs allege. It is well-established that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components" and the trier of fact must "look at the whole picture and not merely at the individual figures in it." *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).* Here, defendants are charged with engaging in a single conspiracy, which affected a variety of vitamins. Severance is generally disallowed in cases alleging single conspiracies or even in cases where the allegations are "a series of overlapping and interwoven conspiracies." *See Ohio v. Louis Trauth Dairy, Inc., 856 F.Supp. 1229, 1240 (S.D.Ohio 1994); Little v. BellSouth Telecomm., 1995 WL 468256,* at \*1 (E.D.La. Aug. 7, 1995). Courts also consistently deny motions to sever where plaintiffs allege that defendants have engaged in a common scheme or pattern of behavior. *See, e.g.,*

*Brereton v. Communications Satellite Corp., 116 F.R.D. 162, 164 (D.D.C.1987).* The cases cited by defendants are inapposite. *See Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co., 497 F.2d 1151, 1154 (2d Cir.1974)* (complaint contained no allegation of conspiracy and "[n]o connection at all between the practices engaged in by each of the 164 defendants [was] alleged."); *Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674* (6 th Cir.1988) (affirming district court's exercise of discretion in finding, after extensive pretrial proceedings, that one loan transaction should be severed because it was wholly unrelated to the remainder of the case and raised different issues); *Intercon Research Associates, Ltd. v. Dresser Industries, Inc., 696 F.2d 53* (7 th Cir.1982) (affirming district court's determination that breach of contract claims against different parties were insufficiently related to permit joinder).

**\*18** Defendants claim that the guilty pleas support the proposition that there are three distinct conspiracies in this case. Defendants also claim that the class plaintiffs' decision to plead three separate complaints for multiple vitamins, choline chloride, and Vitamin B3 or niacin, and the Court's decision to conditionally certify two separate settlement classes for direct purchasers of choline chloride and multiple vitamins, supports defendants' position that there are three separate conspiracies. However, the Court agrees with plaintiffs that the criminal guilty pleas do not establish boundaries for this civil litigation and that the class settlements involve strategic decisions and may not be as expansive as their potential claims.

Fed.R.Civ.P. 20(a) permits joinder of defendants:
> if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A ... defendant need not be interested in ... defending against all the relief demanded.

Joinder rules are interpreted to encourage "the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966). The "terms 'transaction

Not Reported in F.Supp.2d, 2000 WL 1475705 (D.D.C.), 2000-1 Trade Cases P 72,914
**(Cite as: 2000 WL 1475705 (D.D.C.))**

or occurrences' should be interpreted broadly to per-
mit all reasonably related claims for relief by or
against different parties to be tried in a single pro-
ceeding. Absolute identity of all events is unneces-
sary." *State of Ohio,* 856 F.Supp. at 1239.

As discussed above, plaintiffs have alleged a single
global conspiracy involving all named defendants,
they have identified the vitamins that were part of the
conspiracy, what the conspirators agreed to do, and
how they accomplished their goals. The complaints
expressly request judgment against all defendants,
jointly and severally. Moreover, plaintiffs' allegations
allege a common series of transactions and occur-
rences and raise common questions of law and fact
applicable to all defendants. Therefore, accepting
plaintiffs' allegations as true, as the Court must when
evaluating motions to dismiss, defendants' motions to
sever must be denied. These motions are premature.
No depositions have been taken and document dis-
covery is still in an early stage. Under these circum-
stances, severance is not warranted. *See SEC v. Na-
tional Student Marketing Corp.,* 360 F.Supp. 284,
296 (D.D.C.1973) (denying severance at the pleading
stage where the moving defendants "allegedly acted
'singly and in concert' with other defendants," even
while recognizing that it might be proper to sever
their aspect of the case at "a more advanced stage"
when "discovery is completed and all relevant facts
have been disclosed and considered."); [FN20] *see
also State of Ohio,* 856 F.Supp. at 1239-40 (denying
severance because court determined that proceeding
on a consolidated basis through trial was the most ef-
ficient course). Therefore, defendants' motions to
sever will be denied.

> FN20. Significantly, the court considered it
> important that the Judicial Panel on Mul-
> tidistrict Litigation had found "that the in-
> terests of justice could best be served by
> conducting consolidated and coordinated
> discovery in this district." *Id.* at 295.

V. CONCLUSION
**\*19** For the foregoing reasons, the pending motions
to dismiss for failure to plead fraudulent concealment
with sufficient particularity are denied. The motions
to dismiss for failure to state a claim are denied, with

two limited exceptions. First, Degussa-Huls Corp.'s
Motion will be granted with respect to the *NBTY, et
al.* plaintiffs' claims under the Donnelly Act for indir-
ect purchases that occurred prior to December 23,
1998; the Motion will be denied on all other grounds.
Second, DuCoa L.P. and DCV, Inc.'s Motion will be
granted solely with respect to *Tyson, et al.* plaintiff
Publix's claims for damages incurred through pur-
chases made prior to June 30, 1993; that Motion will
similarly be denied on all other grounds. The alternat-
ive motions to sever certain claims are all denied. An
order will accompany this opinion.

Not Reported in F.Supp.2d, 2000 WL 1475705
(D.D.C.), 2000-1 Trade Cases P 72,914

END OF DOCUMENT

Tab 6

RECEIVED

SEP 2 7 2005

[illegible] LLP

**FILED**
LOS ANGELES SUPERIOR COURT

SEP 2 1 2005

JOHN A. CLARKE, CLERK

BY E. SABALBURO, DEPUTY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| KATHLEEN LEDWICK, | CASE NO. BC 324 518 |
| Plaintiff, | RULING ON DEMURRER AND MOTION |
| vs. | TO STRIKE |
| ASTRAZENECA PHARMACEUTICALS | |
| LP, et al., | |
| Defendants | |

Hearing date: 8/11/05

Ruling date:  9/21/05

After considering the moving, opposing and reply papers the court now rules as follows:

**The demurrers are OVERRULED as to the individual plaintiffs, SUSTAINED WITHOUT LEAVE TO AMEND as to the first and second causes of action (B&P §§ 17200 and 17500) brought by the associational plaintiffs, and OVERRULED as to the third and fourth causes of action brought by the associational plaintiffs.**

**The motions to strike are GRANTED as to Ledwick's prayer for treble damages and DENIED otherwise.**

1

## I.    INTRODUCTION

2

3    From the complaints, the following facts appear.  Defendants AstraZeneca

4    Pharmaceuticals LP and Zeneca, Inc. marketed the drug Prilosec, a widely prescribed

5    drug, used to treat acid reflux disease.  The active molecule in Prilosec is omeprazole.

6    Omeprazole exists in two mirror image forms (isomers), called the S-form and the R-

7    form.  Prilosec contains both forms, making what is called a "racemic" mixture.  The

8    patent for Prilosec was set to expire in 2001, at which time its value would decrease as

9    generic drug manufacturers entered the market.

10    To preserve revenues, defendants developed Nexium, a drug that contains only the

11    S-form of omeprazole, now called *esomeprazole*.

12    A Prilosec generic pill contains 20 mg of R- and S-omeprazole and costs $0.49.  A

13    Nexium pill contains 40 mg of esomeprazole and costs more than $4.00.

14    Plaintiffs allege defendants deceptively market Nexium.

15    The American Federation of Labor and Congress of Industrial Organizations

16    (AFL-CIO), Congress of California Seniors (CCS), and California Alliance for Retired

17    Americans (CARA) filed a lawsuit and later amended to add an additional plaintiff,

18    James Weiss.  The second amended complaint, hereafter the "Weiss complaint," is

19    operative.

20    Kathleen Ledwick filed a separate lawsuit against the same defendants on the

21    same causes of action.  Her first amended complaint, hereafter the "Ledwick complaint,"

22    is operative.  The two cases have been deemed related.

23    All plaintiffs allege violations of Business & Professions Code sections 17200 et

24    seq. and 17500 et seq., violation of the Consumer Legal Remedies Act (CLRA), Civil

25    Code § 1750 et seq., and unjust enrichment.

26    Defendants demur to both complaints and move to strike portions of both.

27

28

1
2

## II.    COMPLAINTS

3      Plaintiffs allege defendants falsely represented, in direct contact with physicians
4  (Weiss, ¶ 64; Ledwick, ¶ 63) and advertising (Weiss, ¶ 62; Ledwick, ¶ 62) that Nexium is
5  more effective than Prilosec when, in fact, it isn't. (Weiss, ¶ 65; Ledwick, ¶ 64.)
6      In its 2000 Annual Report, AstraZeneca claimed that "Nexium is the first [drug] to
7  offer significant clinical improvements over *Losec* [Prilosec] in terms of acid control and
8  clinical efficacy . . . . Nexium offers more effective acid inhibition than other [drugs] and
9  in the treatment of reflux oesophagitis, provides healing and symptom relief in more
10  patients and in a shorter period of time than *Losec*." (Weiss, ¶ 60; Ledwick, ¶ 60.)
11      Further examples of allegedly misleading promotion and advertising include
12  advertisements found at ¶¶ 102, 104, 106, 108, 110, 112, 114, 16 and 118 of the Weiss
13  complaint and corresponding paragraphs of the Ledwick complaint. Plaintiffs allege
14  these advertisements are deceptive because they fail to disclose that Prilosec is as
15  effective as Nexium. "The foregoing advertisements are just examples of the themes and
16  messages conveyed in hundreds of advertisements distributed to doctors and/or
17  consumers. The net effect of this misleading campaign was to establish Nexium as a
18  superior drug for acid relief and as such to allow it to command a price substantially in
19  excess of generic Prilosec." (Weiss, ¶ 120; Ledwick, ¶ 119.).)
20      Weiss alleges that he, "like all Class members, has purchased Nexium and has
21  been harmed by defendants' misconduct because he would not have purchased Nexium
22  had he known the truth." (Weiss, ¶ 123.) Ledwick alleges she, "like all Class members,
23  has purchased Nexium and has been harmed by Defendants' misconduct. Had
24  Astrazeneca not purposely and successfully created false beliefs among patients and
25  doctors about Nexium's superiority, Plaintiffs would not have purchased Nexium at a
26  premium over equally effective generic and OTC drugs . . . ." (Ledwick, ¶ 125.)

27
28

## III.    DEMURRERS

Defendants filed two demurrers, one to each complaint.  Each demurrer incorporates the demurrers and arguments of the other.  In the demurrer to the Weiss complaint, defendants object that plaintiffs lack standing under Business & Professions Code sections 17200 et seq. (UCL) and 17500 et seq., fail to allege causation sufficient to their CLRA claims, and fail adequately to allege unjust enrichment.

In the demurrer to the Ledwick complaint, defendants incorporate the above objections and additionally object that:  1) Federal law preempts plaintiffs' claims; 2) plaintiffs do not identify any factual statement in any advertisement that is false; 3) plaintiffs do not allege any advertisement conflicts with FDA-approved Nexium labeling; 4) plaintiffs' non-disclosure theory, that defendants should disclose that Prilosec is just as good as Nexium, conflicts with federal law because it is illegal to suggest to a consumer what drug he should take; 5) plaintiffs may not collaterally attack FDA approval of Nexium; and 6) no UCL, CLRA, or false advertising claim will lie where plaintiffs' only complaint is that a product was overpriced.

Because both demurrers and motions pertain to both complaints the court will combine them to examine all issues raised.

### A.    Proposition 64

Defendants first object that neither Weiss nor Ledwick has standing to allege violation of Business & Professions Code section 17200 et seq. or section 17500 et seq. because neither alleges he or she lost money due to defendant's unfair practices. (Undesignated statutory references are to the Business & Professions Code.)  Defendants further objection that the associational plaintiffs lack standing because Proposition 64 did away with associational standing in the UCL and false advertising contexts.

Proposition 64, passed by voters in November, 2004, amended the standing requirements for actions under 17200 et seq. (UCL claim) and 17500 et seq. (false

advertising claim).  To bring either a UCL or false advertising claim a plaintiff must now allege he or she personally lost money or property and that the loss was a result of defendant's misconduct.  In effect, the Proposition 64 requires plaintiffs to allege and establish personal monetary injury and causation.

1.    Damages

Both Weiss and Ledwick allege they purchased Nexium at a premium but would not have but for defendants' misconduct.  (Weiss, ¶ 123; Ledwick, ¶ 125.)  Defendants argue Weiss admits in his complaint that he used some free samples, made copayments, and received rebates (Weiss, ¶ 19) but does he not allege how long he received free samples, the amount of the copayment, how much "extra" he paid, or how much the rebates were.  Therefore, defendants argue, Weiss does not allege he lost money or property, i.e., does not allege he was out of pocket.  Perhaps, defendants argue, the copayment for Prilosec would have been the same or the rebates paid for the drug entirely.

This argument has some resonance in the complaint, wherein Weiss ambivalently alleges that he "paid extra but received rebates back from the manufacturer." (Weiss, ¶ 19.)  However, a liberal reading of the complaint, which the court is required to give at this stage, recognizes that "paid extra" implies increased out-of-pocket expense and that manufacturer rebates rarely equal the purchase price of the product.  Therefore, how much Weiss paid and was reimbursed are factual matters not to be resolved on demurrer.

Therefore, the demurrer on this ground is overruled.

2.    Causation

Defendants next object that plaintiffs fail to allege they personally saw any of defendants' advertisements or representations, and that the advertising could not have caused plaintiffs' injury unless they themselves saw it.

-5-

1    Defendants offer no California authority supporting the argument and the court

2 finds none. On the contrary, to establish causation it is "sufficient that defendant makes a

3 misrepresentation to one group intending to influence the behavior of the ultimate

4 purchaser, and that he succeeds in this plan." (*Committee on Children's Television, Inc.*

5 *v. General Foods Corp.* (1983) 35 Cal.3d 197, 219; see also Rest.2d Torts, ¶ 533 ["The

6 maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to

7 another who acts in justifiable reliance upon it if the misrepresentation, although not

8 made directly to the other, is made to a third person and the maker intends or has reason

9 to expect that its terms will be repeated or its substance communicated to the other, and

10 that it will influence his conduct in the transaction or type of transaction involved."].)

11    Defendants attempt to get some mileage out of this court's recent statement in

12 another case, *Fite v. Berkeley Premium Nutraceuticals, Inc.*, No. BC 313 557 (*Fite*),

13 where it held that to establish causation a plaintiff must allege "plaintiffs' actual reliance

14 on the representations and injury arising therefrom." (Slip op. at p. 6 (Cal. Super. Ct.

15 May 10, 2005) (Chaney, J., presiding).) This statement will not take defendants far. In

16 *Fite* defendant had argued that after passage of Proposition 64 a representative plaintiff

17 alleging false advertising must allege and prove that *every class member* relied on the

18 advertising. The court disagreed, reasoning that Proposition 64 pertained only to the

19 representative's standing, not to the class's injury or causation thereof. Therefore, actual

20 reliance was required merely to establish representative standing, after which the normal

21 elements of the cause of action, e.g., representations that are reasonably likely to mislead,

22 pertain. Accordingly the court held a plaintiff need not establish each class member's

23 reliance, only his own. This holding did not abrogate well-settled third-party reliance law

24 where, for example, injury to a patient may be caused by a pharmaceutical company's

25 misrepresentations to a physician.

26    Even so, defendants argue, plaintiffs fail to allege their physicians saw

27 AstraZeneca's advertising for Nexium, prescribed Nexium because of the advertising, or

28 was swayed by the advertising from his or her independent medical judgment.

1        This argument, too, is without merit.  Upon demurrer the court must construe the

2    complaint liberally, taking as true all material facts alleged and all reasonable inferences

3    that may be drawn from those facts.  Plaintiffs allege at length that defendants directed

4    their advertising at physicians and that plaintiffs would not have purchased Nexium, a

5    prescription drug, but for defendants' advertising.  It is reasonable to infer from this that

6    plaintiffs' physicians became aware of the advertising and were influenced by it.

7    Whether they were influenced in fact may not be resolved by demurrer.

8        Therefore, the demurrer on this ground is overruled.

9

10   3.    Associational Standing

11

12       The AFL-CIO, CCS and CARA were not personally injured by defendants'

13   alleged misrepresentations—they assert only "associational standing."  To establish such

14   standing an association "must demonstrate that its members would otherwise have

15   standing to sue in their own right."  (*Associated Builders & Contractors, Inc. v. San*

16   *Francisco Airports Comm'n* (1999) 21 Cal.4th 352, 361.)  Defendants argue Proposition

17   64 eliminated common law associational standing.

18       The court agrees.  Before Proposition 64, sections 17204 and 17535 provided that

19   a UCL or false advertising claim could be brought by "any person acting for the interests

20   of itself, *its members* or the general public."  (*Ibid.*, emphasis added.)  Now, sections

21   17204 and 17535 provides that such claims may be brought only by "any person who has

22   suffered injury in fact and has lost money or property . . . ."  (*Ibid.*)  By removing the

23   reference to an association's "members," and by requiring injury to plaintiffs' own

24   finances, the voters indicated their intent to eliminate associational standing in the UCL

25   and false advertising contexts.

26       Therefore, the demurrer to the first and second causes of action, for violation of

27   Business & Professions Code sections 17200 et seq. and 17500 et seq., respectively, is

28   sustained without leave to amend as to the AFL-CIO, CCS and CARA.

-7-

**B.    Federal Issues**

Defendants' next round of objections, presented in the demurrer to the Ledwick complaint and incorporated by reference into the demurrer to the Weiss complaint, follow a theme fueled by several defects in both complaints. Defendants argue that because Prilosec advertising comports with federal law and the allegedly non-deceptive alternatives proposed by plaintiffs don't, plaintiffs' decrial of the advertising is preempted or barred by federal law. Defendants offer a number of avenues to reach this conclusion--federal preemption, FDA regulation, the First Amendment--all following the theme: Plaintiffs allege that activity permitted by federal law is wrongful and that activity prohibited by federal law is proper; federal law controls; therefore plaintiffs' claims are barred or preempted.

The argument finds its ground in the complaints themselves. Overarchingly, the complaints allege defendants purposed to preserve market share by misrepresenting that Nexium is better than Prilosec. Defendants effected their purpose through direct communication with physicians, direct advertising to physicians, targeted advertising, and general advertising. As a legal conclusion it cannot reasonably be denied that misrepresenting one product as better than another constitutes false advertising unprotected by federal law. That defendants directly communicated this misrepresentation to physicians suffices to state plaintiffs' claim and preserve the complaints against demurrer.

But plaintiffs go further. First, in a section entitled "Further examples of Misleading Promotion and Advertising," they attach Nexium advertising to the complaints. (Weiss, ¶¶ 102-120; Ledwick, ¶¶ 101-119.) Plaintiffs allege the "advertisements are just examples of the themes and messages conveyed." (Weiss, ¶ 120; Ledwick, ¶ 119.) The advertising, however, does not appear to support plaintiffs' claims. Most of it does not mention Prilosec and that which does, does so neutrally.

Next, plaintiffs make much of an AstraZeneca annual report touting the virtues of

-8-

Nexium over Prilosec.  (Weiss, ¶ 7; Ledwick, ¶ 7.)  However, it is not clear how widely this report was disseminated or whether defendants intended it to constitute advertising.

Perhaps to supplement the facial neutrality of "exemplar" advertising, plaintiffs suggest defendants' implied misrepresentations and concealment of material facts create an aura of deception:  Defendants failed to disclose that test results on the relative efficacy of Nexium and Prilosec are ambiguous or that dosage manipulation would equalize the efficacy of Nexium and Prilosec.

1.    Preemption

In their demurrer to the Ledwick complaint defendants first object that plaintiffs' claims are preempted by federal law.  Defendants preface the argument by contending plaintiffs "fail[] to point to any statement in any advertising of Nexium that [they] assert[] is false." (Ledwick Dem., Pts. & Auth., p. 8.)  "Rather," defendants argue, plaintiffs "attack[] a claim of superiority that [they] contend[] is implicit in AstraZeneca's advertising and that should have been cured by a disclosure that Prilosec in a double dose is equally effective." (*Ibid.*)  This claim fails, defendants argue, because the implied message of superiority is not inconsistent with federally approved labeling and advertising that complies with FDA requirements is immune from attack under California law.

The court will attempt to unwind the numerous issues the argument presents.

At the outset, even if defendants' preemption argument were meritorious it would not be ground for sustaining the demurrer because plaintiffs do not allege only an implied message of superiority (and improper cure therefor), they also allege defendants explicitly represented to physicians and consumers that Nexium is superior to Prilosec.  (Weiss, ¶¶ 59, 61, 62, 64 ; Ledwick, ¶¶ 59, 61, 62, 63  ["AstraZeneca spent $98 million on direct-to-consumer promotions, again claiming Nexium was superior to Prilosec."].)  It may be this allegation of explicit representation of superiority is groundless—plaintiffs

give no citation of text, either in paragraph 62 ("'we've captured the essence of Prilosec and created a new PPI . . . introducing Nexium the powerful new PPI from the makers of Prilosec'") or the exemplar advertising to support it. But the allegation states a fact that upon demurrer must be accepted as true: Defendants explicitly represented to consumers that Nexium is better than Prilosec.

Defendants first argue plaintiffs fail to identify any factual statement in any ad that is false. This is a correct statement, but failure to identify false factual statements in advertising is not ground for demurrer where plaintiffs also allege misleading factual statements made directly to consumers, not through advertising.

Defendants next argue plaintiffs' allegation of a misleading message is preempted by federal law because an attack on advertising that does not conflict with Nexium's FDA-approved labeling would infringe on the FDA's exclusive authority to approve drugs and contradict the FDA's implicit finding that the labeling is not misleading.

A civil lawsuit under state law is preempted where the state law establishing liability conflicts with federal law that permits the challenged conduct. (*Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 899.) Assuming drug labeling or the FDA's authority to prescribe it qualify as federal law for purposes of a preemption analysis, defendants do not explain, and the court cannot fathom, how Nexium's labeling affirmatively supports defendants' claim that Nexium is superior to Prilosec. The court is unaware of any allegation that Nexium's labeling even mentions Prilosec, much less demonstrates Nexium's superiority to it. Additionally, the court is unaware of any allegation that the promotional statements at issue were derived by defendants from Nexium labeling. Rather, it appears the challenged statements arose after Nexium was approved and do little, if anything, to reference the labeling. Even if the advertising were somehow derived from the labeling it would be nonsensical to hold all advertising valid or immunized simply because it does not "conflict" with the labeling. If all advertising were permissible simply because it does not conflict with the label a manufacturer could say virtually anything, so long as he avoids the label's limited purlieu. (A claim that

-10-

1    snake oil cures dandruff does not conflict with the label identifying the oil as coming
2    from a snake.)
3        Defendants next argue that, "unable to point to any actionable misstatement,"
4    plaintiffs allege defendants' advertising is misleading because it fails to disclose that
5    "double the standard dose of Prilosec would be "equally as effective" as a 40 mg does of
6    Nexium. "E.g, [Weiss compl.] ¶¶ 6, 41, 102, 104, 106, 108, 110, 112, 114, 116, 118."
7    (Ledwick dem., pts. & auth., p. 13.)  Such a disclaimer, defendants argue, would be
8    conflict with federal law.
9        This argument comprises a faulty premise followed by a strawman.  As discussed
10   above, plaintiffs' *have* pointed to an actionable misstatement.  And nowhere do plaintiffs
11   allege defendants' advertising is misleading because it fails to disclose that a double dose
12   of Prilosec is as effective as a single dose of Nexium.  The court need not determine
13   whether a disclaimer nobody espouses would conflict with federal law.
14       Defendants argue plaintiffs cannot challenge the FDA's approval of a 40 mg dose
15   of Nexium.
16       Plaintiffs bring no such challenged.
17       Defendants argue plaintiffs cannot collaterally attack the FDA's approval of
18   Nexium.
19       Plaintiffs mount no such attack.
20       Finally, defendants argue plaintiffs cannot state a claim based on defendants
21   charging too much for Nexium.
22       Predatory pricing does not form the basis of any of plaintiffs' claims.
23       Defendants' demurrer on the ground of preemption is overruled.
24
25   2.    First Amendment
26
27       Defendants argue plaintiffs' claims are barred by the First Amendment because
28   states may not burden commercial speech either by imposing restrictions on speech that

-11-

is not false or misleading or by requiring the further disclosures plaintiffs espouse (regarding the quality of Nexium in relation to Prilosec or its pricing or dosage).

This argument fails for the same reason defendants' preemption argument fails: It is based on a faulty premise, that its speech is not alleged to be false or misleading, and on mischaracterization of the complaints. Therefore, the demurrer on this ground is overruled.

3.    Abstention Doctrine

In a similar vein, defendants argue the court should decline to exercise its equitable jurisdiction in what is essentially a regulatory matter because the FDA, which has issued a complex web of regulations, holds extensive investigatory and enforcement authority, and subjected Nexium to rigorous testing is better able to cure any deceptive advertising.

Defendants admit no California appellate court has addressed abstention in the context of a false advertising claim. This court is not satisfied the FDA, which evaluates the safety and efficacy of drugs, wishes to concern itself overmuch with the UCL and false advertising claims plaintiffs assert here. Plaintiffs do not challenge the safety or efficacy of Nexium. Nor do plaintiffs allege defendants' advertising leads to some risk of physical harm. Rather, plaintiffs allege defendants' practices impact consumer pocketbooks. The court is unaware of any FDA interest in such matters. Therefore, the demurrer on this ground is overruled.

4.    Safe Harbor

Repeating its preemption argument in part, defendants argue its advertising is not actionable under the UCL because it is not inconsistent with the FDA-approved labeling. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163,

182.) The argument fails as discussed above. Therefore, the demurrer on this ground is overruled.

## C.    Conclusion

Defendants' demurrer to the first and second causes of action, for violation of Business & Professions Code sections 17200 et seq. and 17500 et seq., respectively, is sustained without leave to amend as to the AFL-CIO, CCS and CARA and overruled as to the individual plaintiffs. Defendants' demurrer to the third and fourth causes of action is overruled.

## IV.    MOTIONS TO STRIKE

## A.    Privilege

Defendants move to strike a number of allegations relating to their actions in obtaining FDA approval for Nexium and patents for Prilosec and in bringing actions against generic competitors. Defendants object to these allegations n the ground this activity is privileged under Civil Code section 47 (the litigation or petition privilege) and therefore allegations pertaining to them are irrelevant.

The court does not understand plaintiffs to predicate their claims on this activity but rather on how defendants communicated with physicians and consumers. Plaintiffs describe the (arguably) privileged activity not to establish liability but to evidence defendants' plan to maintain its market share (which plan drove defendants' advertising campaign) and their knowledge of the relative benefits of Nexium. The allegations constitute neither improper nor irrelevant matter. Therefore, the motion to have them stricken is denied.

**B.     CLRA Damages**

Defendants move to strike plaintiffs' claims for CLRA damages on the ground plaintiffs' CLRA notice-and-demand letter was deficient.

Subdivision (a) of Civil Code section 1782 provides that:

> Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following: . . . (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of section 1770.

This notification procedure cannot be liberally construed. (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 40.) "[A] class demand letter under the [CLRA] should set forth, as explicitly as possible, the objected-to practices, the relief requested, and the intent to file a class action should the letter's demands not be met." (*Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 594.) "The purpose of the notice requirement of section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections . . . ." (*Outboard Marine, supra*, at p. 40.)

Plaintiffs' notice-and-demand letters stated that "AstraZeneca has engaged in consumer fraud, false and misleading advertising and deceptive practices in connection with the sale of the Nexium product" and "[i]n particular, . . . has violated §§ 1770(a)(5), (7), (8), and (9)." (CLRA Amendments to Complaints, Exh. A.) The letters were sent after the complaints were filed and reference them. (*Ibid.*)

Defendants argue this notice is inadequate because it does not describe the allegedly deceptive practices and does not indicate what advertising or other activity is misleading.

The argument is without merit. Plaintiffs' letters identify the particular subsections of Civil Codes section 1770 that have been violated and reference complaints in which the violations are described in detail. This notice suffices. Therefore, defendants' motion to strike the prayer for CLRA damages is denied.

-14-

1

**C.     Treble Damages**

2

3      Defendants move to strike Ledwick's prayer for treble damages on the ground that

4  no applicable statute permits treble damages.

5      Ledwick seeks "Treble damages and all other penalties as allowed by law."

6  (Ledwick compl., prayer, ¶ C.)

7      Ledwick responds that she does not seek "treble" damages, but instead seeks the

8  triumvirate of damages permitted by the CLRA:  actual, punitive and additional damages

9  for senior citizens and disabled persons.

10     The complaint seeks "treble damages," not a triumvirate of damages.  Plaintiff

11 identifies no statute entitling her to treble damages.  Therefore, the motion to strike the

12 prayer for them is granted.

13

14 **In Sum:**

15

16     **The demurrers are OVERRULED as to the individual plaintiffs,**

17 **SUSTAINED WITHOUT LEAVE TO AMEND as to the first and second causes of**

18 **action (B&P §§ 17200 and 17500) brought by the associational plaintiffs, and**

19 **OVERRULED as to the third and fourth causes of action brought by the**

20 **associational plaintiffs.**

21     **The motions to strike are GRANTED as to Ledwick's prayer for treble**

22 **damages and DENIED otherwise.**

23

24 IT IS SO ORDERED.

25 Dated: 9/21/05

26

27                                          Victoria Gerrard Chaney

28                                                    Judge

-15-

Tab 7

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 2993937 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Pennsylvania Employee Benefit Trust Fund v.
Zeneca, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PENNSYLVANIA EMPLOYEE BENEFIT TRUST
FUND, on behalf of itself and all others similarly
situated, Joseph Macken, and Commissioner Linda
A. Watters, Plaintiffs,
v.
ZENECA, INC. and Astrazeneca Pharmaceuticals,
L.P., Defendants.
**No. Civ. 05-075-SLR.**

Nov. 8, 2005.

Steve W. Berman, and Thomas M. Sobol, of Hagens
Berman Sobol & Sharpiro LLP, Seattle, Washington;
Barbara J. Hart, of Goodkind Labaton Rudoff &
Sucharow LLP, New York, New York; Jeffrey L.
Kodroff, and Theodore M. Lieveman, of Spector
Roseman & Kodroff P.C., Philadelphia,
Pennsylvania; Pamela S. Tikellis, A. Zachary Naylor,
and Robert R. Davis, of Chimicles & Tikellis LLP,
Wilmington, Delaware. for Plaintiffs.
Jack B. Blumenfeld, R. Judson Scaggs, Jr., and Nat-
alie J. Haskins, of Morris Nichols Arsht & Tunnell,
Wilmington, Delaware, for Defendant, Peter I. Ostro-
ff, Mark E. Haddad, Alycia A. Degen, and Joshua E.
Anderson, of Siddley Austin Brown & Wood LLP,
Los Angeles, California; John W. Treece, Maja C.
Eaton, and Richard D. Raskin, of Sidley Austin
Brown & Wood LLP, Chicago, Illinois, of counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

**\*1** On February 11, 2005, plaintiff Pennsylvania Em-
ployee Benefit Trust Fund filed a putative nationwide
class action against AstraZeneca, Inc. and As-
traZeneca Pharmaceuticals, L.P. (collectively called
"defendants"). (D.I.1) On April 5, 2005, Linda A.
Watters [FN1] filed a putative nationwide class action

against defendants. (Civ. No. 05-196-SLR, D.I.1) On
April 14, 2005, Joseph Macken filed a putative na-
tionwide class action against defendants. (Civ. No.
05-220-SLR, D.I.1) On May 27, 2005, Pennsylvania
Employee Benefit Trust Fund, Linda A. Watters,
Joseph Macken, AFSCME District Council 47 Health
& Welfare Fund, Victoria Scofield, Janet McGrorty,
Richard Tikkuri, Wisconsin Citizen Action, United
Senior Action of Indiana and Carolina Fair Share
(collectively called "plaintiffs") filed a consolidated
class action complaint. (Civ. No. 05-75-SLR, D.I.20,
27) [FN2] Before the court is defendants' motion to
dismiss for failure to state a claim upon which relief
can be granted. (D.I.32) The court has jurisdiction
over this matter pursuant to 28 U.S.C. § 1332(a).
(D.I. 1 at ¶ 18)

> FN1. More specifically, Ms. Watters filed
> suit in her capacity as Commissioner, Of-
> fices of Financial Services for the State of
> Michigan in her capacity as Rehabilitator of
> The Wellness Plan and in her capacity as Li-
> quidator of Michigan Health Maintenance
> Organization Plans, Inc., formerly known as
> OmniCare Health Plan, Inc.

> FN2. Unless otherwise noted, all references
> to "D.I." are to docket items in Civ. No.
> 05-75-SLR, the lead case in this consolid-
> ated action.

II. BACKGROUND

According to the consolidated complaint (D.I.20), the
drug Prilosec is a proton-pump inhibitor ("PPI") used
to treat heartburn and esophageal erosions. *Id.* By the
year 2000, Prilosec, long advertised as the "purple
pill", was the most widely prescribed drug in the
world. *Id.* Before the patent on Prilosec expired, de-
fendants received approval by the Food and Drug
Administration ("FDA") for a new PPI, marketed as
Nexium. (D.I. 20 at ¶ 6) The FDA released the ap-
proved labeling for Nexium in February 2001.
(D.I.34, ex. 1) By 2003, sales of Nexium reached
$3.3 billion. (D.I. 20 at ¶ 13)

Plaintiffs allege that, once Prilosec could be sold as the generic drug omeprazole, defendants engaged in a massive advertising campaign to boost the sales of the more expensive prescription drug Nexium. In their advertisements, defendants "either implicitly or expressly represented" that Nexium was superior to Prilosec. In doing so, defendants "suppress[ed] and/ or omitt[ed]" information demonstrating that "Nexium ... [is] not more effective at equivalent doses to the standard therapeutic dose of Prilosec." (D.I. 20 at 155(d)) (emphasis added) Plaintiffs assert that this misleading advertising campaign has resulted in "billions of dollars of unnecessary drug expenditures by third party payors" and that "hundreds of thousands of patients have taken Nexium and continue to do so when they should not." (D.I. 20 at ¶¶ 7, 9, 11, 86, 91, 98, 110, 155, 160) Plaintiffs contend that defendants' marketing strategy has violated the Delaware Consumer Fraud Act, 6 Del. C. § 2511, et seq ("DCFA"), as well as the consumer protection statutes of the other 49 states. (D.I. 20 ¶ 166) Plaintiffs also assert a claim for unjust enrichment and a claim of negligent misrepresentation. (D.I. 20 ¶¶ 173-78, 179-84)

### III. STANDARD OF REVIEW

*2 In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc ., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiffs cannot demonstrate any set of facts that would entitle them to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

### IV. DISCUSSION

In order to prevail on their theory of liability, plaintiffs must demonstrate, first, that the Nexium advertisements "either implicitly or expressly" describe Nexium as superior to Prilosec and, second, that Nexium, in fact, is "not more effective at equivalent doses to the standard therapeutic dose of Prilosec." The question before the court instantly is whether it has jurisdiction to resolve these issues as pled. For the reasons that follow, the court concludes that plaintiffs have not stated claims upon which relief can be granted.

### A. Misleading Advertising Under the DCFA

With respect to the first issue, the DCFA provides that

[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

6 Del. C. § 2513(a). The purpose of the DCFA is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices." 6 Del. C. § 2515.[FN3] Despite its broad purpose, however, the DCFA does not apply "[t]o any advertisement or merchandising practice which is subject to and complies with the rules and regulations, of and the statutes administered by, the Federal Trade Commission." 6 Del. C. § 2513(b)(2). The Federal Trade Commission ("FTC") and the FDA share exclusive jurisdiction over regulation of drug marketing; the FDA is given primary authority to regulate prescription drugs. 36 Fed.Reg. 18,539 (1971) ("The Food and Drug Administration has primary responsibility with respect to the regulation of the truth or falsity of prescription drug advertising."). The information included in the labeling of a new drug reflects a determination by the FDA that the information is not "false or misleading." 21 C.F.R. § 314.125(b)(6) (stating the FDA must deny a new drug application if it determines that "[t]he proposed labeling is false or misleading in any particu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2993937 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

lar"). By approving information to be included in the drug labeling, the FDA has determined that the information complies with its rules and regulations. Therefore, if the FDA labeling supports the statements made in advertising for an FDA-approved drug, the statements are not actionable under 6 Del. C. § 2513(b). *American Home Products Corp. v. Johnson & Johnson,* 672 F.Supp. 135 (S.D.N.Y.1987) ( "Moreover, AHP's compliance with FDA labeling standards automatically puts it in compliance with FTC requirements as well, since the FTC has officially recognized that the FDA has primary jurisdiction over all matters relating to the labeling of [over the counter] drugs.") (internal citations omitted); *Bober v. Glaxo Wellcom PLC,* 246 F.3d 934, 942 (7th Cir.2001) ("[R]ecognizing the primacy of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law."); *see Solvay Pharmaceuticals, Inc. v. Ethex Corp.,* 2004 WL 742033 (D.Minn.2004) ("[W]here a claim requires interpretation of a matter that is exclusively within the jurisdiction and expertise of the FDA and FDCA, plaintiffs cannot use the Lanham Act as a backdoor to private enforcement.") (citing *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 231 (3d Cir.1990)).

> FN3. Plaintiffs use statements made in defendants' 2000 Annual Report as evidence of false or misleading statements. The case law provides that the court "cannot ignore the clear language of the statute which restricts its application to deceptive practices 'in connection with the sale or advertisement' of merchandise." ' *Norman Gershman's v. Mercedes-Benz,* 558 A.2d 1066, 1074 (Del.Super.1989). Plaintiffs have not alleged that any statements used in the Annual Report were used in the sale or advertisement of Nexium to consumers.

*3 Plaintiffs have characterized as misleading multiple statements found in the Nexium advertisements. These statements will be addressed in seriatim.

1. Nexium is a "new" drug. Defendants received FDA approval for a "new PPI". (D.I. 20 at ¶ 6)

2. "The Purple Pill". The FDA-approved labeling describes the pill as "amethyst" in color. (D.I. 34, ex. 1 at 39)

3. "From the makers of Prilosec". Nexium is manufactured for AstraZeneca, as was Prilosec. (D.I. 34, ex. 1 at 40)

4. "Compared with Prilosec". Nexium was compared to Prilosec in the FDA approved labeling. (D.I. 34, ex. 1 at 13)

5. "Just one prescription Nexium a day gives may people complete resolution of heartburn symptoms". The FDA-approved labeling describes studies where "many" patients were symptom-free of heartburn with the use of Nexium. (D.I. 34, ex 1 at 14, 18) The labeling states:
Two multicenter, randomized, double-blind placebo-controlled studies were conducted in a total of 717 patients comparing four weeks of treatment with NEXIUM 20 mg or 40 mg once daily versus placebo for resolution of GERD symptoms.... The percentage of patients that were symptom-free of heartburn was significantly higher in the NEXIUM groups compared to placebo at all follow-up visits.

(D.I. 34, ex. 1 at 18) In addition, the labeling contains a chart of the Cumulative Percent with Sustained Resolution (defined as the cumulative proportion of patients who have reached the start of sustained resolution). After 14 days, the three studies resulted in 64.8%, 65.4%, and 67.6% (patients who reached the start of sustained resolution), respectively. After 28 days, the values were 74.2%, 73.9%, 75.1%. (D.I. 34, ex. 1 at 14) While the court need not define "many," it concludes these numbers are sufficient to support the statement made in the advertisement.

6. "Proven efficacy in short-term healing (4-8 weeks)". The FDA-approved labeling states that Nexium "is indicated for the short-term treatment (4 to 8 weeks) in the healing and symptomatic resolution of diagnostically confirmed erosive esophagitis." (D.I. 34, ex. 1 at 23) In addition, the labeling recommends 40 mg of Nexium once daily for 4 to 8 weeks for the healing of erosive esophagitis. (D.I. 34, ex. 1 at 37)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2993937 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

7. "Proven symptom control". The FDA-approved labeling describes studies where "the proportion of patients on Nexium who remained in remission and were free of heartburn and other GERD symptoms was well differentiated from placebo". (D.I. 34, ex. 1 at 18) Furthermore, the labeling concludes that, in a study done, "[t]he percentage of patients that were symptom-free of heartburn was significantly higher in the NEXIUM groups compared to placebo at all follow-up visits." (D.I. 34, ex. 1 at 18)

8. "Heal the damage". The FDA-approved labeling indicates Nexium is effective in the "healing and symptomatic resolution" of erosive esophagitis. (D.I. 34, ex. 1 at 14, 18, 23, 34)

*4 9. "In GERD patients, power to control acid". The FDA-approved labeling includes a study done to determine the pH in patients with symptomatic gastroesophageal reflux disease (GERD). The data for Nexium 40 mg showed the pH remained above 4 for 16.8 hours.FN4 (D.I. 34, ex. 1 at 7) With Nexium 20 mg, the pH remained above 4 for 12.7 hours.

FN4. A higher pH results in a less acidic environment.

Plaintiffs take issue with this statement because, according to plaintiffs, the FDA reviewers do not believe that PPIs are effective for GERD patients in general. Nevertheless, Nexium was FDA-approved for treatment of GERD. (D.I. 34, ex. 1 at 37)

10. "Safety and tolerability similar to Prilosec". The FDA-approved labeling describes a study where the "safety in the treatment of healing erosive esophagitis" was conducted on patients taking Nexium 20 mg, Nexium 40 mg, omeprazole (Prilosec) 20 mg daily. "The most frequently occurring adverse events ... in all three groups was headache (5.5, 5.0 and 3.8, respectively) and diarrhea (no difference among the three groups). Nausea, flatulence, abdominal pain, constipation, and dry mouth occurred at similar rates among patients taking Nexium or omeprazole." (D.I. 34, ex. 1 at 32)

Having reviewed all the advertising materials cited by plaintiffs, the court concludes that such materials are related to the safety and efficacy of Nexium, are

consistent with the FDA-approved labeling and, therefore, are not actionable under the DCFA pursuant to 6 Del. C. § 2513(b)(2).

Alternatively, the court concludes that, even if the DCFA exception were held not to apply to the statements made in the Nexium advertisements, any statements made that comply with the FDA-approved labeling would not be actionable under a state consumer fraud act because they are preempted by federal law. The information included in the labeling of a new drug reflects a determination by the FDA that the information is not "false or misleading." 21 C.F.R. § 314.125(b)(6). See Cytyc Corp. v. Neuromedical Sys., Inc., 12 F.Supp.2d 296, 301 (S.D.N.Y.1998) (granting a motion to dismiss because the challenged statements "comport substantively," even if not "precisely," with the FDA-approved labeling and can be considered "neither false nor misleading"); SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co., 1996 WL 280810, *13 (S.D.N.Y.1996) (concluding that in a Lanham Act case, the advertisements were "neither facially false nor misleading" because the claims challenged were "based on the package labeling approved by the FDA"); American Home Products, 672 F.Supp. at 144 (holding that "compliance with FDA warning requirements" is a complete defense to Lanham Act and unfair competition claims). For this reason, the claims of violation of the deceptive practices and consumer fraud acts of the fifty states are dismissed. To the extent that any of these statutes do not have a similar exemption clause, the claims are preempted by the FDA's approved labeling.

B. Nexium's Efficacy

*5 Plaintiffs claim that Nexium advertisements "either implicitly or expressly represent[ ]" that Nexium is superior to Prilosec "at equivalent doses." As a preliminary matter, in its review of the advertising materials of record, the court did not find any explicit statements that Nexium was "superior" to Prilosec.FN5 Even if any of the advertisements were deemed to implicitly claim that Nexium is superior to Prilosec, the court concludes that such claims, if consistent with the FDA-approved labeling, related to the

Not Reported in F.Supp.2d, 2005 WL 2993937 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

safety or efficacy of the drug and are excluded from liability under the DCFA. FN6

> FN5. The following statements mention Prilosec: "We captured the essence of Prilosec ... and created a new PPI ... Introducing Nexium". Nexium has been approved by the FDA as a "new PPI." Since both Prilosec and Nexium are PPIs, the court does not find the language "We captured the essence of Prilosec" as inconsistent: with the FDA-approved labeling or as touting the superiority of Nexium over Prilosec. "In erosive esophagitis sutdies compared with Prilosec". As detailed above, Nexium was compared with Prilosec in studies. The advertisement does not comment on the results of the comparisons. Moreover, it is important to note that any comparisons made in the studies between omeprazole 20 mg (Prilosec) and Nexium 40 mg cannot be deemed misleading, as a 40 mg omeprazole (Prilosec) has not been approved by the FDA.

> FN6. Plaintiffs cite to an FDA reviewer who specifically looked at whether Nexium performed better than Prilosec. The court finds this is evidence that superiority is something the FDA considers in its labeling determinations. Therefore, claims of superiority do fall under the categories of safety and efficacy.

Alternatively, in order to prevail on a claim that such an advertisement is false or misleading, plaintiffs would have the burden to prove the fact that the approved dosage of Nexium is not superior to the approved dosage of omeprazole/Prilosec. The issue of whether one drug is more effective than another drug is clearly within the expertise of the FDA and should not be resolved in a court of law through the adversarial system. The court concludes, therefore, that plaintiffs have not stated a claim upon which relief can be granted by this court. *See generally Sandoz, 902 F.2d at 230-32* (declining to decide whether a label is literally false when the FDA had yet to so determine).

C. Unjust Enrichment

"The elements of unjust enrichment are (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law." *Jackson Nat'l. Live Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch.1999).* Plaintiffs have not pled a relationship between the alleged enrichment and the alleged impoverishment, as they have not specifically pled that they relied on the defendants' advertisements in purchasing Nexium. Furthermore, plaintiffs have not sufficiently pled an absence of justification by defendants regarding the advertisements. Indeed, the only foreseeable way to show an absence of justification is to show the misrepresentations are not true (i.e., that Nexium is not superior to Prilosec). As stated above, the court declines to entertain this argument.

D. Negligent Misrepresentation

For a claim of negligent misrepresentation, plaintiffs must allege: "(1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon false information ." *HMG/Courtland Properties, Inc. v. Gray, 1999 WL 504781, at *24 (Del. Ch.1995)* Plaintiffs have not alleged a justifiable reliance by each of the named plaintiffs in the suit and, thus, the claim for negligent misrepresentation is dismissed.

V. CONCLUSION

For the reasons stated herein, defendants' motion to dismiss is granted. An appropriate order shall issue.

D.Del.,2005.
Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.
Not Reported in F.Supp.2d, 2005 WL 2993937 (D.Del.)

END OF DOCUMENT

Tab 8

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261

**(Cite as: Not Reported in F.Supp.2d)**

H

U.S. v. Microsoft Corp.

D.D.C.,1998.

United States District Court, District of Columbia.
**UNITED STATES** of America, Plaintiff,
v.
**MICROSOFT** CORPORATION, Defendant.
STATE of New York, ex rel. Attorney General Dennis C. Vacco, et al ., Plaintiffs and Counterclaim-Defendants,
v.
**MICROSOFT** CORPORATION, Defendant and Counterclaim Plaintiff.
**No. CIV. A. 98-1232 (TPJ, CIV. A. 98-1233 (TPJ.**

Sept. 14, 1998.

MEMORANDUM AND ORDER

JACKSON, District J.

**\*1** On May 18, 1998, in separate actions, the United States Department of Justice ("U.S." or "DOJ") and twenty states' Attorneys General (the "States") FN1 filed complaints against Microsoft Corporation ("Microsoft"), alleging violations of federal and numerous state antitrust statutes. The DOJ and the States also applied separately for preliminary injunctive relief to prevent irreparable harm to competition in an alleged market for Internet browsers and to potential competition in the market for personal computer ("PC") operating systems. The Court consolidated the cases pursuant to Fed.R.Civ.P. 42(a) and advanced and consolidated the trial of both actions on the merits with the hearing of plaintiffs' preliminary injunction applications, pursuant to Fed.R.Civ.P. 65(a)(2). The hearing/trial is scheduled to begin on September 23, 1998.

> FN1. This memorandum refers to the U.S. and the States collectively as "plaintiffs."

The complaints allege essentially the same antitrust violations, namely, that Microsoft: (1) unreasonably restrained competition by "tying" its Internet browser to Windows 98; (2) unreasonably restrained competition by entering into "exclusive dealing" arrange-

ments with various Internet providers; (3) unreasonably restrained competition by imposing "boot and start-up screen" restrictions on original equipment manufacturers ("OEMs"); (4) illegally maintained a monopoly in its operating system software through various exclusionary and predatory practices, including, but not limited to, the tying and exclusive dealing arrangements; and (5) attempted to monopolize the market for Internet browsers. The States bring a separate claim of monopoly "leveraging," arguing, *inter alia,* that Microsoft has unlawfully used its operating system monopoly to obtain a competitive advantage in the browser market. Each state also brings a pendent claim alleging violations of its respective state's antitrust laws.

The U.S. and the plaintiff States seek virtually the same relief, namely, that the Court enjoin Microsoft from: (1) entering into or enforcing certain contractual provisions which allegedly foreclose distribution and/or promotion of competing Internet browsers; (2) distributing a "bundled" version of its operating system and browser unless Microsoft provides a practical way of removing browser functions and provides OEMs that do not wish to license the browser an appropriate deduction from the royalty fee; (3) distributing a "bundled" version of its operating system and browser unless Microsoft treats Netscape Corporation's ("Netscape") browser the same as its own with respect to inclusion and removal; and (4) retaliating against any OEM that chooses to remove Microsoft's browser from Windows 98.

Microsoft denies the allegations, and moves for summary judgment on all counts. The Court finds sufficient material facts to be in dispute to preclude the entry of summary judgment on all but one of plaintiffs' claims. Because the theory of "monopoly leveraging" is inconsistent with both the Sherman Act's plain text and with Supreme Court pronouncements on the general limitations of its reach, the Court will grant summary judgment in favor of Microsoft on the States' Third Claim for Relief. *See* States' First Am. Compl. at 26. In all other respects the motion will be denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

I.

**\*2** A microprocessor [FN2] is the "brain" of the PC. Most of the world's PCs run on the "x86/Pentium" class of microprocessor, originally designed by Intel Corporation. In addition to the processor, the PC consists of a number of other components, including various hardware device. (*e.g.,* disk drives) and the operating system.

> FN2. The microprocessor is sometimes referred to as the "processor," the "microchip" (or simply "chip"), or the central processing unit ("CPU").

The operating system ("OS") is the "command center" of the personal computer. It controls the interaction between the processor, memory, peripheral devices such as keyboards, screens, disk drives, and printers. Independent software vendors ("ISVs") write software application programs (such as word processors, games, etc.) that rely on certain general functions embedded in the OS. Applications software does this by using (or "calling on") the OS's application programming interfaces ("APIs"). Because those functions reside on the OS, ISVs do not have to write them into every software application they develop.

In 1980, Microsoft licensed from another company a PC operating system which it modified and introduced in 1981 as the "Microsoft Disk Operating System" ("MS-DOS"). When IBM entered the PC market in 1981, it selected MS-DOS as its operating system. As a result, MS-DOS enjoyed enormous sales and eventually commanded a dominant share of the market.

In 1985, Microsoft introduced a product called "Windows." Originally, Windows was a "shell," which acted as a graphical interface between the user and the MS-DOS operating system, permitting the user to perform functions by pointing and clicking with his mouse, rather than by typing text. Windows and MS-DOS were originally offered and sold separately, but Microsoft combined the underlying operating system with the graphical user interface in "Windows 95," presently the most widely-used PC operating system in the world.

The Internet is a global network that links smaller networks of computers. The World Wide Web ("Web") is the fastest-growing part of the Internet, composed of multimedia "pages" written in Hypertext Markup Language ("HTML") and connected to other pages by hypertext links. "Browsers" are specialized software programs that allow PC users to locate, access, and display content and applications located on the Web, by, among other things, "translating" HTML into an intelligible format for the user.

Consumers most often obtain their browsers as preinstalled software from their OEMs or *via* downloads from their Internet Access Providers ("IAPs"). IAPs provide users with telephone numbers and software that their computers use to access the Web. There are two types of IAPs: (1) Online Service Providers ("OLSs") (*e.g.,* America Online, Prodigy, CompuServe, Microsoft Network) offer a full range of online services in addition to Web access, including e-mail, news, entertainment, and places to "meet" people with similar interests; and (2) Internet Service Providers ("ISPs") (*e.g.,* AT & T Worldnet, Mindspring, Netcom) offer a cheaper, more "bare bones" package, including e-mail, Web access, and basic software.

**\*3** On July 15, 1994, the U.S. commenced an action against Microsoft under Section 2 of the Sherman Act, 15 U.S.C. § 2 (" § 2"). The complaint alleged, among other things, that Microsoft had entered into anticompetitive agreements and engaged in unlawful marketing practices directed at OEMs. The effect of those practices, the DOJ alleged, was unlawfully to maintain Microsoft's monopoly in the PC operating system market.

Microsoft ultimately consented to the entry of a "Final Judgment" (or "Consent Decree"), which the Court entered on August 21, 1995. The Consent Decree prohibited Microsoft from continuing the challenged practices and from engaging in other anticompetitive behavior.

On October 20, 1997, the U.S. petitioned the Court for an order to show cause why Microsoft should not be found in civil contempt for violating the terms of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

the Consent Decree by requiring OEMs to license and distribute Microsoft's Internet browser ("Internet Explorer" or "IE") as a condition of obtaining a license for Microsoft's Windows 95 operating system. On December 11, 1997, the Court declined to hold Microsoft in contempt, but preliminarily enjoined the company from continuing the challenged licensing practices. *See United States v. Microsoft Corp., 980 F.Supp. 537 (D.D.C.1997)*.

Microsoft appealed the December 11 Order. The D.C. Circuit reversed and remanded, holding that the Court "erred procedurally in entering a preliminary injunction without notice to Microsoft and substantively in its implicit construction of the consent decree on which the preliminary injunction rested." *See United States v. Microsoft Corp., 147 F.3d 935, 938 (D.C.Cir.1998)* ( *"Microsoft"* ). The D.C. Circuit also granted Microsoft's application for a writ of mandamus revoking the Court's reference of certain matters to a special master. *See id.*

The Court of Appeals "tentatively" concluded that Windows 95/IE is a permissible "integrated product" under the applicable terms of the Consent Decree. *Id. at 953.* An "integrated product," the court held, is one "that combines functionalities (which may also be marketed separately and operated together) in a way that offers advantages unavailable if the functionalities are bought separately and combined by the purchaser." *Id. at 948.* The D.C. Circuit concluded that Microsoft had "clearly met the burden of ascribing facially plausible benefits to its integrated design as compared to an operating system combined with a stand-alone browser," *id. at 950,* but left the issue to be finally decided based "on a more complete record." *Id. at 952.*

## II.

Plaintiffs contend, and for present purposes, the Court must assume, that Microsoft enjoys a monopoly in the market for operating systems that are compatible with Intel x86/Pentium microprocessors.FN3 According to the DOJ's economic expert, between 1991 and 1997, Microsoft's share of that market held consistently at approximately 90%. *See* Declaration of David S. Sibley. FN4

("Sibley Decl.") ¶ 14 (citing International Data Corp., *Operating Environments, Review and Forecast 1996-2001* (1997)). Several OEMs, including Packard Bell, Hewlett Packard, Micron, and Gateway, have expressed their belief that they have no commercially reasonable alternative to Microsoft's operating system. Plaintiffs postulate that Microsoft's dominant position in the market is reinforced by high barriers to entry, most importantly its enormous "installed base" and the large number of software applications that run on Windows but not on other operating systems.

> FN3. Microsoft disputes plaintiffs' definition of the "relevant markets" and their allegations of Microsoft's power within those markets. Microsoft recognizes, however, that these issues are "sharply disputed by the parties" and are "typically resolved in a battle among expert economists" at trial. *See* Def.'s Mem. in Opp'n to Pls.' Mots. for Prelim. Inj. at 2, 3. Microsoft concedes that, for purposes of deciding its motion for summary judgment, the Court must assume that Microsoft is a monopolist in a relevant market.

> FN4. Dr. Sibley is a Professor of Economics at the University of Texas at Austin.

**\*4** Despite its strong position in the market for operating systems, internal Microsoft correspondence indicates that the company recently discerned a threat to its operating system monopoly in the growing popularity of Internet browsers. Because browsers offer the potential to overcome the incompatibility between different operating systems by allowing applications to run on a variety of operating systems, browsers threaten to reduce or eliminate the key barrier to entry that protects Microsoft's share of the operating systems market.

Software created to run on particular operating systems (or "platforms") generally will not function on different platforms. Independent software vendors ("ISVs") must, therefore, choose the platforms for which they will develop and support different versions of their software. *See generally Sun Microsystems, Inc. v. Microsoft Corp., 999 F.Supp. 1301,*

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

1302 (N.D.Cal.1998). Because of Windows' domin- ant market share, ISVs naturally write their applica- tions to run on Windows, leading to "network ef- fects" that support Microsoft's high market share; the more applications that are written for a particular OS, the more attractive will consumers find that OS, thus further increasing market share, leading to more new software applications, and so forth.

A new programming language, known as "Java," FN5 is designed in part to permit applications written in it to run on any platform or operating system ("across platforms"), thus permitting ISVs to create and distribute a single version of their software cap- able of operating on many otherwise incompatible system platforms and browsers. Programs written in Java are compiled into intermediate instructions which are then "interpreted" by another computer program which emulates a hypothetical CPU called a "Java Virtual Machine" ("JVM"). The JVM trans- lates the instructions into language that can be under- stood by the specific CPU on which the JVM is run- ning.

> FN5. Java was developed by Sun Microsys- tems, Inc ("Sun").

Netscape Corporation's ("Netscape") "Navigator" browser is one means by which Java is distributed to consumers, since a JVM component is shipped with Netscape's browser. *See* P. Maritz (Vice President in charge of Microsoft's Platforms Group) 7/14/97 e- mail (recognizing Netscape as "the major distribution vehicle" for Java) (Ex. 61 to Pls.' Joint Resp. to Mi- crosoft's Mot. for Summ. J. & Reply in Supp. of Mots. for Prelim. Inj.).FN6 Furthermore, Navigator is itself a "platform" to which many applications are written.

> FN6. This memorandum refers to exhibits attached to DOJ's preliminary injunction ap- plication as "PI Ex."; the States' preliminary injunction exhibits as "States' PI Ex."; Mi- crosoft's summary judgment exhibits as "SJ Ex."; and plaintiffs' exhibits in opposition thereto as "SJ Opp'n Ex."

The more applications written directly to the browser

or the JVM it hosts, the more fungible the underlying operating system becomes. Because browsers such as Navigator will run on any operating system, and have the ability to host "cross-platform" applications, they pose a potential threat to Windows' dominance.

Certain statements of Microsoft executives proffered by plaintiffs indicate that the company recognized the impending danger. For example, Microsoft CEO Bill Gates stated that the Netscape/Java combination threatens to "commoditize" the operating system. *See* B. Gates 5/26/95 e-mail (PI Ex. 2). Following a 1997 meeting with Mr. Gates, Microsoft's Ben Slivka de- scribed Java as "the biggest threat to Microsoft" and wrote to Mr. Gates that "clearly the work the Java team is doing has hit a raw nerve with you." SJ Opp'n Ex. 60. And in an essay posted on Microsoft's Web site, Mr. Gates recognized the potential of Netscape's browser to "become a de facto platform for software development, ultimately replacing Windows as the mainstream set of software standards." States' PI Ex. 3. Other Microsoft executives recognized browsers as "alternative *platform[s]* to Windows," B. Silverberg Internet Platforms & Tools Div. Mtg. Agenda (emphasis in original) (PI Ex. 33), that might eventu- ally "obsolete" Windows. B. Chase 4/4/97 e-mail (PI Ex. 15). One Vice President warned that "[t]he situ- ation is threatening our operating systems and desktop applications share at a fundamental level," and declared: "Netscape pollution must be eradic- ated." J. Raikes 8/13/96 memo (PI Ex. 34).

**\*5** Microsoft allegedly set out to eliminate the threats posed by Java and Netscape. Plaintiffs contend that Mr. Gates led the charge to "wrest control of Java away from Sun," SJ Opp'n Ex. 60, and to convert Java to what Microsoft called a "polluted" version which would effectively limit applications to those which would run on Microsoft's systems. To accom- plish this goal, Microsoft allegedly entered into a series of anticompetitive agreements with customers and competitors to restrict the use of Java and to sub- stitute the use of Microsoft's version of Java, known as "J/Direct." *See, e.g.,* T. Nielsen 8/25/97 e-mail to B. Gates ("[W]e are just proactively trying to put obstacles in Sun's path and get anyone that wants to write in java to use J/Direct.") (SJ Opp'n Ex. 62).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

According to plaintiffs, while Microsoft was combating Sun's Java on one front, it simultaneously set its sights on Netscape. In July of 1996, plaintiffs contend, Netscape enjoyed a 48% share of the browser market, compared to Microsoft's 11%. *See* Microsoft 11/11/96 "Internet Explorer Marketing Plan Review" (States' PI Ex. 26). Microsoft allegedly made it "job # 1" to remedy that disparity. *See, e.g.,* P. Maritz 6/20/96 e-mail (PI Ex. 92). But to accomplish that job, plaintiffs claim, Microsoft was unwilling to compete on the merits of Internet Explorer alone.

According to plaintiffs, Microsoft's strategy depended largely on leveraging its strong position in the operating systems market to gain a foothold in the market for browsers. Once again, plaintiffs rely heavily on contemporaneous statements of Microsoft executives to support their claims. For example, Jim Allchin, a Microsoft Senior Vice President, wrote: "I don't understand how IE is going to win. The current path is simply to copy everything that Netscape does packaging and product wise ... My conclusion is that we must leverage Windows more ... We need to advantage Windows-more specifically [Windows 98]." PI Ex. 94.

Moshe Dunie, another Microsoft Vice President, wrote in an e-mail to Mr. Gates and several other executives: "The stunning insight is this: To make [consumers] switch away from Netscape, we need to make them to upgrade [sic] to [Windows 98] ... [W]e can leverage these assets to convert the Navigator installed base and eclipse Netscape's browser market share leadership. But if we rely on IE4 alone to achieve this, we will fail." *See* M. Dunie 2/24/97 e-mail (States' PI Ex. 1). Microsoft executive Christian Wildfeuer apparently agreed: "It seems clear that it will be very hard to increase browser market share on the merits of IE 4 alone. It will be more important to leverage the [operating system] asset to make people use IE instead of Navigator." C. Wildfeuer 2/24/97 e-mail (PI Ex. 23).

Microsoft representatives met with top executives from Netscape on June 21, 1995. The parties disagree vehemently regarding the substance and purpose of that meeting. Plaintiffs allege that Microsoft proposed an illegal market allocation, with Microsoft be-

coming the sole supplier of browsers for use with Windows and with Netscape becoming the sole supplier for other PC platforms, such as Apple and UNIX. Plaintiffs contend that this proposal was consistent with a pattern of Microsoft's behavior that included similar discussions with Intel (to urge Intel not to continue to develop certain software), Apple (to persuade Apple to stop marketing its "QuickTime" media streaming software for use with Windows), and a company called Real Networks (seeking Real Network's assurances that it would get out of the base streaming media platform business and not share its technology with Microsoft's competitors).

**\*6** Plaintiffs claim that Netscape refused the market allocation offer, causing Microsoft to adopt a two-part strategy to gain market share for IE. First, it began to distribute IE free of charge. One Microsoft Vice President, Paul Maritz, allegedly told Intel Corporation executives that Microsoft intended to "cut off [Netscape's] air supply. Everything they're selling, we're going to give away for free." *See* Steve Lohr & John Markoff, *Why Microsoft is Taking a Hard Line With the Government,* N.Y. Times, Jan. 12, 1998, at D1 (PI Ex. 4).

Plaintiffs further charge that Microsoft was not content with pricing Netscape out of the market, but was also determined to cut off Netscape's means of distributing its product. According to internal Microsoft documents, consumers most often obtain their browsers from their IAPs or as preinstalled software from their OEMs; approximately 43% of all browser users obtain their software from one of those two sources.[FN7] In deposition testimony, Microsoft executives acknowledged that the ISP channel and the OEM channel are the two most important channels for distribution. *See, e.g.,* Myhrvold Dep. at 43:7-18.

> [FN7.] Twenty-five percent obtain their browser from their place of employment, 13% by "downloading" it from the Internet, and 4% at retail. *See* Microsoft 4/97 "IE Market Review" (States' PI Ex. 25).

Plaintiffs contend that Microsoft used a variety of illegal means to ensure that significant market parti-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

cipants did not distribute Netscape's browser through either the IAP or OEM channel. Microsoft allegedly accomplished its purpose by: (1) implementing an illegal tie between IE and Windows, purchased of necessity by virtually every OEM for installation on new PCs; and (2) using its control over a monopoly asset-"real estate" on the Windows desktop-to restrict IAPs and Internet Content Providers ("ICPs")[FN8] from offering their customers competing browsers.

> [FN8.] Internet Content Providers are firms such as Disney, Hollywood Online and CBS Sportsline, that provide news, entertainment, and other information from sites on the Web.

In addition to a direct assault on Netscape's major channels of distribution, plaintiffs allege, Microsoft used its monopoly power to induce major computer industry firms, including Apple and Intel, to limit or reduce their use of and support for Netscape's browser. As a result of the totality of Microsoft's efforts, plaintiffs contend, its share of the browser market increased from 3% or 4% in early 1996 to approximately 50% in early 1998.

Plaintiffs concede that Microsoft's dominance in the operating system market does not, by itself, warrant concern. There is no reason to believe that the market, left to itself, will not generate alternatives to Windows, despite the high barriers to entry. *See* Sibley Decl. ¶ 17. Historical precedent, for example, demonstrates that compact disc technology was able to overcome similar barriers in the music industry and overtake the LP as the standard medium for recording music. The antitrust laws are implicated, however, if it can be shown that Microsoft constructed *artificial* entry barriers that further restrict the naturally difficult task of providing alternatives to Microsoft's operating system.

Plaintiffs contend that Microsoft's behavior, including the bundling of its browser with Windows and the contractual restrictions on the use of competing browsers by OEMs, IAPs and ICPs, was designed to enable Microsoft to monopolize the browser market. The intended result was twofold: first, to remove the Internet browser as a software platform that can exert

competitive pressure on Microsoft's operating system monopoly; and second, to establish for Microsoft a new monopoly in the browser market. Such conduct, plaintiffs allege, violates Sections 1 and 2 of the Sherman Act.[FN9]

> [FN9.] Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 proscribes the "monopoliz[ation], or attempt[ed] monopoliz[ation], or combin[ation] or conspir[acy] ... to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

### III.

**\*7** "A tying arrangement is an 'agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from another supplier." ' *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Such arrangements are "*per se*" Section 1 violations, *i.e.,* conclusively unreasonable if proven, when the seller exploits its market power in the tying product market "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984),[FN10] and a "substantial volume of commerce in the tied market" is affected. *See Eastman Kodak,* 504 U.S. at 462; *see also Foster v. Maryland State Savs. & Loan Ass'n,* 590 F.2d 928, 931 (D.C.Cir.1978) (arrangement must affect a "not insubstantial" volume of commerce).

> [FN10.] In *Jefferson Parish,* four concurring Justices would have abandoned the *per se* rule. *Id.* at 32.

"Before an unlawful tying arrangement may properly be found, ... it must be determined that 'two separate products are in fact involved." ' *See Foster,* 590 F.2d

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

at 931 (quoting *Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 507, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)). In the typical case, whether a package consists of one or more "separate" products depends "not on the functional relation" between the components, "but rather on the character of the demand" for them. *See Jefferson Parish,* 466 U.S. at 19; *see also Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1289 (9th Cir.1983) ("Products that function together and are sold in combination may still be 'separate' if consumers would prefer to buy them individually at the price necessary to market them separately ... It is the relationship of the producer's selling decision to market demand, not the physical characteristics of the products alone, that determines the existence of legally separable products."). The critical question is whether the bundle consists of products which are "distinguishable in the eyes of buyers." *Jefferson Parish,* 466 U.S. at 19. Courts generally find two products to exist if there is "sufficient consumer demand so that it is efficient for a firm to provide" them separately, *Eastman Kodak,* 504 U.S. at 462, even if the products are "functionally linked" so that one is "useless without the other." *Id.* (quoting *Jefferson Parish,* 466 U.S. at 19 n. 30).

Microsoft argues that *Jefferson Parish* 's "demand" test does not apply to cases involving physically integrated products or questions of product design. Microsoft distinguishes *Jefferson Parish* on the ground that it dealt not with an integrated *product,* but with a "functionally integrated package of *services.*" *See Jefferson Parish,* 466 U.S. at 19 (emphasis supplied). Similarly, *Eastman Kodak* dealt with the question of whether replacement parts and *service* for Kodak's photocopiers were separate products. *See Eastman Kodak,* 504 U.S. at 459.

**\*8** Microsoft advances a theory that courts considering tying claims involving physically integrated products or questions of product design-like the Windows 98/IE combination-have applied a much more deferential standard. Such "technological tying" claims, Microsoft contends, can succeed only if plaintiffs prove that the challenged combination was carried out *solely* for the purpose of tying two separate products together "rather than to achieve some

technologically beneficial result." *See Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1330 (5th Cir.1976). Any other rule, Microsoft argues, "would enmesh the courts with technical and uncertain inquiry into the technological justifiability of functional integration and cast unfortunate doubt on the legality of product innovations in serious detriment to the industry and without any legitimate antitrust purpose." *See Telex Corp. v. IBM,* 367 F.Supp. 258, 347 (N.D.Okla.1973), *rev'd on other grounds,* 510 F.2d 894 (10th Cir.1975).

Microsoft's argument has its genesis in a body of case law addressing claims that, in the 1960s and 1970s, IBM illegally tied the central processing unit of its computers to various peripheral devices, such as disk drives. The peripheral devices and the CPUs were originally manufactured and sold separately and connected to each other with cables. As IBM developed new technologies with more compact circuitry, it was able to place many devices in one box along with the CPU, and to sell the combination as one unit. Naturally, the effect was to injure small manufacturers who were in the business of producing the peripheral devices.

Courts generally concluded that IBM's integrations did not amount to illegal tying, holding that "where a court is dealing with what is physically and in fact a single product," the antitrust laws do "not contemplate judicial dissection of that product into parts and the reconstitution of these parts into a tying agreement." *See Telex,* 367 F.Supp. at 347 (denying claim that IBM's "integration of additional memory and control functions" into its CPUs constituted unlawful tying, even though the court found IBM to be a monopolist, and that there was evidence that IBM's actions "were designed to help stem the growth of its plug compatible competition"); *see also Innovation Data Processing, Inc. v. IBM,* 585 F.Supp. 1470, 1476 (D.N.J.1984) (integration of "dump-restore" utility into mainframe operating system held to be "a lawful package of technologically interrelated components"); *ILC Peripherals Leasing Corp. v. IBM,* 448 F.Supp. 228 (N.D.Cal.1978) (disk drive and head/disk assembly ("HDA") combination lawful), *aff'd per curiam sub nom., Memorex Corp. v. IBM,* 636 F.2d 1188 (9th Cir.1980). So long as the evid-

ence demonstrated that the challenged integration "represented technological advancements," the courts generally held that IBM's decision to integrate additional functionality into its CPUs could not "be fairly regarded as predatory within the contemplation of antitrust policy." *Telex,* 367 F.Supp. at 342.

**\*9** In a more recent case, the Ninth Circuit considered a tying challenge to Kodak's decision to simultaneously introduce its "110 Instamatic" camera, a new film and developing process, and the equipment necessary to process the new film. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534 (9th Cir.1983). One of Kodak's competitors in the photofinishing business alleged an unlawful tying arrangement because "the 110 system was incompatible with then existing photographic products and photofinishing equipment." *Id.* at 544. The Ninth Circuit rejected the claim, "even if ... effective use of any one of the new products necessitates purchase of some or all of the others." *Id.* at 543. "Any other conclusion," the court reasoned, "would unjustifiably deter the development and introduction of those new technologies so essential to the continued progress of our economy." *Id.*

In the *IBM* cases, plaintiffs unsuccessfully challenged IBM's right to *bundle* two technologically related products. The allegations in the present case differ from the IBM allegations in one critical respect: plaintiffs allege that Microsoft did not just bundle IE into Windows 98, but took the further step of *contractually* prohibiting OEMs from *unbundling* the two (assuming that IE could be "unbundled" from the operating system, a disputed issue of fact). [FN11] In contrast, in the *Telex* case, there was no *forced* tie of memory and control functions. The integration was "wholly optional," 367 F.Supp. at 347, and IBM continued to offer the two products separately. *Id.* Similarly, in *Innovation Data Processing,* IBM continued to license the utility program and the operating system separately as well as together, at the user's option. 585 F.Supp. at 1475. [FN12] And *Foremost Pro Color* did not involve the bundling of products at all, but rather Kodak's development of new technological formats that rendered competitors' complements incompatible. "The *development and introduction* " of those formats, *"standing alone"* (without any con-

tractual requirement that users take the products together) was deemed not to amount to tying. *See Foremost Pro Color,* 703 F.2d at 542 (emphasis supplied). [FN13]

FN11. Plaintiffs rely on the Declaration of Edward W. Felten, Assistant Professor of Computer Science at Princeton University, for the proposition that Web browsing functionality can be removed from Windows 98 without damaging the underlying operating system. Whether Dr. Felten's "mechanism," *see* Felten Decl. ¶ 7, actually removes the "browser," or merely removes code that "look[s] more like a key to opening IE than anything that could plausibly be considered IE itself." *Microsoft,* 147 F.3d at 952 n. 17, remains to be seen.

FN12. That court went on to state that, even had IBM not offered the products separately, there would be no unlawful tie because the items were part of a single product. *Innovation Data Processing,* 585 F.Supp. at 1476. Following *Jefferson Parish,* however, the court revisited its decision, emphasizing that the basis for its original decision was the finding of no coercion, and declining to reach the "separate product" question. *See Innovation Data Processing v. IBM,* 603 F.Supp. 646, 648-49 (D.N.J.1984).

FN13. Plaintiffs also distinguish the *ILC* case. There, the court found that the drive unit and head/disk assembly were a single product because: they were designed to be and would be used as a unit; the aggregation offered dramatically larger online storage capacity; the aggregation satisfied a recognized customer need; the aggregation resulted in cost savings that were passed on, at least in part, to end users; the drive unit and head/drive assembly were normally used in fixed proportions; and the practice of other industry participants was to sell the integrated product at a single price. *See ILC,* 448 F.Supp. at 232-34. In contrast, plaintiffs contend, operating systems and browsers are

not used in fixed proportions. Despite the D.C. Circuit's assumption to the contrary, *see Microsoft,* 147 F.3d at 948, plaintiffs contend that some users prefer to use as many as three separate browsers while others prefer none at all. Furthermore, plaintiffs argue, not all sellers bundle the products together; no consumer savings have been shown to result from the bundling; and not even Microsoft claims that the benefits of bundling Windows and IE are "dramatic."

Unlike the *IBM* plaintiffs, neither the U.S. nor the States challenges Microsoft's right to bundle IE and Windows. Instead, they challenge the contractual prohibitions against unbundling, and Microsoft's refusal to offer what plaintiffs allege are two products separately. The cases Microsoft cites in opposition are not inconsistent with the teaching of *Jefferson Parish* and *Eastman Kodak* that it is for the *market* (and not Microsoft) to determine whether the bundling is desirable. *See also Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 287 (2d Cir.1979) ("[N]o one can determine with any reasonable assurance whether one product is 'superior' to another. The only question that can be answered is whether there is sufficient demand for a particular product to make its production worthwhile, and the response, so long as the free choice of consumers is preserved, can only be inferred from the reaction of the market."). The market can make that determination only if two bundled products are also offered in their unbundled form, as they were in the *IBM* cases.

**\*10** In short, this Court is not convinced that either the *IBM* cases or *Foremost Pro Color* dictate that Microsoft's licensing practices should be evaluated by a more lenient standard than the one articulated by the Supreme Court in *Jefferson Parish* and *Eastman Kodak,* simply because the case involves "physically integrated products or questions of product design," as Microsoft puts it.[FN14] Despite the Court's misgivings, however, the D.C. Circuit clearly appears to have adopted Microsoft's proposed "technological tying" standard in reversing this Court's Order preliminarily enjoining Microsoft from requiring OEMs to take IE as a condition of licensing Windows 95. *See United States v. Microsoft Corp.,* 147 F.3d 935

(D.C.Cir.1998) ( "*Microsoft* "), *rev'g United States v. Microsoft Corp.,* 980 F.Supp. 537 (D.D.C.1997). While that decision was ostensibly limited to interpreting specific terms of the Consent Decree, *see Microsoft,* 147 F.3d at 950 n. 14, the analysis was, in the Court of Appeals' eyes, "consistent with tying law." *Id.* at 950.

> FN14. In fact, in *Jefferson Parish,* the Supreme Court implicitly rejected Microsoft's argument that the Court's analysis was limited to integrated packages of *services. See Jefferson Parish,* 466 U.S. at 19 n. 30 ("We have often found arrangements involving functionally linked *products* at least one of which is useless without the other to be prohibited tying devices.") (emphasis supplied ) (citing, *e.g., Mercoid Corp. v. Mid-Continent Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944) (heating system and stoker switch); *Morton Salt Co. v. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) (salt machine and salt); *Leitch Mfg. Co. v. Barber Co.,* 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938) (process patent and material used in the patented process); *International Business Machines Corp. v. United States,* 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (computer and computer punch cards); *Carbice Corp. v. American Patents Corp.,* 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931) (ice cream transportation package and coolant); *FTC v. Sinclair Refining Co.,* 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923) (gasoline and underground tanks and pumps); *United Shoe Mach. Co. v. United States,* 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1921) (shoe machinery and supplies, maintenance, and peripheral machinery), *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 558-60 (E.D.Pa.1960) (components of television antennas), *aff'd,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (*per curiam* )).

In cases challenging technical integrations, the Court of Appeals wrote, the ultimate issue is whether the "integrated design offers benefits when compared to

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

a purchaser's combination of corresponding stand-alone functionalities." *Id.* at 949. Noting what it views as the "limited competence of courts to evaluate high-tech product designs and the high cost of error" in making such evaluations, the Court of Appeals cautioned that courts should be "wary of second-guessing the claimed benefits of a particular design decision ." *Id.* at 950 n. 13. Courts should reject any challenge to an integrated product design, the court opined, if there is "a plausible claim" that the integration "brings some advantage." *Id.* at 950.

The Court of Appeals went on to articulate a framework for determining whether an integration amounts to a single product for purposes of evaluating a tying claim. "[I]ntegration may be considered genuine if it is beneficial when compared to a purchaser combination." *Id.* at 949. And "in making this inquiry," a court should not "embark on [a] product design assessment," *id.,* but rather, "[a] court's evaluation of a claim of integration must be narrow and deferential." *Id.* at 949-50. An integrated product should pass muster if there are "facially plausible benefits to its integrated design." *Id.* at 950. The court noted, however, that manufacturers should not be permitted "to metaphorically 'bolt' two products together," *i.e.,* place two separate products in a single package "for an anticompetitive purpose (or for no purpose at all)." *Id.* at 949 & n. 12; *see also* X Phillip E. Areeda *et al., Antitrust Law* ¶ 1746b, at 227 (1996) ("The main test is whether the items operate better when bundled by the defendant than when linked by the end user.").

The Court of Appeals expressed its "tentative" view, *id.* at 953, that the Windows 95/IE combination amounted to a "genuine" integration, but expressly left to a more fully developed factual record the final determination of whether Microsoft's claims of "technological benefits" could be substantiated. *Id.* at 951 n. 15, 952. Because numerous issues of material fact remain in dispute as the record presently stands, the Court will deny Microsoft's motion for summary judgment on the tying claims.

**\*11** Microsoft argues that the Windows/IE integration offers users a myriad of benefits. It asserts, for example, that the integrated design allows users to move "seamlessly" from a Web site to a floppy disk

to a CD-ROM to a local area network with a single mouse click, thus making computers easier for consumers to use. But plaintiffs contend that "a comparable browsing experience can be achieved by the combination of Windows 98 and a competing browser." Sibley Decl. ¶ 35.

Microsoft also claims that "IE technologies" in Windows not only permit access to the Internet, but also provide numerous "system services" that are "not directly related to Web browsing" that "enhanc[e] the functionality of a wide variety of applications." *See Microsoft,* 147 F.3d at 951. Because that functionality resides on the operating system, ISVs are freed from the need to develop and include it as part of their products. In response, plaintiffs contend that "the ability to browse the web using IE can be removed and replaced with a competing browser in such a way that the consistency of the Windows platform for ISVs would not be frustrated in any appreciable manner." Sibley Decl. ¶ 34.

Microsoft also asserts that IE technologies perform numerous functions in Windows that are totally "unrelated to Web browsing." *Microsoft,* 147 F.3d at 951. For example, IE technologies supply a new user interface in Windows that adopts the navigational paradigms of the Web, including "back" and "forward" buttons, lists of "favorite" sources of information and a "history" of recently-accessed information. Microsoft also claims that IE technologies are essential to the Windows 98 "Help" system, which requires an HTML "interpreter" to display the content of "Help" files and to provide easy user access from "Help" to updated on-line resources. Furthermore, Microsoft asserts, IE technologies in Windows 98:(1) provide support for multiple video monitors; (2) invoke a "Disk Cleanup Wizard" to free up hard disk space by deleting unnecessary files; and (3) invoke a Windows Update feature that permits users to download Windows updates from a Microsoft Web site. Whether or not those functions actually rely on technology provided by the browser, and whether they could be just as efficiently provided by a competing browser, is unclear on the record as it presently stands.

In any event, whether or not the "integration brings

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

benefits does not," the Court of Appeals made clear, "end the inquiry." *Microsoft*, 147 F.3d at 951. "It is also necessary that there be some reason Microsoft, rather than the OEMs or end users, must bring the functionalities together." *Id.* (citing X Phillip E. Areeda *et al., Antitrust Law* ¶ 1746b, at 227; ¶ 1747, at 229 (1996)). Without the benefit of a factual record that this Court had expected the special master to develop, the D.C. Circuit expressed its preliminary belief that "if Microsoft presented [OEMs] with an operating system and a stand-alone browser application, rather than with the interpenetrating design of Windows 95 and IE 4, the OEMs could *not* combine them in the way in which Microsoft has integrated IE 4 into Windows 95." *Microsoft*, 147 F.3d at 952 (emphasis supplied). That conclusion applies even more forcefully to Windows 98, Microsoft argues, where IE technologies are even more deeply integrated into the OS. Whether it is so remains to be seen.

**\*12** Plaintiffs disagree. While they concede that IE provides "a small number of Internet-oriented updates that are not available through the installation of Internet Explorer, as distributed separately from the operating system," *see* Mem. of the U.S. in Supp. of Mot. for Prelim. Inj. at 43 n. 41, plaintiffs nevertheless contend that "the browsing functionality in Windows 98 is almost entirely equivalent to that provided when Internet Explorer 4.01 is installed on top of Windows 95." *Id.* (citing C. Jones (Microsoft) Dep. at 34:2-8).

To summarize, the Court cannot determine whether Windows and IE are "separate products" until it becomes clear what are the synergistic benefits that are *unique* to the Windows/IE combination, *i.e.,* benefits that could not be obtained by combining another browser with Windows. Moreover, it is unclear exactly how the integration is more beneficial when compared to a combination effected by an OEM or an ultimate consumer. Finally, the Court must determine whether Microsoft "metaphorically 'bolt[ed]' two products together," "for an anticompetitive purpose (or for no purpose at all)." *See Microsoft*, 147 F.3d at 949 & n. 12. Plaintiffs cite Microsoft documents describing the bundling as motivated by a desire to thwart browser competition and to "weld" the products together to achieve that goal. *See, e.g.,* B.

Veghte 2/8/97 e-mail (SJ Opp'n Ex. 19).

To succeed on their tying claims, however, plaintiffs must do more than prove that Windows and IE are separate products. They must also show that Windows (the alleged tying product) is conditioned on the purchase of IE, and that the conditioning affects a "substantial volume of commerce" in the browser market. *See Eastman Kodak*, 504 U.S. at 462; *Foster*, 590 F.2d at 931. Microsoft contends that neither of those elements can be proved.

In order to prove the requisite "conditioning," plaintiffs must prove that licensees "might have preferred" not to license a browser, or to license it "elsewhere on different terms," *Jefferson Parish*, 466 U.S. at 12, and that Microsoft "coerces the abdication of [licensees'] independent judgment" as to the relative merits of competing browsers. *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *see also Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 684 (4th Cir.1992) ("The purpose of the inquiry into consumer demand is to determine whether there are customers who would, absent an illegal agreement, purchase the tied product without the tying product, and the tying product without the tied product."). Plaintiffs allege that Microsoft's goal was to "*make* people use IE instead of Navigator" by "leverag[ing] the [operating system]." *See* C. Wildfeuer 2/24/97 e-mail (emphasis supplied) (PI Ex. 23).

Microsoft argues that plaintiffs cannot satisfy the "conditioning" requirement of the tying test, because no OEM has been forced to *purchase* a separate product; IE technologies are included in a *single royalty* paid by OEMs for Windows 98. But as Professor Areeda has pointed out, "the tie may be obvious, as in the classic form, or somewhat more subtle, as when a machine is sold or leased at a price that covers 'free' servicing." *See* IIIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 760b6, at 51 (1996). Whether Microsoft invoices OEMs separately for Windows and IE or collects a single royalty of the same amount, it compels OEMs to take (and, one way or the other, to pay for) the entire package of software.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

**\*13** Microsoft also disputes plaintiffs' claims that the Windows/IE combination affects a not insubstantial amount of commerce in the browser market. It argues that neither the design of Windows 98 nor the Windows licensing agreements appreciably impacts Netscape's ability to distribute its browser. OEMs are free to preinstall Netscape Navigator as an add-on (so long as they do not disturb IE) and several leading OEMs apparently do so.

But plaintiffs maintain that while OEMs may preinstall Netscape's browser (leaving IE itself in place, with no other icons or folders larger than IE's), the reality is that many OEMs hesitate to do so, mainly because they believe that too many icons and layers cause customer confusion, which could increase product support costs. OEMs bear the burden of providing technical support for the software they preinstall, a fact that creates a disincentive for preinstalling duplicative titles in a single product category. Furthermore, preinstalling two browsers would double the necessary product testing for OEMs. In fact, Microsoft has actually cited these factors itself to dissuade some OEMs from loading a second browser on their computers. *See* J. Kempin 10/2/97 Dep at 37. And Joachim Kempin, Microsoft's Senior Vice President of OEM Sales, agrees that OEMs "should be" concerned about installing two browsers on their machines. *See id.* at 31.

The volume of foreclosed commerce necessary to satisfy the tying standard need only be "substantial enough in terms of dollar-volume so as not to be merely *de minimis.*" *Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 501, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) ($190,000 not an insubstantial amount, even though only a very small percentage of the market); *see also Digidyne Corp. v. Data General Corp.,* 734 F.2d 1336, 1341, 1347 (9th Cir.1984) (citing *Fortner* ). While plaintiffs do not cite a dollar value or a percentage of the market that is allegedly foreclosed, the facts are sufficiently in dispute to at least raise a genuine issue for trial. Furthermore, where, as here, products in the tied product market (browsers) are potential "partial substitutes" for the tying product, antitrust concerns are heightened because tying agreements not only reduce competition in the tied market, but also reinforce market power in

the tying market. *See* X Phillip E. Areeda *et al., Antitrust Law* ¶ 1747 a-c, at 230-33 (1996); *see also Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 795 (1st Cir.1988).

### IV.

As Microsoft recognizes in its own internal communications, consumers are likely to select whatever Internet services (including browsers and IAPs) they see the first time they turn on their PC, *see, e.g.,* M. Dunie 2/24/97 e-mail ("[O]nce everything is in the OS and right there, integrated into the OS ... there would be no more need to use something 'separate.' ') (States' PI Ex. 1), and are unlikely to go through the trouble of switching. *See, e.g.,* B. Chase 4/4/96 Planning Memo ("We know that it is very hard and expensive to make people switch") (States' PI Ex. 2).

**\*14** Plaintiffs allege that, in addition to "tying" IE to Windows, Microsoft sought to control the OEM channel of browser distribution by restricting OEMs' ability to alter the Windows "boot-up" sequence.FN15 After the machine boots up, the user sees a default or "first" screen. The boot-up and first screen present a convenient opportunity for vendors of software and services to address potential customers, providing them with information about and access to their products, and for OEMs to communicate with their customers about configuration settings.

> FN15. The "boot-up" sequence is the installation and configuration routine a PC goes through when a user turns it on.

When Windows 95 was first released, a number of OEMs who preinstalled Windows 95 customized the content and configurations of the computers' boot-up and first screens for various commercial reasons. Some OEMs altered the arrangement, number and content of icons and folders which accessed IAPs, Internet browsers and other software through the Windows 95 desktop. These OEMs struck deals with IAPs and ICPs that earned revenue for OEMs and garnered customers for the IAPs and ICPs. In an internal e-mail, Bill Gates wrote of his concern that OEMs were bundling non-Microsoft browsers and "coming up with offerings together with Internet Ser-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

vice providers that get displayed on their machines in a FAR more prominent way than ... our Internet browser" and that those offerings were interfering with the "very very important goal" of "[w]inning Internet browser share." B. Gates 1/5/96 e-mail (PI Ex. 45) (emphasis in original).

Allegedly to address this concern, Microsoft, as a condition of licensing Windows 98, began prohibiting OEMs from adding to the sequence of screens every user sees in the boot-up sequence and from modifying the first screen displayed to the user at the conclusion of the boot-up sequence.[FN16] OEMs could not remove folders or icons from the Windows desktop, create icons or folders larger than those placed by Microsoft on the desktop, and could not alter the boot-up sequence by, for instance, presenting an OEM-created screen that would highlight a choice of Internet browsers or the OEM's own Internet offerings. Plaintiffs contend that the boot and start-up screen restrictions amount to an unreasonable restraint of trade in violation of § 1.

> FN16. Several OEMs, including Micron, Hewlett Packard, and Gateway, have requested that Microsoft allow them to provide new PC purchasers with an alternative boot-up sequence or first screen, but Microsoft has refused.

The restrictions are subject to a "rule of reason" analysis, and are unlawful only if they injure competition by restricting competitors' output more than they further Microsoft's legitimate objectives, *see, e.g., National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *American Ad Management, Inc. v.. GTE Corp.,* 92 F.3d 781, 791 (9th Cir.1996), or if Microsoft's objectives could be achieved by a less restrictive means, *see Sullivan v. NFL,* 34 F.3d 1091, 1103 (1st Cir.1994).

Microsoft argues that its OEM license agreements merely highlight and expressly state the rights that Microsoft already enjoys under federal copyright law. Consequently, it contends, the agreements are not subject to challenge under the antitrust laws. According to Microsoft, the license agreements merely re-

quire that the very first time a consumer turns on his new computer, Microsoft's copyrighted operating system be allowed to go through its initial startup sequence as designed, developed and tested by Microsoft and to display the Windows "desktop" screen without any aspects of that screen having been altered by the OEM.

**\*15** Microsoft argues that it "may refrain from vending or licensing and content [itself] with simply exercising the right to exclude others from using [its intellectual] property." *See Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932). But whatever copyright protection Microsoft enjoys in its software is not unlimited. For example, copyright in a computer program does not extend to its functional aspects. *See, e.g., Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807 (1st Cir.1995), *aff'd by an equally divided Court,* 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996). It does not preclude design choices dictated by necessity, cost, convenience or consumer demand. *See, e.g., Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir.1994) (user interface of computer program entitled to only limited protection against "virtually identical" copying, because of license and because of limited number of different ways the underlying idea can be expressed); *Computer Assocs. Int'l v. Altai,* 982 F.2d 693, 715 (2d Cir.1992) (significant portions of structure, sequence, and organization of program may be copied in order to write similar program to run on different platform). And it does not render inviolate portions of the program that are not original to its creator. *See Stenograph L.L.C. v. Bossard Assocs., Inc.,* 144 F.3d 96, 99 (D.C.Cir.1998).

Furthermore, copyright law does not give Microsoft blanket authority to license (or refuse to license) its intellectual property as it sees fit. A copyright does not give its holder immunity from laws of general applicability, including the antitrust laws. *See Data General Corp. v. Grumman Sys. Supp. Corp.,* 36 F.3d 1147, 1185 n. 63 (1st Cir.1994) ("It is in any event well settled that concerted and contractual behavior that threatens competition is not immune from antitrust inquiry simply because it involves the exercise of copyright privileges."). Copyright holders are restricted in their ability to extend their control to other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

markets. *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next.") (internal citation and quotation marks omitted). They may not prevent the development and use of interoperable programs by competitors. *See, e.g., DSC Communications Corp. v. DGI Techs. Inc.,* 81 F.3d 597, 601 (5th Cir.1996) (likely copyright misuse to use copyright in a computer program operating a telephone switch to prevent a competitor from designing and testing a compatible switch using copyright holder's protocol). Antitrust liability may also attach to other anticompetitive licensing restrictions involving copyrighted works. *See, e.g., Practice Management Info. Corp. v. American Med. Ass'n,* 121 F.3d 516, 520-21 (9th Cir.1997) (finding copyright misuse where copyright owner entered into license agreements restricting licensees from competing with it), *amended by,* 133 F.3d 1140 (9th Cir.), *cert. denied,* 524 U.S. 952, 118 S.Ct. 2367, 141L.Ed.2d 736 (1998); *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970 (4th Cir.1990) (same).

**\*16** In addition to claiming a right to "exclude" licensees as it sees fit, Microsoft cites the Second Circuit's opinion in *Gilliam v. ABC,* 538 F.2d 14 (2d Cir.1976), recognizing a copyright holder's "moral right of integrity" where a copyrighted work was significantly changed, or "mutilated," but still promoted under its original name. But the *Gilliam* court acknowledged the lack of statutory or doctrinal support in copyright law for the right it recognized, *see Gilliam,* 538 F.2d at 24, and ultimately grounded its decision in trademark law. *Id.* at 24-25. Several subsequent decisions considering *Gilliam* have declined to endorse the "moral right"argument Microsoft advances. *See, e.g., Halicki v. United Artists Communications, Inc.,* 812 F.2d 1213, 1214 (9th Cir.1987); *Weinstein v. University of Illinois,* 811 F.2d 1091, 1095 n. 3 (7th Cir.1987); *Paramount Pictures Corp. v. Video Broad. Sys, Inc.,* 724 F.Supp. 808, 820 (D.Kan.1989).

Moreover, whatever policy justifications that may ex-

ist for a moral right of integrity in works of art are substantially weaker when the work at issue is a computer program, whose value lies in its functionality, not its artistry. The Copyright Act itself expressly allows owners of a copy of a computer program to "adapt" it in certain circumstances without the copyright owner's permission. *See* 17 U.S.C. § 117; *see also Aymes v. Bonelli,* 47 F.3d 23 (2d Cir.1995). Although Microsoft undoubtedly enjoys some "right against mutilation" in its software, there are significant factual questions in dispute on this issue, chief among them the extent of copyright protection in the *specific* portions of the software plaintiffs seek to modify.

Microsoft also claims that the boot and start-up screen restrictions are justified by legitimate business reasons, each of which is disputed by plaintiffs. For example, the restrictions purportedly ensure a "stable and consistent platform" for ISVs who must know that the software code that provides required system services ("APIs") will be present on every computer. In response, plaintiffs contend that the necessary APIs would be unaffected by alterations to the Windows boot-up sequence, modifications to the contents of desktop folders, or creation of icons of different shapes and sizes.

Microsoft also insists that the restrictions are necessary to ensure a "consistent user experience across multiple brands of computers." But plaintiffs point out that Microsoft permits OEM modifications that do not affect the browser, even though such modifications may result in an "inconsistent user experience." For example, Microsoft grants exceptions to the screen restrictions for some OEM tutorials and "system check" applications. *See* J. Kempin (Microsoft) 3/18/98 Dep., 58:24-59:25. It permits some OEMs to display their own ISP sign-up software before the Windows 98 boot-process is completed for the first time, and permits OEMs to preload the software of their choice, subject to Microsoft's license restrictions. *Removal* by OEMs of the IE icon would not, plaintiffs argue, affect the overall "look and feel" of Windows any more than *adding* various software (which Microsoft permits). Similarly, the "look and feel" would not be affected by permitting OEMs to install icons of different sizes, plaintiffs

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

Page 15

Case 1:06-cv-02084-RWR    Document 37-4    Filed 05/21/2007    Page 38 of 53

contend.

**\*17** Finally, Microsoft claims that the restrictions are necessary to "preserve Microsoft's reputation as a supplier of quality operating system software and enhance[ ] the value of Microsoft's brand name." *See Gilliam,* 538 F.2d at 18-19 (reputational injury resulting from unauthorized alteration of copyrighted work is irreparable). But plaintiffs argue that this "quality control" defense is implausible. Microsoft requires OEMs to bear the cost of providing post-sale software support for the computers they sell. Accordingly, OEMs are unlikely to take any action that will do anything to increase the likelihood that customers will call them for technical assistance.

Regardless of the viability of its justifications for the agreements, Microsoft contends that there is no antitrust violation because there is no market foreclosure. OEMs are free to configure the computers so that on all *subsequent* occasions (after the initial boot) they will boot directly into an alternative "shell" (such as Netscape Communicator). But several OEMs (and Microsoft executives) have expressed their belief that, while the licenses technically allow OEMs to engineer a mechanism for "user-initiated" action after the first boot-up is complete to alter the Microsoft-required screens, these factors are of negligible value to OEMs. It is both costly and time-consuming for OEMs to develop such a mechanism, plaintiffs contend. *See* B. Chase (Microsoft) 3/1/96 e-mail ("most OEMs won't go through the hassle to develop such a DOS utility") (PI Ex. 43); J. Kempin (Microsoft) 3/18/98 Dep., 62:2-63:10; R. Brownrigg (Gateway 2000) Dep., 49:15-51:2; F. Santos (Hewlett-Packard) Dep., 29:11-30:15.

Numerous issues remain genuinely in dispute on the boot and start-up screen claim. These include the extent of copyright protection in the *specific* portions of software plaintiffs seek to modify and whether Microsoft abused its copyright for anticompetitive purposes. Plaintiffs also contest the legitimacy of Microsoft's claimed business justifications and Microsoft's claims that the restrictions do not foreclose competitors' opportunities.

V

Since May 1995, plaintiffs allege, Microsoft has substantially foreclosed non-Microsoft browsers from the IAP and ICP distribution channels by relying on its operating system monopoly to coerce IAPs and ICPs into entering into what amount to "exclusive dealing" arrangements. Plaintiffs claim that, in return for placement on Microsoft's coveted Windows desktop the content of which Microsoft controls by virtue of the boot and start-up screen restrictions), providers reluctantly agreed to distribute and promote IE and *not* to distribute and/or promote competitive browsers.

For example, plaintiffs assert, Microsoft reached agreements with the largest OLSs, including America Online, CompuServe, and Prodigy, by which Microsoft undertook to include an icon for the OLSs' client software both in the "Online Services" folder FN17 that is displayed on the Windows desktop, and in the Windows "Start" menu. Pursuant to the agreements, Microsoft must also invest in the support and development of improved versions of the OLSs' client software. In return, the OLSs agree to: (1) distribute and promote IE to their subscribers as the "exclusive" or "primary" browser, and not to distribute a non-Microsoft browser unless a customer specifically requests it; (2) eliminate links on their Web sites from which their subscribers could download a competing browser; (3) refrain from "expressing or implying" to their subscribers that a competing browser is available (and even from displaying a logo for a non-Microsoft browser on the OLS's home page or elsewhere); (4) limit the percentage of competing browsers they distribute to 15%, even in response to specific requests from customers; and (5) design their Web sites using Microsoft-specific, proprietary programming extensions so that those sites look better when viewed with IE than when viewed through a competing browser.

> FN17. This folder contains the icons of the various providers. When the user "double-clicks" the icon, he is connected to the provider and permitted to "sign up" for the provider's service.

**\*18** A number of ISPs agreed to similar terms in return for Microsoft's agreement to include them in a

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261

**(Cite as: Not Reported in F.Supp.2d)**

list of providers that are shown to an end-user who selects his Internet access provider using a Windows 98 feature called the Internet Connection Wizard ("ICW"). When a user elects to use the ICW, Windows dials into a computer maintained by Microsoft that transmits to the user a list of participating ISPs. If the user decides to sign up for an ISP's service, Windows connects him to a computer maintained by that ISP, and the user's computer is automatically configured to work properly with the Internet connection provided by that ISP. In return, ISPs pay Microsoft a referral fee for each customer referred to them through the ICW and agree to terms similar to those in the OLS agreements.

The third group of providers entering into such agreements with Microsoft were ICPs. One of IE 4.0's new features is the provision of "channels" that appear on the right side of the Windows desktop screen after IE 4.0 is installed. Channel buttons are icons on the Windows desktop screen that, when clicked, lead the user directly to a particular content provider's Web site or service, [FN8] without having to sign on to the Internet through some intermediary step. In order to gain prominent "channel placement," certain ICPs agreed: (1) not to compensate the manufacturer of an "other browser" [FN19] (including by distributing its browser) for the distribution, marketing, or promotion of the ICP's content; (2) not to promote any browser produced by any manufacturer of an "other browser"; (3) not to allow any manufacturer of an "other browser" to promote and highlight the ICP's channel content on or for its browsers; and (4) to design its Web sites using Microsoft-specific, proprietary programming extensions so that those sites look better when viewed with IE than when viewed through a competing browser.

> FN18. Examples include The Disney Channel and a channel, developed by Intuit, providing financial software and services.

> FN19. For purposes of the ICP agreements, "other browsers" include the top two browsers (exclusive of IE) by browser share.

Plaintiffs contend that providers sometimes agreed to Microsoft's terms despite their preference not to be locked into exclusive browser distribution agreements. CompuServe, the nation's second-largest OLS, for example, expressed its preference "to have flexibility in software" that it distributes. *See* K. Knott Dep. at 25:4-5. An MCI executive testified that his company would have liked to "have had the flexibility to be able to promote other browsers should there be a marketing advantage to do so." *See* S. Von Rump (MCI) Dep. at 11:15-17. And AT & T told Microsoft that it wanted to remain "browser neutral," and that the "level of exclusivity" demanded by Microsoft was problematic for AT & T's partnership with Netscape. *See* D. Steele (Microsoft) 3/14/96 e-mail (PI Ex. 58); B. Silverberg Dep., 170:21-171:5. Nevertheless, plaintiffs contend, these providers acceded to Microsoft's restrictions in order to gain access to the nearly ubiquitous Windows desktop. For example, Microsoft allegedly told AT & T during negotiations: "You want to be part of the Windows box, you're going to have to do something special for us ... If you want that preferential treatment from us ... we're going to want something very extraordinary from you." *See* B. Silverberg Dep. at 159:10-16.

**\*19** Exclusive dealing arrangements pose two related, but distinct antitrust concerns. First, they threaten to eliminate opportunities for products unable to find ample other outlets to the marketplace. Second, they raise the barriers to entry in a market because, in order to enter, producers will have to be vertically integrated (*i .e.,* they will have to operate at both the manufacturing and retailing levels).

Recognizing potentially pro-competitive rationales for such agreements, *see, e.g., Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir.1997)* ("well-recognized economic benefits to exclusive dealing arrangements"), *petition for cert. filed,* 66 U.S.L.W. 3750 (U.S. May 11, 1998) (No. 97-1828), courts are obliged to apply a "rule of reason" analysis. *See, e.g., Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 393 (7th Cir.1984)* (rule of reason must be applied to exclusive dealing). As a threshold matter, courts generally determine whether a "substantial share of the relevant market" is foreclosed. *See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328-29, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).* Once foreclosure of a sufficient percentage is found, courts

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

consider the agreements' *actual* impact on competition (as opposed to merely the foreclosed market share), *see* Tampa Elec., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580; *see also* Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 478-79 (7th Cir.1988); *Interface Group v. Massachusetts Port Auth. ., 816 F.2d 9, 11-12 (1st Cir.1987)*, and any procompetitive justifications that may outweigh anticompetitive effects.

In considering the degree of foreclosure, it is important to remember that the relevant figure is the share of the browser market that is *foreclosed* by the challenged agreements, and *not* Microsoft's total browser share. Plaintiffs do not need to show that Microsoft's competitors are *completely* excluded from the marketplace. *Cf. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)* (competitor never contended that the joint marketing program at issue was essential to its survival, but rather that it impeded its marketing efforts). Nevertheless, plaintiffs must establish foreclosure on the order of greater than 40% to prevail on their exclusive dealing claims. *See, e.g., United States v. Dairymen, Inc., 758 F.2d 654 (6th Cir.1985)* (unpublished) (50% sufficient); *Sewell Plastics, Inc. v. Coca-Cola Co., 720 F.Supp. 1196, 1212-14 (W.D.N.C.1989)* (40% insufficient); *Oltz v. St. Peter's Community Hosp., 656 F.Supp. 760 (D.Mont.1987)* (84% sufficient). Plaintiffs must also establish the extent to which exclusive dealing contracts are imposed on *other* resellers in the market. *See Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co., 810 F.2d 1289, 1295 (4th Cir.1987)* (j .n.o.v. for defendant where plaintiff failed to show extent to which exclusive dealing was used in the market as a whole).

Without citing a specific percentage of the market that is allegedly foreclosed, plaintiffs allege that Microsoft has entered into agreements with the "largest and most important" ISPs and OLSs and the "largest and most popular" ICPs. The OLSs in Microsoft's Online Services folder include America Online, CompuServe, Prodigy, AT & T WorldNet and Microsoft Network, which, according to plaintiffs, collectively account for over 53% of the total North American subscriber base for Internet access. *See* Mi-

crosoft 1/23/98 Internet Customer Unit FY '98 Mid-Year Review (SJ Opp'n Ex. 26). In 1997, Microsoft estimated that 43% of home users access the Internet through AOL alone. *See* Microsoft April 1997 IE Market Review (PI Ex. 54). And one Microsoft executive has estimated Internet Explorer's share of usage among AOL subscribers as 92%. *See* C. Myhrvold 1/13/98 e-mail (SJ Opp'n Ex. 80).

**\*20** Plaintiffs contend that Microsoft's conduct, *in the aggregate, see* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (courts should consider cumulative effects in assessing likelihood of anticompetitive harm); City of Anaheim v. Southern Cal. Edison Co., 955 F.2d 1373, 1376 (9th Cir.1992), is substantially likely to entrench Microsoft's operating system monopoly and harm competition. Most importantly, plaintiffs allege, Netscape is foreclosed from the "vast majority" of IAPs, which are the single most important channel through which users acquire their browsers.[FN20]

> [FN20.] In September 1996, Microsoft executive Brad Chase estimated that at least 31% of Internet users get their browsers from an IAP. *See* B. Chase 9/9/96 e-mail.

Microsoft contends that Netscape and other competitors are *not* foreclosed from the marketplace, and that the availability to Netscape and others of alternative channels of distribution, including the possibility of direct sales to end users, by itself is fatal to an exclusive dealing claim. *See, e.g., Omega Envtl., 127 F.3d at 1162-63; Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir.1991); Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 (5th Cir.1988)*. Microsoft claims that Netscape has arrangements with thousands of ISPs and ICPs, who include "Netscape Now" buttons on their Web sites that facilitate the electronic downloading of Navigator. Netscape also apparently has arrangements with leading ISVs such as Corel, IBM, Novell, Oracle and Sun, and various OEMs who pre-install Navigator on their computers. Netscape executives testified that the company, through these and other channels, will distribute between 150 and 170 million copies of its browser this year alone.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

But Netscape's CEO also testified that the ISP channel is one of the principal means through which Netscape has historically distributed its browser, and that other methods of distribution cannot make up for the lack of access to the ISP and OEM channels. Netscape's principal remaining channel for distributing its browser is to permit users to download it from a Netscape Web site, but Microsoft itself recognizes the decreasing viability of browser distribution through downloads, as browsers increase in complexity and size, resulting in inordinately long download times and a high rate of failure. *See* Myhrvold Dep., 152:19-153:4; J. Belfiore Dep. at 45:2-16; B. Chase 11/19/97 e-mail (PI Ex. 73). Microsoft's Carl Stork, who oversaw the development of Windows 95 and Windows 98, testified that having a browser pre-installed on a PC when a user buys it avoids the "painstaking" process of downloading, which is "fraught with risk," and reduces support calls and the potential for errors. *See* Stork Dep. at 42-43.

In addition to disputing the percentage of the market that may be foreclosed by the agreements in question, the parties disagree about numerous other factors courts consider in determining whether competition in the relevant market is actually affected. Microsoft argues that, since the OLS arrangements are short-term, they cannot unreasonably restrain trade. *See, e.g., Omega Envtl., 127 F.3d at 1163-64.*[FN21] Excluding the agreement with AOL, which expires on January 1, 2001, all of Microsoft's OLS agreements expire either this year or next. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 676 F.2d 1291 (9th Cir.1982)* (condemning contracts in excess of ten years); *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236-38 (1st Cir.1983)* (approving two-year contracts); *Roland Mach., 749 F.2d at 394-95* (approving agreements that could be terminated on one year notice). This factor may be appropriate to consider in a final determination of whether the agreements unreasonably restrain trade. It is, however, only one among many factors the Court will consider and does not admit of, much less compel summary judgment for Microsoft on this claim.

> FN21. Microsoft also argues that since it has unilaterally waived the challenged provi-

sions of its ISP and ICP agreements, the claims related to those agreements are moot. But the Court retains jurisdiction to consider even the "waived" practices if they caused anticompetitive effects. *See Northwest Envtl. Defense Ctr. v. Gordon, 849 F.2d 1241, 1245 (9th Cir.1988)* ("The fact that the alleged violation has itself ceased is not sufficient to render a case moot. As long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present."). "[V]oluntary cessation of allegedly illegal conduct" does "not make the case moot." *United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).* Where the "defendant is free to return to his old ways," *id.,* it must demonstrate that it is "absolutely clear" that "the allegedly wrongful behavior could not reasonably be expected to recur." *Vitek v. Jones, 445 U.S. 480, 487, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)* (internal citation and quotation marks omitted). Microsoft has not made such a showing.

**\*21** Microsoft also argues that the limitations on OLSs are justified to prevent "free-riding" by other browser manufacturers on Microsoft's investment in support for the development of improved versions of OLSs' software the agreements commit it to undertake. *See generally Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)* (preventing free riding may justify certain vertical restraints); *see also American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1252 (3d Cir.1975)* (hotel chain's exclusionary agreements with franchisees justified, in part, by chain's desire to strengthen its position *vis-a-vis* its competitors); *Joyce Beverages v. Royal Crown Cola Co., 555 F.Supp. 271, 278 (S.D.N.Y.1983)* (recognizing exclusive dealing as a means of assuring that retailer "devotes undivided loyalty to its particular brand and that it competes vigorously against all competing brands."). But "[w]hen payment is possible, free-riding is not a problem because the 'ride' is not free." *Chicago Prof'l Sports, Ltd. Partnership v. NBA, 961*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-02084-RWR    Document 37-4    Filed 05/21/2007    Page 42 of 53
Not Reported in F.Supp.2d                                                                Page 19
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

F.2d 667, 675 (7th Cir.1992) (Easterbrook, J.). In other words, in order to recoup its investment, Microsoft could simply charge OLSs a fee rather than extract exclusionary rights.

Microsoft views its ISP agreements as nothing more than "commonplace cross-marketing arrangements." *See* *Chuck's Feed & Seed,* 810 F.2d at 1295 (considering extent to which exclusive dealing was used in the market as a whole). For example, Netscape has similar agreements with all five of the regional Bell operating companies ("RBOCs"), providing that Navigator must be the default browser for all customers who do not specifically request an alternative. But plaintiffs point out that the Netscape restrictions will automatically terminate in the event that Microsoft's restrictions on AT & T and MCI are eliminated. *See* Solnik Dep. at 79:2-22; Beran Dep. at 49-52; Barksdale Dep. at 220-21. Moreover, those agreements (unlike Microsoft's) do not require that the RBOCs ship Navigator as a certain minimum percentage of their browsers. And the ISPs in Microsoft's Internet referral server have a combined base of over 4.3 million subscribers, compared to the 625,000 subscribers to the RBOCs. *See* Microsoft 1/28/98 ISP Marketing Update (SJ Opp'n Ex. 25).

Microsoft also points out that its ISP agreements involve only eleven of the more than 4,500 ISPs in the United States and, once again, are short term, typically no longer than one or two years. Moreover, Microsoft points out, the customers of the eleven ISPs appear to be using Netscape's Web browsing software and IE in about the same proportion as Internet users generally. While that may be true, Microsoft's own documents, *see* Microsoft 1/26/98 Referral Server Business Plan (SJ Opp'n Ex. 40), show that IE's share of browser usage is much higher among subscribers to ISPs that have been subject to its agreements since mid-1996 than among subscribers to ISPs that entered into agreements in mid- or late 1997. This supports plaintiffs' argument that the agreements have had a substantial role in increasing Microsoft's browser share.

*22 In summary, the record to date discloses many material issues of fact genuinely in dispute on plaintiffs' exclusive dealing claims. Chief among

them is the degree to which the browser market is foreclosed and the actual effect the agreements have had on competition. Also hotly in dispute is whether the arrangements serve legitimate business purposes that might outweigh any anticompetitive effect. Microsoft claims that consumers benefit by easier access to the Internet; ISPs included in its referral server and OLSs in the Online Services folder benefit by opening the door to a new source of customers; and Microsoft itself benefits by receiving referral fees from the providers and promotion of its browser technologies. *But see* Myhrvold Dep. at 137:6-7. (explaining that the referral server "doesn't even pay for itself, much less generate any profits").

Furthermore, any claimed benefit "cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits" as the challenged policies. *See* *Sullivan v. NFL,* 34 F.3d 1091, 1103 (1st Cir.1994). This difficult balancing of potentially legitimate business justifications against what plaintiffs contend are exclusionary effects are fact-bound questions that generally cannot be resolved on summary judgment. *See, e.g., Betaseed, Inc. v. U & I, Inc.,* 681 F.2d 1203, 1228-30 (9th Cir.1982) (explaining that "the reasonableness of a restrictive practice is a paradigm fact question" and reversing grant of summary judgment for defendant on rule of reason claim).

### VI.

Plaintiffs contend that Microsoft has monopoly power in Intel-compatible PC operating systems, the relevant product market in this case, and that its monopoly is reinforced by high barriers to entry and network effects. Plaintiffs also allege that Microsoft has "willfully" maintained that monopoly by engaging in anticompetitive conduct, including the tying FN22 and other alleged § 1 violations discussed *supra,* aimed at eradicating competition in the browser market, which it perceives as a threat to its operating system monopoly. This conduct, plaintiffs contend, lacks any legitimate business justification.

> FN22. By using monopoly power to compel a customer to purchase a product it might prefer to purchase elsewhere, a monopolist

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

"forecloses competition on the merits in a product market distinct from the market for the tying item." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 22, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). "[B]y doing so, the [monopolist] may build a strong market position in [the tied product market]; and that position [in the tied product market], in turn, may increase its power" in its monopoly product. *Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 795 (1st Cir.1988).

In order to succeed on their claims of illegal monopolization, plaintiffs must prove: (1) Microsoft's possession of monopoly power in a relevant market; and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *See United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). For purposes of summary judgment, Microsoft concedes its possession of monopoly power in the market for Intel-compatible PC operating systems. Accordingly, the Court must deny summary judgment on the monopolization claim if there are disputed facts regarding whether Microsoft has "willfully" maintained its alleged monopoly.

**\*23** A monopolist's conduct that violates § 1 *necessarily* violates § 2. *See United States v. Griffith,* 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 239 (1st Cir.1983). Since the Court found sufficient facts to be in dispute to preclude summary judgment for defendant on plaintiffs' § 1 allegations, summary judgment is *ipso facto* precluded on the monopolization claims. Furthermore, a monopolist's conduct that does not rise to the level of a § 1 violation may nevertheless violate § 2 if it "impair[s] competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *see also Lorain Journal Co. v. United States,* 342 U.S. 143, 149, 72 S.Ct. 181, 96 L.Ed. 162 (1951). As Justice Scalia wrote in *Eastman Kodak,* "[w]here a defendant maintains substantial market power, his activities are examined through a special lens: Beha-

vior that might otherwise not be of concern to the antitrust laws-or that might even be viewed as procompetitive-can take on exclusionary connotations when practiced by a monopolist." 504 U.S. at 488 (Scalia, J., dissenting); *see also Berkey Photo v. Eastman Kodak Co.,* 603 F.2d 263, 274-75 (2d Cir.1979). These are quintessential fact questions and are genuinely disputed.

Plaintiffs also contend that Microsoft is unlawfully *attempting* to monopolize the market for Internet browsers. In order to prevail on this claim, plaintiffs must prove that Microsoft: (1) engaged in predatory or anticompetitive behavior (2) with a specific intent to monopolize and that, (3) there is a "dangerous probability" of its achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also International Distribution Ctrs. v. Walsh Trucking Co.,* 812 F.2d 786, 790 (2d Cir.1987); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir.1981).

The Supreme Court has held that intent to injure or destroy a rival and to expand one's own business are, standing alone, insufficient to produce an antitrust violation. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); *see also Abcor Corp. v. AM Int'l, Inc.,* 916 F.2d 924, 927 (4th Cir.1990); *Morgan v. Ponder,* 892 F.2d 1355, 1359 (8th Cir.1989) (statements such as "we'll do whatever it takes" are "often legitimately used by business people in the heat of competition"); *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 541 (7th Cir.1986) (because "[a]ll lawful competition aims to defeat and drive out competitors," the "mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize"); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 826 (6th Cir.1982). The intent must be "something more than an intent to compete vigorously." *See Spectrum Sports,* 506 U.S. at 459.

**\*24** As Professor Hovenkamp points out, "[i]ntent to 'exclude' is consistent with both efficient practices (research and development) and inefficient ones

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

(predatory pricing)." *See* Herbert Hovenkamp, *Federal Antitrust Policy* 252 (1994). Consequently, courts are hesitant to decide cases as a matter of law where the evidence of intent is ambiguous. *See, e.g., U.S. Phillips Corp. v. Windmere Corp.,* 861 F.2d 695, 698-703 (Fed.Cir.1988) (letting jury decide whether internal memoranda containing statements such as "let's pound [our competitors] into the sand" were simply sales talk or sufficient evidence of anticompetitive intent).

In *Spectrum Sports* the Supreme Court held that improper intent may be inferred from objective evidence such as predatory conduct. *See* 506 U.S. at 459 ("Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize."); *see also William Inglis & Sons,* 668 F.2d at 1027; *United States v. Empire Gas Corp.,* 537 F.2d 296 (8th Cir.1976). The same facts that preclude summary judgment on plaintiffs' § 1 allegations, if proven, might be sufficient for the Court to infer an improper intent from that behavior.

Plaintiffs also contend that Microsoft's specific intent to monopolize the browser market can be inferred from its attempt to solicit its major competitor, Netscape, to participate in an illegal market allocation scheme. *Cf. United States v. American Airlines, Inc.,* 743 F.2d 1114, 1121 (5th Cir.1984) (a solicitation to form a cartel in a concentrated market, even if the solicitation is rejected, can in itself constitute an attempt to monopolize). While Microsoft vigorously disputes plaintiffs' account of the June 21, 1995 meeting with Netscape, plaintiffs' evidence is sufficient to create a genuine dispute. Chris Jones, Microsoft's then Group Manager for Internet Explorer, participated in that meeting. In deposition testimony, Mr. Jones indicated that Microsoft "absolutely" intended to persuade Netscape not to compete and offered as a *quid pro quo* the prospect of Microsoft's staying out of browser development for non-Windows platforms. *See* Jones Dep., 208:5-209:6; 211:22-212:6. Plaintiffs allege that Microsoft's offer was part of a larger pattern of conduct that included similar discussions with Intel, Apple, and Real Networks. *See infra* at 11.

The test of conduct necessary to prove an attempt claim is, of course, substantially more demanding

than the requirements for illegal monopolization. *See, e.g., Transamerica Computer Co., Inc. v. IBM,* 698 F.2d 1377, 1382 (9th Cir.1983) (if conduct is not monopolization, it is not attempt either). The conduct must be sufficiently hostile toward competition so as to be branded "predatory," meaning an attempt to drive rivals from the market or to deter their entry. *See Neumann v. Reinforced Earth Co.,* 786 F.2d 424, 427 (D.C.Cir.1986). In support of their "attempt" claims, plaintiffs cite, among other behavior, the same conduct that supports their claims of tying and other unlawful restraints of trade. While Microsoft repeats its claims that it did not engage in any predatory behavior, the relevant facts are, as previously discussed, genuinely in dispute.

**\*25** To sustain the attempted monopolization claim, plaintiffs must also prove a "dangerous probability" of Microsoft's succeeding in its effort to monopolize the market for Internet browsers. To prove a "dangerous probability," courts generally require plaintiffs to show that a defendant has a certain minimum market share. In *Lorain Journal v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), for example, the Supreme Court upheld a judgment that a newspaper had attempted to monopolize the sale of advertising by refusing to deal with advertisers who purchased advertising from a local radio station. The Supreme Court took particular note of the newspaper's market power and the likelihood that the boycott would eventually eliminate the broadcaster-competitor. *See id.* at 152-54.

The Fourth Circuit has articulated the market share requirement as follows: "(1) claims of less than 30% market shares should presumptively be rejected; (2) claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious ...; (3) claims involving greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied." *See M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.,* 981 F.2d 160, 168 (4th Cir.1992) (*en banc* ).

According to plaintiffs, the latest data from a commercial market research firm show that as of Febru-

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

ary 1998, Internet Explorer had a 58% share of the browser market, with Navigator at 40%. *See Sibley Decl.* ¶ 29 & Table 3. Courts have found a dangerous probability of success on a comparable share of the market. *See, e.g., McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1506 (11th Cir.1988) ("[A] sixty or sixty-five percent market share is a sufficiently large platform ... to create a genuine issue of material fact as to whether ... [the defendant] would succeed in achieving a monopoly."); *Kelco Disposal, Inc. v. Browning-Ferris Indus.,* 845 F.2d 404, 409 (2d Cir.1988) (55% share sufficient), *aff'd,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).

Microsoft agrees that its browser "usage share" has increased in the last several years. It argues, however, that IE's success is due to the rapid addition of features and functionality, rather than any anticompetitive conduct. Moreover, Microsoft also contends that Netscape is still the market leader: Netscape's own June 1998 internal marketing studies show that the usage share for Navigator is 56.7% while IE's share is 37.2%. Microsoft correctly points out that courts rarely find a market share between 30% and 50% sufficient to establish a dangerous probability of monopolization. *See, e.g., U.S. Anchor Mfg. v. Rule Indus., Inc.,* 7 F.3d 986, 1001 (11th Cir.1993) (less than 50% market share insufficient "as a matter of law"); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1415 (7th Cir.1989) (nearly 50% share insufficient); *Broadway Delivery Corp. v. United Parcel Serv. of Am.,* 651 F.2d 122, 129 (2d Cir.1981) (share below 50% precludes finding of dangerous probability absent "significant evidence concerning the market structure to show that the defendant's share ... gives it monopoly power").

**\*26** Microsoft also argues that, regardless of market share, in order to prove attempted monopolization, plaintiffs must show that the structure of the browser market lends itself to monopolization. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.,* 885 F.2d 683, 694 (10th Cir.1989) (defendant must have "the ability to propel itself to monopolistic control over the market"). Microsoft argues that the "fast-moving nature of the software business-where no single firm can gain control over productive assets"-makes it highly unlikely that any firm could

ever acquire the power to control prices or exclude competition, regardless of its market share. *See, e.g., Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 486-87 (D.C.Cir.1996) (no unlawful attempt absent indication that monopolization of corporate car service business in District of Columbia is even possible). Plaintiffs disagree, contending that the structure of the browser market-like the operating system market-lends itself to dominance by one firm.

The statements of Microsoft executives, when considered in conjunction with other evidence of anticompetitive behavior (including the evidence supporting the § 1 claims as well as evidence that Microsoft may have sought to induce Netscape to agree to an illegal market allocation), at least raises a question as to Microsoft's intent to monopolize the browser market. Plaintiffs, of course, must prove that Microsoft intended to do more than "compete vigorously." Similarly, whether or not Microsoft's conduct was "predatory" is not an issue that can be properly decided as a matter of law. And whether Microsoft may be deemed to have a "dangerous probability" of monopolizing the browser market depends primarily on Microsoft's and Netscape's relative shares of the browser market, a question that is sharply disputed. Consequently, the Court must deny Microsoft's motion for summary judgment on plaintiffs' attempted monopolization claims.

VII.

The States bring a separate claim of monopoly "leveraging" under § 2. Under this theory, first recognized by the Second Circuit in dictum [FN23] in *Berkey Photo v. Eastman Kodak Co.,* 603 F.2d 263, 276 (2d Cir.1979), a seller who has a monopoly in one product violates § 2 when it uses a tie-in to obtain a competitive advantage in a second market, "*even if there has not been an attempt to monopolize the second market.*" *See id.* (ultimately not finding liability on this theory) (emphasis supplied).

FN23. *See Twin Lab., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990) (Second Circuit characterizing its *Berkey Photo* leveraging language as dictum).

Not Reported in F.Supp.2d                                                                                                Page 23
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

The continuing viability of the monopoly leveraging theory is in serious doubt. The Supreme Court has offered conflicting views on the theory. In a footnote to *Eastman Kodak Co. v. Image Technical Services, 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)*, the Supreme Court observed that it had "held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next." Less than a year later, however, the Supreme Court noted that " § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)*. And in *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)*, the Supreme Court noted that "[b]ecause the Sherman Act does not prohibit unreasonable restraints of trade as such-but only restraints effected by a contract, combination, or conspiracy-it leaves untouched a single firm's anticompetitive conduct (*short of threatened monopolization*)." (emphasis supplied).

**\*27** While those statements were dicta in cases not involving a "leveraging" claim as such, several courts have either rejected the theory outright or expressed extreme doubts about its viability. For example, in *Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 548 (9th Cir.1991)*, the Ninth Circuit flatly rejected *Berkey Photo* 's theory, holding that, "[u]nless the monopolist uses its power in the first market to acquire and maintain a monopoly in the second market, or to attempt to do so, there is no Section 2 violation." Similarly, in *Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 205 (3d Cir.1992)*, the Third Circuit relied on *Copperweld* in holding that "*Berkey Photo* 's formulation of monopoly leveraging to proscribe unilateral restraints of trade does violence to the text of the Sherman Act." *But see Kerasotes Mich. Theatres v. National Amusements, Inc., 854 F.2d 135, 138 (6th Cir.1988)* (reversing dismissal of leverage claim).

The D.C. Circuit has never spoken definitively on the leveraging theory, but has noted "substantial academ-

ic criticism cast upon the leveraging concept." *See Association for Intercollegiate Athletics for Women v. NCAA, 735 F.2d 577, 586 & n. 14 (D.C.Cir.1984)*. Professor Hovenkamp agrees that the idea that a seller can use a tie-in to enlarge monopoly profits has been "condemned repeatedly by commentators." *See* Herbert Hovenkamp, *Federal Antitrust Policy* 371 (1994). Assuming that Microsoft has an operating system monopoly and browsers are being sold competitively, Microsoft's incentive is to extract all available monopoly profits from the OS/browser *combination.* Accordingly, it already prices its operating system at the monopoly profit-maximizing price, considering what consumers are willing to pay for the entire package. Even if Microsoft were to obtain a monopoly in the market for browsers, the profit-maximizing price for the combination wouldn't change; Microsoft could not make additional monopoly profits even by monopolizing the browser market as well. *See Hirsh v. Martindale-Hubbell, Inc., 674 F.2d 1343, 1349 n. 19 (9th Cir.1982)*.

In fact, the Ninth Circuit noted that "leveraging" may actually "tend to *undermine* monopoly power," *see Alaska Airlines, 948 F.2d at 549* (emphasis in original), since "[e]very time the monopolist asserts its market dominance on a firm in the leveraged market, the leveraged firm has more incentive to find an alternative supplier, which in turn gives alternate suppliers more reason to think they can compete with the monopolist." *Id.*

The Court will grant Microsoft's motion for summary judgment on the States' leveraging claim. While the Supreme Court has not considered a leveraging claim *per se,* it has clearly stated that a firm violates § 2 only when it actually monopolizes or dangerously threatens to do so. The Third and Ninth Circuits and many commentators have rejected the theory outright, as contrary to both economic theory and the Sherman Act's plain language.

VIII.

**\*28** Finally, Microsoft contends that the States' pendent state-law claims, seeking to force Microsoft to alter its copyrighted operating system software (and to allow OEMs to do so), directly conflict with the

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

copyright laws' goal of promoting the distribution of copyrighted works to the general public. *See Harper & Row Publishers, Inc. v. National Enters., 471 U.S. 539, 558, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)* (federal copyright laws' "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors") (internal citation and quotation marks omitted). Microsoft repeats many of the same arguments it made in support of the boot and start-up screen restrictions, *i.e.,* that it has an unfettered right to license (or not to license), and to prevent alterations to its copyrighted software. While courts have upheld the ability of states to regulate some aspects of copyrighted works, *see, e.g., Fox Film Corp. v. Doyal, 286 U.S. 123, 131, 52 S.Ct. 546, 76 L.Ed. 1010 (1932)* (upholding ability of state to levy tax on copyright royalties); *Associated Film Distribution Corp. v. Thornburgh, 683 F.2d 808, 814-17 (3d Cir.1982)* (upholding state regulation of certain procedures by which films were marketed and licensed to theaters), Microsoft argues, they have also recognized that a state law prohibiting the exercise of specific rights conveyed by the copyright laws would be invalid. *See, e.g., Allied Artists Pictures Corp. v. Rhodes, 496 F.Supp. 408, 445 n. 19 (S.D.Ohio 1980); Remick Music Corp. v. Interstate Hotel Co., 58 F.Supp. 523, 544-45 (D.Neb.1944)* (invalidating state statute that interfered with copyright holder's ability to license public performances of copyrighted music).

"[T]he Supremacy Clause, U.S. Const. Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County, Florida v. Automated Med. Lab., Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)* (quoting *Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)*). State laws are "preempted" when they "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); accord Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 98-99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).* But "[c]onsideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded

by Federal Act unless that is the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)* (internal citation and quotation marks omitted).

It is fairly clear that the copyright laws do *not* preempt state antitrust statutes. The Copyright Act's preemption clause provides that "[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." *See* 17 U.S.C. § 301(b)(3).

**\*29** The Tenth Circuit recently addressed a similar preemption question. In *Harolds Stores, Inc. v. Dillard Department Stores, Inc., 82 F.3d 1533 (10th Cir.), cert. denied, 519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 216 (1996),* a retailer sued a competitor, alleging that the competitor's copying of fabric designs violated its copyrights and the state antitrust laws. The defendant argued that the antitrust law was preempted by the federal copyright scheme. *Id. at 1543.* The court rejected the defense, holding that "the restraint of trade component of [the state antitrust act] claim requires a litigant claiming a violation of [that act] to establish proof beyond that required to demonstrate a violation of the exclusive rights protected by § 106 of the Copyright Act, *i.e.,* copying, preparation of derivative works, performance, distribution or display." *Id.*

As explained, *supra,* the Copyright Act does not give a copyright holder a license to engage in anticompetitive behavior that violates *federal* antitrust law. *See, e.g., Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1186-87 & n. 63 (1st Cir.1994)* (it is "well settled that concerted and contractual behavior that threatens competition is not immune from antitrust inquiry simply because it involves the exercise of copyright privileges") (citations omitted); *Allied Artists, 496 F.Supp. at 443-44* (holding that "ownership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in a *per se* illegal tying arrangement"). Microsoft fails to articulate how *state* antitrust laws,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261
**(Cite as: Not Reported in F.Supp.2d)**

which are based upon and largely emulate the federal scheme, *see California v. ARC Am. Corp. .,* 490 U.S. 93, 102, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (state antitrust laws are consistent with broad purposes of federal antitrust laws), "conflict" with any right conferred by federal copyright law. The Supreme Court has recognized that there is "nothing either in the language of the copyright laws or in the history of their enactment to indicate any congressional purpose to deprive the states, either in whole or in part, of their long-recognized power to regulate combinations in restraint of trade." *See Watson v. Buck,* 313 U.S. 387, 404, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

Furthermore, Microsoft has not established the extent of any copyright protection in the *specific* portions of software plaintiffs seek to modify, and the parties dispute whether Microsoft abused its copyright for anticompetitive purposes. Until those questions are resolved, Microsoft's copyright argument is premature at best.

For the foregoing reasons, it is, this 14th day of September, 1998,

ORDERED, that the motion of the defendant Microsoft Corporation for summary judgment on the plaintiff States' Third Claim for Relief is granted, and that claim is dismissed with prejudice; and it is

FURTHER ORDERED, that the motion of Microsoft Corporation for summary judgment is otherwise denied.

D.D.C.,1998.
U.S. v. Microsoft Corp.
Not Reported in F.Supp.2d, 1998 WL 614485 (D.D.C.), 1998-2 Trade Cases P 72,261

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 9

Westlaw.

2001 WL 34153358 (C.A.D.C.)
(Cite as: 2001 WL 34153358)

Page 1

For Opinion See 2001-2 Trade Cases P 73380, 2001 WL 823756, 253 F.3d 34, 213 F.3d 764, 213 F.3d 764

United States Court of Appeals,District of Columbia Circuit.
**UNITED STATES**,
v.
**MICROSOFT** CORP.
Nos. 00-5212 and 00-5213
January 29, 2001.

Microsoft Corp. - Brief
Richard J. Urowsky, Sullivan & Cromwell, New York, New York

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ... iv

GLOSSARY ... ix

INTRODUCTION ... 1

SUMMARY OF ARGUMENT ... 3

ARGUMENT ... 6

I. The District Court's Tying Ruling Should Be Reversed ... 8

 A. Windows and IE Are Not "Separate Products" under This Court's Test ... 10

 B. The Alleged Tie Did Not Have an Anticompetitive Effect on the Putative "Web Browser" Market ... 15

II. The District Court's Monopoly Maintenance Ruling Should Be Reversed ... 17

 A. Microsoft Does Not Possess "Monopoly Power" ... 18

  1. Products Need Not Be Complete Substitutes To Be Included in the Same Product Market ... 18

  2. Plaintiffs Have Not Satisfied Their Burden of Establishing Significant Barriers to Entry ... 20

  3. Microsoft's Behavior Confirms That It Faces Intense Competition ... 22

 B. Microsoft Did Not Engage in Anticompetitive Conduct ... 24

  1. Microsoft Did Not Exclude Navigator from the OEM Channel ... 26

   Predatory Product Design. ... 27

   Microsoft's OEM License Agreements ... 28

   No Restriction on Distribution of Navigator ... 32

  2. Microsoft Did Not Exclude Navigator from the IAP Channel. ... 33

  3. Plaintiffs' Other Allegations Do Not Amount to a Section 2 Violation ... 34

   Microsoft's Agreements with Certain ICPs and ISVs ... 35

   Microsoft's Java Implementation ... 35

   Microsoft's Agreements with Apple ... 37

 C. Plaintiffs Have Not Shown the Requisite Causal Link between Microsoft's Conduct and Its Position in Operating Systems ... 37

III. The District Court's Attempted Monopolization Ruling Should Be Reversed ... 40

 A. Microsoft's June 1995 Discussions with Netscape Did Not Constitute Attempted Monopolization ... 40

 B. Microsoft's Competition with Netscape Following the June 1995 Discussions Did Not Constitute Attempted Monopolization ... 43

  1. Microsoft's Desire To Keep Navigator from Becoming the "Standard" Web Browsing Software Is Not a Specific Intent To Monopolize ... 43

  2. Plaintiffs Have Not Shown a Dangerous Probability of Monopolization ... 45

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unable to refute this fact, plaintiffs set up a straw man: they argue that Microsoft violated Section 2 even though "it did not *completely* foreclose Netscape's distribution of Navigator." Pls. Br. at 68 (emphasis in original); *see also id*. at 42-43, 73-76, 78-79. Microsoft has never contended that Section 2 requires *total* exclusion from the marketplace. MS Br. at 97, 107-10. What is required is a showing of *substantial* exclusion, and that is what is missing from this case. The district court did not find that Microsoft excluded Netscape from *any* percentage of the marketplace, much less a substantial percentage. Instead, the district court expressly acknowledged that Netscape was able to distribute Navigator "to *every* PC user worldwide." 87 F. Supp. 2d at 53 (emphasis added).

Confronted with the district court's finding that "Netscape was able to distribute 160 million copies of Navigator" in 1998 alone despite Microsoft's supposed foreclosure of the OEM and IAP channels, *id.,* plaintiffs argue that Microsoft's conduct was anticompetitive because it supposedly prevented Navigator from being widely used. Pls. Br. at 31, 63, 75-76, 78. The antitrust laws, however, ensure competitors access to the marketplace; they do not guarantee that competitors will use their products. Consumers may choose not to use a particular product for a variety of reasons unrelated to a competitor's access to distribution channels. If competitors can reach the ultimate consumers of their products by distributing directly to them, competing for the services of existing distributors or developing alternative distribution channels, the "[a]ntitrust laws require no more." *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1163 (9th Cir. 1997), *cert. denied,* 525 U.S. 812 (1998); *see also Stitt Spark Plug Co. v. Champion Spark Plug Co.,* 840 F.2d 1253, 1257-58 (5th Cir.), *cert. denied,* 488 U.S. 890 (1988); *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1233-35 (8th Cir. 1987), *cert. denied,* 484 U.S. 1026 (1988); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 393-95 (7th Cir. 1984).

In any event, Navigator *is* widely used. The district court found that Navigator's installed base of users increased from 15 million in 1996 to 33 million in December 1998, 87 F. Supp. 2d at 53; 84 F. Supp. 2d at 103 (FF 378), the period in which Microsoft was supposedly engaged in a "multifaceted campaign of exclusionary conduct," Pls. Br. at 62. Netscape's CEO, Barksdale, testified to even higher figures, estimating in October 1998 that there were "somewhere between 40 and 70 million" Navigator users. 10/21/98 pm Tr. at 13. There is also no truth to plaintiffs' suggestion that the OEM and IAP channels are the only channels effective in generating usage of Web browsing software. Pls. Br. at 15, 63. Netscape informed AOL during AOL's due diligence investigation that "currently about 50% of our installed base" of users obtained Navigator by downloading it from the Internet. DX 2538

at 36457; *see also* DX 2810 at 79. As Netscape's co-founder, James Clark, testified, the Internet is the most efficient distribution system for software in the world. DX 2562 at 41-42. Plaintiffs ignore this evidence.

Leaving aside plaintiffs' failure to show that Netscape was excluded from any portion of the marketplace-which by itself is fatal to their Section 2 claims-plaintiffs' specific allegations of anticompetitive conduct cannot withstand scrutiny.

**1. Microsoft Did Not Exclude Navigator from the OEM Channel.**

Plaintiffs assert that Microsoft "effectively exiled Netscape from the OEM channel." Pls. Br. at 62. First, they challenge the manner in which Microsoft included Web browsing software in Windows 98, *id.* at 66, claiming that Microsoft is guilty of "predatory product design," *id.* at 67. Second, plaintiffs contend that Microsoft's OEM license agreements improperly prohibited "OEMs from modifying Windows in any unauthorized way." *Id.* at 68. Third, plaintiffs contend that Microsoft "offered OEMs valuable incentives and discounts" to "limit distribution of Navigator." *Id.* at 17-18. None of these contentions has merit.

**Predatory Product Design.** Plaintiffs concede that "Microsoft's conduct in developing a Web browser and offering it to OEMs and users with Windows [was] lawful." *Id.* at 66. They also concede that Microsoft's provision of Web browsing software with Windows benefited consumers. *Id.* Recognizing that courts generally refuse to second-guess engineers' product design decisions in antitrust cases, *e.g., ILC Peripherals,* 458 F. Supp. at 439, plaintiffs now insist that they are challenging only "very limited aspects of Microsoft's product design," Pls. Br. at 66, an assertion that cannot be reconciled with their request that Microsoft be broken up and subjected to wide-ranging product design regulations.

Plaintiffs' "predatory product design" claim fails for the same reasons that their "technological tying" claim fails under Section 1. Plaintiffs cite no authority for their suggestion that a different, more stringent standard should apply to product design decisions under Section 2 than applies under Section 1. To the contrary, one of the cases plaintiffs cite, *H.J., Inc. v. ITT,* 867 F.2d 1531, 1542 (8th Cir. 1989), applied the Section 1 standard to a tying claim under Section 2. Nor do plaintiffs articulate a standard that could be applied in the future to distinguish beneficial innovations from "predatory" design changes or enable software developers to determine what functionality may be added to leading products and whether a mechanism must be provided to remove "user access" to that functionality. *See* Pls. Br. at 66. Lastly, plaintiffs do not

deny that there are technical reasons why Windows 98 invokes its IE components by default in a handful of instances. *See* MS Br. at 82-83; Pls. Br. at 108-09. Plaintiffs thus provide no basis to outlaw the design of Windows 98, even if courts are permitted under the Sherman Act to evaluate product design decisions under some vague and amorphous standard.

The law is settled that design changes that improve a product cannot violate Section 2, regardless of the defendant's intent. *E.g.,* *Transamerica,* 481 F. Supp. at 1005 ("Mallard was a design adopted primarily to preclude PCM competition, but it was a superior design, and its effect on competition was negligible. A finding adverse to IBM on this aspect of its conduct would amount to punishment for intent alone."). To hold otherwise would chill technical innovation. That is why courts have roundly rejected allegations of "predatory innovation" or "predatory design." *See* Joseph Gregory Sidak, *Debunking Predatory Innovation,* 83 COLUM. L. REV. 1121, 1121 n.2 (1983) (citing cases). Plaintiffs do not dispute that Microsoft's design of Windows to include Web browsing functionality improved the operating system and benefited consumers. Pls. Br. at 66. Plaintiffs contend that Microsoft lacked "a legitimate business justification" for its design of Windows, *id.* at 67, but it is plaintiffs' suggestion-that Microsoft was required to create a mechanism for hiding "user access" to useful functionality in the operating system-that makes no business sense.

**Microsoft's OEM License Agreements.** Plaintiffs do not dispute that "Microsoft's license agreements have never prohibited OEMs from pre-installing programs, including Navigator, on their PCs and placing icons and entries for those programs on the Windows desktop and in the 'Start' menu." 84 F. Supp. 2d at 63 (FF 217). Nor do they dispute that Microsoft's license agreements do "not forbid the OEM to set Navigator as the default browsing software." *Id.* Plaintiffs instead claim that Microsoft's license agreements are unlawful because they do not permit OEMs to delete or modify parts of Windows without authorization. Pls. Br. at 16-17. In particular, plaintiffs challenge the so-called "Windows Experience" provisions of Microsoft's license agreements, which require that "the very first time a consumer turns on his or her computer, Microsoft's Windows operating system . . . be allowed to go through the initial startup sequence as designed, developed and tested by Microsoft and to display the Windows desktop without any aspect of that screen having been deleted by the OEM." Kempin ¶ 38.

a. Plaintiffs concede that Microsoft's inclusion of Web browsing functionality in Windows did not violate the antitrust laws. Pls. Br. at 102. They nevertheless argue that Microsoft was required to permit OEMs, which act as

Microsoft's distributors, to delete "user access" to that functionality. By claiming that Microsoft must permit OEMs to make unauthorized modifications to its copyrighted operating systems, plaintiffs seek to deprive Microsoft of its rights under federal copyright law.

Contractual provisions limiting the ability of a licensee to modify copyrighted works without the licensor's permission are common in the software industry, and are found in the OEM license agreements of other leading operating system vendors. Kempin ¶ 25; *see, e.g.,* DX 1661 at 4; DX 1777 at 102. From an antitrust perspective, Microsoft's possession of this legal right contributes to its "efficiency in the same way that possession of any other asset does." *Neumann v. Reinforced Earth Co.,* 786 F.2d 424, 427 n.3 (D.C. Cir. 1986). As this Court has explained, "the legitimate assertion of a legal right against a competitor, however damaging to the competitor, or even to competition, that may be, does not constitute monopolizing or attempting to monopolize within the meaning of the Sherman Act." *Id.*

According to plaintiffs, "Microsoft neither articulated a tenable copyright theory that supports its asserted defense, nor offered evidence to support such a claim." Pls. Br. at 69. That assertion is demonstrably false. From the outset of the case, Microsoft argued that plaintiffs' "challenges to Microsoft's license agreements with computer manufacturers are without legal merit by reason of Microsoft's rights under the federal copyright laws." Answer to DOJ's Compl. at 34. As Microsoft argued in seeking summary judgment, "[t]he 'bundle of rights' possessed by the holder of a valid copyright includes the right to prevent unauthorized modifications to its copyrighted work." MS Mem. in Supp. of Mot. for Summ. J. at 54. At trial, Microsoft introduced into evidence Certificates of Registration from the United States Copyright Office for both Windows 95 and Windows 98. 2/24/99 am Tr. at 63-66; DX 813; DX 814; *see also* 84 F. Supp. 2d at 66 (FF 228); Kempin ¶ 2; 2/25/99 am Tr. at 57-58. The admission of these copyright registrations "shift[ed] to [plaintiffs] the burden of proving the invalidity of the copyright[s]." *Fonar Corp. v. Domenick,* 105 F.3d 99, 104 (2d Cir.), *cert. denied,* 522 U.S. 908 (1997). Plaintiffs never contended-much less proved-that Microsoft's copyrights are invalid.

Rather, plaintiffs argue that copyright law permits a licensee to make "minor modifications" to a copyrighted work without authorization from the copyright holder. *See* Pls. Br. at 69-72. According to plaintiffs, "deleting a single icon from Windows 95" and "providing users with additional information in the boot sequence of Windows" are "minor modifications [that] would hardly frustrate the objectives of the Copyright Act." *Id.* at 72. Leaving aside the irony that plaintiffs contend Microsoft violated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34153358 (C.A.D.C.)                                                                                                      Page 19
**(Cite as: 2001 WL 34153358)**

Section 2 and should be broken up because it did not permit OEMs to make what they now call "minor modifications" to Windows, plaintiffs are wrong on both the facts and the law. The Second Circuit's reference in *Gilliam* to "mutilation of [the] work" (quoted at Pls. Br. at 70) was not contained in the discussion of the copyright infringement claim, but rather in the discussion of the separate claim under the Lanham Act. *Gilliam v. ABC,* 538 F.2d 14, 23-24 (2d Cir. 1976). And, contrary to plaintiffs' assertion, Pls. Br. at 70, the Seventh Circuit in *WGN* did not find that the "teletext" included by WGN in the vertical blanking interval of its 9:00 p.m. news broadcast was a "substantial portion of the work." *WGN Cont'l Broad. Co. v. United Video, Inc.,* 693 F.2d 622, 624-28 (7th Cir. 1982).

Nor can the modifications at issue be dismissed as inconsequential. *E.g.,* Kempin ¶ 37. As plaintiffs acknowledge, "[b]etween 1995 and 1999, Microsoft spent more than $100 million each year" developing the IE technologies in Windows. Pls. Br. at 15. Having made that substantial investment, Microsoft had a legitimate business interest in preventing OEMs from modifying Windows to deny "user access" to the functionality provided by IE. In addition, "Microsoft advertises Windows as including Internet Explorer, and many product reviews of Windows 98 discuss that feature of the operating system." Kempin ¶ 69. Plaintiffs do not deny that "considerable customer confusion would result and Microsoft's brand image could suffer if customers purchasing a new computer preinstalled with Windows could not find and utilize the Internet Explorer functionality that Microsoft advertises as part of the operating system." Kempin ¶ 69.

b. Wholly apart from Microsoft's rights under federal copyright law, the challenged provisions of Microsoft's license agreements do not limit Netscape's access to the OEM channel. *See* DX 10 at 48339. Plaintiffs do not dispute that "OEMs were permitted to pre-install Navigator on PCs and that many OEMs did so." Pls. Br. at 74. In fact, plaintiffs' own exhibits show that Compaq, Fujitsu, Gateway, Hewlett-Packard, IBM and Sony-six of the world's largest OEMs-distributed Navigator on some of their personal computers. GX 421 at 680; GX 2116 at 201070-71; *see also* Kempin ¶ 21. Rather, plaintiffs contend that, as the quality of IE improved, many OEMs decided either to not preinstall Navigator or to feature it less prominently on their personal computers because Windows already included IE. *See* Pls. Br. at 20, 74-75. Even if true, that contention does not establish an antitrust violation.

To support their claim that Navigator was "exiled" from the OEM channel, plaintiffs challenge the authenticity of the document prepared during AOL's due diligence

investigation of Netscape that reports that Navigator was present on "22% of OEM shipments." DX 2440 at 341778. Plaintiffs assert that "[n]othing in the record explains the source or method of the '[e]stimate' in this anonymous document, which was not subject to cross-examination." Pls. Br. at 75; *see also id.* at 78. To the contrary, Barry Schuler, a senior AOL executive, testified that this so-called "anonymous document" represents a "summary of the findings and proposed financials and operating plans" resulting from AOL's November 1998 due diligence investigation of Netscape. DX 2810 at 74-75. Schuler also stated that AOL used this document to "make our final determination of whether to proceed ahead with" the $10 billion acquisition of Netscape. DX 2810 at 75. Plaintiffs themselves identified the document in their proposed findings of fact as "the due diligence report by Goldman Sachs on the Netscape/AOL transaction," Pls. Joint Proposed Findings of Fact ¶ 380.5.i, and the district court credited the statement in the document that Netscape distributed 160 million copies of Navigator in 1998, 87 F. Supp. 2d at 53.

**No Restriction on Distribution of Navigator.** Plaintiffs suggest that Microsoft's OEM license agreements "restricted Navigator's distribution." Pls. Br. at 73. That suggestion is contradicted by the facts, as the district court found. 84 F. Supp. 2d at 63 (FF 217). Plaintiffs also suggest that Microsoft dissuaded Compaq, Gateway and IBM from distributing Navigator. Pls. Br. at 18. In fact, plaintiffs go so far as to state that Microsoft had an exclusive contract with Compaq requiring it to ship only IE. *Id.* at 77. These statements are likewise false. The undisputed evidence establishes that Compaq, Gateway and IBM all distribute Navigator. Kempin ¶ 21; 2/19/99 am Tr. at 49-50; 6/9/99 pm Tr. at 63. Furthermore, Compaq's John Rose and Stephen Decker both testified that Microsoft never limited in any way Compaq's ability to preinstall Navigator on its new computers. Rose ¶ ¶ 32-33; DX 2564 at 44, 45, 50.

## 2. Microsoft Did Not Exclude Navigator from the IAP Channel.

Plaintiffs contend that Microsoft's agreements with ISPs and OLSs (collectively referred to by the district court as "IAPs") improperly excluded Navigator from an important distribution channel in violation of Section 2. They concede, however, that the district court *rejected* their claim that those same agreements violated Section 1. Pls. Br. at 5. They also do not dispute that courts apply exactly the same standard to alleged exclusive dealing agreements under Section 2 as they do under Section 1. MS Br. at 109-10 (citing cases).

In an attempt to salvage their monopoly maintenance claim, plaintiffs argue that the district court's "Section 1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 10

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa                    **2006 Supplement**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**PUBLISHERS**

76 Ninth Avenue, New York, NY 10011
www.aspenpublishers.com

As a result, "Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents."[38]

As noted, the Court declined either to embrace or to repudiate the essential facility doctrine itself.[39] Its restrictions on the law of unilateral refusal to deal were written so as to apply to all unconditioned unilateral refusals to deal, whether or not denominated as denials of an essential facility. The Court did observe:

> It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the "essential facilities"; where access exists, the doctrine serves no purpose. Thus, it is said that "essential facility claims should ... be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." Respondent believes that the existence of sharing duties under the 1996 Act supports its case. We think the opposite: The 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access. To the extent respondent's "essential facilities" argument is distinct from its general §2 argument, we reject it.[40]

## Analysis

The Court's opinion very severely limits the scope of unlawful unilateral refusals to deal under §2 of the Sherman Act. The limitations apply to both the "essential facility" doctrine and the refusal to deal doctrine as articulated in *Aspen Skiing*.[41]

*First*, before a unilateral refusal to deal is unlawful under §2, the refusal must be "irrational" in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival.[42] The Court found such a sacrifice in *Aspen*,[43] which the *Verizon* decision declared to be "at or near the outer boundary" of §2 liability.[44] *Aspen* had condemned the refusal to deal because the defendant

---

38. Ibid.
39. Ibid.
40. Id. at 881, quoting ¶773e in the 2003 Supplement.
41. See note 25.
42. An amicus brief filed by the government had urged the Court to adopt a test that a refusal to deal is not unlawful unless it involves a short-run "sacrifice" of this nature. *Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Petitioner*, 2003 WL 21269559 (May 23, 2003).
43. See note 25.
44. *Verizon*, 124 S. Ct. at 879.

**Phillip E. Areeda**
*Late Langdell Professsor of Law*
Harvard University

**John L. Solow**
*Associate Professor of Economics*
University of Iowa

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie
Professor of Law*
University of Iowa

**Volume IIA
Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.
New York      Gaithersburg

output will be competitive. For example, an accident victim is seldom in a position to shop comparatively for ambulance services. The prices can then exceed the competitive level, notwithstanding the presence of many rival ambulances.

Antitrust law is largely passive toward informational asymmetries. It seldom attempts to generate or redistribute market information but may take such asymmetries into account when appraising conduct. For example, an agreement making price information more readily available among competitors can strengthen a cartel or facilitate oligopolistic coordination by helping cartel members or oligopolists to monitor "cheating."[1] Or an agreement limiting advertising may either facilitate collusion by limiting customers' ability to engage in low-cost comparison shopping, or in certain markets it may improve the quality of available information by suppressing that which is likely to mislead customers.[2]

## ¶411.  Agency and Free Rider Problems

In most markets, the give and take of competition is driven by (1) the wish of each seller to maximize its revenue and (2) the wish of each buyer to minimize its outlay. But sometimes one market participant is represented by an agent whose personal incentives diverge from its principal's goals. If the principal is unable or unwilling to monitor the agent's decisions, the market may fail to yield the competitive outcome.

The health care market may be an illustration. Notwithstanding the presence of many rival physicians, the patient may be relatively indifferent to the physician's prices, which (at least in the short run) are paid for by someone else—namely, by an insurer, whose premiums are paid by the patient's employer. When employers and insurers neglect to monitor such prices closely, the prices may exceed the competitive level even though the market is occupied by numerous physicians.

Of course, an agency problem does not distort the competitiveness of the market as a whole when only an occasional buyer or seller is affected. For example, an agency problem can deprive a particular seller of the best price without affecting sellers generally.

¶410.   n.1.   See ¶¶2111–2114 (information exchanges among competitors).
2.   This is the best reading of the Supreme Court's decision in *California Dental Assn. v. FTC*, 526 U.S. 756 (1999). See ¶2023, and ¶2023.1 in the Supplement.

As a general matter, antitrust institutions take the agency problem into account only passively. They do not affirmatively address the conduct of agents, but they may uphold a challenged restraint that solves a significant agency problem.[1] In other areas, however, existing antitrust rules may fail to take agency problems into account, as we sometimes point out. Perhaps the best known example is resale price maintenance imposed by manufacturers upon their dealers to prevent one dealer from taking a "free ride" on the promotional efforts of another dealer.[2] In such cases the resale price maintenance is a procompetitive solution to a serious agency problem, and antitrust errs by making it unlawful per se.

## ¶412.  "Second Best" Problems

**412a.  Introduction.**  We have already described three situations in which the logic of the perfectly competitive model does not supply satisfactory policy guides. When economies of scale dictate monopoly or high concentration, we cannot always have both minimum costs and competitive prices. And because some degrees of monopoly, at least for some period of time, yield additional technological gains that outweigh short-run losses in resource allocation, we cannot have both perfect competition and appropriate rates of technological progressiveness. Finally, product differentiation, though providing additional value in the form of variety, may preclude operation at efficient levels of output.

We now discuss two additional respects in which maximum feasible conformity to the competitive model may be an inappropriate policy goal. *First,* so long as we must accept substantial departures from competitive price and output in some markets in the economy, it is no longer certain that the elimination of monopoly in other markets would improve resource allocation or that monopolization of an additional market would worsen it. *Second,* when a market is imperfect in one respect, an additional imperfection may improve rather than worsen that market's economic performance.[1]

¶411.  n.1.  See, e.g., *Kartell v. Blue Shield (Mass.),* 749 F.2d 922 (1st Cir. 1984), cert. denied, 471 U.S. 1029 (1985) (upholding restraint on physicians' maximum prices imposed by third-party insurer).
  2.  See ¶1613.
¶412.  n.1.  The general theory was developed in R. Lipsey & R. Lancaster, The General Theory of Second Best, 24 Rev. Econ. Stud. 11 (1956). A good, brief discussion of implications is contained in F. M. Scherer & D. Ross, Industrial Market Structure and Economic

**Phillip E. Areeda**
*Late Langdell Professsor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume III**
**Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.
New York          Gaithersburg

icant must its causal relationship with monopoly be? (4) May the answers to either of those questions be varied with the nature of the sanctions sought? We now turn to those questions.


## ¶651.   Monopolizing Conduct Defined

This Paragraph first gives a definition of unlawful exclusionary conduct under §2 of the Sherman Act and then explains what is and is not involved in assessing conduct under that definition.

**651a.   Exclusionary conduct defined.**   Exclusionary conduct is acts that

(1)   are reasonably capable of creating, enlarging, or prolonging monopoly power by impairing the opportunities of rivals; and

(2)   that either (2a) do not benefit consumers at all, or (2b) are unnecessary for the particular consumer benefits that the acts produce, or (2c) produce harms disproportionate to the resulting benefits.

**651b.   Formulations requiring "purpose" or "intent" generally unnecessary and sometimes harmful.**   *1. Generally.*   In describing the conduct element of the monopolizing offense, numerous cases have employed terms such as "purpose," "intent," "willfulness," or "not inevitable." For example, in the early *Standard Oil* decision,[1] Chief Justice White noted the defendant's anticompetitive behavior but felt compelled to speak of intent:

> [Defendant's many acquisitions and mergers give rise] in the absence of countervailing circumstances, . . . to the *prima facie* presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination . . . with the purpose of excluding others from the trade and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce. . . .
>
> [This] *prima facie* presumption of intent to restrain trade . . . to bring about monopolization . . . is made conclusive by considering

¶651.   n.1.   *Standard Oil Co. v. United States*, 221 U.S. 1 (1911).

**Phillip E. Areeda**
*Late Langdell Professsor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume IIIA**
**Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.
New York          Gaithersburg

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

Copyright © 2002 by the President and Fellows of Harvard College

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to make copies of any part of this publication should be mailed to:

Permissions
Aspen Law & Business
1185 Avenue of the Americas
New York, NY 10036

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 1-56706-602-X (Set)
0-7355-2693-1 (Vol. IIIA)

Second Edition

1  2  3  4  5  6  7  8  9

for its superiority. The court held that the proper criterion of supe-
riority was unconstrained buyer acceptance in the marketplace, not
jury acceptance in the courtroom.

**781d.  Product innovation and output.**   Some product inno-
vations will involve lower production costs and increased output
and may therefore lead to lower market prices. If the new technol-
ogy involves new scale economies, the innovator may build a larger
plant and attain or reinforce market dominance at lower prices.
However, this merely returns us to two old issues: expansion and
predatory pricing. Mere expansion is not unlawful even for a mo-
nopolist,[7] and prices are to be tested according to the rules for dis-
tinguishing competitive from predatory prices.[8]

**781e.  "Excessive" investment in innovation.**   We have now
concluded that the "better mousetrap" should be approved cate-
gorically. However, we should consider the possibility that the de-
fendant has "over-invested" in, say, the research and development
leading to the improved product.

The theoretical possibilities are several. Suppose that a defen-
dant invested $X in research and development (R&D) with the
knowledge (1) that the payoff would return $Y and (2) that $Y is less
than could be earned through some alternative investment avail-
able to the defendant. One might even imagine R&D undertaken
with the following accurate knowledge: the new product would win
a monopoly when priced to yield an attractive profit above ordi-
nary production and distribution costs, but not including R&D costs.
Assuming for the moment that there are defendants who would
take this course of action, this again is the familiar problem of preda-
tory pricing or investment, with even stronger reasons for pre-
sumptive if not conclusive legality, given that the payoff for R&D is
even more speculative than for other investments. Furthermore, a
society concerned with its productivity would not wish to instruct
firms that they undertake R&D at the peril of treble damage anti-
trust liability. Nor is a different conclusion called for when the de-
fendant undertakes R&D or exploits it with the realization that it
will be profitable only if it occupies the full market and thus
achieves or maintains a monopoly.

---

7.   See, e.g., *Brookeside Ambulance Serv. v. Walker Ambulance Serv.*, 1993-2 Trade Cas.
¶70,394 (N.D. Ohio), aff'd mem., 39 F.3d 1181 (6th Cir. 1994) (defendant ambulance service's
practice of opening offices in high traffic areas to match the plaintiff's opening of such offices
was not monopolistic).

8.   See generally Ch. 7C (2d).

We therefore conclude that all product innovation should be lawful in the absence of bundling, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing—that is, where the innovation investment brings the defendant's prices below the appropriate cost measure.[9]

## ¶782.    Specific Tortious Practices

**782a.    Introduction; business torts generally.**    A business tort is, by definition, an act that improperly harms a rival either directly or by improperly winning away a customer. This capacity to impair the opportunities of rivals can also make an act "exclusionary" when undertaken by a monopolist. Before we discuss particular torts, several general observations might illuminate the relationship between the law of torts and the law of monopolization under Sherman Act §2. The most important point is the fourth.

*First,* the existence of a tort remedy does not necessarily obviate antitrust concern, for the public interest in competition is not necessarily vindicated by private tort remedies. Accordingly, where antitrust concerns are substantial, antitrust provides greater damages and attorney's fees, and thus greater incentives to sue. Moreover, broader equitable remedies will sometimes be appropriate under the antitrust laws.[1] Unfortunately, these incentives are also present when antitrust concerns are not substantial.

*Second,* the tort standard is not the exclusive nor even the appropriate test of "exclusionary" behavior. State tort laws may provide a learning experience that can be used by antitrust courts in determining when challenged conduct should be regarded as improper. Yet, the objects, history, and dynamics of tort law are generally not responsive to the concerns of Sherman Act §2. In any event, state law should not be determinative of the antitrust outcome. State tort laws differs from state to state, and antitrust courts should not treat two monopolists differently because of these fortuitous differences. Furthermore, state tort law will not always speak with clarity on the more technical points that are likely to be in dispute. The difficulties necessarily encountered by the federal courts in applying state law in diversity cases should not be unnecessarily imported to

---

9.    See Ch. 7C-3 (2d).
¶782.    n.1.    In addition, the territorial jurisdiction of a state court may be narrower than that of the federal antitrust court.

manageable, the courts should be willing to adopt presumptions of propriety with respect to some minor acts that might conceivably be exclusionary. To force the inquiry, the plaintiff must be required to make a significant preliminary showing of impropriety. (4) The concept of exclusionary practice would become totally unmanageable unless the judges are willing to adopt a *de minimis* test and to ignore those practices that seem unlikely to have made a substantial impact upon the achievement, maintenance, or expansion of monopoly power.

**782b.  Misrepresentation to buyers.**    A monopolist's misrepresentations encouraging the purchase of its product can fit our general test for an exclusionary practice when the impact on rivals is significant; deception of buyers can impede the opportunities of rivals. Even apart from its impact on rivals, deception is undesirable because it can injure buyers and offend public morality. There is no redeeming virtue in deception, but there is a social cost in litigation over it.

To determine the impropriety of a representation implicates the usual tort issues with respect to nondisclosure (when is there a duty to speak?), the distinction between fact and opinion, the knowledge or due care of the speaker, the actual degree of reliance by those allegedly deceived, and the reasonableness of any such reliance.[2]

That particular buyers might have been deceived is not itself of §2 concern. The buyer's injury is independent of the seller's power; to be deceived by a minor seller can be just as costly to the buyer as to be deceived by a monopolist. Of course, the effect on honest rivals might be worse when continuous deception is practiced by a monopolist than when practiced by one of many small firms in a competitive market.

The key problem here is the difficulty of assessing the connection between any improper representations and the speaker's monopoly power. The more typical deception defendant is the smaller firm or recent entrant that makes its false claims, collects the payments from deceived consumers, and then disappears or becomes

---

2.    Federal Trade Commission Act §5 empowers the Commission to order the termination of "unfair methods of competition . . . and unfair or deceptive acts or practices." Misrepresentations and especially deceptive advertising are included. And although the Commission has not attempted to proscribe all "puffing," its prohibitory orders do not depend upon showing that any buyer actually relied on a false or incomplete representation. This may be altogether appropriate in an effort to lift standards of accuracy in public advertising by prospective orders against continuation of the conduct and without any other public or private remedies or sanctions. But such rulings cannot be applied automatically where serious additional sanctions would result.

judgment-proof. The false claim leading to or perpetuating durable market power by a firm capable of being sued is much less likely. Because the likelihood of significant creation of durable market power is so small in most observed instances—and because the prevalence of arguably improper misrepresentation is so great—the courts would be wise to regard misrepresentations as presumptively *de minimis* for §2 purposes.

The presumption could be overcome by cumulative proof that the representations were clearly false, clearly material, clearly likely to induce reasonable reliance, made to buyers without knowledge of the subject matter, continued for prolonged periods, and not readily susceptible of neutralization or other offset by rivals.

The Second Circuit accepted these principles in its *Berkey* decision.[3] Kodak had introduced a new film, Kodacolor II, promoted its virtues, arranged demonstrations so as not to reveal the "red eye" of flash pictures for early batches of the new film, and indicated a 14-month shelf life although the film lost half its speed within three to six months. The court found no antitrust violation here.

> A monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted by competitive exigencies as to constitute an entry barrier. . . . And in its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible. Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of §2.
>
> The Sherman Act is not a panacea for all evils that may infect business life. Before we would allow misrepresentation to buyers to be the basis of a competitor's treble damage action under §2, we would at least require the plaintiff to overcome a presumption that the effect on competition of such a practice was *de minimis*.[4]

3. *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 287–288 & n.41 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980).

4. Id. See also *Taylor Publishing Co. v. Jostens*, 216 F.3d 465 (5th Cir. 2000) (dominant firm lured customers with low price offers but later convinced them to purchase additional items at premium prices; no coercion of customers; no antitrust violation); *American Professional Testing Serv. v. Harcourt Brace Jovanovich*, 108 F.3d 1147 (9th Cir. 1997) (dominant offeror of bar review courses sent five anonymous and damaging fliers about plaintiff rival to law schools over a two-month period; Ninth Circuit requires proof of a "significant and enduring adverse impact on competition," quoting this Paragraph in previous edition; very little evidence that law students actually relied on the fliers in making their decisions). By contrast, *National Assn. of Pharmaceutical Mfrs. v. Ayerst Laboratories*, 850 F.2d 904 (2d Cir. 1988), held that the plaintiff's claim of monopolization by false statements to buyers should not have been dismissed. A manufacturer of name brand drugs had sent pharmacists a letter warning them of the dangers of certain generic drugs, cautioning against use of the plaintiff's generic product for some conditions. The court concluded that the plaintiff should be allowed discovery on its claim that the letter's assertions were " 'clearly' false, clearly material, and clearly likely to

---

Fina
inant fir
firm just
custome
inant fir
ing by a
always c

**782**
specifies
be able to
nied to ri
served. E
market. '
the same
"induced
Such pe
where th
product,
uct witho
ticular s
manufac

Alth
wrongfu
ilar prac
senting c
for the p
canvasse

induce reaso
the §2 violat
*Davis v. Sout*
could have i
and coercive
or economic

In *Inte*
449 U.S. 106
from the Tw
tain charters
tive in sever.
canceled and
the first stat
vertisement
ings, and req
court.

5. S
tion by buye
notwithstan
*George R. Wh*
1004 (1975).

Finally, misrepresentations and organized deception by a dominant firm may have §2 implications when used against a nascent firm just as it is entering the market. Such a firm has no established customer base and typically lacks the resources to answer the dominant firm's deception effectively. Of course, even honest advertising by a dominant firm can deter new entrants, but we virtually always consider honest advertising as competition on the merits.

**782c. Influencing purchaser specifications.** When a buyer specifies features that only the monopolist can meet, rivals will not be able to bid for the patronage. If much of the market is thereby denied to rivals, the monopolist's power will be strengthened and preserved. But that result simply reflects the monopolist's success in the market. There is no impropriety in being preferred by buyers. And the same may be true even though the monopolist "influenced," "induced," or "persuaded" the buyer to adopt such specifications.[5] Such persuasion would merely reflect competitive superiority where the monopolist has truthfully explained the features of its product, their utility to a buyer, the consequences of using a product without these features, and the consequences of adopting a particular specification in terms of the number and identity of manufacturers who could bid for the job.

Although the fact of influence or inducement cannot itself be wrongful, its manner may be improper. Apart from bribes and similar practices, improper inducement would flow from misrepresenting one's own product, the rival product, or the consequences for the purchaser of any given specification. The issues are those canvassed in ¶b on misrepresentation and in ¶d on disparagement.

---

induce reasonable reliance." Of course, these facts alone would not be sufficient to establish the §2 violation; a showing of power and exclusionary effect would also be necessary. See also *Davis v. Southern Bell Tel. & Tel. Co.*, 1994-1 Trade Cas. ¶70,510 (S.D. Fla.) (telephone company could have monopolized market for inside telephone wire maintenance by using deceptive and coercive marketing tactics that led customers to believe that such services were necessary or economically sensible alternatives to plaintiff's offerings).

In *International Travel Arrangers v. Western Airlines*, 623 F.2d 1255 (8th Cir.), cert. denied, 449 U.S. 1063 (1980), Western Airlines, which was found to have a monopoly of air carriage from the Twin Cities to Hawaii, placed advertisements discouraging public patronage of certain charters organized by the plaintiff. The special master found the advertisements deceptive in several ways, including a statement that all such charters already scheduled had been canceled and that travel agents understood the pros and cons of such charters. The falsity of the first statement was admitted. The Eighth Circuit found sufficient evidence that the advertisement was false, deceptive, and misleading. Id. at 1624. The decline in inquiries, bookings, and requests after the advertisement demonstrated its anticompetitive significance to the court.

5. *Security Fire Door Co. v. County of Los Angeles*, 484 F.2d 1028 (9th Cir. 1973) (adoption by buyer of suggested product specifications excluding the plaintiff is no antitrust offense notwithstanding characterization by plaintiff of buyer-seller relation as "conspiracy"). See *George R. Whitten, Jr. v. Paddock Pool Builders*, 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004 (1975).

Tab 11

FT 1.2: D 84/4


STATE LIBRARY OF PENNSYLVANIA

3  0144  00342254  0

# DRUG PRODUCT SELECTION

# Staff Report to the

# Federal Trade Commission

STATE LIBRARY OF PA.
General Library Bureau

MAR 12 1979

12,134

Government Publications Section
Depository Document



# BUREAU OF CONSUMER PROTECTION

# JANUARY 1979

# DRUG PRODUCT SELECTION

### Staff Report to the Federal Trade Commission

## BUREAU OF CONSUMER PROTECTION

## JANUARY 1979

For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402

DRUG PRODUCT SELECTION

Staff Report to the Federal Trade Commission

BUREAU OF CONSUMER PROTECTION

Peter D. Holmes, Attorney

Robert Zwirb, Attorney

Peter K. Pitsch, Attorney

David F. Lean, Economist (Bureau of Economics)

Albert H. Kramer,
Director

Michael C. McCarey
Assistant Director for
Professional Services

CHAPTER I.  INTRODUCTION

On July 7, 1976, the Federal Trade Commission opened an investigation into the sale of multisource prescription drugs.[1] Staff of the Bureau of Consumer Protection submits this report on whether price competition for multisource prescription drugs is unduly restricted by state antisubstitution laws that prohibit pharmacists from selecting lower-cost sources of drugs prescribed by brand name, and whether the Commission should attempt to remedy any existing problem.  We have completed our investigation[2] and have concluded that antisubstitution laws impose substantial unwarranted costs on consumers[3] by unduly restricting price competition in the multisource prescription drug market.[4]  We further conclude that the repeal of antisubstitution laws would produce significant consumer benefits without compromising the quality of health care.[5]  To remedy the situation and facilitate pharmacists' selection (also called "substitution" or "brand

---

[1]    Resolution Directing Use of Compulsory Process in Nonpublic Investigation, File No. 762-3124, July 7, 1976.

[2]    During the course of our investigation we sought comments and documentation from, inter alia, the major brand-name drug manufacturers; brand-name and generic manufacturers' associations; pharmacy and medical associations; the drug wholesalers' association; the Deans of each of the nation's colleges of pharmacy; and from consumer groups.  We further obtained information from the academic community, including experts in biopharmaceutics; state pharmaceutical boards, associations and formulary commissions; other federal agencies, including the Food and Drug Administration; business organizations; and from individual pharmacists, physicians and consumers.  We hired four economic consultants, representing a range of views, to provide their assessments of the potential impact of drug product selection on manufacturers' research and development incentives (see Ch. IX.A., infra).  And in addition to collecting existing studies, we hired an independent market research firm to conduct a multistate survey of pharmacists' attitudes toward their state's drug product selection law (see Ch. VII.C.3., infra).

[3]    See discussion of potential consumer benefits in Ch. VIII., infra.

[4]    See discussion of the role of antisubstitution laws in insulating brand-name manufacturers from price competition, Ch. II.D., infra.

[5]    See analysis of alleged disadvantages of drug product selection at Ch. IX., infra.

interchange") of drug products therapeutically equivalent to but less expensive than products prescribed by brand name, we recommend that the states adopt the Model Drug Product Selection Act discussed in Ch. X.A., infra.[6]

## A.  The Problem

Prescription drugs, which seldom are covered by insurance plans, cost American consumers over eight billion dollars in 1977.[7]  Persons over age 65, who comprise 11 percent of the population, pay 25 percent of the national drug bill, and often must do so on limited fixed incomes.[8]  A considerable portion of this expenditure could be saved if the market fostered the purchase of low-cost equivalent drug products.

The basic problem is that the forces of competition do not work well in a market where the consumer who pays does not choose, and the physician who chooses does not pay.  Patients

---

[6]  This Report generally adopts the term "drug product selection" rather than "brand interchange" or "substitution." "Brand interchange" may mistakenly imply that the pharmacist is limited to selecting another branded drug product for the one prescribed, rather than an unbranded product. "Substitution" may mistakenly imply that the pharmacist is allowed to select an entirely different drug product for the one prescribed, rather than merely a different manufacturer's formulation of the same drug, or to do so surreptitiously.  (In fact, as documented in Ch. VII.A., infra, antisubstitution laws developed at a time when substitution generally did refer to deceptively dispensing a different drug entity.)  "Drug" is used in this Report to indicate the active chemical ingredient or drug entity. "Drug product" means a particular manufacturer's formulation of that same drug entity.  Thus, for example, "Miltown" and "Equanil" are two drug products distributed by Wallace Laboratories and Wyeth Laboratories respectively, each containing the identical drug--meprobamate.  Meprobamate also may be prescribed alone or in combination under the following brand names, among others:  Meprospan, Meprotabs, SK-Bamate, Tamate, Appetrol, Bamadex, Cyclex, Deprol, Equalysen, and Pathibamate.  USAN and the USP Dictionary of Drug Names (M.C. Griffiths ed. 1976), at 172-173.

[7]  Pharmacy Times, April 1978, at 41, 48.  See Ch. V.A., infra, for a discussion of drug costs.

[8]  Drug Topics, Sept. 1, 1977.  See discussion of the special problems of the elderly at Ch. V.B., infra.

2

have little influence in determining which products they will
buy and what prices they must pay for prescriptions.

Chemically (and therapeutically) equivalent versions of
"multisource" prescription drugs (drugs available from more than
one manufacturer) are frequently sold at widely disparate prices.
For example, ampicillin trihydrate, a commonly-prescribed antibiotic,
is available at wholesale prices ranging from $18.74 to $6.00
per hundred capsules.[9]  This wide price disparity is evidence of
the low priority placed on drug prices by prescribing physicians.
In fact, most physicians have little knowledge of drug prices.
One recent study[10] asked physicians from a diversity of practices
to rank their knowledge of drug prices on a scale from one (very
informed) to five (uninformed).  Of the 144 physicians responding,
over 32 percent replied that they had "no idea" of the prices
of commonly-prescribed drugs, and over two-thirds of the remainder
assessed themselves at a four or five.  When the same study
measured physicians' knowledge of the prices of drugs prescribed
in their specialties, it found that two and a half times as many
physicians underestimated as overestimated the price.

The reason for this lack of price awareness is that there
is little incentive for physicians to shop around for the least
expensive drug products.  Patients do not choose their physicians
on the basis of the cost of the drugs the physician prescribes.
Indeed, probably only a small percentage of patients currently
know enough about comparative drug prices or the availability of
less expensive generic equivalents to ask physicians to prescribe
low-cost drug products.[11]  Furthermore, it is time-consuming and
therefore costly for physicians to acquire comparative price
information.  Busy physicians understandably are concerned when
choosing drugs primarily with the relative performance, benefits
and risks associated with the use of a particular drug.  Price
considerations necessarily take on a secondary importance, if

---

[9]   See Table 6: "HEW's MAC Savings on Ampicillin Trihydrate
      250 mg. caps." in Ch. VIII., infra.

[10]  Fink & Kerrigan, "Physicians' Knowledge of Drug Prices,"
      1 Contemp. Pharmacy Prac. 18 (1978).  See Ch. III.C.,
      infra, for a discussion of this and similar studies.  Except
      where otherwise indicated, we have not attempted in this
      Report to analyze the statistical validity of the various
      surveys cited.  Where support is not available from other
      surveys with consistent findings, we have attempted to
      indicate that fact or to cite opposing studies.

[11]  See Ch. VII.B.4 and C.3., infra, for evidence that patients
      seldom ask pharmacists about the availability of low-cost
      products.

Tab 12



**ASPEN**
PUBLISHERS

# IP and Antitrust
## An Analysis of Antitrust Principles
## Applied to Intellectual Property Law

*by Herbert Hovenkamp, Mark D. Janis, and Mark A. Lemley*

Deals concerning the acquisition, transfer, or licensing of intellectual property are among the largest and most important transactions in the United States. When you're seeking to maximize the value of intellectual property without raising antitrust concerns, turn to *IP and Antitrust*. Written by three experts on antitrust and intellectual property law, *IP and Antitrust* provides comprehensive, insightful analysis of the antitrust issues involved in the creation, protection, and transfer of intellectual property interests.

### 2007 Supplement

Now the 2007 Supplement brings you up to date on the latest developments, including these:

- A completely revised chapter on market power, including full treatment of the Supreme Court's *Independent Ink* decision

- A completely revised and updated chapter on IP and competition law in Europe

- Detailed analysis of the FTC's comprehensive decision in the *Rambus* standard-setting case

- Analysis of the *Abbott v. Teva* decision, the first case to address pharmaceutical product-hopping, along with discussion of new pharmaceutical patent strategies and issues

- A new section on the application of *Noerr* immunity to settlement agreements, including discussion of the *Medimmune v. Genentech* case

7700001289

- Discussion of the latest pharmaceutical exclusion payment case, *In re Tamoxifen Citrate*
- Analysis of the *Philips v. ITC* decision and its implications for both the law of tying (package licensing) and patent misuse doctrine
- Observations on IP/antitrust implications of the Supreme Court's *eBay* patent decision
- Analysis of new developments on procedural aspects of IP/antitrust cases
- Discussion of the European Commission's *AstraZeneca* decision on the improper extension of pharmaceutical patents
- Commentary on an important Canadian decision, *Eli Lilly & Co. v. Apotex,* on the relationship between the Patent Act and the Competition Act

**11/06**

**For questions concerning this shipment, billing, or other customer service matters, call our Customer Service Department at 1-800-234-1660.**

**For toll-free ordering, please call 1-800-638-8437.**

© 2007 Aspen Publishers

**a Wolters Kluwer business**

where the predominant evidence indicated they were not."[70] Rather, the court endorsed a more general section 2 inquiry: whether the "design choice is unreasonably restrictive of competition."[71]

This inquiry will be hard in many cases. It will be rare that both parties agree that an innovation is significant,[72] and rarer still that the product change actually makes everyone worse off from a technical standpoint.[73] In many cases the parties will contest the extent of the innovation or even whether the product was innovative at all. They will also dispute whether the design change was necessary to the innovation; if not, the fact that the new product was innovative as a whole will not justify the design change.[74] Resolving these arguments will require a court to delve into the technical details of the product change.[75] Courts are understandably wary of being caught up in such arguments. But it is an

---

70.  *IBM Peripheral EDP Devices*, 481 F. Supp. 965, 1003 (N.D.Cal. 1979), aff'd on other grounds, 698 F.2d 1377, 1382 (9th Cir. 1983).

71.  *Id.* (citing *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 452 n. 46 (9th Cir. 1979)). *Accord GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1228 (S.D.N.Y. 1981); 3A Antitrust Law ¶777 (2d ed. 2001); Franklin M. Fisher, Antitrust and Innovative Industries, 69 Antitrust L.J. — (forthcoming 2001).

72.  *Cf. Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp.2d 1295 (D.Utah 1999) (finding a genuine factual issue as to whether the benefit of Microsoft's integration of products into Windows 95 was "significant").

73.  Thus, in the *Microsoft* Windows 98 case, the District Court found that "Windows 98 users uninterested in browsing" were injured by the inclusion of Internet Explorer, as were users who affirmatively preferred a competing browser. 84 F. Supp. at 53. This conclusion seems unexceptional. More questionable is the court's conclusion that even users who want to use Internet Explorer are hurt by its bundling with Windows 98. See *id.* If true, the conclusion makes the case quite easy. If not, the court is obligated to balance the harm to one group against the benefit to another.

74.  *See id.* at 53, 56 (finding that "Microsoft could offer consumers all the benefits of the current Windows 98 package by distributing the products separately and allowing OEMs or consumers themselves to combine the products if they wished").

75.  Courts may be tempted to resolve such debates by relying on the presence or absence of an intellectual property right covering the new product design, on the theory that if a new design got patent or copyright protection it must be innovative. *Cf. C. R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1370 (Fed. Cir. 1998) (Newman, J., dissenting). While the existence of a patent could conceivably be relevant to the inquiry, we do not think the presence or absence of intellectual property rights should be determinative. Copyrights and trade secrets are not granted after inquiry by the government, but are obtained automatically upon the creation of a new work of authorship or a new secret. The fact that a computer program is copyrighted, therefore, tells us very little about whether the changes in that program are innovative. Patent law is designed to identify innovative ("nonobvious") ideas, but in practice very little innovation is required to obtain a new patent in some industries. Further, the PTO tests how *different* a design is from its predecessors, not whether it is better or worse. Thus, courts would be unwise to presume from the existence of an intellectual property right that a new product design is sufficiently innovative. Similarly, there is no warrant for the opposite presumption—that a failure to patent a product change means it is not innovative.

inquiry that must be made in a section 2 case once market power has been proven.[75.1]

In a recent application of the section 2 standard, the Federal Circuit's *Bard* decision condemned a redesign that arguably had no impact except to make rivals' complementary supplies obsolete.[76] The defendant had modified its patented biopsy gun, a medical device for automatically taking biopsy samples from a patient, so that it would not accept the plaintiff's non-infringing disposable needles or those of other third party suppliers. The patentee argued that the modifications had improved its patented gun, and to hold a patentee "liable for the modification would have the pernicious' effect of penalizing innovators for making improvements to their products."[77] However, the jury had been asked whether the product was improved and had answered in the negative, concluding that the patentee had changed the design merely to exclude the plaintiff's needles. The court affirmed:

> Although Bard contended at trial that it modified its Biopsy gun to make it easier to load and unload, there was substantial evidence that Bard's real reasons for modifying the gun were to raise the cost of entry to potential makers of replacement needles, to make doctors apprehensive about using non-Bard needles, and to preclude the use of "copycat" needles.[78]

Further, one of the defendant's internal documents showed that the redesign had no effect at all on the operability of the gun and another document acknowledged that use of a third party's needles could "not possibly" have ill effects on either the patient or the gun itself.[79] "In view of that evidence, the jury could reasonably conclude that Bard's modifications to its guns constituted restrictive or exclusionary conduct' in a market over which it had monopoly power."[80] More precisely, Bard had legitimately granted power in the market for biopsy guns by virtue of its patent, but secured a second monopoly in disposable needles by virtue of the design change.

---

75.1.  For a case rejecting a claim of introduced incompatibility because the plaintiff had not proven market power, see *HDC Medical, Inc. v. Minntech Corp.*, 411 F. Supp. 2d 1096 (D. Minn. 2006).

76.  *C. R. Bard v. M3 Sys.*, 157 F.3d 1340 (Fed. Cir. 1998), cert. denied, 526 U.S. 1130 (1999).

77.  *Id.* at 1382.

78.  *Id.*

79.  *Id.*

80.  *Id.*

the listing of information in the Orange Book and by limiting patentees to a single 30-month stay for any given drug, regardless of the number of patents listed as covering that drug.[31] The result is that while antitrust challenges to past evergreening efforts will continue, there are unlikely to be new cases brought on the basis of continuing conduct.

## §12.5  Product Changes in the Context of FDA Approval

Pharmaceutical patent owners have engaged in a second form of evergreening, one that might be described as "product-hopping." Product-hopping pharmaceutical companies faced with the possibility of generic competition once a patent expires or is held invalid sometimes make trivial alterations to their approved drugs, get FDA approval for those trivial alterations, and then replace the old product with the new product. For example, a patentee might switch from selling a drug in capsule form to selling the same formulation of the same drug in tablet form. While the change won't matter much to consumers, it can be sufficient to require a generic company to start the ANDA filing process over from scratch, delaying the date of generic entry and triggering an entirely new round of patent litigation. Because the patented pharmaceutical is now being sold only in the new tablet formulation, the generic company will be unable to rely on generic substitution to sell its ANDA-approved capsules. A number of antitrust challenges to product-hopping are pending as of this writing.

A pharmaceutical patent owner has no legal duty either to help its generic competitors or to continue selling a particular product. Patent owners may argue with some justification, therefore, that they cannot be held liable for stopping the sale of a product. At the same time, product-hopping seems clearly to be an effort to game the rather intricate FDA rules to anticompetitive effect.[1] The patentee is making a product change with no technological benefit solely in order to delay competition. Under the analysis we offer in section 12.3e3, such a change could qualify as a predatory product change if it lacks substantial medical benefits.

---

31. 21 U.S.C. §355(j)(5)(b).
**§12.5**  1. See *Abbott Labs v. Teva Pharm.*, 2006 WL 1460077 (D. Del. May 26, 2006) (citing Treatise).

§12.5    **Innovation and Product Changes**

In *Abbott Labs v. Teva Pharmaceuticals*,[2] the court faced such a claim as a matter of first impression. Teva, a generic pharmaceutical manufacturer, alleged that Abbott engaged in a pattern of excluding generic substitutes for TriCor by making a series of changes to its product timed to prevent Teva from introducing a generic substitute. Teva alleged that the changes were of little or no medical value (one change was from capsules to tablets, and another reduced the active amount of the drug slightly), and that the changes were made just as Teva was poised to introduce a generic substitute. Further, Teva alleged that Abbott not only changed its product but bought up and destroyed its old products and listed them as obsolete in a national drug database. As a result, Teva argued, while it was able to enter the market and sell its drugs, it could not take advantage of state generic substitution laws, because Abbott's changes prevented Teva's drug from being equivalent and required it to start over in seeking FDA approval for the modified drug.

Abbott moved to dismiss Teva's antitrust claims, and the district court denied the motion. The court noted that it "faces a difficult task when trying to distinguish harm that results from anticompetitive conduct from harm that results from innovative competition."[3] Nonetheless, the court concluded that rule of reason treatment was appropriate in this instance without any special deference to the defendant's product changes, since the allegations were that those product changes wouldn't face market competition because of regulatory barriers:

> The nature of the pharmaceutical drug market, as described in Plaintiffs' allegations, persuades me that the rule of reason approach should be applied here as well. The per se standard proposed by Defendants presupposes an open market where the merits of any new product can be tested by unfettered consumer choice. But here, according to Plaintiffs, consumers were not presented with a choice between fenofibrate formulations. Instead, Defendants allegedly prevented such a choice by removing the old formulations from the market while introducing new formulations. Hence, an inquiry into the effect of Defendants' formulation changes, following the rule of reason approach, is justified. . . .

---

2.  2006 WL 1460077 (D. Del. May 26, 2006). To the extent it is relevant, M.L. represents Impax Labs, antitrust plaintiff in this case.
3.  *Id.* at __.

**2007 SUPPLEMENT**              **12-46**

Therefore, in this case, an antitrust inquiry into the benefits provided by Defendants' product changes is appropriate. Contrary to Defendants' assertion, Plaintiffs are not required to prove that the new formulations were absolutely no better than the prior version or that the only purpose of the innovation was to eliminate the complementary product of a rival. Rather, as in *Microsoft*, if Plaintiffs show anticompetitive harm from the formulation changes, that harm will be weighed against any benefits presented by Defendants.[4]

Because Teva had alleged that the product changes were not significant improvements and were not cost-justified, its allegations survived the motion to dismiss.

Abbott also argued that because Teva was free to sell the old formulation of TriCor, Abbott's product changes could not have had an anticompetitive effect. The court rejected that claim as well:

To show that conduct has an anticompetitive effect, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005). Competitors need not be barred "from all means of distribution," if they are barred "from the cost-efficient ones." *Microsoft*, 253 F.3d at 64. Here, while Teva and Impax may be able to market their own branded versions of the old TriCor formulations, they cannot provide generic substitutes for the current TriCor formulation, which is alleged to be their cost-efficient means of competing in the pharmaceutical drug market. That opportunity has allegedly been prevented entirely by Defendants' allegedly manipulative and unjustifiable formulation changes. Such a restriction on competition, if proven, is sufficient to support an antitrust claim in this case.[5]

A variant of product-hopping that has yet to be litigated involves the bundling of two drugs, one with patent protection and one without, into a single cocktail.[6] Changing from a single drug to a multi-drug cocktail presents issues similar to changing the formulation of a single drug. A court should not hesitate to find such conduct anticompetitive if the cocktail lacks significant medical benefits over the single drugs alone, if they are sold only in cocktail form and if timed to coincide with the expiration or

---

4.  *Id.* at ___ (citing Treatise) (citation omitted).
5.  *Id.* at ___.
6.  For an example, see Jerry Avorn, Torcetrapib and Atorvastatin – Should Marketing Drive the Research Agenda?, 352 N. Eng. J. Med. 2573 (2005).

invalidation of a patent. On the other hand, combining drugs can have significant medical effects, and as discussed above, courts should show some deference when faced with evidence of significant medical benefit.[7]

The product-hopping problem could be solved if the FDA Act permitted generic substitution across formulations. In the absence of such a statutory change, antitrust cases will continue to arise.

7.   See *supra* §12.3.

Tab 13



STATE LIBRARY OF PENNSYLVANIA

3 0144 00342253 2

# GENERIC SUBSTITUTION
# AND
# PRESCRIPTION DRUG PRICES :

## Economic Effects of State Drug Product Selection Laws



85-1186 - P

**Alison Masson**

and

**Robert L. Steiner**

**Federal Trade Commission**

**1985**

# GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES:

# ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS

by

Alison Masson

and

Robert L. Steiner

Staff Report

of the

Bureau of Economics
Federal Trade Commission

October 1985

# CHAPTER 1

## INTRODUCTION

As of mid-1984 all states have laws allowing pharmacists some choice in selecting which brand of drug to dispense in filling a prescription that names a specific brand.[1] The stated purpose of these drug product selection (DPS) laws is to lower the prices consumers pay for prescription drugs through substitution of lower-price versions of the drug for the higher-price brands typically prescribed by physicians.[2] The previous anti-substitution laws required the pharmacist to dispense whichever brand the physician named. The newer drug product selection laws under certain conditions allow the pharmacist to substitute another generically equivalent drug. Since most prescriptions are written using the proprietary name of a specific brand, rather than the established generic name of the drug product, DPS laws in effect shift the choice of brand for most prescriptions from the physician to the pharmacist. The premise underlying DPS laws is that the pharmacist has a greater incentive than the physician to identify the cheapest source of supply and to pass along at least part of the savings to the consumer.

It is the large price differences between leading brands and "generic" versions of the "same" drug that suggest that consumers could save substantially from substitution.[3] Using

---

[1] By 1980 -- the year analyzed in this report -- only three states still prohibited substitution. Louisiana's law went into effect in October of 1980, Texas' at the beginnning of 1982 and Indiana's in mid-1984.

For a history of the anti-substitution laws and of their replacement with drug product selection laws see Staff Report to the Federal Trade Commission, Drug Product Selection, 1979, hereafter cited as FTC Staff Report (1979).

[2] "Generic substitution" is another term often used for drug product selection, and indeed the substitution of unbranded drug products for branded items is envisioned by the statutes in that lower-price products typically include those sold under the generic name only. The term "drug product selection" encompasses a broader range of pharmacist behavior. In filling generically written prescriptions, pharmacists must always choose a drug product. Also, a substitution may involve a second brand rather than a lower-price unbranded version.

The type of substitution analysed in this study is limited to brand interchange within a generic entity (or drug entity), defined as the set of products which all have the same (combination of) active chemical ingredient(s).

[3] In this study, "generics" are defined as being all products other than leading brands, thereby including some products sold under a proprietary name in addition to products sold under the generic name alone. See Appendix A6 for the definitions of "leading brands" and "generics" and Chapter 3 for data on leading brand and generic prices.

measures of the brand-generic price gap, a number of previous studies have attempted to measure the potential savings which DPS laws offer. These estimates have been large, on the order of hundreds of millions of dollars per year.[4]

This study is an empirical analysis of the effects of these laws. We measure these effects in terms of substitution rates and differences in prices while controlling for influences other than the laws. While our primary data are for 1980, we also discuss more recent trends.

## I. EQUIVALENCE AMONG DRUG PRODUCTS

Consumers benefit from substitution only if there is no significant offsetting diminution in therapeutic efficacy. One important prerequisite for the spread of drug product selection laws was the growing acceptance of the view that for many drugs various brands could be interchanged without loss of therapeutic efficacy.

The issue of *therapeutic* equivalence among *generically* equivalent products is real. Two same-strength products in the same generic entity, containing the same active chemical ingredients in identical proportions, may not always have the same effects in a patient, because differences in inactive ingredients used for binding or coloring may modify the effects of the active ingredients or create their own unintended side effects.

However, for many generic entities, there is now substantial agreement that no serious inequivalence problems exist,

---

4/ See FTC Staff Report (1979), which reviews several estimates. These estimates all assume that dollar savings are not offset by a diminution in therapeutic efficacy. Most estimates are of the maximum potential benefits, that is, the savings that would occur if substitutions were in fact made in every instance permissible. Of course, the actual amount of "savings" depends on the extent to which pharmacists have the opportunity to substitute and on whether they actually choose to exercise the substitution option, as well as on any indirect price effects of the DPS laws.

based either on testing or on long experience.[5]  For some others, tests have shown that products are not equivalent and that free interchange is not appropriate.

All state drug product selection laws prohibit substitution of products judged to be inequivalent, but they differ in the means by which they specify which products are considered to be equivalent.  In some states reliance is placed entirely on independent judgment of the pharmacist, although a criterion typically using the terminology of bioequivalence or therapeutic equivalence may be incorporated in the statute.  In many states (two-thirds of the states in 1980) a formulary lists permissible (or, alternatively, impermissible) drug product interchanges.[6]  The formulary's legal grant of permission to substitute is for a particular drug entity very like the broad grant provided by the existence of a drug product selection statute:  without it, substitution is illegal, regardless of how much encouragement other provisions of the law give to substitution in general.  Data for all states permitting substitution in 1980 show that substitution was permitted on 73.6

---

[5] In a 1979 Federal Register notice, the FDA Commissioner was reported as being "convinced that only a small fraction of all drugs present bioequivalence problems, and that, among those drugs that are currently marketed by more than one supplier, the problem drugs have now mostly been identified." 44 Federal Register 2942, January 12, 1979. Two products are said to be bioequivalent if their absorption into the blood stream and their subsequent excretion into the urine occur at the same rate and to the same extent; in practice, bioequivalence is held to imply therapeutic equivalence. Under FDA regulations some but not all drugs have been tested for bioavailability. In fact, the lack of bioequivalence does not necessarily lead to a significant difference in therapeutic effect. According to the FTC Staff Report (1979, p. 241), "small differences in bioavailability were likely to produce therapeutic problems for drugs with either a steep dose-response curve or a narrow range separating effective and toxic levels. Most clinically useful drugs have relatively flat dose-response curves; therefore, only large differences in bioavailability were likely to alter their therapeutic effect." Members of the expert panel whose report was published by the Office of Technology Assessment in 1974 "estimated that roughly 85 percent to 90 percent of all prescription drugs were not critical dose drugs for which bioavailability studies were necessary." FTC Staff Report (1979, p. 238, footnote.)

[6] Formularies which list permissible substitutions are called "positive" formularies; those that list drugs in which substitution is prohibited are "negative" formularies. The effects of this difference are discussed in Chapter 5, as are secondary effects of formularies, such as limiting liability and simply providing information.

3

percent of all prescriptions for 45 leading multi-source drugs studied.[7]

State formularies vary greatly; the proportion of all prescriptions in these 45 drugs on which substitution was permitted in 1980 ranged from 29 to 98 percent.[8]  This shows that there is no single, universally agreed upon list of drugs which should be considered interchangeable.[9]  Since 1980 the Food and Drug Administration has published its judgments in a periodical list entitled Approved Prescription Drug Products with Therapeutic Equivalence Evaluations.[10]  Many states use the FDA list as a basis for their own formularies or, in the absence of a state formulary, recommendations to practicing pharmacists.  Without such a standard compilation of official opinion, drug product selection laws would have been much more difficult to implement.

For the purposes of this study, we use the therapeutic evaluations embodied in state formularies as the standard for determining when a substitution can be made with no loss in therapeutic effectiveness.  We do, however, note the inconsistency of this standard across states for some drugs.

## II. THE ECONOMIC RATIONALE FOR SUBSTITUTION LAWS

In "perfect" markets, consumers choosing between two identical products with different prices would choose the lower-price product, and the price differential could not be maintained.  However, in many "real" markets, price differentials

---

[7] The data and the selection of the 45-drug sample are described in section III below and in greater detail in Appendix A6.

[8] See Appendix Table A1-1 for 1980 data by state.

[9] General agreement on the advisability of prohibiting substitution in a particular drug entity is reflected in the fact that for some drugs substitution is permitted in all states while for others substitution is prohibited in most formulary states.  Appendix Table A3-2 shows for each of the 45 drugs analysed in this study the number of states which permitted substitution in that entity in 1980.  The proportion of prescriptions on which substitution was permissible in 1980 (excluding the three states which prohibited all substitution) ranged from 55 to 100 percent across the 45 drugs.

[10] U.S. Department of Health and Human Services (1980 and subsequent editions).

4

persist, and in the market for prescription drugs the legal
prohibitions against substitution have contributed especially
to sustained price differentials.

The difference between the price of the leading brand in a
prescription drug entity and the price of alternative brands in
the same entity is typically large: a 1980 average across
37 leading multi-source drugs, weighted by sales in number of
prescriptions, was $8.22 for the leading brand and $6.22 for
the average of other brands, a difference of $2.00, or nearly
25 percent of the leading brand price.[11] Despite this broad
price gap most prescriptions are filled with the leading
brand. None of 12 leading drugs whose patents expired between
1970 and 1976 had in 1979 a market share of less than 90 per-
cent in (wholesale) dollar terms, although market shares were
lower (70 to 90 percent) in terms of units sold.[12] Market
share erosion is moderate at best in the years following patent
expiration.[13]

The institutions of the prescription drug market are mar-
kedly different from those in most other product markets. For
prescription drugs, it has not been the consumer who has made
the choice among brands; it has been the physician. A physi-
cian's prescription is a necessary precondition for the pur-
chase of a prescription drug, and it is the physician who
designates both the chemical compound and, on four-fifths of

[11] Of the 45 drugs selected for study, in only 37 did sales of both brands
and generics, by our definitions, actually appear in the 1980 data.

[12] The analysis of dollar market share is in Statman and Tyebjee (1981).
The analysis of unit market share is contained in a letter from Mark B. Good-
son, Associate Manager, Public Policy Planning, Hoffmann-La Roche Inc. to Ro-
bert L. Steiner, January 6, 1982. The computations were based on IMS data and
covered 6 of the 12 drugs in the Statman/Tyebjee analysis. By mid-1981 the
unit market shares had fallen to 58 to 84 percent in these drugs.

[13] Of course, one possible explanation of the persistence of the price
differential is that leading brands are superior in quality. Despite official
state formularies stating that certain brands are interchangeable, some con-
sumers or their physicians may find that one brand is more effective or confers
fewer side-effects than another. Even in the absence of laws or institutions
restricting their options to purchase prescription drugs, some consumers would
therefore be willing to pay a premium for certain brands of powerful drugs,
just as they do now for over-the-counter drugs and other products.

all prescriptions, a specific brand of the drug.[14]   In the
absence of the opportunity to substitute, consumers have no
opportunity to exercise an unfettered choice of brand on most
of the prescriptions received.

Physicians' behavior reveals not only a marked preference
for prescribing brand-name drugs but also for specifying the
first brand marketed in a drug entity.[15]  In the absence of
substitution, this proclivity towards prescribing the pioneer
brand in effect extends the drug's dominance even after the
expiration of the patent which conferred the initial legal
monopoly.  One explanation of this pattern is that physicians'
prescribing habits are formed early in the life of a newly-
introduced drug, at a time when there is only one version of
the drug, protected by a patent monopoly and promoted heavily
by its manufacturer.  These habits are resistant to change,
even in the face of the lower prices set by post-patent com-
petitors of the leading brand.

Of course it is possible that physicians' preferences for
brands accurately reflect consumers' preferences, but there are
strong arguments to the contrary.  First, there is evidence
that physicians are poorly informed about relative prices of
drugs.[16]  Second, physicians' incentives to choose the most
cost-effective drug seem weak.  A patient buys a bundle of
services from the physician and may consider the particular
brand of the drug to be a minor aspect in choice of a phy-
sician, giving much greater importance to diagnostic ability
and overall quality of care.  Moreover, to the extent that
choice of physician is influenced by the cost of the physi-
cian's services, the variability in other components of that
total cost -- such as the cost of the consultation itself and
the cost of laboratory tests -- may swamp differences in pre-
scription costs.  Finally, patients themselves are not know-
ledgeable about the availability and relative prices of dif-
ferent brands within a generic entity and therefore may not

---

14/ In 1980, 79.9 percent of multi-source prescriptions specified a brand.
This figures is a weighted average for 45 multi-source drugs.

The remaining 20.1 percent were written generically. Regardless of whether
the law permits substitution on brand-written prescriptions, selection of a
particular product is necessarily left to the pharmacist and the consumer when
the prescription has been written by generic name only.

15/ Bond and Lean (1977).

16/ See discussion and references in FTC Staff Report (1979, pp. 64-67).

6

notice when the physician's prescription is not the best alternative available.[17]

Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices. That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists.[18] Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices. Also, pharmacists have an immediate incentive to dispense a generic rather than a leading brand because typically the retail dollar gross margin on the generic is higher.[19] Anti-substitution laws, then, prevented pharmacists from dispensing the highest-profit products, and DPS laws can be viewed as the removal of a constraint on pharmacists' choices. Under the DPS laws, the profit-seeking drug retailer is more likely to choose a drug product with a lower (wholesale) cost and to sell it to consumers at a price below that of the leading brand. By making use of the pharmacist's interest in higher profits, DPS laws offer consumers the benefit of lower prices.

### III. DATA USED IN THIS STUDY

Our primary data are from the National Prescription Audit (NPA) compiled by IMS America, Ltd. and are for 1980; we also make use of some more recent data from various sources. In the

17/ See Chapter 3.
18/ Under all state DPS laws, the physician retains the authority explicitly to prohibit substitution on a particular prescription. In almost all states consumers also have the right to refuse substitution.
19/ See Chapter 3. Also, on publicly funded prescription drug programs, such as Medicaid, pharmacies may by the regulations be given an incentive dispense low-cost versions, as is done with the Maximum Allowable Cost (MAC) program which sets reimbursement ceilings for some drugs. Private insurers now also build into their reimbursement schedules incentives for generic dispensing.

7

Tab 14

Westlaw.                                                                    NewsRoom

4/7/07 PHILA-INQ E01                                                        Page 1


4/7/07 Phila. Inquirer E01
2007 WLNR 6777723

Philadelphia Inquirer (PA)
Copyright 2007 The Philadelphia Inquirer

**April 7, 2007**

Section: BUSINESS

Sales manager is fired after comments hit Web
AstraZeneca said the advice, in a cancer newsletter, violated ethical standards.

Thomas Ginsberg INQUIRER STAFF WRITER

AstraZeneca P.L.C., the pharmaceutical giant with U.S. headquarters near Wilmington, summarily fired a regional sales director from Kennett Square yesterday after his avaricious advice for salespeople found its way to the Internet.

Michael Zubillaga, 50, made the comments in an internal **Oncology** Newsletter, published by and for employees at AstraZeneca's Mid-Atlantic Business Center in Wayne.

In a Q&A section of the newsletter's winter edition, Zubillaga is quoted as stating three sales goals for calling on cancer doctors' offices for 2007. His goal No. 3:

"Call Execution - Not making the calls you are supposed to make does not drive your business. I see it like this: There is a big **bucket** of **money** sitting in every office. Every time you go in, you reach your hand in the bucket and grab a handful. The more times you are in, the more money goes in your pocket. Every time you make a call, you are looking to make more money."

Little in the statement would surprise salespeople, their critics, or, for that matter, most physicians they call on. And Zubillaga did, at another point, don the industry's standard patients-first mantle: "Hold your doctors accountable for the data we have, so that patients are getting the best treatment."

Still, the low-level manager's comments in a company newsletter, no less one dealing with cancer, quickly made waves on the Internet after industry bloggers Peter Rost and Ed Silverman published them.

In a statement yesterday evening, the company said Zubillaga had been fired.

"AstraZeneca strongly repudiates the negative comments made in this newsletter," the statement said. "This newsletter was produced outside of AstraZeneca's required approval and review processes."

Messages left for Zubillaga at his home and work were not returned.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AstraZeneca spokeswoman Kirsten Evraire said Zubillaga was fired not for actual im-
proper conduct, but for his comments, which violated the company's "robust compli-
ance program that calls for responsible sales and marketing practices and conduct."

"All of our sales representatives are trained under these guidelines," the statement
said. "We will reiterate with employees the importance of adhering to the highest
ethical standards and all our compliance policies."

Asked whether Zubillaga was fired for merely speaking his mind, Evraire said: "Our
statement speaks to everything we have to say about the situation."

Zubillaga's comments lighted up several blogs and chat boards on the Internet, some
condemning Zubillaga for propagating a negative image and others complimenting him
for speaking the truth - even while predicting he would be fired for it.

"Crass, but some may well be motivated by such imagery," Silverman said in a post on
his blog Pharmalot.com. "Of course, many docs know that's what the sales teams think
of them. That's why some docs hold out for expensive meals, nice trips, and good
seats to good games, and why others won't let the sales rep past reception."

AstraZeneca employs about 4,500 throughout the Philadelphia-Wilmington region.

Contact staff writer Thomas Ginsberg at 215-854-4177 or tginsberg@phillynews.com.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Health & Family (1HE30); Major Corporations (1MA93))

INDUSTRY:  (Healthcare (1HE06); Pharmaceuticals & Biotechnology (1PH13); Internal
Medicine (1IN54); Healthcare Practice Specialties (1HE49); **Oncology** & Hematology
(1ON95))

Language:  EN

OTHER INDEXING:  (ATLANTIC BUSINESS CENTER; PHARMALOT COM)  (AstraZeneca; Crass; Ed
Silverman; Evraire; Kirsten Evraire; Messages; Michael Zubillaga; Oncology Newslet-
ter; Peter Rost; Silverman; Thomas Ginsberg; Web AstraZeneca; Zubillaga)

EDITION: CITY-D

Word Count: 624
4/7/07 PHILA-INQ E01
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 15

FOCUS - 5 of 27 DOCUMENTS

Copyright 2000 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



(Copyright (c) 2000, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.
### EUROPE

The Wall Street Journal Europe

July 20, 2000 Thursday

**SECTION:** MARKETING & MEDIA; Pg. 24

**LENGTH:** 1428 words

**HEADLINE:** U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --- Industry Hopes to Hook Doctors, Patients Through Costly Giveaways

**BYLINE:** By Scott Hensley and Shailagh Murray, Staff Reporters

**BODY:**

Trudy Hargett, operations manager at the Middlesex Health Center in north Baltimore, has an open-door policy -- for pharmaceutical-company salespeople bearing samples of prescription drugs in great demand.

"Am I going to smile big for the Celebrex guy?" asks Ms. Hargett, referring to the Pharmacia Corp. arthritis drug that is among the most popular at the clinic, which caters mainly to low-income patients. "Well, I'm human, and I know what my patients need."

One frequent clinic visitor, Joann Eisenhart, suffers from several ailments, including panic attacks so severe that she sometimes blacks out. For these episodes, Mrs. Eisenhart, who lacks health insurance, relies on free samples of Paxil, the antidepressant from SmithKline Beecham PLC.

At a time when drug manufacturers are under fire for rising prices and costly marketing campaigns, their growing -- and expensive -- practice of giving away samples has gone largely unnoticed. The companies mainly give away their newer, more profitable drugs, aiming to hook doctors and patients.

Door-to-door salesmen dropping off free brushes or trial-sized soaps for consumers have gone the way of the milkman in the U.S., but drug companies continue to arm their swelling legions of salespeople with starter doses of everything from antibiotics to antidepressants. Their hope is that physicians will be favorably disposed toward their company in the future and prescribe their newest drugs.

Last year, drug companies gave doctors and nurse practitioners free drugs valued at more than $7.2 billion (7.77 billion euros) at retail, a 10% increase over 1998, according to IMS Health, which tracks the industry. At many drug companies, the cost of samples is second only to compensation paid to salespeople in the budget for promoting new drugs, industry insiders say. The companies don't break out spending on samples in their financial reports.

Doctors and drug companies know that once patients begin taking a particular drug, they are unlikely to switch to another, such as a cheaper generic version.

Samples are "a big expense, but there's a proven return on investment," says Steve Saltz, a former vice president of sales for Roche Holding AG's Hoffman LaRoche Inc. and now a consultant for CommonHealth, a drug-marketing and

U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --- Industry Hopes to Hook Doctors, Patients Through Costly Giveaways The Wall Street Journal Europe July 20, 2000 Thursday

advertising firm. "When a person walks out of the doctor's office and they have a sample in hand, that's the most power-ful form of marketing there is."

Some critics raise concern about the practice, particularly when the drugs are given to patients without health insur-ance. It "gives drug companies a sense that they can have greater license to keep prices high, to advertise, to prevent ways to provide real, systemic relief for people -- such as through a Medicare (government health-care) drug benefit," says Ron Pollack, head of Families USA, a health-care advocacy group. Moreover, Mr. Pollack says, relying on samples for needed drugs can harm a patient's health, since the supply can be sporadic.

Frank Clemente, director of Public Citizen's Congress Watch, another advocacy group, says he thinks drug compa-nies are trying to win over low-income people -- including millions with Medicaid coverage -- the same way they lure higher-income patients.

"Samples reinforce that marketing is the primary focus for these companies," he says. "They know they only have a fixed amount of time before a competitor comes along. It's no different from Nike advertising on television."

Drug companies say there are good medical reasons behind the expensive and seemingly anachronistic practice. Even the most thorough clinical testing doesn't guarantee that some drugs will work for a given patient. "Every drug will act differently," says Rose Crane, president of the Bristol-Myers Squibb Co. unit that caters to U.S. primary-care doctors. "It's not like any other mass-produced item." A sample lets doctor and patient determine whether a particular drug is worthwhile before an expensive prescription is filled.

Drug companies also know that samples help build brands and can be directly linked to increased prescriptions for the drugs. The pharmaceutical industry heavily distributes freebies for its newest drugs and usually curtails or eliminates them for products about to go off patent.

Companies say that samples are needed most for new drugs so doctors can gain experience with them. But some physicians say the pattern of sampled drugs is more about marketing than medical practice.

"There's a direct correlation between what I see in my sample closet and what I see on TV in direct-to-consumer advertising," says Jaan Sidorov, an internist at Geisinger General Internal Medicine Clinic in Danville, Pennsylvania. "Cheap, safe and effective generic medications are not there."

The burgeoning sales forces at drug companies mean that there is at least one drug salesperson for every 10 U.S. doctors. Doctors, busier than ever, are often reluctant to spare time for salespeople. Thus, samples have become even more important as sales tools. A key factor: U.S. Food and Drug Administration regulations require that doctors sign for samples, giving salespeople a precious minute or two of face-to-face time to make their pitches.

"The sample is necessary to gain access to the office," CommonHealth's Mr. Saltz declares. "Without it, the doctors don't even want to see you, more often than not."

There's little doubt that most doctors like the freebies and the salutary effect they have on the doctor-patient rela-tionship. "There's something about the doctor walking into the room with a sample," Dr. Sidorov says. "Not only has the doctor come up with the answer, but he's got the pills for you."

And sometimes there are medical advantages, such as an immediate start to therapy for patients in urgent need, such as children with ear infections.

"We've done tons of research" on samples, says Bristol-Myers' Ms. Crane, and they're "the most valuable thing that the doctor can give a patient." Indeed, many doctors depend on samples to help their poorer patients get medicine they might not otherwise be able to afford.

Some doctors say railing against the hard sell is futile.

"You can bemoan the situation or try to work with it," says Jeffrey Mason, an endocrinologist and medical director at ProMed HealthCare Network, a 550-doctor practice based in California. He has a keen interest in samples because ProMed shares the financial risk for drugs prescribed under some of the contracts it has with health insurers. Dr. Mason advocates for salespeople bearing drugs on the practice's recommended list, sometimes providing letters of introduction to help them gain access to hard-to-reach physicians.

"I'm happy when doctors have samples of the products we want to use," Dr. Mason says, and he encourages the "underdogs" among drug makers who promote cost-effective medicines. For instance, for the past year ProMed has

U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --- Industry Hopes to Hook Doctors, Patients Through Costly Giveaways The Wall Street Journal Europe July 20, 2000 Thursday

worked with Forest Laboratories Inc., maker of Celexa, a low-cost antidepressant that competes with Prozac, made by Eli Lilly & Co. With other companies, Dr. Mason tries to reach "gentlemen's agreements" that their representatives will leave only samples of drugs that the practice finds cost-effective.

Abbott Laboratories Inc., for instance, agreed to provide samples of erythromycin, a time-honored, low-cost antibiotic, along with the samples of Biaxin, a more expensive antibiotic that Dr. Mason's group prefers to use only if others fail.

Sensitive to the impact of rising brand-name prescription-drug prices, some insurers are paying for samples of generic drugs to be distributed to physicians. Highmark Blue Cross and Blue Shield is working with pharmacy benefits manager Merck-Medco, a unit of Merck & Co., on a sample counterattack featuring generic blood-pressure, gastrointestinal and anti-infective drugs.

Set to start late this year or early in 2001, the generic samples will "provide some counterbalance to the brand sampling that's out there," says Patrick Kerrish, Highmark's vice president of pharmacy and medical affairs.

Even for drug companies, the special packaging of samples and the logistical costs of providing samples make the practice expensive. Each salesperson becomes a "walking warehouse," and the Food and Drug Administration is phasing in new regulations that require drug companies to keep better track of the samples their representatives leave behind.

The heavy cost of samples drives drug companies to periodically rethink their approaches. Some companies have experimented with vouchers or coupons to be redeemed for trial portions of drugs at pharmacies.

**LOAD-DATE:** December 5, 2004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2007, I caused to be electronically filed Plaintiffs' Statement of Points and Authority in Opposition to Defendants' Motion to Dismiss and accompanying Appendix with the Clerk of the Court via CM/ECF.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system.  Parties may access this filing through the court's CM/ECF System.

_____/S/_____

Linda P. Nussbaum (D.C.Bar No. 483254)