**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

Walgreen Co., et al.,
     Plaintiffs,
   v.
AstraZeneca Pharmaceuticals L.P., et al.,
     Defendants.

_____

:   Civil Case Number:
:   1:06-cv-02084-RWR

Rite Aid Corporation, et al.,
     Plaintiffs,
   v.
AstraZeneca Pharmaceuticals L.P., et al.,
     Defendants.

_____

:   Civil Case Number:
:   1:06-cv-02089-RWR

Louisiana Wholesale Drug Co, Inc., et al.,
     Plaintiff,
   v.
AstraZeneca Pharmaceuticals L.P., et al.,
     Defendants.

_____

:   Civil Case Number:
:   1:06-cv-02157-RWR

Burlington Drug Company, Inc., et al.,
     Plaintiffs,
   v.
AstraZeneca Pharmaceuticals L.P., et al.,
     Defendants.

_____

:   Civil Case Number:
:   1:07-cv-00041-RWR

Meijer, Inc., et al.,
     Plaintiffs,
   v.
AstraZeneca Pharmaceuticals L.P., et al.,
     Defendants.

_____

:   Civil Case Number:
:   1:06-cv-02155-RWR

**REPLY STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

July 2, 2007

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      As a Matter of Law, the Introduction of Nexium Was Not Exclusionary. ........................2

      A.      The Introduction of a New Product Is Not Itself Exclusionary, and Cannot Be Challenged Except in Cases of Bundling, Coercion or Predation......................2

      B.      Plaintiffs Cannot State a Section 2 Claim by Alleging that Nexium Is No Better than Prilosec. ..............................................................................................3

            1.      Allegations That A Monopolist's New Product Is No Better Than Its Old Product Are Insufficient To State A Claim Under Section 2...........4

            2.      In Ruling on the Motion to Dismiss, This Court Should Rely on the FDA-Approved Labeling, Which Establishes the Therapeutic Benefits of Nexium. ...................................................................................7

      C.      The Complaints Do Not Allege Conduct Coming Within Any Recognized Exception to the Rule That the Introduction of New Products Is Not Exclusionary. ...................................................................................................10

            1.      The Allegations Do Not Constitute "Coercion." .......................................10

            2.      The Allegations Do Not Constitute Predatory Conduct. ...........................15

      D.      Under *Trinko*, This Court Should Not Create an Unprecedented Exception That Would Allow Antitrust Challenges to the Introduction of FDA-Approved Drugs.................................................................................................16

II.     The Allegations of Deceptive Advertising and Detailing Should Be Disregarded. ..........19

      A.      The Allegations Are Not Sufficient to Support an Antitrust Claim......................19

      B.      The Allegations Do Not Satisfy Rule 9(b).........................................................23

CONCLUSION....................................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Abbott Labs v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) .................. 1, 12

*American Society of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366 (6th Cir. 2003) ...................................................... 20

*Asa Accugrade, Inc. v. American Numismatic Ass'n*, 370 F. Supp. 2d 213 (D.C.C. 2005) ...................................................................................................................................... 9

\* *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ................................................... 2, 9, 24

\* *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ...................................................................................... 3-4, 11, 13-14, 17, 21

*Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001) ................................................. 5

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007) ............................. 24

*Bridon Am. Corp. v. Mitsui & Co.*, No. 83-1234, 1983 WL 1897 (D.D.C. Nov. 7, 1983) ........................................................................................................................................ 23

*California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727 (9th Cir. 1979) .................. 4

*Covad Comm. Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ............................ 12, 15

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987) ........................................................................................................................ 4

*ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM*, 636 F.2d 1188 (9th Cir. 1980) ....................... 4

*In re Omeprazole Patent Litigation*, No. M-21-81, 2007 WL 1576153 (S.D.N.Y. May 31, 2007) .............................................................................................................................. 10

*In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................... 18

*In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705 (D.D.C. May 9, 2000) ................................................................................................................................ 23

---

\*  Pursuant to Local Rule 7(a), AstraZeneca has marked with an asterisk the cases and authorities on which it chiefly relies.

*In re Warfarin Sodium Antitrust Litig.*, MDL 98-1232-SLR, 1998 WL 883469 (D. Del. 1998) ..................................................................................................... 21

*J.B.D.L. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) ...................................... 18

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ................................................... 9

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001) .................... 24

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578 (D. Del. 2005) ................................................................................................................4, 13

*National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988) .....................20

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1977) ...................................... 15

*Northeastern Tel. Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981) ..................................................4

*Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir. 1976) ........... 4

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ......................................... 7

*Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1072 (N.D. Cal. 2002) ............................ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, 2007 WL 1773208 (U.S. S. Ct. Ct. June 21, 2007) ............................................................................................ 9

*Thomas v. Farley*, 31 F.3d 557 (7th Cir. 1994) ....................................................... 9

*United States v. Martin-Baker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir. 2004) .....................23

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................... 1, 5-7, 14

\* *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .................................................................................... 3, 5, 14, 16-17

*Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) ....................................................24

**Statutes , Regulations and Rules**

15 U.S.C. § 2............................................................................................................ *passim*

21 U.S.C. § 202.1(e)(6)(i), (ii) ................................................................................ 9

21 U.S.C. §§ 355(a), (b) ........................................................................................4

21 C.F.R. §§ 314.125.(b)(5), (b)(6) ......................................................................5

Rule 9(b), Fed. R. Civ. P. .......................................................................... 19, 23-25

Rule 12(b)(6), Fed. R. Civ. P. ...........................................................................4

**Treatises and Texts**

R. Bork, The Antitrust Paradox  (2d ed. 1993) ..................................................... 12

FDA, Guidance for Industry:  Providing Clinical Evidence of Effectiveness for
    Human Drug and Biological Products (May 1998), available at
    http://www.fda.gov/cder/guidance/1397fnl.pdf (last visited June 8, 2007).......................9

Richard G. Gilbert, *Holding Innovation to an Antitrust Standard*, 3 Competition
    Policy Int'l 47 (2007) ....................................................... 17

*  3 P. Areeda & D. Turner, *Antitrust Law*  (1978) ................................................ 21

*  3A P. Areeda & H. Hovenkamp, *Antitrust Law* (2d ed. 2002)  ..................................... 3, 22

3A P. Areeda & H. Hovenkamp, *Antitrust Law* (Supp. 2005) ................................. 21

H. Hovenkamp, *et al.*, *IP and Antitrust*  (2007 Supp.) ...........................................12

5C C. Wright & A. Miller, *Federal Practice & Procedure* (3d ed. 2004)  ........................... 10

## INTRODUCTION

AstraZeneca demonstrated in its Opening Brief that the Complaints fail to allege exclusionary conduct under Section 2 of the Sherman Act. An alleged monopolist's introduction of a new product, even one claimed to be no better than its prior product, is not exclusionary under the antitrust laws when it expands the range of choices in the market. Plaintiffs have not pleaded any of the recognized exceptions to this general rule – bundling, coercion or predation.

In their Opposition, Plaintiffs call the Court's attention to "two vitally important cases" (Pl. Opp. at 12), but both decisions confirm the general rule. *United States v. Microsoft Corp.*, 253 F.3d 34, 58, 64-67 (D.C. Cir. 2001), held that a Section 2 violation requires "illicit exclusion," and condemned the defendant's new product because of *bundling*. Similarly, *Abbott Labs v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 422-24 (D. Del. 2006), held that a complaint came within the *coercion* exception where it alleged that the defendants "suppressed competition by blocking the introduction of [a] generic" and "removing [its] old formulations from the market." *See* pages 5-7 and 12-13, *infra*.

The present case does not allege any such exclusionary conduct. There is no claim of bundling at all, and no viable allegation of coercion or predation. AstraZeneca never removed Prilosec® (omeprazole) from the market. It did not prevent generic entry into the alleged relevant market; on the contrary, multiple companies offered generic formulations of Prilosec. And it certainly did not prevent doctors from prescribing generic Prilosec. The gist of the Complaints is that doctors wrote too many prescriptions for AstraZeneca's new drug, Nexium® (esomeprazole magnesium), rather than Prilosec or generic omeprazole. But that medical preference is not an antitrust violation.

Plaintiffs argue that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle

him to relief." Pl. Opp. at 12. This "no set of facts" standard was explicitly repudiated by the

Supreme Court in *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1968-69 (2007). The Court

warned "that proceeding to antitrust discovery can be expensive. . . . '[T]he costs of modern

federal antitrust litigation and the increasing caseload of the federal courts counsel against

sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can

construct a claim from the events related in the complaint.'" *Id*. at 1967 (citations omitted).

Thus, "a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1965.

## ARGUMENT

### I.    As a Matter of Law, the Introduction of Nexium Was Not Exclusionary.

#### A.    The Introduction of a New Product Is Not Itself Exclusionary, and Cannot Be Challenged Except in Cases of Bundling, Coercion or Predation.

As AstraZeneca demonstrated in its opening brief, a Section 2 complaint must

allege "exclusionary" conduct, and the introduction of a new product by an alleged monopolist is

not itself exclusionary. This is particularly true where (as here) the defendant continues to sell

its old product after introducing the new one, for in that case the new product indisputably

expands the options available in the marketplace. By introducing Nexium while also keeping

Prilosec on the market, AstraZeneca gave physicians an additional PPI choice when treating

erosive esophagitis ("EE") and other acid-related diseases.

Contrary to Plaintiffs' assertion, AstraZeneca never argued "that *all* product

design changes made by a monopolist are *per se* lawful." Pl. Opp. at 2 (emphasis in original).

Rather, AstraZeneca showed that the courts have sharply circumscribed the theories that may be

used to challenge such conduct under Section 2. As Plaintiffs themselves pointed out, the

"leading academic authority on intellectual property and antitrust" concluded that "'*all product*

*innovation should be lawful* in the absence of bundling, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing.'" Pl. Opp. at 3, 15 n.5, quoting 3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 781e, at 271 (2d ed. 2002) (emphasis added). "If a monopolist's products gain acceptance in the market, therefore, it is of no importance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 (2d Cir. 1979).

The *Berkey* opinion drew an important distinction between the product introduction *itself*, which can never be anticompetitive when it expands choice, and "associated conduct," which may present Section 2 issues:

> This is not to say, of course, that new product introductions are Ipso facto immune from antitrust scrutiny. . . ; in all such cases, however, it is not the product introduction itself, but some associated conduct, that supplies the violation.

603 F.2d at 286 n.30.

Plaintiffs have not cited a single case in which a court allowed a challenge to the introduction of a new product, except when accompanied by bundling, coercion or predation. As shown below, Plaintiffs cannot state a Section 2 claim merely by asserting that Nexium was not an improvement over Prilosec. The Complaints do not fall within any of the existing exceptions, and Plaintiffs have failed to make the showing required by *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), to create a new exception to the general rule.

### B.    Plaintiffs Cannot State a Section 2 Claim by Alleging that Nexium Is No Better than Prilosec.

Plaintiffs' try to salvage their Complaint by asserting that Nexium "brought no medical or other benefits of any kind to consumers." Pl. Opp. 1. For two independent reasons, this allegation cannot support a claim. First, under the antitrust laws, it does not matter whether

Nexium was an improvement over Prilosec, for the introduction of a new product cannot be condemned as exclusionary on the grounds that it was no better than the existing product. Second, under Rule 12(b)(6), this Court is not bound by Plaintiffs' conclusory allegations, but may rely on the more specific allegations in the Complaints and in the FDA-approved label, which identify the therapeutic benefits of Nexium.

### 1.    Allegations That A Monopolist's New Product Is No Better Than Its Old Product Are Insufficient To State A Claim Under Section 2.

Introducing a new product is the hallmark of competition, not an "exclusionary" act.  As AstraZeneca demonstrated in its opening brief, case after case has recognized that the entry of a new product is generally pro-competitive, and that its legality should not turn on a jury's after-the-fact technical evaluation of the product's merit.  See Def. Br at 19-21; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 (2d Cir. 1979); *Northeastern Tel. Co. v. AT&T*, 651 F.2d 76, 93 (2d Cir. 1981); *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545-46 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir. 1987); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976); *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 439-41 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM*, 636 F.2d 1188 (9th Cir. 1980); *Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578, 589 (D. Del. 2005).

That is especially true here because Nexium is an FDA-approved prescription drug.  AstraZeneca is permitted by federal law to sell Nexium because it obtained FDA approval of its "new drug application" ("NDA") for Nexium.  21 U.S.C. §§ 355(a), (b).  As part of the NDA approval process, the FDA reviewed and specifically approved the Nexium labeling, which (among other things) reported the results of studies comparing the effectiveness of Prilosec and

Nexium, and presented them as two different drugs. The labeling for Nexium could not and would not have been approved unless the FDA had determined that it was "supported by substantial evidence" and was not "false or misleading." 21 C.F.R. §§ 314.125.(b)(5), (b)(6). The FDA's approval of the labeling thus establishes as a matter of law that Nexium is not the same drug as Prilosec. *See Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938-39 (7th Cir. 2001). The federal agency's finding that Nexium is different from Prilosec and its permission to market Nexium separately from Prilosec cannot be collaterally attacked through the mechanism of an antitrust suit.

Plaintiffs have not cited a single case in which the introduction of a new product was deemed exclusionary because it was not an improvement over existing products. Plaintiffs argue that under *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), they can state a Section 2 claim merely by alleging that the introduction of Nexium was bad for consumers: "The touchstone for determining whether conduct is exclusionary, and therefore unlawful under Section 2, is the effect of that conduct on consumers." Pl. Opp. at 13. This is a gross misstatement of the law, for *Microsoft* did not *sub silentio* reject all the cases cited above. Under *Microsoft*, harm to consumers is a *necessary* element of the offense, but it is by no means *sufficient*. The court held that a Section 2 violation requires "illicit exclusion" that "must harm the competitive *process*." 253 F.3d at 58 (emphasis in original).

Plaintiffs' argument cannot be reconciled with the Supreme Court's 2004 decision in *Trinko*. The complaint in that case alleged that consumers had been harmed by a monopolist's actions, but the Court nevertheless ruled that the complaint must be dismissed because there was nothing improper about the defendant's conduct; the complaint did not assert a "recognized antitrust claim." *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). *Trinko* teaches that an allegation of consumer harm by a monopolist is not sufficient to

5

state a Section 2 claim.  Otherwise, it would be unlawful for a monopolist to raise prices.  Yet, as *Trinko* pointed out, the "charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."  540 U.S. at 407.  The Court warned that the Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."  *Id*. at  415-16.

In short, the "rule of reason" described in *Microsoft* does not come into play unless the challenged act can be deemed exclusionary – that is, unless it amounts to what the D.C. Circuit and the Supreme Court referred to as "illicit exclusion."  *Microsoft*, 253 F.3d at 58, quoted with approval in *Trinko*, 540 U.S. at 414.  In that case, Microsoft violated Section 2 by taking various actions "preventing the effective distribution" of Web browsers by Microsoft's rival, Netscape.  253 F.3d at 58.  To limit the distribution of Netscape's browser, Microsoft imposed restrictions in the license agreements with *every* computer manufacturer ("OEM") as well as many leading software vendors, and it had "exclusive deals" with 14 of the top 15 Internet access providers.  *Id*. at 70-74.  In addition, Microsoft engaged in *bundling* that excluded competition by restricting distribution of Netscape's browser.  Not only did Windows 98 combine Microsoft's operating system (the monopoly product) with its browser, but the software was engineered so that it "prevented OEMs from pre-installing other browsers," and thereby "discouraged OEMs from distributing rival products" to consumers.  *Id*. at 64-65.  The court found that "commingling of browser and operating system code constitute[d] exclusionary conduct."  *Id*. at 67.

*Microsoft* does not help Plaintiffs, for it in no way contradicts the many cases holding that a monopolist's introduction of a new product cannot be challenged on the grounds that it was not an improvement.  The D.C. Circuit resolved the *Microsoft* case without ever deciding whether Windows 98 was better than Windows 95, or whether integrating the browser

with the operating system was good or bad for consumers.  *See id*. at 94.  The issue resolved by the court of appeals was whether the *bundled design* was exclusionary.  *See id.* at 67.

The *Microsoft* decision exposes another fatal flaw in Plaintiffs' Complaints:  they confuse harm to *competitors* with harm to the *competitive process*.  The D.C. Circuit emphasized that "harm to one or more *competitors* will not suffice" to state an antitrust claim.  *Id*. at 58 (emphasis in original).  "'The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'"  *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993)).  The court found that Microsoft harmed the competitive process by making it very difficult for Netscape to obtain distribution of its browsers.  Here, by contrast, there is no allegation that AstraZeneca prevented generic companies from obtaining distribution.  Indeed, the Plaintiffs in this case *are* the distributors – the wholesalers and retail pharmacies.  At all relevant times, if a doctor chose Prilosec as the right drug for a patient, the wholesalers and retail pharmacies were ready, willing and able to provide generic omeprazole to fill that prescription.  *See* Walgreen First Am. Compl. ("Compl.") ¶¶ 2-9, 113.

2.    **In Ruling on the Motion to Dismiss, This Court Should Rely on the FDA-Approved Labeling, Which Establishes the Therapeutic Benefits of Nexium.**

An independent reason for rejecting Plaintiffs' novel antitrust theory is that it is contradicted by the specific allegations in the Complaints and by the clinical data reported in the FDA-approved label for Nexium.  The Complaints admit what the label shows:  At its maximum approved dose for EE, Nexium offers faster and more effective healing and symptom relief for EE patients than does Prilosec at its maximum approved dose for EE.  Hence, even if the Court accepted the proposition that a Section 2 claim could be based on the introduction of a new

product that was not an improvement, this hypothetical situation is not present here, according to the materials that the Court should consider when ruling on a motion to dismiss.

The Nexium label shows that the FDA approved both a 20 mg *and* a 40 mg dose of Nexium for healing EE.[1]  The clinical studies that supported these approvals are summarized on the label.  Specifically, the label sets forth the results of three studies (numbered 2, 3, and 4 on the label) that directly compared a 40 mg dose of Nexium with a 20 mg dose of Prilosec for healing EE.  In two of the studies, the 40 mg dose of Nexium provided faster healing (at the end of 4 weeks) and more complete healing (at the end of 8 weeks) of EE than did a 20 mg dose of Prilosec by a statistically significant margin; Nexium also outperformed Prilosec in the third study, but the results were not statistically significant.  *See* Nexium Labeling (Ex. A) at 13-15.

The label also sets forth the comparative results of Nexium 40 mg and Prilosec 20 mg in relieving the symptoms of EE.  It states that in four studies of EE patients, "the range of median days to the start of sustained resolution (defined as 7 consecutive days with no heartburn) was 5 days for NEXIUM 40 mg, 7-8 days for NEXIUM 20 mg and 7-9 days for omeprazole 20 mg."  Nexium Labeling (Ex. A) at 15.

Indeed, Plaintiffs *concede* in their Complaints that the clinical studies showed "a moderate difference in healing rates of EE in favor of 40 mg Nexium over 20 mg Prilosec," as well as "a slight statistically significant difference in favor of 40 mg Nexium in heartburn resolution."  Compl. ¶¶ 80, 83.  Plaintiffs assert that "a double dose of Prilosec" (*i.e.*, two 20 mg capsules) could be just as effective as 40 mg of Nexium for these indications.  Pl. Opp. at 20.  But the FDA-approved label for Prilosec reports that in a clinical trial, "the 40 mg dose [of

---

[1] For the Court's convenience, the Nexium labeling approved by the FDA is attached as Exhibit A.  The Prilosec labeling approved by the FDA is attached as Exhibit B.  Plaintiffs do not dispute that the Court may take judicial notice of these FDA-approved labels.  *See* Def. Br. at 8 n.2.

Prilosec] was *not* superior to the 20 mg dose of PRILOSEC in the percentage healing rate." Prilosec Labeling (Ex. B) at 12-13 (emphasis added).  Thus, 20 mg was the highest dose of Prilosec that the FDA approved for the healing of EE, whereas Nexium was approved at 40 mg for that indication.  *Id*. at 24-25; Compl. ¶ 84.  And under the FDA's rules, AstraZeneca was entitled to advertise the results of the studies as approved and included in the label.[2]

Plaintiffs argue that, in ruling on the motion to dismiss, this Court is obliged to ignore the actual clinical data because "*the Complaints repeatedly allege . . . no benefits of any kind to consumers.*"  Pl. Opp. at 6 (emphasis in original).  But the Court is not bound to accept mere "conclusions," particularly in antitrust cases that involve "the potentially enormous expense of discovery."  *Twombly*, 127 S.Ct. at 1965, 1967.  Just last week, the Supreme Court pointed out that when ruling on 12(b)(6) motions, "courts *must* consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, 2007 WL 1773208, at *9 (U.S. S. Ct. June 21, 2007) (emphasis added).

In this case, the Complaints rely upon and quote the clinical tests described in the Nexium label.  Compl. ¶ 89.  The Court should therefore rely upon what the label actually says when ruling on the motion.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  When a conclusory allegation in a complaint is contradicted by more specific details, the latter are controlling.  *Thomas v. Farley*, 31 F.3d 557, 558 (7th Cir. 1994); *Asa Accugrade, Inc. v. American Numismatic Ass'n*, 370 F. Supp. 2d 213, 218 (D.D.C. 2005) (allegation of monopoly

---

[2] See 21 C.F.R. § 202.1(e)(6)(i), (ii) (requiring advertising statements to be based on substantial evidence); see also FDA, Guidance for Industry:  Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products, at 3 (May 1998) (noting that "substantial evidence" is generally shown by at least two adequate and well-controlled clinical studies), available at http://www.fda.gov/cder/guidance/1397fnl.pdf (last visited June 8, 2007).

power was "undermined by the facts alleged").  "The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading."  5C C. Wright & A. Miller, *Federal Practice & Procedure* § 1363 (3d ed. 2004) (footnotes omitted).

In sum, the Complaints cannot be sustained on the theory that Nexium was no better than Prilosec.  That theory has been rejected by a long line of antitrust cases, and it is refuted by the FDA-approved label and the specific allegations in the Complaints.

**C.**    **The Complaints Do Not Allege Conduct Coming Within Any Recognized Exception to the Rule That the Introduction of New Products Is Not Exclusionary.**

As noted above, the courts have recognized three exceptions to the general rule that the introduction of new products is not exclusionary.  Those exceptions involved situations where the product introduction was accompanied by bundling, coercion or predatory pricing. The Complaints do not allege bundling, and the allegations do not constitute coercion or predation under the case law.

**1.**    **The Allegations Do Not Constitute "Coercion."**

The Complaints in this case do not come remotely close to alleging coercion. Plaintiffs repeatedly assert that AstraZeneca "prevented" generic competition (*see* Pl. Opp. at 1, 2, 9, 11, 18, 25, 26), but there is no allegation that AstraZeneca prevented the entry of numerous generic competitors.  On the contrary, Plaintiffs concede that the first generic omeprazole product entered the market in 2002.  Compl. ¶ 49.  Beginning in 2003, four other companies began selling generic omeprazole – and two of them did so while infringing AstraZeneca's patents.  *See In re Omeprazole Patent Litigation*, No. M-21-81, 2007 WL 1576153, at *1 & n.2, *7, *144 (S.D.N.Y. May 31, 2007).

10

Plaintiffs cannot establish coercion by alleging that AstraZeneca "prevented" its generic competitors from winning more than a 30% share of the relevant market. *See* Compl. ¶ 108. Nothing coerced or prevented doctors from writing even more prescriptions for Prilosec or its generic equivalents. Prilosec is a well-known, popular medicine that was once "the top-selling drug in the world." Compl. ¶ 42. Any doctor who thought Prilosec was the right drug could prescribe it. And nothing prevented pharmacists from dispensing generic omeprazole when they received a Prilosec prescription.

Recognizing that they cannot come within the "coercion" exception, Plaintiffs argue that *Berkey* should not apply to prescription drugs because the market does not have "free consumer choice": "the consumer does not choose which product to buy – a doctor does." Pl. Opp. at 3. This argument is sophistry, for *doctors* have free choice. Indeed, the rationale of *Berkey* carries extra force when applied to prescription drugs. The Second Circuit concluded that antitrust liability should not turn on a jury's evaluation of "the relative merits of Kodacolor II and Kodacolor X." 603 F.2d at 286. If jurors are not allowed to second guess the choices made by consumers (just like themselves) when purchasing an everyday product, then, *a fortiori*, they should not be second-guessing the medical judgment of the doctors who decided that Nexium was the best drug to prescribe for particular patients.

Plaintiffs object that doctors are "price-insensitive" and thus do not select drugs "based on a balancing of quality and price." Pl. Opp. at 6. If doctors were ignoring price, it means they were prescribing Nexium on the basis of their judgments about "quality." That is hardly a reason for regarding the introduction of Nexium as a violation of the antitrust laws – or for inviting juries to review the medical decisions of doctors. Plaintiffs also complain about AstraZeneca's "massive campaign of blanketing doctors' offices with free samples of Nexium." *Id*. at 3. That was pro-competitive, for "'advertising and promotion [are] essential to vigorous

11

market rivalry.'" *Covad Comm. Co. v. Bell Atl. Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005),

*quoting* R. Bork, *The Antitrust Paradox* 314 (2d ed. 1993).

        Plaintiffs assert that "courts and commentators have concluded that there is no

'free consumer choice' in this market." Pl. Opp. at 24. But the only case cited in support of this

assertion is *Abbott Labs v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006), and the

court said no such thing. Likewise, the only commentators cited by Plaintiffs made no such

broad statement about prescription drugs. Rather, they were commenting on the facts of the

*Abbott* case. *See* H. Hovenkamp, *et al.*, *IP and Antitrust*, § 12.5 at 12-46 (2007 Supp.).

        The central allegation there was that Abbott "manipulated" the FDA approval

process "to prevent generic substitution" for its popular drug TriCor (fenofibrate). 432 F. Supp.

2d at 415. Abbott originally sold TriCor as a *capsule*, but after two competitors filed FDA

applications to offer generic capsules, Abbott developed a TriCor *tablet*. The complaint alleged

that as soon as Abbott began offering the tablets, it "stopped selling TriCor capsules," "bought

back the existing supply of those capsules from pharmacies," and "changed the code for TriCor

capsules in the National Drug Data File ('NDDF') to 'obsolete.'" *Id*. at 416. The FDA later

approved the generic capsules, but "because [Abbott's] TriCor capsule formulation had already

been removed from the market, generic substitution was no longer possible." *Id*. The complaint

went on to allege that Abbott repeated the same maneuver after the two competitors filed

applications with the FDA to offer generic tablets. Abbott responded by introducing tablets with

a slightly lower dosage, and allegedly stopped selling the higher dosage. *Id*. at 418.

        The court denied Abbott's motion to dismiss. The key to its decision was the

allegation that Abbott had removed its existing products from the market and change their NDFF

codes in order to prevent generic competition:

> [H]ere, according to Plaintiffs, consumers were not presented with a choice
> between fenofibrate formulations.  Instead, Defendants allegedly prevented such a
> choice by removing the old formulations from the market while introducing new
> formulations. . . .
>
> By removing the old products from the market and changing the NDFF code,
> Defendants allegedly suppressed competition by *blocking the introduction* of
> generic fenofibrate.  The Court in *Berkey Photo* noted that such conduct, which
> *results in consumer coercion*, is potentially anticompetitive.

*Id*. at 422, 424 (emphasis added).

The present case involves the opposite situation.  Abbott was accused of
"blocking the introduction of generic fenofibrate."  *Id*.  There is no such allegation here.  Abbott
did not expand consumer choice, for it removed one form of TriCor when it started selling
another.  AstraZeneca indisputably *did* expand choice, for it continued to sell Prilosec after
introducing Nexium.  In *Abbott*, the generics were not AB-rated as equivalent to any branded
drug on the market.  In other words, when doctors wrote prescriptions for branded TriCor, there
was no generic substitute available.  In this case, the generics were AB-rated as equivalent to a
very popular drug, Prilosec, and when doctors wrote prescriptions for Prilosec, pharmacists
could substitute generic omeprazole.  The *Abbott* court relied on allegations of "consumer
coercion."  *Id*.  There is no coercion here.  In short, *Abbott* is entirely consistent with the *Berkey*
line of cases.  Indeed, the same judge who decided *Abbott* reaffirmed the *Berkey* principle in
another recent case:  "Absent evidence of anticompetitive conduct, however, it is not the role of
the courts to determine how companies should innovate."  *Medtronic Minimed Inc. v. Smiths
Medical MD Inc.*, 371 F. Supp. 2d 578, 589 (D. Del. 2005).

Plaintiffs' other arguments about "free consumer choice" are frivolous, and do not
come close to establishing coercion.  Plaintiffs say consumer choice was "impaired" because
AstraZeneca had a "head start," introducing Nexium "[e]ighteen months before the first generic
manufacturer received FDA approval."  Pl. Opp. at 26.  But it would have been anti-competitive,

not pro-competitive, for AstraZeneca to withhold Nexium from the market for those 18 months, depriving doctors of the option to prescribe a new drug with higher healing rates and faster symptom resolution for patients with EE. Moreover, the Supreme Court has made it clear that a monopolist has "no duty to aid competitors." *Trinko*, 540 U.S. at 411. Thus, even if AstraZeneca had monopoly power, it was under no obligation to postpone the sale of its new drug while its generic rivals sought FDA approval.

Plaintiffs erroneously cite *Berkey* for the proposition that "a 'head start' by an entrenched monopolist can interfere with consumer choice." Pl. Opp. at 26 (citing footnote 39 in *Berkey*). In fact, the Second Circuit squarely rejected Berkey's argument that it "had a right to be 'at the starting line when the whistle blew.'" 603 F.2d at 285. The court declared that "any firm, even a monopolist, may generally bring its products to market whenever and however it chooses." *Id.* at 286. In the footnote cited by Plaintiffs, the court observed that "the situation might be completely different if, upon the introduction of the 110 system, Kodak had ceased producing film in the 126 size, thereby compelling purchasers to buy a Kodak 110 camera." 603 F.2d at 287 n.39. AstraZeneca did not cease production of Prilosec.

Finally, Plaintiffs argue that consumers lacked "free choice" because many managed care organizations ("MCOs") stopped providing reimbursement for Prilosec (branded or generic) after non-prescription Prilosec OTC became available. Pl. Opp. at 28. But there is no allegation that AstraZeneca *coerced* the MCOs into denying coverage or that this denial was the result of *agreements* with AstraZeneca. Had there been such restrictive agreements, they might have represented the kind of "illicit conduct" that *Microsoft* requires. But there were none here, and Plaintiffs cannot cite any legal authority for their view that AstraZeneca's new product was exclusionary because of the *independent* decisions made by MCOs.

## 2.     The Allegations Do Not Constitute Predatory Conduct.

Plaintiffs cannot state a claim of predatory behavior because the Complaints do not allege that the introduction and marketing of Nexium drove competitors from the market or delayed their entry.  The D.C. Circuit has explained that "a 'predatory' practice is one in which a firm sacrifices short-term profits in order to *drive out of the market* or otherwise discipline a competitor."  *Covad Comm. Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (emphasis added).  Judge Bork provided a similar definition:

> [P]redation involves aggression against business rivals through the use of business practices that would not be considered profit maximizing except for the expectation that (1) actual rivals will be *driven from the market*, or the *entry of potential rivals blocked or delayed*, so that the predator will gain or retain a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to *abandon competitive behavior* the predator finds threatening to its realization of monopoly profits.

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1977) (emphasis added).

The Complaints do not allege that any generic makers of Prilosec have been "driven from the market" or that their entry was "blocked or delayed" by the introduction of Nexium.  Furthermore, the Complaints do not allege that any generic company has "abandon[ed] competitive behavior."  Hence, AstraZeneca's conduct cannot be deemed predatory.

Instead of applying the D.C. Circuit's test for predation, Plaintiffs play word games.  They contend that AstraZeneca expected Nexium to have an "adverse effect on the sales of generic Prilosec."  Pl. Opp. at 32.  But an "adverse effect" on a competitor's sales cannot be equated with as driving a competitor out of the market or forcing it to abandon competitive behavior.  In fact, the Complaint shows that the generic firms are thriving with nearly a 30% share of the market defined by Plaintiffs.  Compl. ¶ 108.  And they achieved this result despite spending little on research and allegedly making no effort to promote their products to doctors.  Compl. ¶ 22.  In any event, there is nothing predatory about investing in new products to take

sales away from competitors.  The Court should reject Plaintiffs' attempt to rewrite the test, for

under Plaintiffs' rendering, the introduction of Nexium would have been predatory even if the

drug were indisputably superior to Prilosec.  It would have made "no economic sense" for

AstraZeneca to spend money developing Nexium unless the result was an increase in sales –

which necessarily implies an adverse effect on the sales of its competitors.

        Plaintiffs assert that "AstraZeneca incurred massive R&D and marketing costs to

switch the market to a product with fewer sales."  Pl. Opp. at 33.  All that Plaintiffs are saying is

that the annual sales of Nexium were less than the sales of Prilosec a few years earlier when it

was "the top-selling drug in the world."  *See* Compl. ¶ 42.  But that hardly makes the

development of Nexium "predatory."  If AstraZeneca had *not* introduced Nexium, its sales in this

market would have dwindled away.  *See* Complaint ¶ 28 (generics "have captured as much as

90% of the brand-name drug's pre-generic sales").

> **D.**    **Under *Trinko*, This Court Should Not Create an Unprecedented Exception That Would Allow Antitrust Challenges to the Introduction of FDA-Approved Drugs.**

        No court has accepted plaintiffs' argument that courts and juries, rather than the

marketplace, should decide if a manufacturer's new product is better than its old product.  And if

there were any question whether this Court should create a new exception to the standard limits

on when new products may be attacked as anticompetitive, *Trinko* resolves the matter.  *Trinko*

strongly counsels against the creation of new exceptions to the "recognized" limits on Section 2

claims, raising concerns that Plaintiffs do not begin to overcome here.  *See Verizon Comm. Inc.*

*v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

        Under the novel exception Plaintiffs propose, a jury would conduct an "inquiry as

to whether [Nexium] resulted in a product improvement," taking into account "a balance of

quality and price." Pl. Opp. at 2, 6. Plaintiffs, however, have failed to demonstrate "the practical

ability of a judicial tribunal" to resolve such issues. *See Trinko*, 540 U.S. at 414. After sifting

through the scientific evidence and evaluating clinical studies comparing Nexium and Prilosec,

the jury presumably would have to decide whether the therapeutic benefits of Nexium justify a

higher price as compared to generic Prilosec. For example, Plaintiffs may wish to ask the jury to

look at Study 4 in the Nexium label and ask: If a patient has erosive esophagitis, is it worth

paying X amount extra for an 81.7% healing rate at four weeks rather than a 68.7% healing rate?

*See* Nexium Labeling (Ex. A) at 13. Plaintiffs do not begin to show that juries can or should

resolve this sort of question. *Cf. Berkey Photo*, 603 F.2d at 286-87 (rejecting a jury inquiry into

superiority because "[a] product that commends itself to many users because superior in certain

respects may be rendered unsatisfactory to others by flaws they considered fatal. . . . [I]n such

circumstances no one can determine with any reasonable assurance whether one product is

'superior' to another.")

        The proposed exception also poses what *Trinko* calls the high "cost of false

positives." 540 U.S. at 414. Juries make mistakes, and it would undermine the purposes of both

the Sherman Act and the Food, Drug and Cosmetic Act if the introduction of a useful drug were

found unlawful, or if the specter of treble damage liability deterred companies from developing

new drugs that represent incremental improvements. As a leading antitrust economist recently

observed: "The risk of excessive enforcement is much higher than the risk of too little

intervention because most innovation is beneficial and would be chilled by attempts to police the

rare cases in which innovation might harm welfare." Richard G. Gilbert, *Holding Innovation to*

*an Antitrust Standard*, 3 Competition Policy Int'l 47, 49 (2007). Professor Gilbert cited research

showing that "incremental prescription drug innovations . . . account for a substantial share of

drug utilization and associated economic and medical benefits." *Id*. at 71-72.

*    *    *

In the final analysis, Plaintiffs are urging this Court to ignore antitrust principles because, in their view, pharmaceutical markets do not work very well and need to be disciplined by the courts: "The market cannot determine which product is superior when the brand company is detailing the redesigned product to doctors and is *not* detailing and providing free samples of the original product." Pl. Opp. at 24. But when Nexium was introduced, Prilosec had been on the market for many years and doctors had written millions of Prilosec prescriptions, recognizing the drug's great therapeutic value. Obviously, doctors did not forget about Prilosec once the detailers stopped calling and providing free samples. Plaintiffs assert that doctors do not care about costs, but those who pay *do* care. The Complaints allege that MCOs pay for most prescriptions, and that the MCOs' coverage decisions can influence doctors' prescription choices. *See* Compl. ¶¶ 97, 101-102. *See also J.B.D.L. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 883-84 (6th Cir. 2007) (describing mechanisms used by MCOs to influence drug selection). Plaintiffs do not dispute the fact that MCOs have Pharmacy & Therapeutics Committees that "review each drug for safety, efficacy and cost." *See In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 603 (S.D.N.Y. 2005). If MCOs thought that Nexium provided no medical benefits compared to Prilosec, they could deny or limit coverage.

Plaintiffs also assert that "once doctors switched from Prilosec to Nexium," their prescriptions were "beyond effective generic competition." Pl. Opp. at 3, 27. This argument displays a crabbed view of the competitive process, for it ignores the opportunity to *compete for the doctor's prescription*. Plaintiffs allege that generic companies chose not to send detailers to doctors, but AstraZeneca did not prevent them from competing in this manner. Other avenues were also available. The generic companies could urge MCOs to favor omeprazole over Nexium in their coverage policies. They could join forces with retail pharmacies (like Plaintiffs herein)

18

to urge consumers to ask their doctors to prescribe the lower-cost generics.  In any case, the fact

that a doctor prescribed Nexium does not mean that the prescription was "beyond" competition

from the generic firms; it simply means that they *lost* the competition for the prescription.

It is not the role of antitrust courts to decide which drugs are best, or which

provide the optimum "balance of price and quality."  *See* Pl. Opp. at 6.  For the reasons set forth

above, the Court should apply longstanding antitrust principles and hold that the introduction of

Nexium cannot be the basis of a claim under Section 2 of the Sherman Act.

## II.     The Allegations of Deceptive Advertising and Detailing Should Be Disregarded.

Plaintiffs' brief is larded with accusations of deception and misrepresentation.

*See* Pl. Opp. at 3, 4, 10, 27, 35, 36, 38, 40, 41, 42, 43.  But it is not until the end of their brief that

Plaintiffs set forth the actual statements attributed to AstraZeneca.  All of those statements are

true.  But even if Plaintiffs were allowed to dispute the scientific results in the FDA-approved

label for Nexium and thereby call into question the truth of these statements, Plaintiffs' claims

would still fail because the statements were not so "clearly false" that they can serve as the basis

for a monopolization claim.  In any event, the Complaints do not satisfy Rule 9(b).

### A.     The Allegations Are Not Sufficient to Support an Antitrust Claim.

Consumer advertising.  In their brief, Plaintiffs object to four statements about

Nexium that they allege appeared in consumer advertisements:  "proven symptom control";

"Proven efficacy in short-term healing (4-8 weeks)"; "effective first-line PPI therapy"; and "Stop

the heartburn – Start the HEALING."  Pl. Opp. at 37.

*All of these statements are true*.  Plaintiffs never deny that Nexium has proven

symptom control and efficacy in short-term healing, or that it stops heartburn.  Rather, Plaintiffs

argue that some consumers might have thought the ads were making *comparative* claims:

"Because the ads said that they were based on studies comparing Nexium to Prilosec, reasonable readers would believe that they meant Nexium had *better* short-term healing and symptom control than Prilosec, was a *better* first-line therapy than Prilosec; and stopped heartburn and healing *faster* than Prilosec." *Id*. at 37-38 (emphasis in original).  The ads, however, did not make these statements.  Plaintiffs have alleged that the ads were misleading in this respect, but that allegation is not enough to support an antitrust claim.  "Permitting antitrust liability for merely potentially misleading or 'true but misleading statements' would chill procompetitive conduct." *American Society of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 & n.7 (6th Cir. 2003).

Plaintiffs try to liken this case to *National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988), but the allegations there were strikingly different.  Ayerst, the manufacturer of a branded drug, sent a letter to pharmacists throughout the country.  The FDA found that this letter was "an attempt to intimidate pharmacists to always dispense" Ayerst's branded drug, rather than a generic equivalent.  *Id*. at 908.  The letter told pharmacists that there was "possible liability associated with dispensing a generic drug" and warned that "litigation is troublesome, expensive and will generate adverse publicity."  The letter went on to say: "Although some generic product manufacturers may be willing to indemnify for monetary awards, no company could adequately compensate you for the trouble and negative publicity that may result from a court case."  *Id*.  The generic competitor sued Ayerst.  In holding that its complaint should not have been dismissed, the Second Circuit placed particular emphasis on the FDA's determinations:  "the FDA found the Letter to be false and misleading in certain respects; and in our view Zenith should be allowed to go forward with discovery to substantiate its claim

that the Letter was clearly false, clearly material, and clearly likely to induce reasonable reliance." *Id.* at 916. The allegations in this case are not remotely comparable.

<u>Detailing to doctors</u>. Plaintiffs allege that when AstraZeneca's detailers called upon doctors, they said Nexium has "significantly greater healing and symptom resolution rates for EE patients"; that "more Nexium patients are symptom free"; that Nexium has a "lower number of treatment failures" than Prilosec, and that Nexium "demonstrates a significant clinical advantage." Pl. Opp. at 37.

*All of these statements are true*. The test results reported in the FDA-approved label showed that EE patients taking the 40 mg approved dose of Nexium had higher healing rates for EE, higher rates of sustained resolution of heartburn, and faster resolution of heartburn than patients taking the highest dose of Prilosec approved for EE. Thus, the statements Plaintiffs seek to challenge are true, but even if their truth were debatable, Plaintiffs cannot come close to satisfying the "clearly false" standard. As the Second Circuit pointed out, "in its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible." *Berkey*, 603 F.2d at 288.

Furthermore, the statements made to doctors cannot support an antitrust claim because doctors do not fall into the category of persons "without knowledge of the subject matter." 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 738a, at 278-79 (1978). Only statements made to "ignorant buyers" are potentially actionable under Section 2. 3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 782a (Supp. 2005). Plaintiffs cite *In re Warfarin Sodium Antitrust Litig.*, No. MDL 98-1232-SLR, 1998 WL 883469 (D. Del. 1998), but that case held that "[o]n a motion to dismiss, plaintiff is entitled to the inference that *the general public* lacked the sophistication to discern that discern that defendant's statements about bioequivalency were false." *Id.* at 11 (emphasis added). Doctors are not the "general public." Even on a motion to

dismiss, the Court should reject any suggestion that doctors are "without knowledge of the subject matter." *See Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002) (dismissing antitrust complaint that alleged misrepresentations about portable gas liquification machines because potential purchasers were "sufficiently sophisticated so as not to be fooled easily"). Doctors have been given the legal authority to write prescriptions because they are qualified to select which drug is best for each patient. Although Plaintiffs argue that doctors "lack the incentive" to appreciate the costs of the drugs they prescribe (Pl. Opp. at 42), the alleged misrepresentations were about medical issues, not economic ones.

Plaintiffs urge this Court to disregard the Areeda-Turner test altogether because, supposedly, the makers of generic Prilosec were "economically precluded" from countering AstraZeneca's statements to doctors about the benefits of Nexium. Pl. Opp. at 40. Plaintiffs cite a passage in the Areeda treatise that "organized deception by a dominant firm *may have § 2 implications* when used against a nascent firm." *Id*. at 39 (emphasis added), *quoting* 3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 782b, at 275 (2d ed. 2002). This passage was not meant to create an exception to the six-part test, which is set forth just one page earlier in the treatise. The authors were simply trying to identify a circumstance in which misrepresentations might possibly "have § 2 implications" – but only if "the representations were clearly false, clearly material, clearly likely to induce reasonable reliance, made to buyers without knowledge of the subject matter, continued for prolonged periods, and not readily susceptible to neutralization or other offset by rivals." *Id*. at 274.

Plaintiffs have not presented a valid reason for disregarding this well-established test. Even if it were true that generic manufacturers did not engage in a detailing campaign to urge doctors to prescribe omeprazole, others were certainly in a position to do so. For example, the Complaints state that a senior government official scolded the doctors at an AMA

convention: "'You should be embarrassed if you prescribe Nexium' because it provides no increased medical benefits." Compl. ¶ 94. Moreover, according to the Complaints, the doctors who were allegedly targeted by AstraZeneca's detailers worked at or for MCOs. Compl. ¶ 91. As noted earlier, MCOs have both the incentive (because they pay for prescriptions) and the ability (through their coverage decisions) to counter any alleged misrepresentations about Nexium. Thus, Plaintiffs cannot satisfy yet another element of the Areeda-Turner test – showing that the alleged misrepresentations were not susceptible of "neutralization or other offset."

### B.      The Allegations Do Not Satisfy Rule 9(b).

The Complaints are not only inadequate under antitrust law, they are woefully deficient under Rule 9(b). The rule requires that a complaint "state the time, place and content of the false representations." *United States v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). Plaintiffs cite *fraudulent concealment* cases where the Rule 9(b) requirements were "relaxed somewhat as to matters peculiarly within the adverse party's knowledge." *Bridon Am. Corp. v. Mitsui & Co.*, No. 83-1234, 1983 WL 1897 at *4 (D.D.C. Nov. 7, 1983); *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705 at *3 (D.D.C. May 9, 2000). But in the present case, Plaintiffs have not alleged that wrongful acts were concealed.

The Complaints do not contain any allegations whatsoever about the *time* when the allegedly misleading statements were made – *i.e.*, whether they were within the statute of limitations or whether they were "continued for prolonged periods," as required by the Areeda-Turner test. In their brief, Plaintiffs assert that the detailing of doctors occurred in "the late 1990s and early 2000s." Pl. Opp. at 37. This is hardly specific, and the dates makes no sense. Nexium was not introduced until March 2001. Compl. ¶ 63.

Furthermore, there is no real specification of the *content* of the allegedly false statements, other than a few sentence fragments. The Complaints do not include the actual advertisements, even though Plaintiffs say it was the "context" that made the ads misleading. Compl. ¶ 92. Moreover, the Complaints fail to specify what any AstraZeneca detailer actually said to any doctor; the only allegation is about what AstraZeneca supposedly "directed its sales force to tell doctors who work for managed care organizations." Compl. ¶ 91.

Plaintiffs argue that Rule 9(b) does not apply here because misrepresentation is "just one aspect" of their claim. Pl. Opp. at 36. Actually, as in *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), their "brief is riddled with references to fraud." *See* Pl. Opp. at 3, 4, 10, 27, 35, 36, 38, 40, 41, 42, 43. In any case, Rule 9(b) does not refer to "claims" of fraud but rather to "averments of fraud." If the requisite particularity is lacking, the remedy is "to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1105 (9th Cir. 2003).

Recognizing this problem, Plaintiffs say they should be allowed to take discovery and then amend their complaints. Pl. Opp. at 38 n.23. But, as the Supreme Court made clear in *Twombly*, defendants should not have to face the enormous expense of discovery in an antitrust case unless a proper claim is stated. 107 S.Ct. 1968-69. Plaintiffs have failed to do so here.

## CONCLUSION

All of the Complaints should be dismissed under Rules 12(b)(6) and 9(b) for

failure to state a claim upon which relief may be granted.

Dated:  July 2, 2007

Respectfully submitted,

By:____/s/Mark E. Haddad_____

Mark E. Haddad (D.C. Bar No. 442547)
Joshua E. Anderson
Alycia A. Degen
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
(213) 896-6000
(213) 896-6600 (fax)

John W. Treece
David M. Schiffman
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
(312) 853-7036 (fax)

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 2nd day of July, 2007, served a true and correct copy of the foregoing on below-listed counsel of record in this proceeding, by electronic means, as well as by United States mail, properly addressed and first class postage prepaid.

_____/S/Mark E. Haddad_____
Mark E. Haddad

**COUNSEL OF RECORD**:

*Counsel for Walgreen Co.*

Robert D.W. Landon III
Richard Alan Arnold
Scott E. Perwin
Lauren C. Ravkind
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131

*Counsel for Rite Aid Corp.*

Robert D.W. Landon III
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131

Steve D. Shadowen
Hangley Aronchick Segal & Pudlin
30 North Third Street, Suite 700
Harrisburg, PA  17101-1713

Joseph T. Lukens
Hangley Aronchick Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933

*Counsel for Louisiana Wholesale Drug Co. and Burlington Drug Company, Inc.*

David U. Fierst (D.C. Bar 912899)
Stein, Mitchell & Mezines LLP
1100 Connecticut Ave, N.W.
Suite 1100
Washington, D.C. 20036

Bruce E. Gerstein
Barry S. Taus
Bret Cebulash
Kevin S. Landau
Kimberly Hennings
Garwin Gerstein & Fisher LLP
1501 Broadway
Suite 1416
New York, New York 10011

L. Gregory Odom
Stuart E. Des Roches
Charles F. Zimmer II
Odom & Des Roches LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

David P. Smith
W. Ross Foote
Percy, Smith & Foote LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA  71309

Daniel Berger
David F. Sorensen
Eric L. Cramer
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103

Brent B. Barriere
Phelps Dunbar LLP
365 Canal Street, Ste. 2000
New Orleans, LA  70130

Adam Moskowitz
Kozyak Tropin & Throckmorton
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134

*Counsel for Meijer, Inc.*

Joseph Vanek
David Germaine
Vanek, Vickers & Masini, P.C.
225 W. Washington
18th Fl.
Chicago, IL 60606

Michael Hausfeld
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005

Linda Nussbaum
Kaplan Fox & Kilsheimer LLP
805 Third Avenue
New York, NY 10022

Steig Olson
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 E. 52nd St., 30th Fl.
New York, NY 10022

Brian Ratner
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005

Susan R. Schwaiger
Kaplan Fox & Kilsheimer LLP
805 Third Avenue
New York, NY 10022

Paul Slater
Sperling & Slater, P.C.
55 W. Monroe Street
Suite 3200
Chicago, IL 60603

# Exhibit A

# FDA APPROVAL LABELING 2/14/01

**APPEARS THIS WAY
ON ORIGINAL**

ı    revised 2/14/01

# NEXIUM™
*(esomeprazole magnesium)*
DELAYED-RELEASE CAPSULES

Rx only

## DESCRIPTION

The active ingredient in NEXIUM™ (esomeprazole magnesium) Delayed-Release Capsules is bis(5-methoxy-2-[(S)-[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole-1-yl) magnesium trihydrate, a compound that inhibits gastric acid secretion. Esomeprazole is the S-isomer of omeprazole, which is a mixture of the S- and R- isomers. Its empirical formula is $(C_{17}H_{18}N_3O_3S)_2Mg \times 3 H_2O$ with molecular weight of 767.2 as a trihydrate and 713.1 on an anhydrous basis. The structural formula is:



The magnesium salt is a white to slightly colored crystalline powder. It contains 3 moles of water of solvation and is slightly soluble in water.

**APPEARS THIS WAY
ON ORIGINAL**

The stability of esomeprazole magnesium is a function of pH; it rapidly degrades in acidic media, but it has acceptable stability under alkaline conditions. At pH 6.8 (buffer), the half-life of the magnesium salt is about 19 hours at 25°C and about 8 hours at 37°C.

NEXIUM is supplied as Delayed-Release Capsules for oral administration. Each delayed-release capsule contains 20 mg or 40 mg of esomeprazole (present as 22.3 mg or 44.5 mg esomeprazole magnesium trihydrate) in the form of enteric-coated pellets with the following inactive ingredients: glyceryl monostearate 40-50, hydroxypropyl cellulose, hydroxypropyl methylcellulose, magnesium stearate, methacrylic acid copolymer type C, polysorbate 80, sugar spheres, talc, and triethyl citrate. The capsule shells have the following inactive ingredients: gelatin, FD&C Blue #1, FD&C Red #40, D&C Red #28, titanium dioxide, shellac, ethyl alcohol, isopropyl alcohol, n-butyl alcohol, propylene glycol, sodium hydroxide, polyvinyl pyrrolidone, and D&C Yellow #10.

## CLINICAL PHARMACOLOGY

### Pharmacokinetics

*Absorption*

NEXIUM Delayed-Release Capsules contain an enteric-coated pellet formulation of esomeprazole magnesium. After oral administration peak plasma levels ($C_{max}$) occur at approximately 1.5 hours ($T_{max}$). The $C_{max}$ increases proportionally when the dose is increased, and there is a three-fold increase in the area under the plasma concentration-time curve (AUC) from 20 to 40 mg. At repeated once-daily dosing with 40 mg, the systemic bioavailability is approximately 90% compared to 64% after a single dose of 40 mg. The mean exposure (AUC) to esomeprazole increases from 4.32 µmol*hr/L on day 1 to 11.2 µmol*hr/L on day 5 after 40 mg once daily dosing.

**APPEARS THIS WAY ON ORIGINAL**

2

The AUC after administration of a single 40 mg dose of esomeprazole is decreased by 33-53% after food intake compared to fasting conditions. Esomeprazole should be taken at least one hour before meals.

The pharmacokinetic profile of esomeprazole was determined in 36 patients with symptomatic gastroesophageal reflux disease following repeated once daily administration of 20 mg and 40 mg capsules of NEXIUM over a period of five days. The results are shown in the following table:

**Pharmacokinetic Parameters of NEXIUM Following Oral Dosing for 5 days**

| Parameter | NEXIUM 40 mg | NEXIUM 20 mg |
|---|---|---|
| AUC (μmol•h/L) | 12.6 | 4.2 |
| Coefficient of variation | 42% | 59% |
| C$_{max}$ (μmol/L) | 4.7 | 2.1 |
| T$_{max}$ (h) | 1.6 | 1.6 |
| t$_{1/2}$ (h) | 1.5 | 1.2 |

Values represent the geometric mean, except the T$_{max}$ which is the arithmetic mean.

*Distribution*

Esomeprazole is 97% bound to plasma proteins. Plasma protein binding is constant over the concentration range of 2-20 μmol/L. The apparent volume of distribution at steady state in healthy volunteers is approximately 16 L.

APPEARS THIS WAY
ON ORIGINAL

3

*Metabolism*

Esomeprazole is extensively metabolized in the liver by the cytochrome P450 (CYP) enzyme system. The metabolites of esomeprazole lack antisecretory activity. The major part of esomeprazole's metabolism is dependent upon the CYP2C19 isoenzyme, which forms the hydroxy and desmethyl metabolites. The remaining amount is dependent on CYP3A4 which forms the sulphone metabolite. CYP2C19 isoenzyme exhibits polymorphism in the metabolism of esomeprazole, since some 3% of Caucasians and 15-20% of Asians lack CYP2C19 and are termed Poor metabolizers. At steady state, the ratio of AUC in Poor metabolizers to AUC in the rest of the population (Extensive metabolizers) is approximately 2.

Following administration of equimolar doses, the S- and R-isomers are metabolized differently by the liver, resulting in higher plasma levels of the S- than of the R-isomer.

*Excretion*

The plasma elimination half-life of esomeprazole is approximately 1-1.5 hours. Less than 1% of parent drug is excreted in the urine. Approximately 80% of an oral dose of esomeprazole is excreted as inactive metabolites in the urine, and the remainder is found as inactive metabolites in the feces.

**Special Populations**

*Geriatric*

The AUC and $C_{max}$ values were slightly higher (25% and 18%, respectively) in the elderly as compared to younger subjects at steady state. Dosage adjustment based on age is not necessary.

*Pediatric*

The pharmacokinetics of esomeprazole have not been studied in patients < 18 years of age.

APPEARS THIS WAY
ON ORIGINAL

*Gender*
The AUC and $C_{max}$ values were slightly higher (13%) in females than in males at steady state. Dosage adjustment based on gender is not necessary.

*Hepatic Insufficiency*
The steady state pharmacokinetics of esomeprazole obtained after administration of 40 mg once daily to 4 patients each with mild (Child Pugh Class A), moderate (Child Pugh Class B), and severe (Child Pugh Class C) liver insufficiency were compared to those obtained in 36 male and female GERD patients with normal liver function. In patients with mild and moderate hepatic insufficiency, the AUCs were within the range that could be expected in patients with normal liver function. In patients with severe hepatic insufficiency the AUCs were 2 to 3 times higher than in the patients with normal liver function. No dosage adjustment is recommended for patients with mild to moderate hepatic insufficiency (Child Pugh Classes A and B). However, in patients with severe hepatic insufficiency (Child Pugh Class C) a dose of 20 mg once daily should not be exceeded (See DOSAGE AND ADMINISTRATION).

*Renal Insufficiency*
The pharmacokinetics of esomeprazole in patients with renal impairment are not expected to be altered relative to healthy volunteers as less than 1% of esomeprazole is excreted unchanged in urine.

APPEARS THIS WAY
ON ORIGINAL

5

**Pharmacokinetics: Combination Therapy with Antimicrobials**

Esomeprazole magnesium 40 mg once daily was given in combination with clarithromycin 500 mg twice daily and amoxicillin 1000 mg twice daily for 7 days to 17 healthy male and female subjects. The mean steady state AUC and $C_{max}$ of esomeprazole increased by 70% and 18%, respectively during triple combination therapy compared to treatment with esomeprazole alone. The observed increase in esomeprazole exposure during co-administration with clarithromycin and amoxicillin is not expected to produce significant safety concerns.

The pharmacokinetic parameters for clarithromycin and amoxicillin were similar during triple combination therapy and administration of each drug alone. However, the mean AUC and $C_{max}$ for 14-hydroxyclarithromycin increased by 19% and 22%, respectively, during triple combination therapy compared to treatment with clarithromycin alone. This increase in exposure to 14-hydroxyclarithromycin is not considered to be clinically significant.

**Pharmacodynamics**
*Mechanism of Action*
Esomeprazole is a proton pump inhibitor that suppresses gastric acid secretion by specific inhibition of the $H^+/K^+$-ATPase in the gastric parietal cell. The S- and R-isomers are protonated and converted in the acidic compartment of the parietal cell forming the active inhibitor, the achiral sulphenamide. By acting specifically on the proton pump, esomeprazole blocks the final step in acid production, thus reducing gastric acidity. This effect is dose-related up to a daily dose of 20 to 40 mg and leads to inhibition of gastric acid secretion.

APPEARS THIS WAY
ON ORIGINAL

*Antisecretory Activity*

The effect of esomeprazole on intragastric pH was determined in patients with symptomatic gastroesophageal reflux disease in two separate studies. In the first study of 36 patients, NEXIUM 40 mg and 20 mg capsules were administered over 5 days. The results are shown in the following table:

**Effect on Intragastric pH On Day 5 (N=36)**

| Parameter | NEXIUM | NEXIUM |
|---|---|---|
| | 40 mg | 20 mg |
| % Time Gastric | 70%* | 53% |
| pH >4[†] (Hours) | (16.8 h) | (12.7 h) |
| Coefficient of variation | 26% | 37% |
| Median 24 Hour pH | 4.9* | 4.1 |
| Coefficient of variation | 16% | 27% |

[†] Gastric pH was measured over a 24-hour period
*p<0.01 NEXIUM 40 mg vs NEXIUM 20 mg

In a second study, the effect on intragastric pH of NEXIUM 40 mg administered once daily over a five day period was similar to the first study. (% time with pH>4 was 68% or 16.3 hours).

APPEARS THIS WAY
ON ORIGINAL

7

*Serum Gastrin Effects*

The effect of NEXIUM on serum gastrin concentrations was evaluated in approximately 2,700 patients in clinical trials up to 8 weeks and in over 1,300 patients for up to 6-12 months. The mean fasting gastrin level increased in a dose-related manner. This increase reached a plateau within two to three months of therapy and returned to baseline levels within four weeks after discontinuation of therapy.

*Enterochromaffin-like (ECL) Cell Effects*

In 24-month carcinogenicity studies of omeprazole in rats, a dose-related significant occurrence of gastric ECL cell carcinoid tumors and ECL cell hyperplasia was observed in both male and female animals (see PRECAUTIONS, Carcinogenesis, Mutagenesis, Impairment of Fertility). Carcinoid tumors have also been observed in rats subjected to fundectomy or long-term treatment with other proton pump inhibitors or high doses of $H_2$-receptor antagonists.

Human gastric biopsy specimens have been obtained from more than 3,000 patients treated with omeprazole in long-term clinical trials. The incidence of ECL cell hyperplasia in these studies increased with time; however, no case of ECL cell carcinoids, dysplasia, or neoplasia has been found in these patients.

In over 1,000 patients treated with NEXIUM (10, 20 or 40 mg/day) up to 6-12 months, the prevalence of ECL cell hyperplasia increased with time and dose. No patient developed ECL cell carcinoids, dysplasia, or neoplasia in the gastric mucosa.

APPEARS THIS WAY
ON ORIGINAL

8

*Endocrine Effects*

NEXIUM had no effect on thyroid function when given in oral doses of 20 or 40 mg for 4 weeks. Other effects of NEXIUM on the endocrine system were assessed using omeprazole studies. Omeprazole given in oral doses of 30 or 40 mg for 2 to 4 weeks had no effect on carbohydrate metabolism, circulating levels of parathyroid hormone, cortisol, estradiol, testosterone, prolactin, cholecystokinin or secretin.

**Microbiology**

Esomeprazole magnesium, amoxicillin and clarithromycin triple therapy has been shown to be active against most strains of *Helicobacter pylori* (*H. pylori*) *in vitro* and in clinical infections as described in the **Clinical Studies and INDICATIONS and USAGE** sections.

*Helicobacter*

*Helicobacter pylori*

Susceptibility testing of *H. pylori* isolates was performed for amoxicillin and clarithromycin using agar dilution methodology, and minimum inhibitory concentrations (MICs) were determined.

*Pretreatment Resistance*

Clarithromycin pretreatment resistance rate (MIC $\geq 1$ µg/mL) to *H. pylori* was 15% (66/445) at baseline in all treatment groups combined. A total of > 99% (394/395) of patients had *H. pylori* isolates which were considered to be susceptible (MIC $\leq 0.25$ µg/mL) to amoxicillin at baseline. One patient had a baseline *H. pylori* isolate with an amoxicillin MIC = 0.5 µg /mL.

APPEARS THIS WAY
ON ORIGINAL

9

*Clarithromycin Susceptibility Test Results and Clinical/Bacteriologic Outcomes*

The baseline *H. pylori* clarithromycin susceptibility results and the *H. pylori* eradication results at the Day 38 visit are shown in the table below:

**Clarithromycin Susceptibility Test Results and Clinical/Bacteriological Outcomes[a] for Triple Therapy -**
(Esomeprazole magnesium 40 mg once daily/amoxicillin 1000 mg twice daily/clarithromycin 500 mg twice daily for 10 days)

| Clarithromycin Pretreatment Results | *H. pylori* negative (Eradicated) | *H. pylori* positive (Not Eradicated) Post-treatment susceptibility results | | | |
|---|---|---|---|---|---|
| | | S[b] | I[b] | R[b] | No MIC |
| Susceptible[b] | 182 | 4 | 0 | 2 | 14 |
| Intermediate[b] | 1 | 0 | 0 | 0 | 0 |
| Resistant[b] | 29 | 1 | 0 | 13 | 2 |

[a] Includes only patients with pretreatment and post-treatment clarithromycin susceptibility test results
[b] Susceptible (S) MIC ≤ 0.25 µg/mL, Intermediate (I) MIC =0.5 µg/mL, Resistant (R) MIC ≥ 1.0 µg /mL

Patients not eradicated of *H. pylori* following esomeprazole magnesium/amoxicillin/clarithromycin triple therapy will likely have clarithromycin resistant *H. pylori* isolates. Therefore, clarithromycin susceptibility testing should be done. when possible. Patients with clarithromycin resistant *H. pylori* should not be re-treated with a clarithromycin-containing regimen.

APPEARS THIS WAY
ON ORIGINAL

*Amoxicillin Susceptibility Test Results and Clinical/Bacteriological Outcomes*

In the esomeprazole magnesium/amoxicillin/clarithromycin clinical trials, 83% (176/212) of the patients in the esomeprazole magnesium/amoxicillin/clarithromycin treatment group who had pretreatment amoxicillin susceptible MICs ($\leq$ 0.25 $\mu$g/mL) were eradicated of *H. pylori*, and 17% (36/212) were not eradicated of *H. pylori*. Of the 36 patients who were not eradicated of *H. pylori* on triple therapy, 16 had no post-treatment susceptibility test results and 20 had post-treatment *H. pylori* isolates with amoxicillin susceptible MICs. Fifteen of the patients who were not eradicated of *H. pylori* on triple therapy also had post-treatment *H. pylori* isolates with clarithromycin resistant MICs. There were no patients with *H. pylori* isolates who developed treatment emergent resistance to amoxicillin.

*Susceptibility Test for Helicobacter pylori*

The reference methodology for susceptibility testing of *H. pylori* is agar dilution MICs. One to three microliters of an inoculum equivalent to a No.2 McFarland standard ($1 \times 10^7$ - $1 \times 10^8$ CFU/mL for *H. pylori*) are inoculated directly onto freshly prepared antimicrobial containing Mueller-Hinton agar plates with 5% aged defibrinated sheep blood ($\geq 2$ weeks old). The agar dilution plates are incubated at 35°C in a microaerobic environment produced by a gas generating system suitable for *Campylobacter*. After 3 days of incubation, the MICs are recorded as the lowest concentration of antimicrobial agent required to inhibit growth of the organism. The clarithromycin and amoxicillin MIC values should be interpreted according to the following criteria:

APPEARS THIS WAY
ON ORIGINAL

11

| Clarithromycin MIC (μg/mL) [a] | Interpretation |
|---|---|
| ≤ 0.25 | Susceptible (S) |
| 0.5 | Intermediate (I) |
| ≥1.0 | Resistant (R) |

| Amoxicillin MIC (μg/mL) [a,b] | Interpretation |
|---|---|
| ≤ 0.25 | Susceptible (S) |

[a] These are breakpoints for the agar dilution methodology and they should not be used to interpret results obtained using alternative methods.

[b] There were not enough organisms with MICs > 0.25 μg/mL to determine a resistance breakpoint.

Standardized susceptibility test procedures require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Standard clarithromycin and amoxicillin powders should provide the following MIC values:

| Microorganism | Antimicrobial Agent | MIC (μg/mL) [a] |
|---|---|---|
| *H. pylori* ATCC 43504 | Clarithromycin | 0.016 – 0.12 (μg/mL) |
| *H. pylori* ATCC 43504 | Amoxicillin | 0.016 – 0.12 (μg/mL) |

[a] These are quality control ranges for the agar dilution methodology and they should not be used to control test results obtained using alternative methods.

APPEARS THIS WAY
ON ORIGINAL

12

# Clinical Studies
## Healing of Erosive Esophagitis

The healing rates of NEXIUM 40 mg, NEXIUM 20 mg, and omeprazole 20 mg (the approved dose for this indication) were evaluated in patients with endoscopically diagnosed erosive esophagitis in four multicenter, double-blind, randomized studies. The healing rates at weeks 4 and 8 were evaluated and are shown in the table below:

### Erosive Esophagitis Healing Rate (Life-Table Analysis)

| Study | No. of Patients | Treatment Groups | Week 4 | Week 8 | Significance Level * |
|-------|-----------------|------------------|--------|--------|---------------------|
| 1 | 588 | NEXIUM 20 mg | 68.7% | 90.6% | N.S. |
|   | 588 | Omeprazole 20 mg | 69.5% | 88.3% | |
| 2 | 654 | NEXIUM 40 mg | 75.9% | 94.1% | $p < 0.001$ |
|   | 656 | NEXIUM 20 mg | 70.5% | 89.9% | $p < 0.05$ |
|   | 650 | Omeprazole 20 mg | 64.7% | 86.9% | |
| 3 | 576 | NEXIUM 40 mg | 71.5% | 92.2% | N.S. |
|   | 572 | Omeprazole 20 mg | 68.6% | 89.8% | |
| 4 | 1216 | NEXIUM 40 mg | 81.7% | 93.7% | $p < 0.001$ |
|   | 1209 | Omeprazole 20 mg | 68.7% | 84.2% | |

*log-rank test vs omeprazole 20 mg
N.S. = not significant ($p > 0.05$).

APPEARS THIS WAY
ON ORIGINAL

13

In these same studies of patients with erosive esophagitis, sustained heartburn resolution and time to sustained heartburn resolution were evaluated and are shown in the table below:

### Sustained Resolution[1] of Heartburn (Erosive Esophagitis Patients)

| Study | No. of Patients | Treatment Groups | Cumulative Percent[2] with Sustained Resolution | | Significance Level[3] |
|---|---|---|---|---|---|
| | | | Day 14 | Day 28 | |
| 1 | 573 | NEXIUM 20 mg | 64.3% | 72.7% | N.S. |
| | 555 | Omeprazole 20 mg | 64.1% | 70.9% | |
| 2 | 621 | NEXIUM 40 mg | 64.8% | 74.2% | p <0.001 |
| | 620 | NEXIUM 20 mg | 62.9% | 70.1% | N.S. |
| | 626 | Omeprazole 20 mg | 56.5% | 66.6% | |
| 3 | 568 | NEXIUM 40 mg | 65.4% | 73.9% | N.S. |
| | 551 | Omeprazole 20 mg | 65.5% | 73.1% | |
| 4 | 1187 | NEXIUM 40 mg | 67.6% | 75.1% | p <0.001 |
| | 1188 | Omeprazole 20 mg | 62.5% | 70.8% | |

[1]Defined as 7 consecutive days with no heartburn reported in daily patient diary.
[2]Defined as the cumulative proportion of patients who have reached the start of sustained resolution
[3]log-rank test vs omeprazole 20 mg
N.S. = not significant (p > 0.05).

APPEARS THIS WAY
ON ORIGINAL

14

In these four studies, the range of median days to the start of sustained resolution (defined as 7 consecutive days with no heartburn) was 5 days for NEXIUM 40 mg, 7-8 days for NEXIUM 20 mg and 7-9 days for omeprazole 20 mg.

There are no comparisons of 40 mg of NEXIUM with 40 mg of omeprazole in clinical trials assessing either healing or symptomatic relief of erosive esophagitis.

*Long-Term Maintenance of Healing of Erosive Esophagitis*
Two multicenter, randomized, double-blind placebo-controlled 4-arm trials were conducted in patients with endoscopically confirmed, healed erosive esophagitis to evaluate NEXIUM 40 mg (n=174), 20 mg (n=180), 10 mg (n=168) or placebo (n=171) once daily over six months of treatment.

No additional clinical benefit was seen with NEXIUM 40 mg over NEXIUM 20 mg.

The percentage of patients that maintained healing of erosive esophagitis at the various time points are shown in the figures below:

APPEARS THIS WAY
ON ORIGINAL

15



Maintenance of Healing Rates by Month (Study 177)

APPEARS THIS WAY
ON ORIGINAL

16



**Maintenance of Healing Rates by Month (Study 178)**

s= scheduled visit

Patients remained in remission significantly longer and the number of recurrences of erosive esophagitis was significantly less in patients treated with NEXIUM compared to placebo.

APPEARS THIS WAY
ON ORIGINAL

17

In both studies, the proportion of patients on NEXIUM who remained in remission and were free of heartburn and other GERD symptoms was well differentiated from placebo.

In a third multicenter open label study of 808 patients treated for 12 months with NEXIUM 40 mg, the percentage of patients that maintained healing of erosive esophagitis was 93.7% for six months and 89.4% for one year.

## Symptomatic Gastroesophageal Reflux Disease (GERD)

Two multicenter, randomized, double-blind, placebo-controlled studies were conducted in a total of 717 patients comparing four weeks of treatment with NEXIUM 20 mg or 40 mg once daily versus placebo for resolution of GERD symptoms. Patients had ≥ 6-month history of heartburn episodes, no erosive esophagitis by endoscopy, and heartburn on at least four of the seven days immediately preceding randomization.

The percentage of patients that were symptom-free of heartburn was significantly higher in the NEXIUM groups compared to placebo at all follow-up visits (Weeks 1, 2, and 4).

No additional clinical benefit was seen with NEXIUM 40 mg over NEXIUM 20 mg.

The percent of patients symptom-free of heartburn by day are shown in the figures below:

APPEARS THIS WAY
ON ORIGINAL

18



Percent of Patients Symptom-Free of Heartburn by Day
(Study 225)

APPEARS THIS WAY
ON ORIGINAL

19

**Percent of Patients Symptom-Free of Heartburn by Day**
**(Study 226)**



In three European symptomatic GERD trials, NEXIUM 20 mg and 40 mg and omeprazole 20 mg were evaluated. No significant treatment related differences were seen.

APPEARS THIS WAY
ON ORIGINAL

20

*Helicobacter pylori (H. pylori) Eradication in Patients with Duodenal Ulcer Disease*

*Triple Therapy (NEXIUM/amoxicillin/clarithromycin):* Two multicenter, randomized, double-blind studies were conducted using a 10 day treatment regimen. The first study (191) compared NEXIUM 40 mg once daily in combination with amoxicillin 1000 mg twice daily and clarithromycin 500 mg twice daily to NEXIUM 40 mg once daily plus clarithromycin 500 mg twice daily. The second study (193) compared NEXIUM 40 mg once daily in combination with amoxicillin 1000 mg twice daily and clarithromycin 500 mg twice daily to NEXIUM 40 mg once daily. *H. pylori* eradication rates, defined as at least two negative tests and no positive tests from CLOtest®, histology and/or culture, at 4 weeks post-therapy were significantly higher in the NEXIUM plus amoxicillin and clarithromycin group than in the NEXIUM plus clarithromycin or NEXIUM alone group. The results are shown in the following table:

APPEARS THIS WAY
ON ORIGINAL

21

*H. pylori* Eradication Rates at 4 Weeks after 10 Day Treatment Regimen

| Study | Treatment Group | Per-Protocol[†] % of Patients Cured [95% Confidence Interval] (Number of patients) | Intent-to-Treat[‡] |
|-------|-----------------|------------|------------|
| 191 | NEXIUM plus amoxicillin and clarithromycin | 84%* [78, 89] (n=196) | 77%* [71, 82] (n=233) |
| | NEXIUM plus clarithromycin | 55% [48, 62] (n=187) | 52% [45, 59] (n=215) |
| 193 | NEXIUM plus amoxicillin and clarithromycin | 85%** [74, 93] (n=67) | 78%** [67, 87] (n=74) |
| | NEXIUM | 5% [0, 23] (n=22) | 4% [0, 21] (n=24) |

† Patients were included in the analysis if they had *H. pylori* infection documented at baseline, had at least one endoscopically verified duodenal ulcer ≥ 0.5 cm in diameter at baseline or had a documented history of duodenal ulcer disease within the past 5 years, and were not protocol violators. Patients who dropped out of the study due to an adverse event related to the study drug were included in the analysis as not *H. pylori* eradicated.

‡ Patients were included in the analysis if they had documented *H. pylori* infection at baseline, had at least one documented duodenal ulcer at baseline, or had a documented history of duodenal ulcer disease, and took at least one dose of study medication. All dropouts were included as not *H. pylori* eradicated.

APPEARS THIS WAY
ON ORIGINAL

22

*p < 0.05 compared to NEXIUM plus clarithromycin
**p < 0.05 compared to NEXIUM alone

The percentage of patients with a healed baseline duodenal ulcer by 4 weeks after the 10 day treatment regimen in the NEXIUM plus amoxicillin and clarithromycin group was 75% (n=156) and 57% (n=60) respectively, in the 191 and 193 studies (per-protocol analysis).

## INDICATIONS AND USAGE

**Treatment of Gastroesophageal Reflux Disease (GERD)**

*Healing of Erosive Esophagitis*

NEXIUM is indicated for the short-term treatment (4 to 8 weeks) in the healing and symptomatic resolution of diagnostically confirmed erosive esophagitis. For those patients who have not healed after 4-8 weeks of treatment, an additional 4-8-week course of NEXIUM may be considered.

*Maintenance of Healing of Erosive Esophagitis*

NEXIUM is indicated to maintain symptom resolution and healing of erosive esophagitis. Controlled studies do not extend beyond 6 months.

*Symptomatic Gastroesophageal Reflux Disease*

NEXIUM is indicated for treatment of heartburn and other symptoms associated with GERD.

**H. pylori Eradication to Reduce the Risk of Duodenal Ulcer Recurrence**

*Triple Therapy (NEXIUM plus amoxicillin and clarithromycin):* NEXIUM, in combination with amoxicillin and clarithromycin, is indicated for the treatment of patients with H. pylori infection and duodenal ulcer disease

APPEARS THIS WAY
ON ORIGINAL

23

(active or history of within the past 5 years) to eradicate *H. pylori*. Eradication of *H. pylori* has been shown to reduce the risk of duodenal ulcer recurrence. (See CLINICAL STUDIES and DOSAGE AND ADMINISTRATION.)

In patients who fail therapy. susceptibility testing should be done. If resistance to clarithromycin is demonstrated or susceptibility testing is not possible, alternative antimicrobial therapy should be instituted. (See CLINICAL PHARMACOLOGY, Microbiology and the clarithromycin package insert, CLINICAL PHARMACOLOGY, Microbiology.)

## CONTRAINDICATIONS

NEXIUM is contraindicated in patients with known hypersensitivity to any component of the formulation or to substituted benzimidazoles.

Clarithromycin is contraindicated in patients with a known hypersensitivity to any macrolide antibiotic.

Concomitant administration of clarithromycin with pimozide is contraindicated. There have been post-marketing reports of drug interactions when clarithromycin and/or erythromycin are co-administered with pimozide resulting in cardiac arrhythmias (QT prolongation, ventricular tachycardia, ventricular fibrillation, and torsade de pointes) most likely due to inhibition of hepatic metabolism of pimozide by erythromycin and clarithromycin. Fatalities have been reported. (Please refer to full prescribing information for clarithromycin.)

Amoxicillin is contraindicated in patients with a known hypersensitivity to any penicillin. (Please refer to full prescribing information for amoxicillin.)

APPEARS THIS WAY
ON ORIGINAL

24

## WARNINGS

CLARITHROMYCIN SHOULD NOT BE USED IN PREGNANT WOMEN EXCEPT IN CLINICAL CIRCUMSTANCES WHERE NO ALTERNATIVE THERAPY IS APPROPRIATE. IF PREGNANCY OCCURS WHILE TAKING CLARITHROMYCIN, THE PATIENT SHOULD BE APPRISED OF THE POTENTIAL HAZARD TO THE FETUS. (See WARNINGS in prescribing information for clarithromycin.)

Amoxicillin: Serious and occasionally fatal hypersensitivity (anaphylactic) reactions have been reported in patients on penicillin therapy. These reactions are more apt to occur in individuals with a history of penicillin hypersensitivity and/or a history of sensitivity to multiple allergens.

There have been well documented reports of individuals with a history of penicillin hypersensitivity reactions who have experienced severe hypersensitivity reactions when treated with a cephalosporin. Before initiating therapy with any penicillin, careful inquiry should be made concerning previous hypersensitivity reactions to penicillins, cephalosporins, and other allergens. If an allergic reaction occurs, amoxicillin should be discontinued and the appropriate therapy instituted.

SERIOUS ANAPHYLACTIC REACTIONS REQUIRE IMMEDIATE EMERGENCY TREATMENT WITH EPINEPHRINE. OXYGEN, INTRAVENOUS STEROIDS, AND AIRWAY MANAGEMENT, INCLUDING INTUBATION, SHOULD ALSO BE ADMINISTERED AS INDICATED.

APPEARS THIS WAY
ON ORIGINAL

25

Pseudomembranous colitis has been reported with nearly all antibacterial agents, including clarithromycin and amoxicillin, and may range in severity from mild to life threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents.

Treatment with antibacterial agents alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that a toxin produced by *Clostridium difficile* is a primary cause of "antibiotic-associated colitis".

After the diagnosis of pseudomembranous colitis has been established, therapeutic measures should be initiated. Mild cases of pseudomembranous colitis usually respond to discontinuation of the drug alone. In moderate to severe cases, consideration should be given to management with fluids and electrolytes, protein supplementation, and treatment with an antibacterial drug clinically effective against *Clostridium difficile colitis*.

## PRECAUTIONS

### General

Symptomatic response to therapy with NEXIUM does not preclude the presence of gastric malignancy.

Atrophic gastritis has been noted occasionally in gastric corpus biopsies from patients treated long-term with omeprazole, of which NEXIUM is an enantiomer.

APPEARS THIS WAY
ON ORIGINAL

**Information for Patients**
Patients should be informed of the following:
NEXIUM Delayed-Release Capsules should be taken at least one hour before meals.

For patients who have difficulty swallowing capsules, one tablespoon of applesauce can be added to an empty bowl and the NEXIUM Delayed-Release Capsule can be opened, and the pellets inside the capsule carefully emptied onto the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellet/applesauce mixture should not be stored for future use.

Antacids may be used while taking NEXIUM.

**Drug Interactions**
Esomeprazole is extensively metabolized in the liver by CYP2C19 and CYP3A4.

*In vitro* and *in vivo* studies have shown that esomeprazole is not likely to inhibit CYPs 1A2, 2A6, 2C9, 2D6, 2E1 and 3A4. No clinically relevant interactions with drugs metabolized by these CYP enzymes would be expected. Drug interaction studies have shown that esomeprazole does not have any clinically significant interactions with phenytoin, warfarin, quinidine, clarithromycin or amoxicillin.

APPEARS THIS WAY
ON ORIGINAL

27

Esomeprazole may potentially interfere with CYP2C19, the major esomeprazole metabolizing enzyme. Coadministration of esomeprazole 30 mg and diazepam, a CYP2C19 substrate, resulted in a 45% decrease in clearance of diazepam. Increased plasma levels of diazepam were observed 12 hours after dosing and onwards. However, at that time, the plasma levels of diazepam were below the therapeutic interval, and thus this interaction is unlikely to be of clinical relevance.

Esomeprazole inhibits gastric acid secretion. Therefore, esomeprazole may interfere with the absorption of drugs where gastric pH is an important determinant of bioavailability (eg, ketoconazole, iron salts and digoxin).

Coadministration of oral contraceptives, diazepam, phenytoin, or quinidine did not seem to change the pharmacokinetic profile of esomeprazole.

*Combination Therapy with Clarithromycin*

Co-administration of esomeprazole, clarithromycin, and amoxicillin has resulted in increases in the plasma levels of esomeprazole and 14-hydroxyclarithromycin. (See CLINICAL PHARMACOLOGY, Pharmacokinetics: Combination Therapy with Antimicrobials.)

Concomitant administration of clarithromycin with pimozide is contraindicated. (See clarithromycin package insert.)

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
The carcinogenic potential of esomeprazole was assessed using omeprazole studies. In two 24-month oral carcinogenicity studies in rats, omeprazole at daily doses of 1.7, 3.4, 13.8, 44.0 and 140.8 mg/kg/day (about 0.7 to 57 times the human dose of 20 mg/day expressed on a body surface area basis)

APPEARS THIS WAY
ON ORIGINAL

28

produced gastric ECL cell carcinoids in a dose-related manner in both male and female rats; the incidence of this effect was markedly higher in female rats, which had higher blood levels of omeprazole. Gastric carcinoids seldom occur in the untreated rat. In addition, ECL cell hyperplasia was present in all treated groups of both sexes. In one of these studies, female rats were treated with 13.8 mg omeprazole/kg/day (about 5.6 times the human dose on a body surface area basis) for 1 year, then followed for an additional year without the drug. No carcinoids were seen in these rats. An increased incidence of treatment-related ECL cell hyperplasia was observed at the end of 1 year (94% treated vs 10% controls). By the second year the difference between treated and control rats was much smaller (46% vs 26%) but still showed more hyperplasia in the treated group. Gastric adenocarcinoma was seen in one rat (2%). No similar tumor was seen in male or female rats treated for 2 years. For this strain of rat no similar tumor has been noted historically, but a finding involving only one tumor is difficult to interpret. A 78-week mouse carcinogenicity study of omeprazole did not show increased tumor occurrence, but the study was not conclusive.

Esomeprazole was negative in the Ames mutation test, in the *in vivo* rat bone marrow cell chromosome aberration test, and the *in vivo* mouse micronucleus test. Esomeprazole, however, was positive in the *in vitro* human lymphocyte chromosome aberration test. Omeprazole was positive in the *in vitro* human lymphocyte chromosome aberration test, the *in vivo* mouse bone marrow cell chromosome aberration test, and the *in vivo* mouse micronucleus test.

The potential effects of esomeprazole on fertility and reproductive performance were assessed using omeprazole studies. Omeprazole at oral doses up to 138 mg/kg/day in rats (about 56 times the human dose on a body surface area basis) was found to have no effect on reproductive performance of parental animals.

APPEARS THIS WAY
ON ORIGINAL

## Pregnancy

### Teratogenic Effects. Pregnancy Category B

Teratology studies have been performed in rats at oral doses up to 280 mg/kg/day (about 57 times the human dose on a body surface area basis) and in rabbits at oral doses up to 86 mg/kg/day (about 35 times the human dose on a body surface area basis) and have revealed no evidence of impaired fertility or harm to the fetus due to esomeprazole. There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

Teratology studies conducted with omeprazole in rats at oral doses up to 138 mg/kg/day (about 56 times the human dose on a body surface area basis) and in rabbits at doses up to 69 mg/kg/day (about 56 times the human dose on a body surface area basis) did not disclose any evidence for a teratogenic potential of omeprazole. In rabbits, omeprazole in a dose range of 6.9 to 69.1 mg/kg/day (about 5.5 to 56 times the human dose on a body surface area basis) produced dose-related increases in embryo-lethality, fetal resorptions, and pregnancy disruptions. In rats, dose-related embryo/fetal toxicity and postnatal developmental toxicity were observed in offspring resulting from parents treated with omeprazole at 13.8 to 138.0 mg/kg/day (about 5.6 to 56 times the human doses on a body surface area basis). There are no adequate and well-controlled studies in pregnant women. Sporadic reports have been received of congenital abnormalities occurring in infants born to women who have received omeprazole during pregnancy.

APPEARS THIS WAY
ON ORIGINAL

**Amoxicillin**
*Pregnancy Category B.* See full prescribing information for amoxicillin before using in pregnant women.

**Clarithromycin**
*Pregnancy Category C.* See WARNINGS (above) and full prescribing information for clarithromycin before using in pregnant women.

**Nursing Mothers**
The excretion of esomeprazole in milk has not been studied. However, omeprazole concentrations have been measured in breast milk of a woman following oral administration of 20 mg. Because esomeprazole is likely to be excreted in human milk, because of the potential for serious adverse reactions in nursing infants from esomeprazole, and because of the potential for tumorigenicity shown for omeprazole in rat carcinogenicity studies, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**
Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use**
Of the total number of patients who received NEXIUM in clinical trials, 778 were 65 to 74 years of age and 124 patients were ≥ 75 years of age.

No overall differences in safety and efficacy were observed between the elderly and younger individuals, and other reported clinical experience has not identified differences in responses between the elderly and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

APPEARS THIS WAY
ON ORIGINAL

31

## ADVERSE REACTIONS

The safety of NEXIUM was evaluated in over 10,000 patients (aged 18-84 years) in clinical trials worldwide including over 7,400 patients in the United States and over 2,600 patients in Europe and Canada. Over 2,900 patients were treated in long-term studies for up to 6-12 months. In general, NEXIUM was well tolerated in both short and long-term clinical trials.

The safety in the treatment of healing of erosive esophagitis was assessed in four randomized comparative clinical trials, which included 1,240 patients on NEXIUM 20 mg, 2,434 patients on NEXIUM 40 mg, and 3,008 patients on omeprazole 20 mg daily. The most frequently occurring adverse events (≥1%) in all three groups was headache (5.5, 5.0, and 3.8, respectively) and diarrhea (no difference among the three groups). Nausea, flatulence, abdominal pain, constipation, and dry mouth occurred at similar rates among patients taking NEXIUM or omeprazole.

Additional adverse events that were reported as possibly or probably related to NEXIUM with an incidence < 1% are listed below by body system:

APPEARS THIS WAY
ON ORIGINAL

32

*Body as a Whole:* abdomen enlarged, allergic reaction, asthenia, back pain, chest pain, chest pain substernal, facial edema, peripheral edema, hot flushes, fatigue, fever, flu-like disorder, generalized edema, leg edema, malaise, pain, rigors; *Cardiovascular:* flushing, hypertension, tachycardia; *Endocrine:* goiter; *Gastrointestinal:* bowel irregularity, constipation aggravated, dyspepsia, dysphagia, dysplasia GI, epigastric pain, eructation, esophageal disorder, frequent stools, gastroenteritis, GI hemorrhage, GI symptoms not otherwise specified, hiccup, melena, mouth disorder, pharynx disorder, rectal disorder, serum gastrin increased, tongue disorder, tongue edema, ulcerative stomatitis, vomiting; *Hearing:* earache, tinnitus; *Hematologic:* anemia, anemia hypochromic, cervical lymphoadenopathy, epistaxis, leukocytosis, leukopenia, thrombocytopenia; *Hepatic:* bilirubinemia, hepatic function abnormal, SGOT increased, SGPT increased; *Metabolic/Nutritional:* glycosuria, hyperuricemia, hyponatremia, increased alkaline phosphatase, thirst, vitamin B12 deficiency, weight increase, weight decrease; *Musculoskeletal:* arthralgia, arthritis aggravated, arthropathy, cramps, fibromyalgia syndrome, hernia, polymyalgia rheumatica; *Nervous System/Psychiatric:* anorexia, apathy, appetite increased, confusion, depression aggravated, dizziness, hypertonia, nervousness, hypoesthesia, impotence, insomnia, migraine, migraine aggravated, paresthesia, sleep disorder, somnolence, tremor, vertigo, visual field defect; *Reproductive:* dysmenorrhea, menstrual disorder, vaginitis; *Respiratory:* asthma aggravated, coughing, dyspnea, larynx edema, pharyngitis, rhinitis, sinusitis; *Skin and Appendages:* acne, angioedema, dermatitis, pruritus, pruritus ani, rash, rash erythematous, rash maculo-papular, skin inflammation, sweating increased, urticaria; *Special Senses:* otitis media, parosmia, taste loss, taste perversion; *Urogenital:* abnormal urine, albuminuria, cystitis, dysuria, fungal infection, hematuria, micturition frequency, moniliasis, genital moniliasis, polyuria; *Visual:* conjunctivitis, vision abnormal.

Endoscopic findings that were reported as adverse events include: duodenitis, esophagitis, esophageal stricture, esophageal ulceration, esophageal varices, gastric ulcer, gastritis, hernia, benign polyps or nodules, Barrett's esophagus, and mucosal discoloration.

APPEARS THIS WAY
ON ORIGINAL

33

The incidence of treatment-related adverse events during 6-month maintenance treatment was similar to placebo. There were no differences in types of related adverse events seen during maintenance treatment up to 12 months compared to short-term treatment.

Two placebo-controlled studies were conducted in 710 patients for the treatment of symptomatic gastroesophageal reflux disease. The most common adverse events that were reported as possibly or probably related to NEXIUM were diarrhea (4.3%), headache (3.8%), and abdominal pain (3.8%).

Other adverse events not observed with NEXIUM, but occurring with omeprazole can be found in the omeprazole package insert, ADVERSE REACTIONS section.

**Combination Treatment with Amoxicillin and Clarithromycin**
In clinical trials using combination therapy with NEXIUM plus amoxicillin and clarithromycin, no adverse events peculiar to these drug combinations were observed. Adverse events that occurred have been limited to those that had been observed with either NEXIUM, amoxicillin, or clarithromycin alone.

The most frequently reported drug-related adverse events for patients who received triple therapy for 10 days were diarrhea (9.2%), taste perversion (6.6%), and abdominal pain (3.7%). No treatment-emergent adverse events were observed at higher rates with triple therapy than were observed with NEXIUM alone.

For more information on adverse events with amoxicillin or clarithromycin, refer to their package inserts, ADVERSE REACTIONS sections.

34

APPEARS THIS WAY
ON ORIGINAL

**Laboratory Events**

The following potentially clinically significant laboratory changes in clinical trials, irrespective of relationship to NEXIUM, were reported in ≤ 1% of patients: increased creatinine, uric acid, total bilirubin, alkaline phosphatase, ALT, AST, hemoglobin, white blood cell count, platelets, serum gastrin, potassium, sodium, thyroxine and thyroid stimulating hormone (see CLINICAL PHARMACOLOGY, *Endocrine effects for further information on thyroid effects*). Decreases were seen in hemoglobin, white blood cell count, platelets, potassium, sodium, and thyroxine.

In clinical trials using combination therapy with NEXIUM plus amoxicillin and clarithromycin, no additional increased laboratory abnormalities particular to these drug combinations were observed.

For more information on laboratory changes with amoxicillin or clarithromycin, refer to their package inserts, ADVERSE REACTIONS section.

**OVERDOSAGE**

A single oral doses of esomeprazole at 510 mg/kg (about 103 times the human dose on a body surface area basis), was lethal to rats. The major signs of acute toxicity were reduced motor activity, changes in respiratory frequency, tremor, ataxia, and intermittent clonic convulsions.

APPEARS THIS WAY
ON ORIGINAL

35

There have been no reports of overdose with esomeprazole. Reports have been received of overdosage with omeprazole in humans. Doses ranged up to 2,400 mg. (120 times the usual recommended clinical dose). Manifestations were variable, but included confusion, drowsiness, blurred vision, tachycardia, nausea, diaphoresis, flushing, headache, dry mouth, and other adverse reactions similar to those seen in normal clinical experience (see omeprazole package insert - ADVERSE REACTIONS). No specific antidote for esomeprazole is known. Since esomeprazole is extensively protein bound, it is not expected to be removed by dialysis. In the event of overdosage, treatment should be symptomatic and supportive.

As with the management of any overdose, the possibility of multiple drug ingestion should be considered. For current information on treatment of any drug overdose, a certified Regional Poison Control Center should be contacted. Telephone numbers are listed in the Physicians' Desk Reference (PDR) or local telephone book.

## DOSAGE AND ADMINISTRATION

The recommended adult dosages are outlined in the table below. NEXIUM Delayed-Release Capsules should be swallowed whole and taken at least one hour before eating.

For patients who have difficulty swallowing capsules, one tablespoon of applesauce can be added to an empty bowl and the NEXIUM Delayed-Release Capsule can be opened, and the pellets inside the capsule carefully emptied onto the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellet/applesauce mixture should not be stored for future use.

APPEARS THIS WAY
ON ORIGINAL

36

The pellets have also been shown *in vitro* to remain intact when exposed to tap water, orange juice, apple juice and yogurt.

Recommended Adult Dosage Schedule of NEXIUM

| Indication | Dose | Frequency |
|---|---|---|
| **Gastroesophageal Reflux Disease (GERD)** | | |
| Healing of Erosive Esophagitis | 20 mg or 40 mg | Once Daily for 4 to 8 Weeks* |
| Maintenance of Healing of Erosive Esophagitis | 20mg | Once Daily |
| Symptomatic Gastroesophageal Reflux Disease | 20 mg | Once Daily for 4 Weeks*** |
| ***H. pylori* Eradication to Reduce the Risk of Duodenal Ulcer Recurrence** | | |
| *Triple Therapy:* | | |
| NEXIUM | 40 mg | Once Daily for 10 Days |
| Amoxicillin | 1000 mg | Twice Daily for 10 Days |
| Clarithromycin | 500 mg | Twice Daily for 10 Days |

APPEARS THIS WAY
ON ORIGINAL

37

(see CLINICAL STUDIES). The majority of patients are healed within 4 to 8 weeks. For patients who do not heal after 4-8 weeks, an additional 4-8 weeks of treatment may be considered.
** Controlled studies did not extend beyond six months.
*** If symptoms do not resolve completely after 4 weeks, an additional 4 weeks of treatment may be considered.

Please refer to amoxicillin and clarithromycin full prescribing information for CONTRAINDICATIONS, WARNINGS and dosing in elderly and renally-impaired patients.

## Special Populations

*Geriatric:* No dosage adjustment is necessary. (See CLINICAL PHARMACOLOGY, Pharmacokinetics.)

*Renal Insufficiency:* No dosage adjustment is necessary. (See CLINICAL PHARMACOLOGY, Pharmacokinetics.)

*Hepatic Insufficiency:* No dosage adjustment is necessary in patients with mild to moderate liver impairment (Child Pugh Classes A and B). For patients with severe liver impairment (Child Pugh Class C), a dose of 20 mg of NEXIUM should not be exceeded (See CLINICAL PHARMACOLOGY, Pharmacokinetics.)

*Gender:* No dosage adjustment is necessary. (See CLINICAL PHARMACOLOGY, Pharmacokinetics.)

## HOW SUPPLIED

NEXIUM Delayed-Release Capsules, 20 mg, are opaque, hard gelatin, amethyst colored capsules with two radial bars in yellow on the cap and 20 mg in yellow on the body. They are supplied as follows:

NDC 0186-5020-31 unit of use bottles of 30

38

NDC 0186-5022-28 unit dose packages of 100
NDC 0186-5020-54 bottles of 90
NDC 0186-5020-68 bottles of 100
NDC 0186-5020-82 bottles of 1000

NEXIUM Delayed-Release Capsules, 40 mg, are opaque, hard gelatin, amethyst colored capsules with three radial bars in yellow on the cap and 40 mg in yellow on the body. They are supplied as follows:

NDC 0186-5040-31 unit of use bottles of 30
NDC 0186-5042-28 unit dose packages of 100
NDC 0186-5040-68 bottles of 100
NDC 0186-5040-82 bottles of 1000

**Storage**
Store at 25°C (77°F); excursions permitted to 15 - 30°C (59 - 86°F). [See USP Controlled Room Temperature]. Keep container tightly closed. Dispense in a tight container if the product package is subdivided.

**REFERENCES**

1. National Committee for Clinical Laboratory Standards. Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria That Grow Aerobically. Fifth Edition: Approved Standard NCCLS Document M7-A5, Vol. 20, no. 2, NCCLS, Wayne, PA, January 2000.

Issued date to be placed here

39

All trademarks are the property of the AstraZeneca group

© AstraZeneca 2001

Manufactured for:
AstraZeneca LP
Wilmington, DE 19850
By: AstraZeneca AB
Sodertalje, Sweden

Product of France

Rev. 02/01

**AstraZeneca**

40

# Exhibit B

NDA 19810/S-074
Page 4

FDA Revised July 12, 2002

91941XX
640004-XX

## PRILOSEC*
(OMEPRAZOLE)
DELAYED-RELEASE CAPSULES

## DESCRIPTION

The active ingredient in PRILOSEC (omeprazole) Delayed-Release Capsules is a substituted benzimidazole, 5-methoxy-2-[[(4-methoxy-3, 5-dimethyl-2-pyridinyl) methyl] sulfinyl]-1*H*-benzimidazole, a compound that inhibits gastric acid secretion. Its empirical formula is $C_{17}H_{19}N_3O_3S$, with a molecular weight of 345.42. The structural formula is:



Omeprazole is a white to off-white crystalline powder which melts with decomposition at about 155°C. It is a weak base, freely soluble in ethanol and methanol, and slightly soluble in acetone and isopropanol and very slightly soluble in water. The stability of omeprazole is a function of pH; it is rapidly degraded in acid media, but has acceptable stability under alkaline conditions.

PRILOSEC is supplied as delayed-release capsules for oral administration. Each delayed-release capsule contains either 10 mg, 20 mg or 40 mg of omeprazole in the form of enteric-coated granules with the following inactive ingredients: cellulose, disodium hydrogen phosphate, hydroxypropyl cellulose, hydroxypropyl methylcellulose, lactose, mannitol, sodium lauryl sulfate and other ingredients. The capsule shells have the following inactive ingredients: gelatin-NF, FD&C Blue #1, FD&C Red #40, D&C Red #28, titanium dioxide, synthetic black iron oxide, isopropanol, butyl alcohol, FD&C Blue #2, D&C Red #7 Calcium Lake, and, in addition, the 10 mg and 40 mg capsule shells also contain D&C Yellow #10.

## CLINICAL PHARMACOLOGY

### Pharmacokinetics and Metabolism: Omeprazole

PRILOSEC Delayed-Release Capsules contain an enteric-coated granule formulation of omeprazole (because omeprazole is acid-labile), so that absorption of omeprazole begins only after the granules leave the stomach. Absorption is rapid, with peak plasma levels of omeprazole occurring within 0.5 to 3.5 hours. Peak plasma concentrations of omeprazole and AUC are approximately proportional to doses up to 40 mg, but because of a saturable first-

NDA 19810/S-074
Page 5

pass effect, a greater than linear response in peak plasma concentration and AUC occurs with doses greater than 40 mg. Absolute bioavailability (compared to intravenous administration) is about 30-40% at doses of 20-40 mg, due in large part to presystemic metabolism. In healthy subjects the plasma half-life is 0.5 to 1 hour, and the total body clearance is 500-600 mL/min. Protein binding is approximately 95%.

The bioavailability of omeprazole increases slightly upon repeated administration of PRILOSEC Delayed-Release Capsules.

Following single dose oral administration of a buffered solution of omeprazole, little if any unchanged drug was excreted in urine. The majority of the dose (about 77%) was eliminated in urine as at least six metabolites. Two were identified as hydroxyomeprazole and the corresponding carboxylic acid. The remainder of the dose was recoverable in feces. This implies a significant biliary excretion of the metabolites of omeprazole. Three metabolites have been identified in plasma — the sulfide and sulfone derivatives of omeprazole, and hydroxyomeprazole. These metabolites have very little or no antisecretory activity.

In patients with chronic hepatic disease, the bioavailability increased to approximately 100% compared to an I.V. dose, reflecting decreased first-pass effect, and the plasma half-life of the drug increased to nearly 3 hours compared to the half-life in normals of 0.5-1 hour. Plasma clearance averaged 70 mL/min, compared to a value of 500-600 mL/min in normal subjects.

In patients with chronic renal impairment, whose creatinine clearance ranged between 10 and 62 mL/min/1.73 $m^2$, the disposition of omeprazole was very similar to that in healthy volunteers, although there was a slight increase in bioavailability. Because urinary excretion is a primary route of excretion of omeprazole metabolites, their elimination slowed in proportion to the decreased creatinine clearance.
The elimination rate of omeprazole was somewhat decreased in the elderly, and bioavailability was increased. Omeprazole was 76% bioavailable when a single 40 mg oral dose of omeprazole (buffered solution) was administered to healthy elderly volunteers, versus 58% in young volunteers given the same dose. Nearly 70% of the dose was recovered in urine as metabolites of omeprazole and no unchanged drug was detected. The plasma clearance of omeprazole was 250 mL/min (about half that of young volunteers) and its plasma half-life averaged one hour, about twice that of young healthy volunteers.

In pharmacokinetic studies of single 20 mg omeprazole doses, an increase in AUC of approximately four-fold was noted in Asian subjects compared to Caucasians.

Dose adjustment, particularly where maintenance of healing of erosive esophagitis is indicated, for the hepatically impaired and Asian subjects should be considered.

PRILOSEC Delayed-Release Capsule 40 mg was bioequivalent when administered with and without applesauce. However, PRILOSEC Delayed-Release Capsule 20 mg was not bioequivalent when administered with and without applesauce. When administered with applesauce, a mean 25% reduction in $C_{max}$ was observed without a significant change in AUC for PRILOSEC Delayed-Release Capsule 20 mg. The clinical relevance of this finding is

NDA 19810/S-074
Page 6

unknown.

The pharmacokinetics of omeprazole have been investigated in pediatric patients of different ages.

Pharmacokinetic Parameters of Omeprazole Following Single and Repeated Oral Administration in Pediatric Populations Compared to Adults

| Single or Repeated Oral Dosing /Parameter | Children[†] < 20 kg 2-5 years 10 mg | Children[†] > 20 kg 6-16 years 20 mg | Adults[‡] (mean 76 kg) 23-29 years (n=12) |
|---|---|---|---|
| Single Dosing | | | |
| $C_{max}$* (ng/mL) | 288 (n=10) | 495 (n=49) | 668 |
| AUC* (ng h/mL) | 511 (n=7) | 1140 (n=32) | 1220 |
| Repeated Dosing | | | |
| $C_{max}$* (ng/mL) | 539 (n=4) | 851 (n=32) | 1458 |
| AUC* (ng h/mL) | 1179 (n=2) | 2276 (n=23) | 3352 |

Note: * = plasma concentration adjusted to an oral dose of 1 mg/kg.
[†] Data from single and repeated dose studies
[‡] Data from a single and repeated dose study
Doses of 10, 20 and 40 mg Omeprazole as Enteric-Coated Granules

Following comparable mg/kg doses of omeprazole, younger children (2-5 years) have lower AUCs than children 6 – 16 years or adults; AUCs of the latter two groups did not differ. (See DOSAGE AND ADMINISTRATION – Pediatric Patients.)

## Pharmacokinetics: Combination Therapy with Antimicrobials

Omeprazole 40 mg daily was given in combination with clarithromycin 500 mg every 8 hours to healthy adult male subjects. The steady state plasma concentrations of omeprazole were increased ($C_{max}$, $AUC_{0-24}$, and $T_{1/2}$ increases of 30%, 89% and 34% respectively) by the concomitant administration of clarithromycin. The observed increases in omeprazole plasma concentration were associated with the following pharmacological effects. The mean 24-hour gastric pH value was 5.2 when omeprazole was administered alone and 5.7 when co-administered with clarithromycin.

The plasma levels of clarithromycin and 14-hydroxy-clarithromycin were increased by the concomitant administration of omeprazole. For clarithromycin, the mean Cmax was 10% greater, the mean $C_{min}$ was 27% greater, and the mean $AUC_{0-8}$ was 15% greater when clarithromycin was administered with omeprazole than when clarithromycin was administered alone. Similar results were seen for 14-hydroxy-clarithromycin, the mean $C_{max}$ was 45% greater, the mean $C_{min}$ was 57% greater, and the mean $AUC_{0-8}$ was 45% greater. Clarithromycin concentrations in the gastric tissue and mucus were also increased by concomitant administration of omeprazole.

Clarithromycin Tissue Concentrations
2 hours after Dose[,]

| Tissue | Clarithromycin | Clarithromycin + Omeprazole |
|---|---|---|
| Antrum | 10.48 ± 2.01 (n = 5) | 19.96 ± 4.71 (n = 5) |
| Fundus | 20.81 ± 7.64 (n = 5) | 24.25 ± 6.37 (n = 5) |
| Mucus | 4.15 ± 7.74 (n = 4) | 39.29 ± 32.79 (n = 4) |

[,] Mean ± SD (µg/g)

NDA 19810/S-074
Page 7

For information on clarithromycin pharmacokinetics and microbiology, consult the clarithromycin package insert, CLINICAL PHARMACOLOGY section.

The pharmacokinetics of omeprazole, clarithromycin, and amoxicillin have not been adequately studied when all three drugs are administered concomitantly.

For information on amoxicillin pharmacokinetics and microbiology, see the amoxicillin package insert, ACTIONS, PHARMACOLOGY and MICROBIOLOGY sections.

### Pharmacodynamics
*Mechanism of Action*
Omeprazole belongs to a new class of antisecretory compounds, the substituted benzimidazoles, that do not exhibit anticholinergic or $H_2$ histamine antagonistic properties, but that suppress gastric acid secretion by specific inhibition of the $H^+/K^+$ ATPase enzyme system at the secretory surface of the gastric parietal cell. Because this enzyme system is regarded as the acid (proton) pump within the gastric mucosa, omeprazole has been characterized as a gastric acid-pump inhibitor, in that it blocks the final step of acid production. This effect is dose-related and leads to inhibition of both basal and stimulated acid secretion irrespective of the stimulus. Animal studies indicate that after rapid disappearance from plasma, omeprazole can be found within the gastric mucosa for a day or more.

*Antisecretory Activity*
After oral administration, the onset of the antisecretory effect of omeprazole occurs within one hour, with the maximum effect occurring within two hours. Inhibition of secretion is about 50% of maximum at 24 hours and the duration of inhibition lasts up to 72 hours. The antisecretory effect thus lasts far longer than would be expected from the very short (less than one hour) plasma half-life, apparently due to prolonged binding to the parietal $H^+/K^+$ ATPase enzyme. When the drug is discontinued, secretory activity returns gradually, over 3 to 5 days. The inhibitory effect of omeprazole on acid secretion increases with repeated once-daily dosing, reaching a plateau after four days.

Results from numerous studies of the antisecretory effect of multiple doses of 20 mg and 40 mg of omeprazole in normal volunteers and patients are shown below. The "max" value represents determinations at a time of maximum effect (2-6 hours after dosing), while "min" values are those 24 hours after the last dose of omeprazole.

Range of Mean Values from Multiple Studies
of the Mean Antisecretory Effects of Omeprazole
After Multiple Daily Dosing

| Parameter | Omeprazole 20 mg | | Omeprazole 40 mg | |
|---|---|---|---|---|
| | Max | Min | Max | Min |
| % Decrease in Basal Acid Output | 78* | 58-80 | 94* | 80-93 |
| % Decrease in Peak Acid Output | 79* | 50-59 | 88* | 62-68 |
| % Decrease in 24-hr. Intragastric Acidity | | 80-97 | | 92-94 |

*Single Studies

Single daily oral doses of omeprazole ranging from a dose of 10 mg to 40 mg have produced 100% inhibition of 24-hour intragastric acidity in some patients.

NDA 19810/S-074
Page 8

### Enterochromaffin-like (ECL) Cell Effects
In 24-month carcinogenicity studies in rats, a dose-related significant increase in gastric carcinoid tumors and ECL cell hyperplasia was observed in both male and female animals (see PRECAUTIONS, Carcinogenesis, Mutagenesis, Impairment of Fertility). Carcinoid tumors have also been observed in rats subjected to fundectomy or long-term treatment with other proton pump inhibitors or high doses of $H_2$-receptor antagonists.

Human gastric biopsy specimens have been obtained from more than 3000 patients treated with omeprazole in long-term clinical trials. The incidence of ECL cell hyperplasia in these studies increased with time; however, no case of ECL cell carcinoids, dysplasia, or neoplasia has been found in these patients. (See also CLINICAL PHARMACOLOGY, Pathological Hypersecretory Conditions.) However, these studies are of insufficient duration and size to rule out the possible influence of long-term administration of omeprazole on the development of any premalignant or malignant conditions.

### Serum Gastrin Effects
In studies involving more than 200 patients, serum gastrin levels increased during the first 1 to 2 weeks of once-daily administration of therapeutic doses of omeprazole in parallel with inhibition of acid secretion. No further increase in serum gastrin occurred with continued treatment. In comparison with histamine $H_2$-receptor antagonists, the median increases produced by 20 mg doses of omeprazole were higher (1.3 to 3.6 fold vs. 1.1 to 1.8 fold increase). Gastrin values returned to pretreatment levels, usually within 1 to 2 weeks after discontinuation of therapy.

### Other Effects
Systemic effects of omeprazole in the CNS, cardiovascular and respiratory systems have not been found to date. Omeprazole, given in oral doses of 30 or 40 mg for 2 to 4 weeks, had no effect on thyroid function, carbohydrate metabolism, or circulating levels of parathyroid hormone, cortisol, estradiol, testosterone, prolactin, cholecystokinin or secretin.

No effect on gastric emptying of the solid and liquid components of a test meal was demonstrated after a single dose of omeprazole 90 mg. In healthy subjects, a single I.V. dose of omeprazole (0.35 mg/kg) had no effect on intrinsic factor secretion. No systematic dose-dependent effect has been observed on basal or stimulated pepsin output in humans.

However, when intragastric pH is maintained at 4.0 or above, basal pepsin output is low, and pepsin activity is decreased.

As do other agents that elevate intragastric pH, omeprazole administered for 14 days in healthy subjects produced a significant increase in the intragastric concentrations of viable bacteria. The pattern of the bacterial species was unchanged from that commonly found in saliva. All changes resolved within three days of stopping treatment.

The course of Barrett's esophagus in 106 patients was evaluated in a U.S. double-blind controlled study of PRILOSEC 40 mg b.i.d. for 12 months followed by 20 mg b.i.d. for 12 months or ranitidine 300 mg b.i.d. for 24 months. No clinically significant impact on Barrett's mucosa by antisecretory therapy was observed. Although neosquamous epithelium developed during antisecretory therapy, complete elimination of Barrett's mucosa was not achieved. No significant difference was observed between treatment groups in development of dysplasia in Barrett's mucosa and no patient developed

NDA 19810/S-074
Page 9

esophageal carcinoma during treatment. No significant differences between treatment groups were observed in development of ECL cell hyperplasia, corpus atrophic gastritis, corpus intestinal metaplasia, or colon polyps exceeding 3 mm in diameter (see also CLINICAL PHARMACOLOGY, Enterochromaffin-like (ECL) Cell Effects).

## Clinical Studies
### Duodenal Ulcer Disease
*Active Duodenal Ulcer*— In a multicenter, double-blind, placebo-controlled study of 147 patients with endoscopically documented duodenal ulcer, the percentage of patients healed (per protocol) at 2 and 4 weeks was significantly higher with PRILOSEC 20 mg once a day than with placebo ($p \leq 0.01$).

| Treatment of Active Duodenal Ulcer % of Patients Healed | | |
| --- | --- | --- |
| | PRILOSEC 20 mg a.m. (n = 99) | Placebo a.m. (n = 48) |
| Week 2 | 41 | 13 |
| Week 4 | 75 | 27 |
| ($p \leq 0.01$) | | |

Complete daytime and nighttime pain relief occurred significantly faster ($p \leq 0.01$) in patients treated with PRILOSEC 20 mg than in patients treated with placebo. At the end of the study, significantly more patients who had received PRILOSEC had complete relief of daytime pain ($p \leq 0.05$) and nighttime pain ($p \leq 0.01$).

In a multicenter, double-blind study of 293 patients with endoscopically documented duodenal ulcer, the percentage of patients healed (per protocol) at 4 weeks was significantly higher with PRILOSEC 20 mg once a day than with ranitidine 150 mg b.i.d. ($p < 0.01$).

| Treatment of Active Duodenal Ulcer % of Patients Healed | | |
| --- | --- | --- |
| | PRILOSEC 20 mg a.m. (n = 145) | Ranitidine 150 mg b.i.d. (n = 148) |
| Week 2 | 42 | 34 |
| Week 4 | 82 | 63 |
| ($p < 0.01$) | | |

Healing occurred significantly faster in patients treated with PRILOSEC than in those treated with ranitidine 150 mg b.i.d. ($p < 0.01$).

In a foreign multinational randomized, double-blind study of 105 patients with endoscopically documented duodenal ulcer, 20 mg and 40 mg of PRILOSEC were compared to 150 mg b.i.d. of ranitidine at 2, 4 and 8 weeks. At 2 and 4 weeks both doses of PRILOSEC were statistically superior (per protocol) to ranitidine, but 40 mg was not superior to 20 mg of PRILOSEC, and at 8 weeks there was no significant difference between any of the active drugs.

NDA 19810/S-074
Page 10

### Treatment of Active Duodenal Ulcer
% of Patients Healed

| | PRILOSEC | | Ranitidine |
|---|---|---|---|
| | 20 mg (n = 34) | 40 mg (n = 36) | 150 mg b.i.d. (n = 35) |
| Week 2 | 83 | 83 | 53 |
| Week 4 | 97 | 100 | 82 |
| Week 8 | 100 | 100 | 94 |
| (p ≤ 0.01) | | | |

## H. pylori Eradication in Patients with Duodenal Ulcer Disease

*Triple Therapy(PRILOSEC/clarithromycin/amoxicillin)*— Three U.S., randomized, double-blind clinical studies in patients with *H. pylori* infection and duodenal ulcer disease (n = 558) compared PRILOSEC plus clarithromycin plus amoxicillin to clarithromycin plus amoxicillin. Two studies (126 and 127) were conducted in patients with an active duodenal ulcer, and the other study (M96-446) was conducted in patients with a history of a duodenal ulcer in the past 5 years but without an ulcer present at the time of enrollment. The dose regimen in the studies was PRILOSEC 20 mg b.i.d. plus clarithromycin 500 mg b.i.d. plus amoxicillin 1 g b.i.d. for 10 days; or clarithromycin 500 mg b.i.d. plus amoxicillin 1 g b.i.d. for 10 days. In studies 126 and 127, patients who took the omeprazole regimen also received an additional 18 days of PRILOSEC 20 mg q.d. Endpoints studied were eradication of *H. pylori* and duodenal ulcer healing (studies 126 and 127 only). *H. pylori* status was determined by CLOtest®, histology and culture in all three studies. For a given patient, *H. pylori* was considered eradicated if at least two of these tests were negative, and none was positive.

The combination of omeprazole plus clarithromycin plus amoxicillin was effective in eradicating *H. pylori*.

### Per-Protocol and Intent-to-Treat H. pylori Eradication Rates
% of Patients Cured [95% Confidence Interval]

| | PRILOSEC +clarithromycin +amoxicillin | | Clarithromycin +amoxicillin | |
|---|---|---|---|---|
| | Per-Protocol † | Intent-to-Treat ‡ | Per-Protocol † | Intent-to-Treat ‡ |
| Study 126 | 77 [64, 86] (n = 64) | 69 [57, 79] (n = 80) | 43 [31, 56] (n = 67) | 37 [27, 48] (n = 84) |
| Study 127 | 78 [67, 88] (n = 65) | 73 [61, 82] (n = 77) | 41 [29, 54] (n = 68) | 36 [26, 47] (n = 83) |
| Study M96-446 | 90 [80, 96] (n = 69) | 83 [74, 90] (n = 84) | 33 [24, 44] (n = 93) | 32 [23, 42] (n = 99) |

† Patients were included in the analysis if they had confirmed duodenal ulcer disease (active ulcer, studies 126 and 127; history of ulcer within 5 years, study M96-446) and *H. pylori* infection at baseline defined as at least two of three positive endoscopic tests from CLOtest®, histology, and/or culture. Patients were included in the analysis if they completed the study.  Additionally, if patients dropped out of the study due to an adverse event related to the study drug, they were included in the analysis as failures of therapy. The impact of eradication on ulcer recurrence has not been assessed in patients with a past history of ulcer.

‡ Patients were included in the analysis if they had documented *H. pylori* infection at baseline and had confirmed duodenal ulcer disease. All dropouts were included as failures of therapy.

- (p < 0.05) versus clarithromycin plus amoxicillin.

*Dual Therapy (PRILOSEC/clarithromycin)*— Four randomized, double-blind, multicenter studies (M93-067, M93-100, M92-812b, and M93-058) evaluated PRILOSEC 40 mg q.d. plus clarithromycin 500 mg t.i.d. for 14 days, followed by PRILOSEC 20 mg q.d. (M93-067, M93-100, M93-058) or by PRILOSEC 40 mg q.d. (M92-812b) for an additional 14 days in patients with active duodenal ulcer associated with *H. pylori*. Studies M93-067 and M93-100 were conducted in the U.S. and Canada and enrolled 242 and 256 patients, respectively. *H. pylori* infection and duodenal ulcer were confirmed in 219 patients in Study M93-067 and 228 patients in Study M93-100. These studies compared the combination regimen to PRILOSEC and clarithromycin monotherapies. Studies M92-812b and M93-058 were conducted in Europe and enrolled 154 and 215 patients, respectively. *H. pylori* infection and

NDA 19810/S-074
Page 11

duodenal ulcer were confirmed in 148 patients in study M92-812b and 208 patients in Study M93-058. These studies compared the combination regimen to omeprazole monotherapy. The results for the efficacy analyses for these studies are described below. *H. pylori* eradication was defined as no positive test (culture or histology) at 4 weeks following the end of treatment, and two negative tests were required to be considered eradicated of *H. pylori*. In the per-protocol analysis, the following patients were excluded: dropouts, patients with missing *H. pylori* tests post-treatment, and patients that were not assessed for *H. pylori* eradication because they were found to have an ulcer at the end of treatment.

The combination of omeprazole and clarithromycin was effective in eradicating *H. pylori*.

| *H. pylori* Eradication Rates (Per-Protocol Analysis at 4 to 6 Weeks) % of Patients Cured [95% Confidence Interval] | | | |
|---|---|---|---|
| | PRILOSEC + Clarithromycin | PRILOSEC | Clarithromycin |
| **U.S. Studies** | | | |
| Study M93-067 | 74 [60, 85][rs] (n = 53) | 0 [0, 7] (n = 54) | 31 [18, 47] (n = 42) |
| Study M93-100 | 64 [51, 76][rs] (n = 61) | 0 [0, 6] (n = 59) | 39 [24, 55] (n = 44) |
| **Non U.S. Studies** | | | |
| Study M92-812b | 83 [71, 92][s] (n = 60) | 1 [0, 7] (n = 74) | N/A |
| Study M93-058 | 74 [64, 83][s] (n = 88) | 1 [0, 6] (n = 90) | N/A |

[s] Statistically significantly higher than clarithromycin monotherapy ($p < 0.05$)
[s] Statistically significantly higher than omeprazole monotherapy ($p < 0.05$)

Ulcer healing was not significantly different when clarithromycin was added to omeprazole therapy compared to omeprazole therapy alone.

The combination of omeprazole and clarithromycin was effective in eradicating *H. pylori* and reduced duodenal ulcer recurrence.

| Duodenal Ulcer Recurrence Rates by *H. pylori* Eradication Status % of Patients with Ulcer Recurrence | | |
|---|---|---|
| | *H. pylori* eradicated[*] | *H. pylori* not eradicated[*] |
| **U.S. Studies** [t] | | |
| 6 months post-treatment | | |
| Study M93-067 | 35 (n = 49) | 60 (n = 88) |
| Study M93-100 | 8 (n = 53) | 60 (n = 106) |
| **Non U.S. Studies** [s] | | |
| 6 months post-treatment | | |
| Study M92-812b | 5 (n = 43) | 46 (n = 78) |
| Study M93-058 | 8 (n = 53) | 43 (n = 107) |
| **12 months post-treatment** | | |
| Study M92-812b | 5 (n = 39) | 68 (n = 71) |

[*] *H. pylori* eradication status assessed at same timepoint as ulcer recurrence
[t] Combined results for PRILOSEC + clarithromycin, PRILOSEC, and clarithromycin treatment arms
[s] Combined results for PRILOSEC + clarithromycin and PRILOSEC treatment arms
[*] ($p \leq 0.01$) versus proportion with duodenal ulcer recurrence who were not *H. pylori* eradicated

### Gastric Ulcer
In a U.S. multicenter, double-blind, study of omeprazole 40 mg once a day, 20 mg once a day, and placebo in 520 patients with endoscopically diagnosed gastric ulcer, the following results were obtained.

NDA 19810/S-074
Page 12

| | Treatment of Gastric Ulcer % of Patients Healed (All Patients Treated) | | |
|---|---|---|---|
| | PRILOSEC 20 mg q.d. (n = 202) | PRILOSEC 40 mg q.d. (n = 214) | Placebo (n = 104) |
| Week 4 | 47.5* | 55.6* | 30.8 |
| Week 8 | 74.8* | 82.7*·† | 48.1 |

    * (p < 0.01) PRILOSEC 40 mg or 20 mg versus placebo
    † (p < 0.05) PRILOSEC 40 mg versus 20 mg

For the stratified groups of patients with ulcer size less than or equal to 1 cm, no difference in healing rates between 40 mg and 20 mg was detected at either 4 or 8 weeks. For patients with ulcer size greater than 1 cm, 40 mg was significantly more effective than 20 mg at 8 weeks.

In a foreign, multinational, double-blind study of 602 patients with endoscopically diagnosed gastric ulcer, omeprazole 40 mg once a day, 20 mg once a day, and ranitidine 150 mg twice a day were evaluated.

| | Treatment of Gastric Ulcer % of Patients Healed (All Patients Treated) | | |
|---|---|---|---|
| | PRILOSEC 20 mg q.d. (n = 200) | PRILOSEC 40 mg q.d. (n = 187) | Ranitidine 150 mg b.i.d. (n = 199) |
| Week 4 | 63.5 | 78.1*·** | 56.3 |
| Week 8 | 81.5 | 91.4*·** | 78.4 |

    * (p < 0.01) PRILOSEC 40 mg versus ranitidine
    ** (p < 0.01) PRILOSEC 40 mg versus 20 mg

*Gastroesophageal Reflux Disease (GERD)*
**Symptomatic GERD**
A placebo controlled study was conducted in Scandinavia to compare the efficacy of omeprazole 20 mg or 10 mg once daily for up to 4 weeks in the treatment of heartburn and other symptoms in GERD patients without erosive esophagitis. Results are shown below.

| | % Successful Symptomatic Outcome[a] | | |
|---|---|---|---|
| | PRILOSEC 20 mg a.m. | PRILOSEC 10 mg a.m. | Placebo a.m. |
| All patients | 46*·† (n = 205) | 31† (n = 199) | 13 (n = 105) |
| Patients with confirmed GERD | 56*·† (n = 115) | 36† (n = 109) | 14 (n = 59) |

    [a]Defined as complete resolution of heartburn
    * (p < 0.005) versus 10 mg
    † (p < 0.005) versus placebo

*Erosive Esophagitis*
In a U.S. multicenter double-blind placebo controlled study of 20 mg or 40 mg of PRILOSEC Delayed-Release Capsules in patients with symptoms of GERD and endoscopically diagnosed erosive esophagitis of grade 2 or above, the percentage healing rates (per protocol) were as follows:

| Week | 20 mg PRILOSEC (n = 83) | 40 mg PRILOSEC (n = 87) | Placebo (n = 43) |
|---|---|---|---|
| 4 | 39* | 45* | 7 |
| 8 | 74* | 75* | 14 |

    * (p < 0.01) PRILOSEC versus placebo.

In this study, the 40 mg dose was not superior to the 20 mg dose of PRILOSEC in the percentage

NDA 19810/S-074
Page 13

healing rate. Other controlled clinical trials have also shown that PRILOSEC is effective in severe GERD. In comparisons with histamine $H_2$-receptor antagonists in patients with erosive esophagitis, grade 2 or above, PRILOSEC in a dose of 20 mg was significantly more effective than the active controls. Complete daytime and nighttime heartburn relief occurred significantly faster ($p < 0.01$) in patients treated with PRILOSEC than in those taking placebo or histamine $H_2$- receptor antagonists.

In this and five other controlled GERD studies, significantly more patients taking 20 mg omeprazole (84%) reported complete relief of GERD symptoms than patients receiving placebo (12%).

### Long Term Maintenance Treatment of Erosive Esophagitis
In a U.S. double-blind, randomized, multicenter, placebo controlled study, two dose regimens of PRILOSEC were studied in patients with endoscopically confirmed healed esophagitis. Results to determine maintenance of healing of erosive esophagitis are shown below.

Life Table Analysis

|  | PRILOSEC 20 mg q.d. (n = 138) | PRILOSEC 20 mg 3 days per week (n = 137) | Placebo (n = 131) |
|---|---|---|---|
| Percent in endoscopic remission at 6 months | 70 | 34 | 11 |

'($p < 0.01$) PRILOSEC 20 mg q.d. versus PRILOSEC 20 mg 3 consecutive days per week or placebo.

In an international multicenter double-blind study, PRILOSEC 20 mg daily and 10 mg daily were compared to ranitidine 150 mg twice daily in patients with endoscopically confirmed healed esophagitis. The table below provides the results of this study for maintenance of healing of erosive esophagitis.

Life Table Analysis

|  | PRILOSEC 20 mg q.d. (n = 131) | PRILOSEC 10 mg q.d. (n = 133) | Ranitidine 150 mg b.i.d. (n = 128) |
|---|---|---|---|
| Percent in endoscopic remission at 12 months | 77 | '58 | 46 |

'($p = 0.01$) PRILOSEC 20 mg q.d. versus PRILOSEC 10 mg q.d. or Ranitidine.
'($p = 0.03$) PRILOSEC 10 mg q.d. versus Ranitidine.

In patients who initially had grades 3 or 4 erosive esophagitis, for maintenance after healing 20 mg daily of PRILOSEC was effective, while 10 mg did not demonstrate effectiveness.

### Pathological Hypersecretory Conditions
In open studies of 136 patients with pathological hypersecretory conditions, such as Zollinger-Ellison (ZE) syndrome with or without multiple endocrine adenomas, PRILOSEC Delayed-Release Capsules significantly inhibited gastric acid secretion and controlled associated symptoms of diarrhea, anorexia, and pain. Doses ranging from 20 mg every other day to 360 mg per day maintained basal acid secretion below 10 mEq/hr in patients without prior gastric surgery, and below 5 mEq/hr in patients with prior gastric surgery.

Initial doses were titrated to the individual patient need, and adjustments were necessary with time in some patients (see DOSAGE AND ADMINISTRATION). PRILOSEC was well tolerated at these high

NDA 19810/S-074
Page 14

dose levels for prolonged periods (> 5 years in some patients). In most ZE patients, serum gastrin levels were not modified by PRILOSEC. However, in some patients serum gastrin increased to levels greater than those present prior to initiation of omeprazole therapy. At least 11 patients with ZE syndrome on long-term treatment with PRILOSEC developed gastric carcinoids. These findings are believed to be a manifestation of the underlying condition, which is known to be associated with such tumors, rather than the result of the administration of PRILOSEC. (See ADVERSE REACTIONS.)

## Microbiology

Omeprazole and clarithromycin dual therapy and omeprazole, clarithromycin and amoxicillin triple therapy have been shown to be active against most strains of *Helicobacter pylori in vitro* and in clinical infections as described in the INDICATIONS AND USAGE section.

*Helicobacter*
*Helicobacter pylori*
### Pretreatment Resistance

Clarithromycin pretreatment resistance rates were 3.5% (4/113) in the omeprazole/clarithromycin dual therapy studies (M93-067, M93-100) and 9.3% (41/439) in omeprazole/clarithromycin/amoxicillin triple therapy studies (126, 127, M96-446).

Amoxicillin pretreatment susceptible isolates (≤ 0.25 µg/mL) were found in 99.3% (436/439) of the patients in the omeprazole/clarithromycin/amoxicillin triple therapy studies (126, 127, M96-446). Amoxicillin pretreatment minimum inhibitory concentrations (MICs) > 0.25 µg/mL occurred in 0.7% (3/439) of the patients, all of whom were in the clarithromycin and amoxicillin study arm. One patient had an unconfirmed pretreatment amoxicillin minimum inhibitory concentration (MIC) of > 256 µg/mL by Etest[®].

### Clarithromycin Susceptibility Test Results and Clinical/Bacteriological Outcomes

| Clarithromycin Susceptibility Test Results and Clinical/Bacteriological Outcomes [a] | | | | | |
|---|---|---|---|---|---|
| Clarithromycin Pretreatment Results | Clarithromycin Post-treatment Results | | | | |
| | *H. pylori* negative - eradicated | *H. pylori* positive - not eradicated | | | |
| | | Post-treatment susceptibility results | | | |
| | | S [b] | I [b] | R [b] | No MIC |
| Dual Therapy - (omeprazole 40 mg q.d./clarithromycin 500 mg t.i.d. for 14 days followed by omeprazole 20 mg q.d. for another 14 days) (Studies M93-067, M93-100) | | | | | |
| Susceptible [b]  108 | 72 | 1 | | 26 | 9 |
| Intermediate [b]  1 | | | | 1 | |
| Resistant [b]  4 | | | | 4 | |
| Triple Therapy - (omeprazole 20 mg b.i.d./clarithromycin 500 mg b.i.d./amoxicillin 1 g b.i.d. for 10 days - Studies 126, 127, M96-446; followed by omeprazole 20 mg q.d. for another 18 days - Studies 126, 127) | | | | | |
| Susceptible [b]  171 | 153 | 7 | | 3 | 8 |
| Intermediate [b] | | | | | |
| Resistant [b]  14 | 4 | 1 | | 6 | 3 |

[a] Includes only patients with pretreatment clarithromycin susceptibility test results
[b] Susceptible (S) MIC ≤ 0.25 µg/mL, Intermediate (I) MIC 0.5 - 1.0 µg/mL, Resistant (R) MIC ≥ 2 µg/mL

Patients not eradicated of *H. pylori* following omeprazole/clarithromycin/amoxicillin triple therapy or omeprazole/clarithromycin dual therapy will likely have clarithromycin resistant *H. pylori* isolates. Therefore, clarithromycin susceptibility testing should be done, if possible. Patients with clarithromycin resistant *H. pylori* should not be treated with any of the following: omeprazole/clarithromycin dual therapy, omeprazole/clarithromycin/amoxicillin triple therapy, or other

NDA 19810/S-074
Page 15

regimens which include clarithromycin as the sole antimicrobial agent.

## Amoxicillin Susceptibility Test Results and Clinical/Bacteriological Outcomes

In the triple therapy clinical trials, 84.9% (157/185) of the patients in the omeprazole/clarithromycin/amoxicillin treatment group who had pretreatment amoxicillin susceptible MICs (≤ 0.25 μg/mL) were eradicated of *H. pylori* and 15.1% (28/185) failed therapy. Of the 28 patients who failed triple therapy, 11 had no post-treatment susceptibility test results and 17 had post-treatment *H. pylori* isolates with amoxicillin susceptible MICs. Eleven of the patients who failed triple therapy also had post-treatment *H. pylori* isolates with clarithromycin resistant MICs.

## Susceptibility Test for *Helicobacter pylori*

The reference methodology for susceptibility testing of *H. pylori* is agar dilution MICs[1]. One to three microliters of an inoculum equivalent to a No. 2 McFarland standard ($1 \times 10^7$ - $1 \times 10^8$ CFU/mL for *H. pylori*) are inoculated directly onto freshly prepared antimicrobial containing Mueller-Hinton agar plates with 5% aged defibrinated sheep blood (≥ 2 weeks old). The agar dilution plates are incubated at 35°C in a microaerobic environment produced by a gas generating system suitable for campylobacters. After 3 days of incubation, the MICs are recorded as the lowest concentration of antimicrobial agent required to inhibit growth of the organism. The clarithromycin and amoxicillin MIC values should be interpreted according to the following criteria:

| Clarithromycin MIC (μg/mL)* | Interpretation | |
| --- | --- | --- |
| ≤ 0.25 | Susceptible | (S) |
| 0.5 | Intermediate | (I) |
| > 1.0 | Resistant | (R) |
| Amoxicillin MIC (μg/mL)** | Interpretation | |
| ≤ 0.25 | Susceptible | (S) |

* These are tentative breakpoints for the agar dilution methodology and they should not be used to interpret results obtained using alternative methods.
' There were not enough organisms with MICs > 0.25 μg/mL to determine a resistance breakpoint.

Standardized susceptibility test procedures require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Standard clarithromycin and amoxicillin powders should provide the following MIC values:

| Microorganism | Antimicrobial Agent | MIC (μg/mL)* |
| --- | --- | --- |
| *H. pylori* ATCC 43504 | Clarithromycin | 0.016- 0.12 (μg/mL) |
| *H. pylori* ATCC 43504 | Amoxicillin | 0.016- 0.12 (μg/mL) |

*These are quality control ranges for the agar dilution methodology and they should not be used to control test results obtained using alternative methods.
1 National Committee for Clinical Laboratory Standards. Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria That Grow Aerobically – Fifth Edition. Approved Standard NCCLS Document M7-A5, Vol. 20, No. 2, NCCLS, Wayne, PA. January 2000.

## INDICATIONS AND USAGE

### Duodenal Ulcer

PRILOSEC Delayed-Release Capsules are indicated for short-term treatment of active duodenal ulcer. Most patients heal within four weeks. Some patients may require an additional four weeks of therapy.

PRILOSEC Delayed-Release Capsules, in combination with clarithromycin and amoxicillin, are indicated for treatment of patients with *H. pylori* infection and duodenal ulcer disease (active or up to 1-year history) to eradicate *H. pylori*.

PRILOSEC Delayed-Release Capsules, in combination with clarithromycin, are indicated for treatment of patients with *H. pylori* infection and duodenal ulcer disease to eradicate *H. pylori*.

NDA 19810/S-074
Page 16

Eradication of *H. pylori* has been shown to reduce the risk of duodenal ulcer recurrence (see CLINICAL PHARMACOLOGY, Clinical Studies and DOSAGE AND ADMINISTRATION).

Among patients who fail therapy, PRILOSEC with clarithromycin is more likely to be associated with the development of clarithromycin resistance as compared with triple therapy. In patients who fail therapy, susceptibility testing should be done. If resistance to clarithromycin is demonstrated or susceptibility testing is not possible, alternative antimicrobial therapy should be instituted. (See Microbiology section, and the clarithromycin package insert, MICROBIOLOGY section.)

**Gastric Ulcer**
PRILOSEC Delayed-Release Capsules are indicated for short-term treatment (4-8 weeks) of active benign gastric ulcer. (See CLINICAL PHARMACOLOGY, Clinical Studies, Gastric Ulcer.)

**Treatment of Gastroesophageal Reflux Disease (GERD)**
*Symptomatic GERD*
PRILOSEC Delayed-Release Capsules are indicated for the treatment of heartburn and other symptoms associated with GERD.

*Erosive Esophagitis*
PRILOSEC Delayed-Release Capsules are indicated for the short-term treatment (4-8 weeks) of erosive esophagitis which has been diagnosed by endoscopy.

(See CLINICAL PHARMACOLOGY, Clinical Studies.)

The efficacy of PRILOSEC used for longer than 8 weeks in these patients has not been established. In the rare instance of a patient not responding to 8 weeks of treatment, it may be helpful to give up to an additional 4 weeks of treatment. If there is recurrence of erosive esophagitis or GERD symptoms (eg; heartburn), additional 4-8 week courses of omeprazole may be considered.

**Maintenance of Healing of Erosive Esophagitis**
PRILOSEC Delayed-Release Capsules are indicated to maintain healing of erosive esophagitis.

Controlled studies do not extend beyond 12 months.

**Pathological Hypersecretory Conditions**
PRILOSEC Delayed-Release Capsules are indicated for the long-term treatment of pathological hypersecretory conditions (eg, Zollinger-Ellison syndrome, multiple endocrine adenomas and systemic mastocytosis).

**CONTRAINDICATIONS**
**Omeprazole**
PRILOSEC Delayed-Release Capsules are contraindicated in patients with known hypersensitivity to any component of the formulation.

**Clarithromycin**
Clarithromycin is contraindicated in patients with a known hypersensitivity to any macrolide antibiotic.

NDA 19810/S-074
Page 17

Concomitant administration of clarithromycin with cisapride, pimozide, or terfenadine is contraindicated. There have been post-marketing reports of drug interactions when clarithromycin and/or erythromycin are co-administered with cisapride, pimozide, or terfenadine resulting in cardiac arrhythmias (QT prolongation, ventricular tachycardia, ventricular fibrillation, and torsades de pointes) most likely due to inhibition of hepatic metabolism of these drugs by erythromycin and clarithromycin. Fatalities have been reported. (Please refer to full prescribing information for clarithromycin before prescribing.)

### Amoxicillin
Amoxicillin is contraindicated in patients with a history of allergic reaction to any of the penicillins. (Please refer to full prescribing information for amoxicillin before prescribing.)

### WARNINGS
#### Clarithromycin
**CLARITHROMYCIN SHOULD NOT BE USED IN PREGNANT WOMEN EXCEPT IN CLINICAL CIRCUMSTANCES WHERE NO ALTERNATIVE THERAPY IS APPROPRIATE. IF PREGNANCY OCCURS WHILE TAKING CLARITHROMYCIN, THE PATIENT SHOULD BE APPRISED OF THE POTENTIAL HAZARD TO THE FETUS. (See WARNINGS in prescribing information for clarithromycin.)**

### Amoxicillin
SERIOUS AND OCCASIONALLY FATAL HYPERSENSITIVITY (anaphylactic) REACTIONS HAVE BEEN REPORTED IN PATIENTS ON PENICILLIN THERAPY. THESE REACTIONS ARE MORE LIKELY TO OCCUR IN INDIVIDUALS WITH A HISTORY OF PENICILLIN HYPERSENSITIVITY AND/OR A HISTORY OF SENSITIVITY TO MULTIPLE ALLERGENS. BEFORE INITIATING THERAPY WITH AMOXICILLIN, CAREFUL INQUIRY SHOULD BE MADE CONCERNING PREVIOUS HYPERSENSITIVITY REACTIONS TO PENICILLINS, CEPHALOSPORINS OR OTHER ALLERGENS. IF AN ALLERGIC REACTION OCCURS, AMOXICILLIN SHOULD BE DISCONTINUED AND APPROPRIATE THERAPY INSTITUTED. SERIOUS ANAPHYLACTIC REACTIONS REQUIRE IMMEDIATE EMERGENCY TREATMENT WITH EPINEPHRINE. OXYGEN, INTRAVENOUS STEROIDS AND AIRWAY MANAGEMENT, INCLUDING INTUBATION, SHOULD ALSO BE ADMINISTERED AS INDICATED. (See WARNINGS in prescribing information for amoxicillin.)

### Antimicrobials
**Pseudomembranous colitis has been reported with nearly all antibacterial agents and may range in severity from mild to life-threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents.** (See WARNINGS in prescribing information for clarithromycin and amoxicillin.)

Treatment with antibacterial agents alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that a toxin produced by *Clostridium difficile* is a primary cause of "antibiotic-associated colitis."

After the diagnosis of pseudomembranous colitis has been established, therapeutic measures should be

NDA 19810/S-074
Page 18

initiated. Mild cases of pseudomembranous colitis usually respond to discontinuation of the drug alone. In moderate to severe cases, consideration should be given to management with fluids and electrolytes, protein supplementation, and treatment with an antibacterial drug clinically effective against *Clostridium difficile* colitis.

## PRECAUTIONS
### General
Symptomatic response to therapy with omeprazole does not preclude the presence of gastric malignancy.

Atrophic gastritis has been noted occasionally in gastric corpus biopsies from patients treated long-term with omeprazole.

### Information for Patients
PRILOSEC Delayed-Release Capsules should be taken before eating. Patients should be cautioned that the PRILOSEC Delayed-Release Capsule should not be opened, chewed or crushed, and should be swallowed whole.

For patients who have difficulty swallowing capsules, the contents of a PRILOSEC Delayed-Release Capsule can be added to applesauce. One tablespoon of applesauce should be added to an empty bowl and the capsule should be opened. All of the pellets inside the capsule should be carefully emptied on the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately with a glass of cool water to ensure complete swallowing of the pellets. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellets/applesauce mixture should not be stored for future use.

### Drug Interactions
*Other*
Omeprazole can prolong the elimination of diazepam, warfarin and phenytoin, drugs that are metabolized by oxidation in the liver. Although in normal subjects no interaction with theophylline or propranolol was found, there have been clinical reports of interaction with other drugs metabolized via the cytochrome P450 system (eg, cyclosporine, disulfiram, benzodiazepines). Patients should be monitored to determine if it is necessary to adjust the dosage of these drugs when taken concomitantly with PRILOSEC.

Because of its profound and long lasting inhibition of gastric acid secretion, it is theoretically possible that omeprazole may interfere with absorption of drugs where gastric pH is an important determinant of their bioavailability (eg, ketoconazole, ampicillin esters, and iron salts). In the clinical trials, antacids were used concomitantly with the administration of PRILOSEC.

*Combination Therapy with Clarithromycin*
Co-administration of omeprazole and clarithromycin have resulted in increases in plasma levels of omeprazole, clarithromycin, and 14-hydroxy-clarithromycin. (See also CLINICAL PHARMACOLOGY, Pharmacokinetics: Combination Therapy with Antimicrobials.)

Concomitant administration of clarithromycin with cisapride, pimozide, or terfenadine is

NDA 19810/S-074
Page 19

contraindicated.

There have been reports of an interaction between erythromycin and astemizole resulting in QT prolongation and torsades de pointes. Concomitant administration of erythromycin and astemizole is contraindicated. Because clarithromycin is also metabolized by cytochrome P450, concomitant administration of clarithromycin with astemizole is not recommended. (See also CONTRAINDICATIONS, Clarithromycin, above. Please refer to full prescribing information for clarithromycin before prescribing.)

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
In two 24-month carcinogenicity studies in rats, omeprazole at daily doses of 1.7, 3.4, 13.8, 44.0 and 140.8 mg/kg/day (approximately 4 to 352 times the human dose, based on a patient weight of 50 kg and a human dose of 20 mg) produced gastric ECL cell carcinoids in a dose-related manner in both male and female rats; the incidence of this effect was markedly higher in female rats, which had higher blood levels of omeprazole. Gastric carcinoids seldom occur in the untreated rat. In addition, ECL cell hyperplasia was present in all treated groups of both sexes. In one of these studies, female rats were treated with 13.8 mg omeprazole/kg/day (approximately 35 times the human dose) for one year, then followed for an additional year without the drug. No carcinoids were seen in these rats. An increased incidence of treatment-related ECL cell hyperplasia was observed at the end of one year (94% treated vs 10% controls). By the second year the difference between treated and control rats was much smaller (46% vs 26%) but still showed more hyperplasia in the treated group. An unusual primary malignant tumor in the stomach was seen in one rat (2%). No similar tumor was seen in male or female rats treated for two years. For this strain of rat no similar tumor has been noted historically, but a finding involving only one tumor is difficult to interpret. A 78-week mouse carcinogenicity study of omeprazole did not show increased tumor occurrence, but the study was not conclusive. A 26-week p53 (+/-) transgenic mouse carcinogenicity study was not positive.

Omeprazole was not mutagenic in an *in vitro* Ames *Salmonella typhimurium* assay, an *in vitro* mouse lymphoma cell assay and an *in vivo* rat liver DNA damage assay. A mouse micronucleus test at 625 and 6250 times the human dose gave a borderline result, as did an *in vivo* bone marrow chromosome aberration test. A second mouse micronucleus study at 2000 times the human dose, but with different (suboptimal) sampling times, was negative.

In a rat fertility and general reproductive performance test, omeprazole in a dose range of 13.8 to 138.0 mg/kg/day (approximately 35 to 345 times the human dose) was not toxic or deleterious to the reproductive performance of parental animals.

**Pregnancy**
**Omeprazole**
*Pregnancy Category C*
Teratology studies conducted in pregnant rats at doses up to 138 mg/kg/day (approximately 345 times the human dose) and in pregnant rabbits at doses up to 69 mg/kg/day (approximately 172 times the human dose) did not disclose any evidence for a teratogenic potential of omeprazole.

In rabbits, omeprazole in a dose range of 6.9 to 69.1 mg/kg/day (approximately 17 to 172 times the human dose) produced dose-related increases in embryo-lethality, fetal resorptions and pregnancy

NDA 19810/S-074
Page 20

disruptions. In rats, dose-related embryo/fetal toxicity and postnatal developmental toxicity were observed in offspring resulting from parents treated with omeprazole 13.8 to 138.0 mg/kg/day (approximately 35 to 345 times the human dose). There are no adequate or well-controlled studies in pregnant women. Sporadic reports have been received of congenital abnormalities occurring in infants born to women who have received omeprazole during pregnancy. Omeprazole should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

## Clarithromycin
*Pregnancy Category C.* See WARNINGS (above) and full prescribing information for clarithromycin before using in pregnant women.

## Nursing Mothers
It is not known whether omeprazole is excreted in human milk. In rats, omeprazole administration during late gestation and lactation at doses of 13.8 to 138 mg/kg/day (35 to 345 times the human dose) resulted in decreased weight gain in pups. Because many drugs are excreted in human milk, because of the potential for serious adverse reactions in nursing infants from omeprazole, and because of the potential for tumorigenicity shown for omeprazole in rat carcinogenicity studies, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

## Pediatric Use
The safety and effectiveness of Prilosec have been established in the age group 2 years to 16 years for the treatment of acid-related gastrointestinal diseases, including the treatment of symptomatic GERD, treatment of erosive esophagitis, and the maintenance of healing of erosive esophagitis. The safety and effectiveness of Prilosec have not been established for pediatric patients less than 2 years of age. Use of Prilosec in the age group 2 years to 16 years is supported by evidence from adequate and well-controlled studies of Prilosec in adults with additional clinical, pharmacokinetic, and safety studies performed in pediatric patients (see **CLINICAL PHARMACOLOGY, Pharmacokinetics and Metabolism: Omeprazole).**

## *Treatment of Gastroesophageal Reflux Disease (GERD)*
Symptomatic GERD
In an uncontrolled, open-label study of patients aged 2 years to 16 years with a history of symptoms suggestive of nonerosive GERD, 113 patients were assigned to receive a single daily dose of omeprazole (10 mg or 20 mg, based on body weight) either as intact capsule or as an open capsule in applesauce. Results showed success rates of 60% (10 mg omeprazole) and 59% (20 mg omeprazole) in reducing the number and intensity of either pain-related symptoms or vomiting/regurgitation episode was shown.

## *Erosive Esophagitis*
In an uncontrolled, open-label dose-titration study, healing of erosive esophagitis in pediatric patients aged 1 to 16 years required doses that ranged from 0.7 to 3.5 mg/kg/day (80 mg/day). Doses were initiated at 0.7 mg/kg/day. Doses were increased in increments of 0.7 mg/kg/day (if intraesophageal pH showed a pH of < 4 for less than 6% of a 24-hour study). After titration, patients remained on treatment for 3 months. Forty-four percent of the patients were healed on a dose of 0.7 mg/kg body weight; most of the remaining patients were healed with 1.4 mg/kg after an additional 3 months' treatment. Erosive

esophagitis was healed in 51 of 57 (90%) children who completed the first course of treatment in the healing phase of the study. In addition, after 3 months of treatment, 33% of the children had no overall symptoms, 57% had mild reflux symptoms, and 40% had less frequent regurgitation/vomiting.

*Maintenance of Healing of Erosive Esophagitis*
In an uncontrolled, open-label study of maintenance of healing of erosive esophagitis in 46 pediatric patients, 54% of patients required half the healing dose. The remaining patients increased the healing dose (0.7 to a maximum of 2.8 mg/kg/day) either for the entire maintenance period, or returned to half the dose before completion. Of the 46 patients who entered the maintenance phase, 19 (41%) had no relapse. In addition, maintenance therapy in erosive esophagitis patients resulted in 63% of patients having no overall symptoms.

*Safety*
The safety of PRILOSEC Delayed-Release Capsules has been assessed in 310 pediatric patients aged 0 to 16 years and 62 physiologically normal volunteers aged 2 years to 16 years. Of the 310 pediatric patients with acid-related disease, a group of 46 who had documented healing of erosive esophagitis after 3 months of treatment continued on maintenance therapy for up to 749 days.

PRILOSEC Delayed-Release Capsules administered to pediatric patients was generally well tolerated with an adverse event profile resembling that in adults. Unique to the pediatric population, however, adverse events of the respiratory system were most frequently reported in both the 0 to 2 year and 2 to 16 year age groups (46.2% and 18.5%, respectively). Similarly, otitis media was frequently reported in the 0 to 2 year age group (22.6%), and accidental injuries were reported frequently in the 2 to 16 year age group (3.8%).

**Geriatric Use**
Omeprazole was administered to over 2000 elderly individuals (≥ 65 years of age) in clinical trials in the US and Europe. There were no differences in safety and effectiveness between the elderly and younger subjects. Other reported clinical experience has not identified differences in response between the elderly and younger subjects, but greater sensitivity of some older individuals cannot be ruled out.

Pharmacokinetic studies have shown the elimination rate was somewhat decreased in the elderly and bioavailability was increased. The plasma clearance of omeprazole was 250 mL/min (about half that of young volunteers) and its plasma half-life averaged one hour, about twice that of young healthy volunteers. However, no dosage adjustment is necessary in the elderly. (See CLINICAL PHARMACOLOGY.)

**ADVERSE REACTIONS**
PRILOSEC Delayed-Release Capsules were generally well tolerated during domestic and international clinical trials in 3096 patients.

In the U.S. clinical trial population of 465 patients (including duodenal ulcer, Zollinger-Ellison syndrome and resistant ulcer patients), the following adverse experiences were reported to occur in 1% or more of patients on therapy with PRILOSEC. Numbers in parentheses indicate percentages of the adverse experiences considered by investigators as possibly, probably or definitely related to the drug:

NDA 19810/S-074
Page 22

| | Omeprazole (n = 465) | Placebo (n = 64) | Ranitidine (n = 195) |
|---|---|---|---|
| Headache | 6.9 (2.4) | 6.3 | 7.7 (2.6) |
| Diarrhea | 3.0 (1.9) | 3.1 (1.6) | 2.1 (0.5) |
| Abdominal Pain | 2.4 (0.4) | 3.1 | 2.1 |
| Nausea | 2.2 (0.9) | 3.1 | 4.1 (0.5) |
| URI | 1.9 | 1.6 | 2.6 |
| Dizziness | 1.5 (0.6) | 0.0 | 2.6 (1.0) |
| Vomiting | 1.5 (0.4) | 4.7 | 1.5 (0.5) |
| Rash | 1.5 (1.1) | 0.0 | 0.0 |
| Constipation | 1.1 (0.9) | 0.0 | 0.0 |
| Cough | 1.1 | 0.0 | 1.5 |
| Asthenia | 1.1 (0.2) | 1.6 (1.6) | 1.5 (1.0) |
| Back Pain | 1.1 | 0.0 | 0.5 |

The following adverse reactions which occurred in 1% or more of omeprazole-treated patients have been reported in international double-blind, and open-label, clinical trials in which 2,631 patients and subjects received omeprazole.

Incidence of Adverse Experiences ≥ 1%
Causal Relationship not Assessed

| | Omeprazole (n = 2631) | Placebo (n = 120) |
|---|---|---|
| *Body as a Whole, site unspecified* | | |
| Abdominal pain | 5.2 | 3.3 |
| Asthenia | 1.3 | 0.8 |
| *Digestive System* | | |
| Constipation | 1.5 | 0.8 |
| Diarrhea | 3.7 | 2.5 |
| Flatulence | 2.7 | 5.8 |
| Nausea | 4.0 | 6.7 |
| Vomiting | 3.2 | 10.0 |
| Acid regurgitation | 1.9 | 3.3 |
| *Nervous System/Psychiatric* | | |
| Headache | 2.9 | 2.5 |

Additional adverse experiences occurring in < 1% of patients or subjects in domestic and/or international trials, or occurring since the drug was marketed, are shown below within each body system. In many instances, the relationship to PRILOSEC was unclear.

*Body As a Whole:* Allergic reactions, including, rarely, anaphylaxis (see also *Skin* below), fever, pain, fatigue, malaise, abdominal swelling
*Cardiovascular:* Chest pain or angina, tachycardia, bradycardia, palpitation, elevated blood pressure, peripheral edema
*Gastrointestinal:* Pancreatitis (some fatal), anorexia, irritable colon, flatulence, fecal discoloration, esophageal candidiasis, mucosal atrophy of the tongue, dry mouth. During treatment with omeprazole, gastric fundic gland polyps have been noted rarely. These polyps are benign and appear to be reversible when treatment is discontinued.

Gastro-duodenal carcinoids have been reported in patients with ZE syndrome on long-term treatment with PRILOSEC. This finding is believed to be a manifestation of the underlying condition, which is known to be associated with such tumors.
*Hepatic:* Mild and, rarely, marked elevations of liver function tests [ALT (SGPT), AST (SGOT), γ-glutamyl transpeptidase, alkaline phosphatase, and bilirubin (jaundice)]. In rare instances, overt liver disease has occurred, including hepatocellular, cholestatic, or mixed hepatitis, liver necrosis (some fatal), hepatic failure (some fatal), and hepatic encephalopathy.

*Metabolic/Nutritional:* Hyponatremia, hypoglycemia, weight gain

*Musculoskeletal:* Muscle cramps, myalgia, muscle weakness, joint pain, leg pain

*Nervous System/Psychiatric:* Psychic disturbances including depression, aggression, hallucinations, confusion, insomnia, nervousness, tremors, apathy, somnolence, anxiety, dream abnormalities; vertigo; paresthesia; hemifacial dysesthesia

*Respiratory:* Epistaxis, pharyngeal pain

*Skin:* Rash and, rarely, cases of severe generalized skin reactions including toxic epidermal necrolysis (TEN; some fatal), Stevens-Johnson syndrome, and erythema multiforme (some severe); purpura and/or petechiae (some with rechallenge); skin inflammation, urticaria, angioedema, pruritus, alopecia, dry skin, hyperhidrosis

*Special Senses:* Tinnitus, taste perversion

*Urogenital:* Interstitial nephritis (some with positive rechallenge), urinary tract infection, microscopic pyuria, urinary frequency, elevated serum creatinine, proteinuria, hematuria, glycosuria, testicular pain, gynecomastia

*Hematologic:* Rare instances of pancytopenia, agranulocytosis (some fatal), thrombocytopenia, neutropenia, anemia, leucocytosis, and hemolytic anemia have been reported.

The incidence of clinical adverse experiences in patients greater than 65 years of age was similar to that in patients 65 years of age or less.

## Combination Therapy for *H. pylori* Eradication

In clinical trials using either dual therapy with PRILOSEC and clarithromycin, or triple therapy with PRILOSEC, clarithromycin, and amoxicillin, no adverse experiences peculiar to these drug combinations have been observed. Adverse experiences that have occurred have been limited to those that have been previously reported with omeprazole, clarithromycin, or amoxicillin.

*Triple Therapy (PRILOSEC/clarithromycin/amoxicillin)* — The most frequent adverse experiences observed in clinical trials using combination therapy with PRILOSEC, clarithromycin, and amoxicillin (n = 274) were diarrhea (14%), taste perversion (10%), and headache (7%). None of these occurred at a higher frequency than that reported by patients taking the antimicrobial drugs alone.

For more information on clarithromycin or amoxicillin, refer to the respective package inserts, ADVERSE REACTIONS sections.

*Dual Therapy (PRILOSEC/clarithromycin)* — Adverse experiences observed in controlled clinical trials using combination therapy with PRILOSEC and clarithromycin (n = 346) which differed from those previously described for omeprazole alone were: Taste perversion (15%), tongue discoloration (2%), rhinitis (2%), pharyngitis (1%) and flu syndrome (1%).

For more information on clarithromycin, refer to the clarithromycin package insert, ADVERSE REACTIONS section.

## OVERDOSAGE

Reports have been received of overdosage with omeprazole in humans. Doses ranged up to 2400 mg (120 times the usual recommended clinical dose). Manifestations were variable, but included

NDA 19810/S-074
Page 24

confusion, drowsiness, blurred vision, tachycardia, nausea, vomiting, diaphoresis, flushing, headache, dry mouth, and other adverse reactions similar to those seen in normal clinical experience. (See ADVERSE REACTIONS.) Symptoms were transient, and no serious clinical outcome has been reported when PRILOSEC was taken alone. No specific antidote for omeprazole overdosage is known. Omeprazole is extensively protein bound and is, therefore, not readily dialyzable. In the event of overdosage, treatment should be symptomatic and supportive.

As with the management of any overdose, the possibility of multiple drug ingestion should be considered. For current information on treatment of any drug overdose, a certified Regional Poison Control Center should be contacted. Telephone numbers are listed in the Physicians' Desk Reference (PDR) or local telephone book.

Single oral doses of omeprazole at 1350, 1339, and 1200 mg/kg were lethal to mice, rats, and dogs, respectively. Animals given these doses showed sedation, ptosis, tremors, convulsions, and decreased activity, body temperature, and respiratory rate and increased depth of respiration.

## DOSAGE AND ADMINISTRATION

### Short-Term Treatment of Active Duodenal Ulcer

The recommended adult oral dose of PRILOSEC is 20 mg once daily. Most patients heal within four weeks. Some patients may require an additional four weeks of therapy. (See INDICATIONS AND USAGE.)

### *H. pylori* Eradication for the Reduction of the Risk of Duodenal Ulcer Recurrence

*Triple Therapy (PRILOSEC/clarithromycin/amoxicillin)* — The recommended adult oral regimen is PRILOSEC 20 mg plus clarithromycin 500 mg plus amoxicillin 1000 mg each given twice daily for 10 days. In patients with an ulcer present at the time of initiation of therapy, an additional 18 days of PRILOSEC 20 mg once daily is recommended for ulcer healing and symptom relief.

*Dual Therapy (PRILOSEC/clarithromycin)* — The recommended adult oral regimen is PRILOSEC 40 mg once daily plus clarithromycin 500 mg t.i.d. for 14 days. In patients with an ulcer present at the time of initiation of therapy, an additional 14 days of PRILOSEC 20 mg once daily is recommended for ulcer healing and symptom relief.

Please refer to clarithromycin full prescribing information for CONTRAINDICATIONS and WARNING, and for information regarding dosing in elderly and renally impaired patients (PRECAUTIONS: General, PRECAUTIONS: Geriatric Use and PRECAUTIONS: Drug Interactions).

Please refer to amoxicillin full prescribing information for CONTRAINDICATIONS and WARNINGS.

### Gastric Ulcer

The recommended adult oral dose is 40 mg once a day for 4 -8 weeks. (See CLINICAL PHARMACOLOGY, Clinical Studies, Gastric Ulcer, and INDICATIONS AND USAGE, Gastric Ulcer.)

### Gastroesophageal Reflux Disease (GERD)

The recommended adult oral dose for the treatment of patients with symptomatic GERD and no

NDA 19810/S-074
Page 25

esophageal lesions is 20 mg daily for up to 4 weeks. The recommended adult oral dose for the treatment of patients with erosive esophagitis and accompanying symptoms due to GERD is 20 mg daily for 4 to 8 weeks. (See INDICATIONS AND USAGE.)

## Maintenance of Healing of Erosive Esophagitis
The recommended adult oral dose is 20 mg daily. (See CLINICAL PHARMACOLOGY, Clinical Studies.)

## Pathological Hypersecretory Conditions
The dosage of PRILOSEC in patients with pathological hypersecretory conditions varies with the individual patient. The recommended adult oral starting dose is 60 mg once a day. Doses should be adjusted to individual patient needs and should continue for as long as clinically indicated. Doses up to 120 mg t.i.d. have been administered. Daily dosages of greater than 80 mg should be administered in divided doses. Some patients with Zollinger-Ellison syndrome have been treated continuously with PRILOSEC for more than 5 years.

### Pediatric Patients
For the treatment of GERD or other acid-related disorders, the recommended dose for pediatric patients 2 years of age and older is as follows:

| Patient Weight | Omeprazole Dose |
|----------------|-----------------|
| <20kg | 10mg |
| >20kg | 20mg |

On a per kg basis, the doses of omeprazole required to heal erosive esophagitis are greater than those for adults.

For pediatric patients unable to swallow an intact capsule see **Alternative Administration Options** subsection below.

### Alternative Administration Options
For patients who have difficulty swallowing capsules, the contents of a PRILOSEC Delayed-Release Capsule can be added to applesauce. One tablespoon of applesauce should be added to an empty bowl and the capsule should be opened. All of the pellets inside the capsule should be carefully emptied on the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately with a glass of cool water to ensure complete swallowing of the pellets. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellets/applesauce mixture should not be stored for future use.

No dosage adjustment is necessary for patients with renal impairment or for the elderly.

PRILOSEC Delayed-Release Capsules should be taken before eating. In the clinical trials, antacids were used concomitantly with PRILOSEC.

Patients should be cautioned that the PRILOSEC Delayed-Release Capsule should not be opened, chewed or crushed, and should be swallowed whole.

NDA 19810/S-074
Page 26

## HOW SUPPLIED

No. 3426 — PRILOSEC Delayed-Release Capsules, 10 mg, are opaque, hard gelatin, apricot and amethyst colored capsules, coded 606 on cap and PRILOSEC 10 on the body. They are supplied as follows:

**NDC** 0186-0606-31 unit of use bottles of 30
**NDC** 0186-0606-68 bottles of 100
**NDC** 0186-0606-28 unit dose packages of 100
**NDC** 0186-0606-82 bottles of 1000.

No. 3440 — PRILOSEC Delayed-Release Capsules, 20 mg, are opaque, hard gelatin, amethyst colored capsules, coded 742 on cap and PRILOSEC 20 on body. They are supplied as follows:

**NDC** 0186-0742-31 unit of use bottles of 30
**NDC** 0186-0742-28 unit dose package of 100
**NDC** 0186-0742-82 bottles of 1000.

No. 3428 — PRILOSEC Delayed-Release Capsules, 40 mg, are opaque, hard gelatin, apricot and amethyst colored capsules, coded 743 on cap and PRILOSEC 40 on the body. They are supplied as follows:

**NDC** 0186-0743-31 unit of use bottles of 30
**NDC** 0186-0743-68 bottles of 100
**NDC** 0186-0743-28 unit dose packages of 100
**NDC** 0186-0743-82 bottles of 1000.

## Storage

Store PRILOSEC Delayed-Release Capsules in a tight container protected from light and moisture. Store between 15°C and 30°C (59°F and 86°F).

All trademarks are the property of the AstraZeneca group
©AstraZeneca 2002

Manufactured for: AstraZeneca LP, Wilmington, DE 19850
By: Merck & Co., Inc., Whitehouse Station, NJ 08889, USA

91941XX
640004-XX  Rev. 06/02



This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/

Victor Raczkowski
7/15/02 05:13:20 PM